Table of Contents
I. GENERAL FACTS.338
II. PROCEDURAL HISTORY.346
III. INTERPRETATION OF LAWS .350
IV. STANDARDS FOR APPELLATE REVIEW OF FACTS AND LAW .351
V. CONFLICT OF LAWS.353
A. Conflict of Laws Facts.354
B. The Ruling of the Trial Court on the Issue of Choice-of-Law.354
C. Applicable Conflict of Laws Rules .356
1. Law Applicable to the Texas Case.362
2. Law Applicable in the Louisiana Case.363
3. Law Applicable in the Oklahoma Case.369
D. Conclusion.372
VI.STANDARD OF REVIEW OF FACTS IN THE TEXAS CASE
A. The Trial Court’s Duty to Instruct a Jury.373
B. The Trial Court’s Duties to Rule on Requests for Jury Instructions and to Inform the Parties of Proposed Jury Instructions Prior to Arguments to the Jury.. 374
1. Right to Submit Jury Instructions .375
2. Trial Court Duty to Inform Parties of Proposed Jury Instructions and Interrogatories.378
3. Right of a Party to Object to Proposed Jury Instructions.379
C. Patent Jury Instruction Error.383
D. Jury Instruction and Interrogatory Errors.384
1. Failure to Give Instruction.384 ■
2. Erroneous Instructions .401
E. Inconsistencies Between the Texas Jury Verdicts and JNOV and the Judgments and Reasons for Judgment in the Louisiana and Oklahoma Cases.428
1. Negligent Misrepresentation.428
2. Proximate Cause.429
3. Fraud.429
4. Allocation of Fault.430
5. Existence of Pledged Capital for an HMO by Health Net.434
6. Conclusion.434
F. Recapitulation of Errors Affecting the Texas Jury Verdict.•. 434
G. Conclusion. 435
VII.STANDARD OF REVIEW OF FACTS IN THE LOUISIANA AND OKLAHOMA JUDGE TRIAL CASES.435
A. Proximate Cause in the Louisiana Case .435
B. The Tort of Conspiracy in the Louisiana Case.435
C. Unfair or Deceptive Acts or Practices in Violation of the Texas Insurance Code.. 436
D. Allocation of Fault .436
*336E. Refusal to Provide Adequate Written Findings of Fact and Reasons for Judgment.. 438
1. Facts.438
2. Supplemental Assignments of Error.442
3. Applicable Law.442
4. The Trial Court’s Reasons for the Nineteen (19) Month Delay.446
5. The Trial Court’s Failures to Comply with the Order to Provide Written Findings of Fact and Reasons for Judgment.447
6. Conclusion.448
F. Application of Erroneous Texas Law in the Louisiana and Oklahoma Cases.448
G. Conclusion.449
VIII. PRESCRIPTION/PEREMPTION: STATUTES OF LIMITATIONS AND REPOSE ^
A. The Proper Procedure to Assert Prescription/Peremption. Cl
1. Affirmative Defense. Cl
2. Objection of No Cause of Action. Cl
3. Summary Judgment. Cl
4. Prescription/Peremption . Cl
B. Choice-of-Law. Cl
1. Liberative Prescription or Peremption in the Louisiana Case Cl
2. The Texas and Oklahoma Exceptions. 05
C. Conclusion. 05
IX.SHAM SALE .468
X.PIERCING THE CORPORATE VEIL — SINGLE BUSINESS ENTERPRISE .482
A.The Trial Court’s Reasons.482
P. The Lew . .483
1. Texas Law.483
2. Louisiana Law.484
3. Oklahoma Law.487
Burden of Proof and Persuasion.488
Common SBE Circumstances Pre- and Post-Sale .489
1. Pre-Sale Health Net/AmCareco SBE Issue.489
2. Post-Sale Health Net/AmCareco SBE Issue.490
XI.LIABILITY FOR FRAUD .
A. Fraud in Obtaining Regulator Approval of the Sale.
1. The Stock Purchase Agreement and Side Letter Contract
2. The Financial Spreadsheet For The Sale.
3. Failure to file Side Letter. Cl
4. Failure to file Letter of Intent. Cl
5. Failure to file Closing Agreement. Cl
B. Fraud in Financial Reporting to Regulators After the Sale. Cl
1. Facts. CM
2. The Law of Fraud. Cl
3. Conclusion. Cl
C. Conclusion. Cl
XII. LIABILITY FOR BREACH OF FIDUCIARY DUTY.557
A. The Texas Case.557
B. The Louisiana Case.560
C. The Oklahoma Case .563
D. Conclusion.564
XIII. LIABILITY FOR VIOLATION OF THE TEXAS INSURANCE CODE.564
A. The Texas Case.564
B. The Louisiana and Oklahoma Cases.566
C. Conclusion.567
XIV. LIABILITY FOR CONSPIRACY.567
A. The Texas Case.567
B. The Louisiana Case.568
C. The Oklahoma Case .570
D. Conclusion.570
*337XV. COSTS.511
A. Facts.511
B. Conflict of Laws on Costs.511
C. Louisiana Law on Costs.572
D. Allocation of Costs .574
LANIER, J.
19These matters come before this Court on appeal from judgments rendered by the trial court in the consolidated matters of J. Robert Wooley v. Thomas S. Lucksinger, Nineteenth Judicial District Court Docket Number 499,737, J. Robert Wooley v. Foundation Health Corp, et al., Nineteenth Judicial District Court Docket Number 509,297, and J. Robert Wooley v. PriceWaterhouseCoopers, LLC, Nineteenth Judicial District Court Docket Number 512,366. These three separate trial court actions (La.C.C.P. art. 421) were consolidated (La.C.C.P. art. 1561) for trial.
The first and third numbered actions (District Court Docket Number 499,737 and District Court Docket Number 512,-366) assert tort causes of action by J. Robert Wooley, Commissioner of Insurance for the State of Louisiana, in His Capacity as Liquidator for AmCare Health Plans of Louisiana, Inc. (“the Louisiana Receiver”). In the second numbered action (District Court Docket Number 509,-297), the trial court permitted the cumulation of the Louisiana Receiver’s tort causes of action with a pre-existing action that asserted a contract cause of action by the Louisiana Receiver. The Louisiana contract cause of action was not asserted in either the first or third numbered actions.
Carroll Fisher, Commissioner of Insurance for the State of Oklahoma, in his capacity as Receiver, (“the Oklahoma Receiver”) and Jean Johnson, Texas Special Deputy Receiver (“the Texas Receiver”), intervened in all three actions asserting identical tort causes of action as those asserted by Wooley in the first and third numbered actions. The tort causes of action of the Texas Receiver were tried and factually decided by a jury under the 110docket numbers of all three trial court actions.2 The Louisiana and Oklahoma tort causes of action each were tried and decided by the trial court under the docket numbers of all three trial court actions. The Louisiana contract cause of action was tried and decided by the trial court under the docket numbers of all three trial court actions. For clarity of adjudication, we will adjudicate all issues pertaining to the tort causes of action in a lead opinion, all issues pertaining to the Louisiana contract cause of action in a second opinion, and will dispose of the Texas Receiver’s appeal in a third opinion. The title sheets of our opinions will show the District Court Docket Number for the particular trial court action and the Court of Appeal Docket Numbers that have been assigned to the judgment being adjudicated by this Court in each action.3
*338For the following reasons, we reverse the trial court judgments in favor of the Louisiana, Oklahoma, and Texas Receivers on the tort causes of action in District Court Docket Numbers 499,737, 509,297, and 512,366 and render judgment and dismiss those claims with prejudice.
I. GENERAL FACTS
| nFoundation Health Corporation (Foundation), a Delaware corporation with its principal place of business in California, owned all of the stock of health maintenance organizations (HMOs) that were incorporated and operated in Louisiana, Oklahoma, and Texas. Foundation Health, a Louisiana Health Plan, Inc., was the Louisiana HMO; Foundation Health, an Oklahoma Health Plan, Inc., was the Oklahoma HMO; and Foundation Health, a Texas Health Plan, Inc., was the Texas HMO. In 1997, Foundation merged with Health Systems International and became Foundation Health Systems, Inc. This corporation is now known as Health Net, Inc. (Health Net)4
Beginning in 1994, Dr. Malik M. Hasan served as Chairman of the Board of Directors and Chief Executive Officer (CEO) of Health Net. Health Net acquired the three HMOs in the 1997 merger and, shortly thereafter, Hasan “came to the conclusion that we were better off disposing of those plans, which may include closing them down or selling them.” At this time Curtis Westen served as Senior Vice President and General Counsel for Health Net. Although Hasan had concerns about the viability and/or profitability of the HMOs, he told Westen he could “negotiate” with a buyer “but you will not slow down the winding-down process.”5 Hasan directed that there could be a sale if three conditions are met: (1) the buyer knows “what challenge he has;” (2) the buyer “has the requisite capital;” and 112(3) “the regulators approve.”6 Hasan retired as President and CEO of Health Net in August of 1998 and Jay Michael Gellert became CEO.
Shattuck Hammond Partners, a partnership providing investment banking services, was retained by Health Net and identified a group of investors headed by Thomas S. Lucksinger, who is domiciled in Texas, as a potential buyer for the HMOs. Lucksinger is a Texas lawyer who was also a certified public accountant, had been a partner in the Vinson & Elkins Texas law firm, had been the CEO of a successful Texas HMO named NYLCARE that had approximately 500,000 members, taught a course on health care policy at the University of Texas, and served on the Solvency Oversight Committee of the Texas Depart*339ment of Insurance. The Lucksinger group formed AmCareco, Inc. (AmCareco), a corporation chartered in Delaware with its principal place of business in Texas. Lucksinger served as President of AmCa-reco. Other individuals who were associated with and/or served as officers and/or directors of AmCareco and its subsidiaries included Michael D. Nadler, Chief Operation Officer (COO), Stephen J. Nazarenus, Chief Financial Officer (CFO),7 Scott Westbrook, Michael K. Jhin,8 William F. Galtney, Jr., John P. Mudd, and Dr. M. Lee Pearce. These persons are domiciled in Texas and Florida. Correspondence concerning the possible sale and purchase of the stock of the HMOs was exchanged between Shattuck Hammond, individuals at Health Net, and individuals in the Luck-singer group. The correspondence discussed possible scenarios | ^whereby Health Net would: (1) recoup loans it had made to the HMOs; (2) acquire preferred shares of AmCareco stock;9 and (3) “cash sweep” funds out of the HMOs back to Health Net.
On April 17, 1998, Health Net and Am-Careco signed a “Letter of Intent” that outlined an agreement to negotiate the sale and purchase of the stock of the HMOs. According to the terms of the Letter of Intent, both parties would negotiate in good faith and a target date for a definitive agreement was set as May 18, 1998.10
The Letter of Intent included a “Term Sheet” as an attachment. The Term Sheet set forth “the principal terms for the acquisition by [AmCareco] ... of the stock of the [HMOs] from [Health Net].” The Term Sheet included specific terms, in-eluding: “Purchase Price/Cash Sweep,” “Reserve/Receivable True-Up,” “Put Rights,” and “Right of First Refusal.” The term “Purchase Price/Cash Sweep” included a calculation for “the ‘book value’ of the [HMOs] as of closing (after the Restructuring Reserve (as defined below) reversal referenced below) less ... the ... Cash Sweep (as defined below),” and “[Health Net] would reverse prior to closing all non-cash restructuring and merger related liabilities and reserves (the “Restructuring Reserves”)” and “settle prior to closing all inter-company accounts.... ” Exhibit A attached to the Term Sheet set forth “an estimated calculation of such [Health Net] Cash Sweep ... as of February 28, 1998, assuming the Restructuring Reserve reversal referenced above has been effected.” The attachment contained a line item “Cash Sweep [$8.5]” and the following notations: “[a]ssumes the reversal of $6.3 million in | ^Restructuring Reserves prior to the closing” and “[bracketed numbers will change in the event the Louisiana Local Deposit may be used to meet the Statutory Requirements.” A review of the Letter of Intent shows that it specially states that “[t]his’letter of intent and the term sheet are for the purpose of setting forth the substance of the discussions between Acquiring Co. [AmCareco] and [Health Net] and to serve as the basis for continuing discussions and preparations of definitive agreements for the Proposed Acquisitions” and that “[t]his letter of intent and term sheet do not constitute an agreement to consummate the Proposed Acquisitions or create any binding obligation in connection thereiuith, and no *340such binding obligation shall arise unless and until such definitive agreements are executed by [AmCareco] and [Health Net].” (Emphasis added.)
Pursuant to a “Stock Purchase Agreement” dated November 4, 1998, Health Net agreed to sell and AmCareco agreed to buy all of the stock of the HMOs. Assisting AmCareco in the drafting of the Letter of Intent and the Stock Purchase Agreement was Proskauer Rose, a law firm with its principal place of business in New York, represented by one of its partners, Stuart Rosow, a resident of New York. The Stock Purchase Agreement included the terms of the sale, an outside date of closing of January 31, 1999,11 representations and warranties by both the buyer and seller, and other additional provisions. In particular, the Stock Purchase Agreement provided for the issuance of preferred stock in AmCareco to Health Net and a Cash Payment from the HMOs to Health, Net. The Cash Payment was to be an amount determined pursuant to a formula contained in the Stock Purchase Agreement and was based on financial figures contained in an Estimated Balance Sheet.
| L-Additional provisions of the Stock Purchase Agreement provided that “all non-cash restructuring and merger related liabilities and reserves (the “Restructuring Reserves”) shall be reversed” and “all inter-company accounts between [the HMOs] and [Health Net] shall be settled.” The Stock Purchase Agreement also included stock redemption provisions pertaining to “put” and “call” rights.12 Health Net’s right to compel AmCareco to redeem Heath Net’s AmCareco stock was secured by a $2 million letter of credit in favor of Health Net. A mechanism for a “true-up” 13 one year after the closing would be used to determine the necessity of any adjustments to the Cash Payment or the number of shares of preferred stock issued and would be based on figures contained in a Final Balance Sheet.
In addition, AmCareco and Health Net entered into a letter agreement (the “Side Letter”) on November 4, 1998. The Side Letter provided that AmCareco would attempt to acquire between $5-$15 million in additional private financing. The Side Letter also provided that if the closing was delayed beyond January 15, 1999, and Health Net was required to supply additional premium deficiency reserve funds (PDR)14 to the HMOs, the parties would negotiate a method for Health Net to be repaid any cash loaned15 to the HMOs that was contributed to the PDRs.
*341|1(jWhen the closing was delayed beyond January 15, 1999, Health Net loaned $6.3 million to the HMOs. Specifically, Health Net loaned $700,000 to the Texas HMO in December 1998, $3.3 million to the Texas HMO in March 1999, and $2.3 million to the Louisiana HMO in March 1999.16 Am-Careco raised only $8.5 million in additional private financing.
In anticipation of the purchase of the stock of the HMOs, AmCareco engaged the Texas law firm of Vinson & Elkins to prepare the required “Form-A” applications for regulatory approval of the acquisitions. Virtually identical Form-A applications17 were submitted to the Departments of Insurance of Louisiana, Oklahoma, and Texas. The Louisiana Form-A application for acquisition of the Louisiana HMO contained a list of investors as of March 1, 1999. The investors and them respective investment amounts were identified on the Louisiana Form-A as: Foundation $12,000,000 (“in the form of contributed HMO assets to be exchanged for AmCareco Class A Preferred Shares”); Luxor Holdings II, LLC or Assignee (Pearce) $5,000,000; St Luke’s Healthcare System (Jhin) $500,000; Lueksinger $500,000; Jeff D. Nesmith $250,000; Brian Parsley, M.D. $250,000; James Considine, M.D. $250,000; Jon D. Epstein/J. Evans Atwell 117$250,000.18 The Form-A applications contained copies of the Stock Purchase Agreement, the Side Letter, and financial statements and spreadsheets relating to the HMOs and AmCareco, including a “Cash Sweep and Preferred A Share Calculation.” This document, prepared by Shattuck Hammond, was an estimated balance sheet of the three HMOs and AmCareco after the acquisition.
On April 29, 1999, Susan Conway, the attorney with Vinson & Elkins who represented AmCareco in the application process, forwarded to each state’s Department of Insurance an updated version of the Cash Sweep and Preferred A Share Calculation. This calculation was based on balance sheets for the quarter ending March 31, 1999.19 It reflected “accounting adjustments and fund transfers to be made in connection with the closing.” According to the Cash Sweep line item on the calculation sheet forwarded to the Louisiana Department of Insurance (LaDOI), $243,531 was to be swept from the Louisiana HMO; on the sheet forwarded to the Oklahoma Department of Insurance (OkDOI), $2,903,761 was to be swept from the Oklahoma HMO; and in the cover letter of the *342calculation sheet forwarded to the Texas Department of Insurance (TxDOI), $2,920,123 was to be swept from the Texas HMO. The total of these proposed sweeps was $6,067,415. On April 30, 1999, the regulators in each state approved the acquisition of the stock of the HMOs by AmCareco. Upon the purchase of the stock of the HMOs by AmCareco, the HMOs became known as AmCare Health Plans of | lsTexas, Inc., (AmCare-TX), Am-Care Health Plans of Louisiana, Inc., (Am-Care-LA) and AmCare Health Plans of Oklahoma, Inc. (AmCare-OK)
A Closing Agreement between AmCare-co and Health Net was executed between April 30 and May 6, 1999. In the Closing Agreement, the parties finalized the transaction, waived certain conditions set forth in the Stock Purchase Agreement, and agreed to additional terms and conditions. The financial provisions of the spreadsheet remained the same. It appears the Closing Agreement ivas not given to the regulators before or after approval of the acquisition.20
The terms of the Closing Agreement included:
3. Post-Closing Covenants.
[[Image here]]
(q) The Parties hereby acknowledge and agree that the premium deficiency reserves of the acquired corporations [HMOs] should be considered a “Restructuring Reserve” and therefore reversed pursuant to Section 2.1 of the Stock Purchase Agreement in order to calculate the Cash Payment, which reversal has been reflected in the FHS Cash Sweep and Preferred A Share Calculation prepared for Closing and attached as Exhibit E to this Agreement.
The Cash Sweep and Preferred A Share Calculation attached as an exhibit to the Closing Agreement reflected a cash sweep from Louisiana of $2,543,530, from Oklahoma of $2,903,761, and from Texas of $2,920,123, for a total of $8,367,414. The $2,543,530 represented the repayment of the $2,300,000 PDR loan and a Cash Payment of $243,531. The issuance of preferred stock resulted in Health Net acquiring a forty-seven percent (47%) ownership interest in AmCareco.
119FoIlowing approval of the sale of the stock by the regulators, each HMO was a wholly-owned subsidiary of AmCareco. The HMOs subsequently were managed by AmCare Management of Texas, Inc., (Am-Care-MGT) a wholly-owned subsidiary of AmCareco that was incorporated by Am-Careco. After the acquisition, Lucksinger continued to serve as President and the CEO of AmCareco and the HMOs, Nazar-enus served as the CFO, and Nadler served as the COO.
During the period immediately following the sale of the stock, Health Net and. AmCareco entered into a Transition Services Agreement. This agreement provided that Health Net would provide certain administrative and operational services to the HMOs, such as E-mail and computer system assistance, until AmCareco could assume those activities. By the express terms of the agreement, AmCareco retained “ultimate authority and responsibility,” with Health Net merely providing the contracted services to the HMOs.
The Cash Payment was implemented on or about May 3, 1999. At that time, the account authorizations at financial institutions where the HMOs’ accounts were located did not authorize AmCareco to transfer funds within the accounts. *343Therefore, Health Net, with the concurrence of AmCareco, initiated wire transfers of the funds for the Cash Payment from the HMOs’ accounts to Health Net. The sum of $2,543,530 was transferred from the Louisiana HMO, $2,903,761 was transferred from the Oklahoma HMO and $2,920,123 was transferred from the Texas HMO, for a total Cash Payment to Health Net of the $8,367,414.
The Stock Purchase Agreement also required AmCareco to purchase a $2 million letter of credit to secure Health Net’s redemption right. This letter of credit was established at Chase Bank on May 3, 1999.
|2nAccording to state regulators approving the sale of stock, AmCare-LA was required to maintain a minimum of $4 million in capital,21 AmCare-OK was required to maintain a minimum net worth of $750,000,22 and AmCare-TX had a surplus statutory requirement of $700,000,23 for a total of $5,450,000.
The first quarterly statements reported by the HMOs were for the period ending June 30, 1999. Amended documents prepared by AmCare-LA and filed with La-DOI 24 reflect AmCare-LA’s net worth at $3,785,007; documents prepared by Am-Care-OK and filed with OkDOI stated AmCare-OK’s net worth at $2,129,991; amended documents prepared by Am-Care-TX and filed with TxDOI25 reflect AmCare-TX’s net worth at $936,947, for a combined new worth of the three HMOs of $6,851,945.
Based on the reported Louisiana financial statement, LaDOI contacted AmCare-LA in November of 1999, requesting that additional contributions be made to bring AmCare-LA’s net worth up to the required $4 million. Correspondence between AmCare-LA and LaDOI over the next several months indicates LaDOI’s continued concern regarding this deficiency. 121 Because AmCare-LA continued to be below the net worth requirement, in April 2000, AmCare-LA requested and LaDOI approved a monthly, rather than quarterly, financial reporting schedule in lieu of an immediate cash infusion from AmCareco.
Texas Department of Insurance officials were concerned about the financial condition and operations of AmCare-TX, and a meeting to discuss their concerns was held in November 1999. At the meeting, items to be discussed included “[t]he HMO’s current statutory deposit” and “the HMO’s [PDR] and the methods used to calculate the reserve.” Notes from the meeting show that Nazarenus “indicated the paperwork is being processed on the [statutory deposit and is almost completed.” As to the issue of the PDR, Nazarenus “indicat*344ed that the PDR reserve set up initially by Foundation [Health Net] included a wind down, reserve, as of 12/31/98. AmCare [AmCare-TX] didn’t think this reserve was necessary so they amortized the full amount in the second quarter of 1999.” Specific follow-up actions discussed were that Nazarenus “will follow up later with questions concerning the PDR calculation” and “[t]he HMO will submit to [TxDOI] a request to release part of the Statutory Deposit by 1/15/2000 ... ”.
PriceWaterhouseCoopers (PWC) audited AmCareco and its subsidiaries for the eight-month period from April 30, 1999, through December 31, 1999. PWC reported AmCareco sustained a net loss of $9,192,165 and noted “one of the Company’s subsidiaries has not met the prescribed minimum net worth requirements for the state of Louisiana.” Following the date of the sale of stock, the number of enrollees in the HMOs increased from 33,-550 in 1999 to 82,468 in 2000 and to approximately 105,000-110,000 in 2001.
li^After the sale in 1999, all AmCareco personnel were employed by AmCare-MGT, and it provided services to the HMOs pursuant to management agreements.
During the first two quarters of 2000, the HMOs continued to experience financial difficulties. Upon initial compilation of the required second quarter 2000 financial filings, Lucksinger informed Nazarenus and Nadler by E-mail on May 11, 2000 of the need to discuss “the Oklahoma filing if it is going to show us out of statutory compliance. If we are[,] then I believe we should think about making some sort of intercompany receivable/capital contribution in order to not submit showing noncompliance .... If we show compliance, regardless of how we get there, they should not push us on this issue at this time.... We will also need to immediately fund the amount that we show as the intercompany payable.” Nazarenus responded back, “We can reflect an I/C [intercompany] receivable and a capital contribution to get us into compliance at 3/31/00; the funding of this contribution is a problem.”
After finalizing the second quarter 2000 filings, Nazarenus informed Lucksinger and Nadler:
Louisiana — requires a $200K capital contribution to maintain the $4M net worth requirement
— [LaDOI] will be expecting an immediate cash transfer to satisfy the capital contribution based upon the agreement I reached with them earlier this year....
Oklahoma — the cash position was $0; actually it was an overdraft of $780K[.]
— net worth was $770K, but we now have a capital contribution due to the plan of $2.25M to achieve this minimum net worth....
—• ODI/ODH [the Oklahoma Department of Insurance] have been very hands off but I suspect that the lack of cash and the minimum N/W [net worth] may change their position....
Texas — the cash position was $0; actually it was an overdraft of $200K[.]
| aAmCareco received over $3.8 million in additional funding in September 2000. In exchange for this amount of cash, Am-Careco issued promissory notes to the investors who included Health Net, Pearce, and Galtney. In particular, AmCareco issued to Health Net one promissory note in the amount of $1,750,000.00.
In September and December 2000, Am-Careco acquired two additional health plans, AmeriHealth and Sierra Texas Health Services, Inc., and it purchased and began using a new claims adjudication computer system. According to Mark Tharp, an insurance industry claims *345auditor, during the implementation and use of the new claims computer system, approximately $11 million was paid out in ineligible payments, overpayments, and/or duplicative payments. Following the acquisition of AmeriHealth, AmCareco reported to TxDOI an $8 million receivable in conjunction with the acquisition, which resulted from “balance sheet differences and medical loss ratio guarantees.” TxDOI approved this recording treatment but noted, “Should the collectability of this receivable become questionable or a dispute between the parties arise[,] then AmCare should report the receivable as a non-admitted asset.” In addition, during 2000 and 2001, AmCareco continued to record intercompany receivables from AmCareco to the HMOs to maintain statutory requirements. However, according to an April 30, 2001 investor update by Lucksinger, “AmCareco does not have the resources to pay off these intercompany payables at this time.”
On August 17, 2001, Lucksinger sent a memo to some individual investors and to some officers at Health Net summarizing the difficult financial condition of AmCare-co and the HMOs and stating, “We are now basically living from hand to mouth on our cash flow.” The memo confirms |.¿4AmCareco was “judiciously utilizing the various accounting treatments available to AmCareco, intercompany payables and cash on hand to stretch $2-3 million in total consolidated capital around to cover approximately $16 million in regulatory capital and cash reserve requirements” and admits that AmCareco has “run out of smoke and mirrors.” The memo concludes with a request for approximately $8 million in additional funding.
The accounting treatments that Luck-singer mentioned included moving cash among the HMOs, AmCareco, and Am-Care-MGT, sometimes on a daily or hourly basis. For example, documents reveal that during the business day of July 17, 2001, AmCare-MGT engaged in the following transactions (which are sometimes referred to as the “cash swirl”): (1) $1,941,875.65 was transferred from Am-Care-LA to AmCareco; (2) $2,829,360.13 was transferred from AmCareco to Am-Care-OK; (3) $1,021,075.75 was transferred from AmCare-OK to AmCare-LA; (4) $89,450.76 was transferred from Am-Care-TX to AmCare-OK; (5) $462,535 was transferred from AmCare-TX to Am-Care-LA; (6) $200,000.00 was transferred from AmCare-LA to AmCare-MGT; and (7) $900,000.00 was transferred from Am-Care-MGT to AmCareco.
Although Lucksinger identified and approached potential investors requesting additional capital, they and officers at Health Net declined to provide any additional funding for AmCareco.
In 2001, AmCareco had offices in the following locations: (1) Houston, Dallas, and San Antonio, Texas; (2) Baton Rouge, Shreveport, and New Orleans, Louisiana; and (3) Tulsa and Oklahoma City, Oklahoma. AmCareco had 258 full-time employees, including 43 managerial and executive personnel and 56 temporary employees, and operation centers in Houston and Tulsa. At this time, 7,575 shares of Class B Preferred Stock |25had been issued to 14 shareholders; 7,830 shares of Common Stock had been issued to 15 shareholders; and 7,050 employee stock options had been issued to 42 persons.
On May 1, 2002, LaDOI informed Am-Care-LA that it had been placed under administrative supervision.26
At the June 17, 2002 meeting of the Board of Directors of AmCareco, Nazare-*346ñus’ finance report stated AmCareco’s net worth was negative $16.7 million, the inter-company receivables were $29.6 million, processed but unpaid claims totaled approximately $15.8 million, and unprocessed claims totaled $23 million.
On July 26, 2002 pursuant to the terms of the Stock Purchase Agreement, Health Net exercised its redemption right and collected the $2 million provided for by the letter of credit.
II. PROCEDURAL HISTORY
J. Robert Wooley, the Louisiana Commissioner of Insurance (the Commissioner), had AmCare-LA placed in Rehabilitation on September 23, 2002,27 based on a determination by the Commissioner that AmCare-LA was financially troubled. The order of Rehabilitation vested in the Commissioner title to all property and other assets of AmCare-LA, empowered the Commissioner to commence and defend any and all legal actions concerning Am-Care-LA, and provided for continuing the business affairs of AmCare-LA. On October 7, 2002, the Commissioner filed a petition for the liquidation of AmCare-LA and an order of injunction and an order of liquidation were entered the same day.
12r,On December 16, 2002, AmCare-TX was placed into receivership and a Texas Receiver was appointed. On January 21, 2003, AmCare-TX was placed in permanent receivership.
On April 30, 2002, AmCare-OK’s license to conduct business in Oklahoma expired. At that time, AmCare-OK filed an application for renewal of its license. On September 18, 2002, AmCare-OK’s operations were limited to “conclusion of business” and AmCare-OK’s application to renew its business license was denied effective October 1, 2002. On July 8, 2003, AmCare-OK was placed in receivership and an Oklahoma Receiver was appointed. (The three state-appointed Receivers are hereinafter sometimes referred to collectively as “the Receivers.”)
On June 30, 2003, the Louisiana Commissioner filed three actions in the 19th Judicial District Court in and for East Baton Rouge Parish, Louisiana. The first action, Docket Number 499,737, was filed against the directors and officers of Am-Care-LA, AmCareco and AmCare-MGT (hereinafter referred to as the “D & O action”).28 This action is a tort action alleging the directors and officers failed to properly manage AmCare-LA. Health Net was not named as a party defendant in this action at this time. A second action, Docket Number 509,297, was filed against FHC, Foundation Health Systems, Inc., and its successor, Health Net, Inc., seeking enforcement of a parental guarantee (suretyship contract) executed by FHC for the Louisiana HMO in 1996 (the “Louisiana parental guarantee action”). The third action, Docket Number 512,366, was filed against_[2jPriceWaterhouseCoopers, LLC, a Delaware corporation doing business in Louisiana (the “PWC action”). The third action asserted claims in tort for accounting negligence and breach of con*347tract by PWC, AmCare-LA’s auditor.29
On September 30, 2003, the Texas receiver filed an action in the 250th Judicial District Court in Travis County, Texas, entitled Johnson v. PWC, Cause Number GN303897 (the “Johnson action”). The Johnson action, which the Oklahoma Receiver joined, essentially named the same defendants as the Louisiana actions and asserted the same substantive tort claims as the Louisiana actions.
On September 1, 2004, the Oklahoma Receiver filed a petition for intervention in the D & O and the PWC actions in Louisiana asserting tort causes of action.30 On September 13, 2004, the Louisiana, Oklahoma, and Texas Receivers filed a motion in the D & O action seeking approval for the “joint litigation” and prosecution of their claims. The district court granted the order for joint litigation on September 21, 2004.
On September 27, 2004, the Texas Receiver filed petitions for intervention in the D & O and PWC actions asserting tort causes of action and naming as defendants PWC, Lucksinger, Nadler, Nazarenus, Mudd, Jhin, and Galtney. Health Net was not named as a party defendant in these interventions.
On October 15, 2004, the Texas Receiver filed a petition for intervention in the Louisiana parental guarantee action. This petition cumulated Texas tort claims with the Louisiana contract action. For the first 12ntime the Texas Receiver named Health Net as a party defendant in these proceedings. On October 15, 2004, the three Receivers filed a joint motion to consolidate the three pending actions. The minute entry for November 8, 2004 states, “Next urged was a motion for intervention and motion to consolidate filed on behalf of Oklahoma and Louisiana Receivers.... [T]he motions were granted.”31
Further, on October 15, 2004, the Commissioner and the Oklahoma Receiver filed an amended and restated petition in the consolidated actions which cumulated the tort claims with the Louisiana contract claim. Named as defendants were Luck-singer, Nadler, Nazarenus, Jhin, Galtney, Mudd, Westbrook, Pearce, Executive Risk Indemnity, Inc., Executive Risk Specialty Insurance Company, Executive Risk Management Association, Greenwich Insurance Company, XL Specialty, Foundation Health Corporation, Foundation Health Systems, Inc., Health Net, Inc., PWC, Proskauer Rose, Stewart Rosow, and Am-Careco, Inc. This petition raised claims of fraud, conspiracy, gross negligence, negligence, unjust enrichment, breach of fiduciary duties and breach of contract. The Commissioner and the Oklahoma Receiver sought compensatory and exemplary (punitive) damages and attorney fees.
Finally, on October 15, 2004, the Texas Receiver filed a first supplemental and amending petition in the three consolidated actions naming as defendants PWC, Lucksinger, Nadler, Nazarenus, Mudd, Jhin, Galtney, Pearce, Foundation Health Corporation, Foundation Health Systems, Inc., Proskauer Rose, Rosow, and Health *348Net. The Texas 1 ^Receiver’s amended petition asserted claims of negligent misrepresentation, violation of the Texas Insurance Code, fraud, conspiracy, and breach of fiduciary duty and sought compensatory and exemplary (punitive) damages and attorney fees.
Several of the defendants and Health Net filed exceptions raising objections of lis pendens, lack of personal jurisdiction, lack of subject matter jurisdiction, prematurity, vagueness, improper cumulation, prescription, peremption, res judicata, improper joinder, no cause of action, and no right of action. These exceptions were overruled. Health Net filed a declinatory exception raising the objection of improper venue. The exception was overruled and Health Net appealed.
While Health Net’s appeal of the venue issue was pending, the trial court proceeded with the three “joint litigation” and consolidated actions. On February 4, 2005, Health Net filed its answer to the “Consolidated, Amended and Restated Petition of the Louisiana and Oklahoma Receivers.” On February 14, 2005, Health Net filed an amended answer and a recon-ventional demand against several named defendants and a third party demand against the LaDOI, raising claims of indemnity, contribution, detrimental reliance and regulator fault.32 Upon motion by the Louisiana Receiver, on May 9, 2005, the trial court judge ruled as a matter of conflict of laws (law) that Louisiana law applied to all procedural issues and Texas law applied to all substantive issues raised by these actions. Health Net filed its answer to the Texas Receiver’s petitions on June 13, 2005. Before the Isotrial began on June 16, 2005, all defendants except Health Net settled.33 In a common trial, the trial court judge decided the claims of the Louisiana and the Oklahoma Receivers, and a jury decided the facts for the claims of the Texas Receiver.
On June 30, 2005, in the Texas case, the jury returned a verdict finding Health Net eighty-five percent (85%) at fault and “Any other Company” fifteen percent (15%) at fault and awarded $52,400,000.00 in compensatory damages which was reduced to $44,540,000.00 in the subsequent trial court judgment that memorialized the jury verdict. The jury awarded Texas $65,000,000.00 in punitive damages. The jury also awarded Health Net a dollar-for-*349dollar settlement credit reduction. Health Net sought a Judgment Notwithstanding the Verdict (JNOV) or alternatively a new trial. On November 3, 2005, the trial court granted Health Net’s JNOV as to fault allocation, apportioning fifteen percent (15%) fault to “other persons”, and reduced the jury award of punitive damages by thirty percent (30%). Health Net’s motion for a new trial was denied. Both the judgment memorializing |sithe jury verdict and the judgment rendering the JNOV were issued under all three trial court docket numbers.
On November 4, 2005, the trial court rendered separate judgments in favor of the Louisiana and Oklahoma plaintiffs, and each judgment reflected that it was rendered in all three of the trial court actions. The trial court found Health Net to be seventy percent (70%) at fault, “Any other Company” fifteen percent (15%) at fault and “Any other Person(s)” fifteen percent (15%) at fault, and found Health Net liable for attorney fees and punitive damages, with quantum for the attorney fees and punitive damages to be determined at a subsequent bifurcated trial. The Louisiana plaintiff was awarded $9,511,624.19 in compensatory damages, reduced to $6,658,136.93. Health Net also was held liable under the Louisiana parental guarantee for the full amount of $9,511,624.19.34 The Oklahoma plaintiff was awarded $24,426,005.00 in compensatory damages, reduced to $17,098,203.50.
Health Net took suspensive appeals from the judgments in the three docketed trial court actions. The Texas Receiver took a devolutive appeal from the trial court judgment and the judgment granting the JNOV in the three trial court actions. The Louisiana Receiver and the Oklahoma Receiver each filed answers to Health Net’s appeals of the judgments in their favor.35
| :aOn December 6, 2005,36 after the bifurcated trial on the issues of quantum for the Louisiana and Oklahoma plaintiffs’ punitive damages and attorney fees claims, the trial court judge found the Louisiana plaintiff failed to meet his burden of proof for these claims and dismissed the claims. On December 12, 2005,37 the trial court judge found the Oklahoma plaintiff failed to meet her burden of proof for these claims and dismissed the claims. The Louisiana and Oklahoma plaintiffs then filed a motion seeking an award of treble damages. Health Net responded with a motion to strike the election, which was granted. In addition, the trial court granted Health Net’s request for a preliminary injunction enjoining the Texas and Oklahoma plaintiffs from pursuing their claims against Health Net in the Johnson action pending in Travis County, Texas. The trial court also sustained the Louisiana plaintiffs exception raising the objection of no cause of action as to Health Net’s third party demand against LaDOI asserting regulator fault.
*350This Court, in Wooley v. AmCare, 2005-2025 (La.App. 1 Cir. 10/25/06), 944 So.2d 668, affirmed the trial coui't’s ruling holding venue for the Texas and Oklahoma interventions was proper in East Baton Rouge Parish. In Wooley v. AmCare, 2006-1146-1154 (La.App. 1 Cir. 1/17/07), 952 So.2d 720, this Court held that the judgments dismissing the Louisiana and Oklahoma exemplai’y damage and attorney-fees claims were absolute nullities, reinstated the original judgments, and dismissed those appeals. In Wooley v. Lucksinger, 2006-1164-1166 (La.App. 1 Cir. 5/4/07), 961 So.2d 1225, this Court held the preliminary injunction granted to Health Net was moot. In Wooley v. Lucksinger, 2006-1167-1169 (La.App. 1 Cir. 5/4/07), 961 So.2d 1228, this Court affirmed the trial court’s dismissal of Health |33Net’s detrimental reliance claims and third party demands against LaDOI and referred the regulator fault claim to the merits. These judgments are final and definitive. La. C.C.P. art. 2166.
III. INTERPRETATION OF LAWS
Louisiana Revised Statutes 24:177 is entitled “Legislative intent, text, history and other indices of intent” and provides, in pertinent part, as follows:
A. When the meaning of a law cannot be ascertained by the application of the provisions of Chapter 2 of the Preliminary Title of the Louisiana Civil Code and Chapter 1 of Title 1 of the Louisiana Revised Statutes of 1950, the court shall consider the intent of the legislature.
B. (1) The text of a law is the best evidence, of legislative intent.
Chapter 2 of the Preliminary Title of the Louisiana Civil Code is entitled “Interpretation of Laws” and is comprised of La. C.C. arts 9 through 13. Chapter 1 of Title 1 of the Louisiana Revised Statutes is entitled “Interpretation of Revised Statutes” and is comprised of La. R.S. 1:1 through 17. When construing a law or a constitutional provision, the word “shall” universally is considered to mean mandatory. La. R.S. 1:3; La. C.C.P. art. 5053; La.C.Cr.P. art. 5; La. Ch.C. art. 107; Champagne v. Ward, 2003-3211, p. 21 (La.1/19/05), 893 So.2d 773, 786.
Accordingly, the interpretation (construction) of a law or a constitutional provision must start by applying the rules found in the designated provisions of the Civil Code and the Revised Statutes to the language of the law or the constitutional provision at issue. P. Lamonica & J. Jones, 20 La. Civ. Law Treatise, Legislative Law and Procedure, § 7.4, pp. 136-38 (2004), and the authorities cited therein; see Wooley, 2006-1167 at p. 12, 961 So.2d at 1237.
Li In Holly & Smith Architects, Inc. v. St. Helena, Congregate Facility, Inc., 2006-0582, pp. 9-10 (La.11/29/06), 943 So.2d 1037, 1045, appears the following:
When we are called upon to review legislative provisions, this Court follows certain guidelines, as we did in Louisiana, Municipal Association v. State, 04-0227 (La.1/19/05); 893 So.2d 809. In Louisiana Municipal Association [2004-0227 at pp. 35-36, 893 So.2d at 836-37], this Court recognized:
Questions of law, such as the proper interpretation of a statute, are reviewed, by this court under the de novo standard of review. After our review, we “render judgment on the record, without deference to the legal conclusions of the tribunals below. This court is the ultimate arbiter of the meaning of the laws of this state.”
“Legislation is the solemn expression of legislative will, and therefore, the interpretation of a law involves primarily the search for the legislature’s intent.” The interpretation of a statute starts *351with the language of the statute itself. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written, and no further interpretation may be made in search of the intent of the legislature.
The laivs of statutory construction require that laws on the same subject matter must be interpreted, in reference to each other. The legislature is presumed to have acted with deliberation and to have enacted a statute in light of the preceding .statutes involving the same subject matter. “Under our longstanding rules of statutory construction, where it is possible, courts have a duty in the interpretation of a statute to adopt a construction which harmonizes and reconciles it with other provisions dealing with the same subject matter.”
A statute must be “applied and interpreted in a manner that is logical and consistent with the presumed fair purpose and intention the Legislature had in enacting it.” In addition, “courts are bound to give effect to all parts of a statute and cannot give a statute an interpretation that makes any part superfluous or meaningless, if that result can be avoided.” (Emphasis added; footnote omitted.)38
| as See also M.J. Farms, Ltd, v. Exxon Mobil Corp., 2008 WL 2811534, 2007-2371, pp. 12-14 (La.7/1/08), 998 So.2d 16, 26-27.
IV. STANDARDS FOR APPELLATE REVIEW OF FACTS AND LAW
These consolidated actions assert causes of action that accrued in the states of Louisiana, Oklahoma, and Texas. When an action is filed in a state asserting that a cause of action arose or accrued in another state, initially the applicable state law is determined by whether the issue involved is a matter of substance (right) or a matter of procedure (remedy). Matters of procedure are determined by the law of the forum, i.e., the place where the action is filed. Wooley, 2005-2025 at p. 17, 944 *352So.2d at 678, and the authorities cited therein.
In Louisiana, the standards for appellate review are considered procedural in nature and the constitution, law, and jurisprudence of this state [¡^control. Milstead v. Diamond M Offshore, Inc., 95-2446, p. 11 (La.7/2/96), 676 So.2d 89, 95-96. Accordingly, we will review these consolidated actions pursuant to the Louisiana standards for the appellate review of facts and law.
Pursuant to La. Const. art. V, § 10(A) and (B), Courts of Appeal have appellate jurisdiction to review “all civil matters” and have the power and authority to review “law and facts.” This language is clear and unambiguous. This constitutional jurisdiction to review the law and facts is plenary and unlimited. See also La. Const, art. V, § 5(C). Such a review is referred to as a de novo review. A de novo review or an appeal de novo is “[a]n appeal in which the appellate court uses the trial court’s record but reviews the evidence and laiv without deference to the trial comt’s rulings.” (Emphasis added.) Black’s Law Dictionary 94 (7th ed.1999).
The constitution is implemented by La. C.C.P. art. 2164, which provides, in pertinent part, as follows:
The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal.
Official Revision Comment (a) for Article 2164 provides as follows:
(a) The purpose of this article is to give the appellate court complete freedom, to d,o justice on the record irrespective of whether a particular legal point or theory was made, argued, or passed on by the court below. This article insures that the “theory of a case” doctrine, which has served to introduce the worst features of the common law writ system into Louisiana is not applicable to appeals under this Code. See Hubert, The Theory of a Case in Louisiana, 24 Tul.L.Rev. 66 (1949). (Emphasis added.)
See also La. C.C.P. arts. 1635 and 2129.39 In F. Maraist & H. Lemmon, 1 La. Civ. Law Treatise, Civil Procedure, § 14.9, p. 382 (1999), appears the following:
|37An appellate court, vested with the authority to render any judgment that is just, legal and proper upon the record, may consider an issue raised for the first time on appeal or may even consider an issue not raised by the parties if its resolution is necessanj for a proper judgment on the record. (Emphasis added; footnote omitted.)
Although the constitutional power and authority of appellate courts to review facts in civil cases is plenary and unlimited, jurisprudence has evolved that requires that trial court findings of fact must be reviewed on appeal pursuant to the manifest error (clearly wrong) standard of review. Hebert v. Rapids Parish Police Jury, 2006-2001, p. 24 (La.4/11/07), 974 So.2d 635, 653-54 (on rehearing); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Maraist & Lemmon, 1 La. Civ. Law Treatise, Civil Procedure, § 14.14, p. 391-98. This standard of appellate review is a two-part test: 1) the appellate court must find from the record whether there is a reasonable factual basis for the finding of the factfinder; and 2) the appellate court must further determine whether the record establishes the finding is not manifestly erroneous (clearly wrong). Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Factual findings should not be reversed on appeal absent manifest *353error. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). If the trial court’s or jury’s factual findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Consequently, when there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous. Stobart v. State, Through Department of Transportation & Development, 617 So.2d 880, 883 (La.1993); Sistler, 558 So.2d at 1112.
Finally, in Maraist & Lemmon, 1 La. Civ. Law Treatise, Civil Procedure, § 14.14, at 395-96, appears the following:
IssThe manifest error rule assumes that the trier of fact applied the correct law in reaching its conclusion. If the trier of fact applied the incorrect law because of erroneous and prejudicial jury instructions or because of erroneous and prejudicial procedural or eviden-tiary rulings, and if the appellate court determines the error could have affected the outcome beloiu, the manifest error rule does not apply, and the appellate court makes an independent determination of the facts from the record on appeal. The appellate court then decides the case on the record facts without according any deference to the factual findings of the trial court, whether judge or jury. However, if the error in instructions or in evidentiary rulings affects only one of several parts of a verdict or judgment, the appellate court may disregard those factual findings affected by the error while according the usual deference to the unaffected findings. (Emphasis added; footnotes omitted.)
Questions of law are reviewed by appellate courts in Louisiana under the de novo standard. Holly & Smith Architects, Inc., 2006-0582 at p. 9, 943 So.2d at 1045; Louisiana Municipal Association v. State, 2004-0227, p. 35 (La.1/19/05), 893 So.2d 809, 836; Hall v. Folger Coffee Co., 2003-1734, p. 10 (La.4/14/04), 874 So.2d 90, 99. Cf. Branch-Hines v. Hebert, 939 F.2d 1311, 1317 and 1320 (5th Cir. [La.] 1991). Accordingly, we will review the law applicable herein without deference to the trial court’s rulings of law.
Y. CONFLICT OF LAWS
Louisiana’s choice-of-law rules are found in La. C.C. art 3515 et seq. and apply in Louisiana actions that involve contacts with other states. La. C.C. arts. 14 and 3517. La. C.C. art. 14 provides as follows:
Unless otherwise expressly provided by the law of this state, cases having contacts with other states are governed by the law selected in accordance with the provision of Book IV of this Code.
In Champagne, 2003-3211 at p. 11, 893 So.2d at 780, appears the following:

Choice of Law Provisions

Unless otherwise expressly provided by the law of this state, cases having contacts with other states are governed by the law selected in accordance with the provisions of Book IV |39of the Civil Code. La. C.C. art. 14. The residual nature of the provisions of Book IV is established by the introductory phrase of La. C.C. art. 14 that reads “unless otherwise expressly provided by the law of this state.” La. C.C. art. 14 Revision Comment (b). This phrase means that the provisions of Book IV are not intended to supercede more specific choice-of-law rules contained in other Louisiana statutes, such as the Insurance Code (See, La. R.S. 22:611 et seq.). Id. When applicable, those rules, being more specific, will prevail over the provi*354sions of Book IV of the Civil CodeT[ 40] (Emphasis added.)
A. Conflict of Laws Facts
The nominal plaintiffs in these consolidated and “Joint/Source Proceedings” are the Insurance Commissioners and Receivers for Liquidation for the states of Louisiana, Oklahoma, and Texas. These plaintiffs are acting on behalf of, and in the interest of, the policyholders, enrollees, members, subscribers, providers, and creditors of the Louisiana, Oklahoma, and Texas HMOs that are in liquidation and the three HMOs. All of the Commissioners and Receivers are domiciled in their respective states. The three HMOs were incorporated in and had their principal places of business in their respective states.
_JjThe domiciles of the defendants are in numerous states. Lucksinger, Nadler, Nazarenus, Jhin, and Galtney are domiciled in Texas. Mudd and Pearce are domiciled in Florida. Rosow is domiciled in New York. Health Net was incorporated in Delaware and its principal place of business is in California. AmCareco was incorporated in Delaware and its principal place of business is in Texas. PWC is a partnership chartered in Delaware with partners .residing in Louisiana and it does business in Louisiana. Proskauer Rose is a foreign law firm operating as a limited liability partnership under New York law, has its principal place of business in New York, and is qualified to do business in Louisiana. Several foreign insurers doing business in Louisiana also were named as defendants. La. C.C. arts. 3518 and 3548.
The conduct of which the plaintiffs complain allegedly occurred in the states of Louisiana, Oklahoma, Texas, California, and New York. A substantial majority of the conduct occurred in Texas. The following conduct occurred in Louisiana and Oklahoma: (1) selling memberships or policies; (2) collecting premiums; (3) processing of claims; (4) day-to-day operations; (5) commercial advertising; and (6) failing to pay claims, benefits or other contractual obligations of policyholders, enrollees, members, subscribers, providers, employees, and other creditors. The three HMOs did business only in their respective states.
The extent of the alleged injury caused by the conduct can be estimated by the compensatory damage awards given in the trial court. Those awards were: (1) $52,400,000.00 (61%) for Texas; (2) $9,511,624.19 (11%) for Louisiana; and (3) $24,426,005.00 (28%) for Oklahoma.
B. The Ruling of the Trial Court on the Issue of Choice-of-Law
14i On October 15, 2004, the Louisiana and Oklahoma Receivers filed a joint mo*355tion in limine to “determine ... the law applicable to various substantive issues in this matter.” (Emphasis added.) On May 9, 2005, a contradictory hearing was held on this motion in the trial court. The following is the pertinent portion of the hearing transcript:
THE COURT: Court overruled the final exception. Now, we need to get back to the choice of law.
It appears, Mr. Cullens [Counsel for the Louisiana and Oklahoma Receivers], to this court, and I know Mr. Percy [Counsel for Health Net] will correct me, but it appears that what you allege and contend in your petition, that there was a design and an enterprise tuhich resulted in fraud, negligence, unfair trade practice, that it had its genesis in the state of Texas, that it had its tentacles that reached into five other of the fifty states, that the damage was treble [sic] because it had a ripple effect, so that the damage occurred in Texas as well as in the five other states on the front line and in the secondary to the forty-five other states.
That is what I have gleaned from reading the several petitions filed in this matter and the innumerable memo-randa and all of the argument. That’s what it appears that you are trying to get to trial on. Is that correct or incorrect?
MR. CULLENS: Yes, in the nutshell, Your Honor, and we also — not that there is any magic to the words, but fiduciary duty claims as well.
THE COURT: That being the case, it appears to this court that there is a single business enterprise very akin in the criminal laiv to — but I don’t want to say those dirty words, Mr. Percy, and send you into cardiac arrest but you knoiu the words I am thinking of. We have been do-wn that aisle before.

But, in any event, it seems that the Texas substantive laio should indeed apply because, in the opinion of this court, as outlined in the foregoing statentents, that the genesis occurred in Texas, the enterprise, the design, the impact, quite a bit of the damage, and that it had a ripple effect.

The court views this as no more than multistate litigation which this court has certainly handled many times before, and parties are aligned in accordance with parallel interests.
Additionally, these parties are clothed with the indicia of some governmental authority allowed to exercise a delegation within the police power of the Executive Branch of the several |42sister states, allowing them to adjudicate claims that they are peculiarly situated to have addressed in any one or more fora.
Each of the several states having joined the compact on the uniform law, a substantial abiding interest in seeing that its consumers, policyholders, citizens, other persons, including juristic persons are protected to the full extent of the law and which claims should be justiciable quickly, efficiently, without undue delay and without undue expense.
Therefore, with respect to the choice of law, the court is going to apply Texas law on the substantive issues of law as outlined and is going to apply Louisiana laio on the procedural issues. Whether an issue is substantive or procedural, there is quite a bit of jurisprudence. Of course, each circuit has its own jurisprudence on that issue, but we can get through that, Mr. McKernan [Counsel for the Texas Receiver].
Therefore, the court will sign judgment in accordance with its ruling. *356Five days to take writs. Anything further? [41] (Emphasis added.)
C. Applicable Conflict of Laws Rules
The threshold question in determining the application of La. C.C. art. 3515 et seq. is whether there is a true conflict, a false conflict, or no conflict. Champagne, 2003-3211 at p. 22, 893 So.2d at 786; Arceneaux v. AmStar Corp., 2005-0177, p. 3 (La.App. 4 Cir. 12/14/05), 921 So.2d 189, 191; Tolliver v. Naor, 115 F.Supp.2d 697, 701 (E.D.La.2000); In re Combustion, Inc., 960 F.Supp. 1056, 1067 (W.D.La.1997). Louisiana Civil Code Article 3515 is the first article in Book IV entitled “CONFLICT OF LAWS” and states the basic and general policy that “an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that|,,.¿issue.” (Emphasis added.) Obviously, if the laws of two states are substantially identical, then there is no conflict. Thus, La. C.C. art. 3544(1) provides, in pertinent part, “[pjersons domiciled in states whose law on the particular issue is substantially identical shall be treated as if domiciled in the same state.” Revision Comments— 1991(f)42 for Article 3544 provides as follows:
Parties domiciled in states with identical law. The second sentence of sub-paragraph (1) provides that persons domiciled in states whose law on the particular issue of loss distribution is substantially identical should be treated as if domiciled in the same state. This legal fiction is justified by both policy and practical considerations. From a policy viewpoint, this rule is supported by the same factors as the common-domicile rule. See comment (e), supra. From a practical viewpoint, this rule will alleviate the court’s choice-of-law burden by properly identifying and resolving as ‘false conflicts’ all cases in which the victim and the tortfeasor were domiciled in states whose law on the issue of financial protection was substantially identical. This rule will also prove useful in cases involving multiple victims or multiple to7-tfeasors because it will enable the court to treat as domi-ciliarles of the same state those victims or tortfeasors ivho are domiciled in states tuith substantially identical law. (Emphasis added.)
See also Tolliver, 115 F.Supp.2d at 702. A false conflict occurs when it is determined that only a single state has an interest in the application of its law to an issue and the other state involved has no interest in the application of its law to the issue. Arceneaux, 2005-0177 at p. 3, 921 So.2d at 191; In re Combustion, Inc., 960 F.Supp. at 1067.
Once a true conflict is identified, courts are required to apply the rules of La. C.C. art. 3515 et seq. on an “issue-by-issue” or “issue specific” basis. In Favaroth v. Appleyard, 2000-0359, p. 4 (La.App. 4 Cir. 5/2/01), 785 So.2d 262, 265, appears the following:
*3571A finder Louisiana’s choice of laiv rules, a sweeping determination that the law of one state applies to the case, as opposed to an issue in a case, constitutes a derogation, of the appropriate analysis. When a conflict exists with regard to more than one issue, each issue should be analyzed separately. One result of this analysis might be that the laws of different states may be applied to different issues in the same dispute, or dépegage. Comment (d) to LSA-C.C. art. 3515. (Emphasis added.)
Revision Comments — 1991(d) for La. C.C. art. 3515 provides as follows:
Issue-by-issue analysis and dépegage. The use of the term “issue” in the first paragraph of this Article is intended to focus the choice-of-law process on the particular issue as to which there exists an actual conflict of laws. When a conflict exists with regard to only one issue, the court should focus on the factual contacts and policies that are pertinent to that issue. When a conflict exists with regard to more than one issue, each issue should be analyzed separately, since each may implicate different states, or may bring into play different policies of these states. Seen from another angle, each state having factual contacts with a given multi-state case may not have an equally strong interest in regulating all issues in the case, but only those issues that actually implicate its policies in a significant way.
This so-called issue-by-issue analysis is an integral feature of all modern American choice-of-law methodologies and facilitates a more nuanced and individualized resolution of conflicts problems. One result of this analysis might be that the laws of different states may be applied to different issues in the same dispute. This phenomenon is known in conflicts literature by its French name of dépegage. Although infrequently referred to by this name, this phenomenon is now a common occurrence in the United States and has received official recognition in Europe. This Article does not prohibit dépegage. However, dépegage should not be pursued for its own sake. The unnecessary splitting of the case should be avoided, especially when it results in distorting the policies of the involved states.
See also Murden v. Acands, Inc., 2005-0319, p. 5 (La.App. 4 Cir. 12/14/05), 921 So.2d 165, 169, writ denied, 2006-0129 (La.4/17/06), 926 So.2d 526; Rigdon v. Pittsburgh, Tank & Tower Co., Inc., 95-2611, p. 5 (La.App. 1 Cir. 11/8/96), 682 So.2d 1303, 1306; Thomas v. Fidelity Brokerage Services, Inc., 977 F.Supp. 791, 794 (W.D.La.1997); In re Ford Motor Co. Bronco II Product Liability Litigation, 177 F.R.D. 360, L,370-71 (E.D.La.1977); F. Maraist & T. Galligan, Louisiana Tort Law, § 22.05, p. 22-23 (2d ed.2007). A review of the trial judge’s ruling at the hearing to determine the appropriate choice of law rules reflects that she made “a sweeping determination that the law of one state” applied (Texas), and she did not conduct an “issue-by-issue” analysis as required by La. C.C. art. 3515 et seq. This is error and it was exacerbated by the initial refusal of the trial court judge to timely file written findings of fact and reasons for judgment in the Louisiana and Oklahoma cases and her subsequent refusal to comply with the order of this Court that she state the pertinent constitutional provisions, laws, and jurisprudence upon which her various decisions were based.43
*358The record does not reflect that Health Net excepted to the trial court choice-of-law ruling. However, La. C.C.P. art. 1635 provides as follows:
Formal exceptions to rulings or orders of the court are unnecessary. For all purposes it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice him. (Emphasis added.)
Health Net has not assigned error for the choice-of-law ruling in this appeal. In Georgia Gulf Corp. v. Board of Ethics for Public Employees, 96-1907, p. 4 (La.5/9/1997), 694 So.2d 173, 175-76, appears the following:
From the outset, the Ethics Commission asserts that the due process issues were not raised in the administrative proceedings, were not assigned as error on the appellate level, and are not properly before us. We disagree.
La.Code Civ.P. art. 2129 provides that an assignment of errors is not necessary in any appeal. Code of Practice of 1870, Art. 896, one of the source provisions for La. Code Civ.P. art|4fi2129, provided that if the trial court record was not certified by the clerk of court of the lower court as containing all of the testimony, the supreme court would only judge the case on a statement of the facts. Code of Practice of 1870, Art. 897, another source provision for La.Code Civ.P. art. 2129, provided that an appellant who did not rely wholly or in part on a statement of facts, an exception to the judge’s opinion, or a special verdict, but on an error of law appearing on the face of the record, would be allowed ten-clays after the lodging of the record to file a statement alleging any errors. The Official Revision Comments under La.Code Civ.P. art. 2129 records that the jurisprudence under the old Code of Practice articles construed them to mean that where there was a certified transcript containing all of the testimony and the grounds for reversal were apparent from the face of the record, no assignment of errors was required. La.Code Civ.P. art. 2129 simply codified this jurisprudence.
Moreover, La.Code Civ.P. art. 2164 provides that an appellate court “shall render any judgment which is just, legal and proper upon the record on appeal.” As noted in the Official Revision Comments under Art. 2164, the appellate court has “complete freedom to do justice on the record irrespective of whether a particular legal point or theory was made, argued, or passed on by the court below.” In a similar vein, Uniform Rules of Louisiana Court of Appeal, Rule 1-3 provides that even in the absence of an assignment of errors, the appellate court can review such issues if the “interest of justice clearly requires .... ”
Under the codal authorities cited herein above, it is clear that the appellate coui't had the right to consider the issue of due process even though there was no assignment of error in that regard. Accordingly we find that the due process issue is also properly before us.
See also Berg v. Zummo, 2000-1699, p. 13, n. 5 (La.4/25/01), 786 So.2d 708, 716, n. 5; Nicholas v. Allstate Ins. Co., 99-2522, pp. 6-10 (La.8/31/00), 765 So.2d 1017, 1022-1024. Determining the proper choice-of-law law to be applied to an issue is a question of law for which this court has the plenary and unlimited constitutional power *359and authority to review de novo. Foshee v. Torch Operating Co., 99-1863, pp. 17-18 (La.App. 3 Cir. 5/17/00), 763 So.2d 82, 92-93. Cf. Duhon v. Union Pacific Resources, Co., 43 F.3d 1011, 1013 (C.A.5 (La.) 1995). Accordingly, we will conduct the required issue-by-issue de novo analysis to decide the assignments of |47error in this case and, if the trial court committed error, determine whether this trial court error was prejudicial for any issue so decided.44 See the excellent discussion of the effect of a legal error in Duzon v. Stallworth, 2001-1187, pp. 30-32 (La.App. 1 Cir. 12/11/02), 866 So.2d 837, 860-861, writ denied, 2003-0589 (La.5/2/03), 842 So.2d 1101, and 2003-0605 (La.5/2/03), 842 So.2d 1110.
With the exception of the Louisiana contractual claim pertaining to the Health Net parental guarantee,45 all of the other causes of action asserted by the plaintiffs involve delictual obligations. The choice of law rules for delictual obligations (torts) are provided for in Title VII of Book IV of the Civil Code, comprised of La. C.C. arts. 3542-3548.
Louisiana Civil Code Article 3542 provides as follows:
Except as otherwise provided in this Title, an issue of delictual or quasi-delic-tual obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the relationship, if any, between the parties was centered; and (2) the policies referred to in Article 3515, as well as the policies of deterring wrongful conduct and of repairing the consequences of injurious acts.
The first paragraph of Article 3542 repeats the basic premise of Louisiana choice-of-law that the impairment of other states’ interests in Louisiana |4Slitigation should be minimized. The second paragraph lists the following factors to be considered when determining whether a state’s policies may be impaired if its law was not applied to a particular issue: (1) place of conduct; (2) place of injury; (3) domicile of the parties; (4) state in which the relationship between the parties is centered; (5) policy for deterring wrongful conduct; and (6) policy for repairing the consequences of injurious acts.
What constitutes domicile is provided for in La. C.C. arts. 3518 and 3548. Article 3518 provides as follows:
For the purposes of this Book, the domicile of a person is determined in accordance with the law of this state. A juridical person may be treated as a domiciliary of either the state of its formation or the state of its principal place of business, whichever is most pertinent to the particular issue.
The Louisiana substantive law on domicile *360is found in La. C.C. arts. 38-46.46 Louisiana Civil Code Article 3548 provides as follows:
For the purposes of this Title, and provided it is appropriate under the principles of Article 3542, a juridical person that is domiciled outside this state, but which transacts business in this state and incurs a delictual or quasi-delictual obligation arising from activity within this state, shall be treated as a domiciliary of this state.
When determining a choice of law problem involving delictual and quasi-delic-tual obligations, the most important issues are those pertaining to a state’s standards of conduct and safety and its policies pertaining to loss distribution and financial protection. Louisiana Civil Code Article 3543 provides as follows:
Issues pertaining to standards of conduct and safety are governed by the law of the state in which the conduct that caused the injury occurred, if the injury occurred in that state or in another state whose law did not provide for a higher standard of conduct.
Lain all other cases, those issues are governed by the law of the state in which the injury occurred, provided that the person whose conduct caused the injury should have foreseen its occurrence in that state.
The preceding paragraph does not apply to cases in which the conduct that caused the injury occurred in this state and was caused by a person who was domiciled in, or had another significant connection with, this state. These cases are governed by the law of this state.
Louisiana Civil Code Article 3544 provides as follows:
Issues pertaining to loss distribution and financial protection are governed, as between a person injured by an offense or quasi-offense and the person who caused the injury, by the law designated in the following order:
(1) If, at the time of the injury, the injured person and the person who caused the injury were domiciled in the same state, by the law of that state. Persons domiciled in states whose law on the particular issue is substantially identical shall be treated as if domiciled in the same state.
(2) If, at the time of the injury, the injured person and the person who caused the injury were domiciled in different states: (a) when both the injury and the conduct that caused it occurred in one of those states, by the law of that state; and (b) when the injury and the conduct that caused it occurred in different states, by the law of the state in which the injury occurred, provided that (i) the injured person was domiciled in that state, (ii) the person who caused the injury should have foreseen its occurrence in that state, and (iii) the law of that state provided for a higher standard of financial protection for the injured person than did the law of the state in which the injurious conduct occurred.
The distinction between issues of “standards of conduct and safety” and those of “loss distribution and financial protection” is set forth in Revision Comments — 1991 of La. C.C. art. 3543 as follows:
(a) Scope and terminology. This Article applies to “issues pertaining to standards of conduct and safety” as distinguished from “issues of loss distribution *361and financial protection” which are governed by Article 3544, infra. This distinction draws from the substantive law of forts and its two fundamental objectives — deterrence and compensation. By way of illustration, so-called “rules of the road” establish or pertain to “standards of conduct and safety”, whereas rules that impose a ceiling on the amount of compensatory damages or provide |,^immunity from suit are “rules of loss-distribution and financial protection”. From the choice-of-law perspective, the reason for distinguishing between conduct-regulating rules and loss-distribution rules is the fact that their operation in space abides by different principles. Thus, while conduct-regulating mies are territorially oriented, compensation or loss-distribution mies are usually not so oriented. A state’s policy of deterrence embodied in its conduct-regulating rules is implicated in all substandard conduct that occurs within its territory, even if the parties involved are not domiciled in that state. Conversely, a state’s loss-distribution policy may or may not extend to non-domiciliaries acting within its territory, but does extend to domiciliaries even when they act outside the state. For the origin and rationale of this distinction in American conflicts law, see Symeonides, ‘Choice of Law for Torts’, 441-44. (Emphasis added.)
Finally, the relationship of Article 3542 with Articles 3543-3546 is described in Revision Comments — 1991 for Article 3542 as follows:
(b) Relation to other articles of this Title. The approach of this Article is further implemented by specific rules contained in Articles 3543-3546, infra, 'which are a priori legislative determinations of “the state whose policies would be most seriously impaired if its law were not applied ”. Being more specific, these Articles should, when applicable, prevail over this Article. However, as with any a priori mies, Articles 3543-3546 may in exceptional cases produce a result that is incompatible with the general objective of Article 354.2, in pursuance of which they were drafted. In order to avoid such a result. Article 3547 contains an “escape clause” which, when applicable, refers these cases back to Article 3542. Moreover, Articles 3543-3546 do not cover the entire spectrum of cases or issues that might fall under the general hearings of these Articles, but only those cases that appeared to be susceptible to a clear and noncontroversial choice-of-law rule. The remaining cases or issues are governed by this Article as the residual article. Thus, Article 3542 is intended to perform a general as well as a residual role. In its residual role, this Article applies to all cases and issues that are not included within the scope of Articles 3543-3546. In its general role, this Article will help determine whether issues that do fall within the general scope of Articles 3543-3546 should be decided under the rules contained therein or under the escape clause of Article 3547 which refers them back to Article 3542. (Emphasis added.)
Louisiana Civil Code Article 3547 provides as follows:
The law applicable under Articles 3543-3546 shall not apply if, from the totality of the circumstances of an exceptional case, it is clearly evident under the principles of Article 3542, that the policies of another state would be more seriously | ril impaired if its law were not applied to the particular issue. In such event, the law of the other state shall apply. (Emphasis added.)
*362See generally, S. Symeonides, Louisiana’s New Law of Choice of Law for Tort Conflicts: An Exegesis, 66 Tul. Law Rev. 677 (1992).
1. Law Applicable to the Texas Case
Louisiana Civil Code Article 3543 is clear and unambiguous in providing that “[i]ssues pertaining to standards of conduct and safety are governed by the law of the state in which the conduct that caused the injury occurred, if the injury occurred in that state or in another state whose law did not provide for a higher standard of conduct.” The record on appeal shows that a majority of the conduct complained of occurred in Texas and, based on the quantum of the damages awarded, sixty-one percent (61%) of the total injuries in this litigation occurred in Texas. Revision Comments — 1991(d) for Article 3543 provides as follows:
Conduct and injury in the same state: Application of the law of that state. The first paragraph of this Article provides that when both tibe tortfeasor’s conduct and the victim’s injury occur in the same state, the laiv of tlbat state applies, regardless of the domicile of the parties or any other factors. As long as the issue is one pertaiidng to regulation of conduct and safety, the state where both the conduct and the injury occur Ibas the best, if not the exclusive, claim for applying its law. This is true regardless of the content of that law, that is, regardless of whether that law provides for a standard of conduct that is lower or higher than, for instance, the law of the state in which either party is domiciled. (Emphasis added.)
Subparagraph (2) of La. C.C. art. 3544 is clear and unambiguous in providing that for issues pertaining to loss distribution and financial protection “[i]f, at the time of the injury the injured person and the person who caused the injury were domiciled in different states: (a) when both the injury and the conduct that caused it occurred in one of those states, by the law of that state.... ” The Texas plaintiff is domiciled in Texas, a majority of |52the conduct complained of occurred in Texas, and all of the injury complained of by the Texas plaintiff occurred in Texas. AmCare-TX is incorporated in Texas and had it principal place of business there. Texas has a comprehensive HMO law. V.T.C.A. Ins.Code §§ 843.001 to 843.464. Revision Comments — 1991(g) for Article 3544 provides, in pertinent part, as follows:
Domicile of either party. Subparagraph (2) deals with cases in which, at the time of the injury, the tortfeasor and the victim were not domiciled in the same state. Clause (a) of that subparagraph, provides that when both tibe injurious conduct and the resulting injury occurred in a state where either the tort-feasor or the victim was domiciled, the law of that state shall apply, regardless of whether it provides for a higher or lower standard of financial protection than, the law of the domicile of the other party. For rationale and supporting authority, see Symeonides, ‘Choice of law for Torts’, 453-56. When a person is injured in his home state by conduct in that state, his rights should be determined by the law of that state, even if the person who caused the injury happened to be from another state. The law of the latter state should not be interjected to the victim’s detriment or benefit. (Emphasis added.)
Thus, even assuming that Health Net is domiciled in either California or Delawai’e, insofar as the Texas litigation is concerned, the trial court judge correctly ruled that Texas law applies to issues pertaining to standards of conduct and safety and to those pertaining to loss distribution and financial protection. The Texas plain*363tiff initially sought in a Texas forum the same basic relief sought in this Louisiana forum. Louisiana courts have recognized the “compelling interest” Texas has in regulating issues involving Texas insurance in Texas. Murden v. Acands, Inc., 2005-0319, p. 7 (La.App. 4 Cir. 12/14/05), 921 So.2d 165, 169-170, and the case cited therein. Thus, applying Texas law in this Texas intervention does not impair Texas policies in general. Applying Texas law in a Texas insurance case in a Louisiana forum generally will not impair Louisiana policies; it does affect Lathe amount of work involved for Louisiana court dockets. La. C.C. arts. 3515 and 3542. However, the law of another state will be applied if La. C.C. art. 3547 or another provision of Louisiana’s law requires it for a particular issue.
2. Law Applicable in the Louisiana Case
As previously indicated, the domiciles of the original defendants in the Louisiana case are located in the states of Texas, Florida, New York, Delaware, California, and Louisiana; the conduct complained of occurred in varying degrees in the states of Louisiana, Oklahoma, Texas, California, and New York; and all of the injuiy complained of in the Louisiana case occurred in Louisiana. The Louisiana HMO was incorporated in Louisiana, had its principal place of business in Louisiana, and only did business in Louisiana. The Louisiana HMO advertised its product, sold contracts to enrollees for health care benefits, collected premiums, processed claims, entered into contracts with providers, conducted day-to-day operations, hired employees, contracted for goods and services, and failed to pay claims, benefits, and other contractual obligations of enrollees, members, subscribers, providers, employees, and other creditors that it was contractually obligated to pay in Louisiana.
For the purposes of Article 3543, the majority of the conduct that caused the injury in Louisiana occurred in Texas. However, the alleged conduct of continuing to conduct business operations when insolvent so that Louisiana conventional obligations could not be met occurred in Louisiana. Louisiana also has asserted delictual causes of action in its petition alleging that these torts caused the failure to perform resulting in multiple breaches of Louisiana contracts involving Louisiana domiciliaries. Louisiana has a very | ¡¡¿strong interest in the sanctity of its conventional obligations. La. C.C. art. 3537 et seq. All of the injury claimed by Louisiana occurred in Louisiana.
Revision Comments — 1991(h), (i), and (j) for Article 3543 provide as follows:
(h) Conduct in more than one state. Cases in which the injurious conduct occurs in more than one state should be approached under the principles of causation of the law of the forum. Ordinarily, these principles will make it possible to determine which particular conduct was, legally speaking, the principal cause of the injury. Following such a determination, the case will be governed by either the law of the state of that conduct or the law of the state of injury, depending on which paragraph of this Article is applicable, and subject always to the “escape clause” of Article 3547, infra. In the latter case, as well as in all cases in which the principles of causation would not yield a clear answer, the applicable law will be determined in accordance with Article 3542. It is also possible that the fact that the injurio'tis conduct teas not localized in any single state could, in appropriate circumstances, evoke the escape clause of Article 8547. even without resorting to the principles of causation.
*364(i) Injury sustained in more than one state. Cases involving multiple victims who sustained their respective injuries in different states should be handled independently for each victim. Cases where the same victim sustained injury-in more than one state should be resolved by a factual determination of where the injury was primarily suffered. Following such a determination, the case will be governed by either the law of the state of injury or the law of the state of conduct, depending on which paragraph, of this Article is applicable, and subject always to the escape clause of Article 3517.
(j) The third, paragraph: Conduct in Louisiana. The third paragraph of this Article is intended, to ensure that conduct in Louisiana by persons domiciled in, or having another similarly significant relationship roith, this state will not be subjected to higher standards of another state where the injury might occur. (Emphasis added.)
Revision Comments — 1991 (b), (c), (d), (e) and (f) for Article 3544 provide, in pertinent part, as follows:
(b) Scope: persons. This Article applies to issues of loss-distribution “as between a person injured by an offense or quasi-offense and the person who caused the injury”....

When one tortfeasor causes injury to more than one person, the applicable laiv should be determined separately with 155regard to each victim. When one person is injured by more than one tort-feasor, the latter’s obligations vis-á-vis the victim and the law governing these obligations should be determined separately with regard to each tortfeasor.

[[Image here]]
(c) Relation to Article 3542. Like Article 3543, this Article is derived from the general principles of Article 3542. When applicable, this Article, being-more specific, prevails over Article 3542. However, according to Article 3517, infra, the rules provided in this Article may, in exceptional cases, be subordinated to the principles of Article 3512. See comment 'under Article 354-7, infra. Moreover, this Article does not cover the entire spectrum of cases involving issues of loss distribution. As with Article 3543, the objective of this Article is to lighten the court’s choice-of-law burden by attempting to identify those cases for which a safe choice-of-law rule could be established in advance based on accumulated experience. Because this experience does not yield safe choice-of-law rules for all cases, this article is purposefully left open-ended. For instance, this article does not cover situations in 'which the wrongful conduct, the resulting injury, and the domicile of each party are each located in different states. Such cases are, therefore, governed by Article 3542, the residual Article.
(d)Domicile. Based on the premise that laws of loss distribution are usually not territorially oriented, this Article pays less attention to territorial factors and focuses instead on the domicile of the parties.... For the domicile of juridical persons, see article 3518, supra, and Article 3548, infra. For the purposes of this Article, the pertinent domicile is the domicile at the time of the injury. This is stated expressly in the article or implied by the use of the past tense. However, a post-injury change of domicile may well be pertinent for the purposes of Article 3542. See Allstate Insurance v. Hague, 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981).
Domicile has been chosen as the primary connecting factor for the purposes of this Article because domicile connotes *365a permanent, factual, consensual, and formal bond between a, person, and a given society. Because of this bond, the person pariicipates, however indirectly, in the shaping of that society’s values and may reasonably expect the protection of its laws. Correspondingly, that society has both a right and a duty to be concerned about that person’s welfare. When the domiciliary bond is attenuated for whatever reason, both the person’s expectations and the society’s concerns may also be diminished accordingly. Thus, when a person is only nominally domiciled in one state, but habitually resides in another or has another substantial factual connection with another state that is pertinent to the particular issue, the interest of the latter state in protecting him may be stronger than that of the former state. | -^Depending on the other factors in the case, such a case may be a good candidate for invoking the “escape clause” of Article 351.7, infra.
(e) Common domicile. The first sentence of subparagraph (1) of this article deals with situations in which, at the time of the injury, both the tortfeasor and the victim were domiciled in the same state. This provision calls for the application of the law of the common domicile regardless of ivhether that law provides for a higher or a lotver standard of financial protection for the victim than does the law of the state where the conduct and/or the injury occmred. In cases where the law of the state of the common domicile provides for a higher standard of financial protection than does the state of conduct and/or the injury, the application of the law of the common domicile has become routine in all states that have abandoned the traditional lex loci delicti rule....
(f) Parties domiciled in states with identical law. The second sentence of subparagraph (1) provides that persons domiciled in states whose law on the particular issue of loss distribution is substantially identical should, be treated as if domiciled in the same state. This legal fiction is justified by both policy and practical considerations. From a policy viewpoint, this rule is supported by the same factors as the common-domicile rule. See comment (e), supra. From a practical viewpoint, this rule will alleviate the court’s choice-of-law burden by properly identifying and resolving as “false conflicts” all cases in which the victim and the tortfeasor were domiciled in states whose law on the issue of financial protection was substantially identical. This rule will also prove useful in cases involving midtiple victims or multiple tortfeasors because it ■will, enable the count to treat as domiciliari.es of the same state those victims or tortfeasors ivho are domiciled in states with substantially identical latu. (Emphasis added).
Finally it must be noted that “Comment (g)to Article 3544 reflects the legislative belief that choice of law should be decided on a state’s interest in the case, rather than the potential benefit or detriment to the litigants.” Tolliver, 115 F.Supp.2d at 703. See generally, S. Symeonides, swpra.
The fact that Congress has allowed each of the fifty states to have its own system governing insurance strongly suggests that, a state-specific system for insurance is a legitimate public purpose. Champagne, 2003-3211 at p. 26, 893 So.2d at 788; Dunlap v. Hartford Ins. Co. of the L57 Midwest, 2004-0725, p. 7 (La.App. 1 Cir. 3/24/05), 907 So.2d 122, 126; Abraham v. State Farm, 465 F.3d 609, 613-14 (C.A.5 (La.) 2006). Louisiana’s system for regulating insurance is particularly state-specific.
*366The insurance industry in Louisiana is pervasively affected by public policymak-ing and is heavily regulated. La. R.S. 22:2 A(1); Segura v. Frank, 93-1271, p. 19 (La.1/14/94), 630 So.2d 714, 730. The reasons for this are discussed in W. McKenzie & H. Johnson, 15 La. Civ. Law Treatise, Insurance Law and Practice § 3, pp. 4-6 (3d ed.2006), as follows:
It is often said that the contract of insurance, and indeed the entire field of insurance law, is so substantially infused with public policy concepts that it is impossible to discuss the subject of insurance without a heavy dose of public policy considerations at every turn. The authors currently adhere to that philosophy, and indeed respectfully suggest that the reader will not have a complete understanding of the subject matter unless the marriage between insurance and public policy is made absolutely clear at the outset of this work.
It is certainly understandable that the legislature and the courts of a state, especially the former, would be very concerned about a relationship into which citizens place enormous amounts of money and in turn have equally substantial expectations about what they will receive in turn. Insurance contracts are so pervasive now that it may be safely predicted that almost every citizen either is now, has been, or may soon be a party to such a contract. We count on insurance contracts to protect our most basic financial and physical resources: our person, our property, and our potential liability for harm to others. It is difficult to imagine our society without contracts of insurance.
In light of the significant involvement of our citizens with these particular contracts, concomitant governmental involvement is easily predictable. Moreover, the nature of the contract is such that it may tend toward an adhesion relationship. The insured is often an individual with relatively little bargaining power and similarly slight expertise in the field of insurance. The insurer is very often a company of both substantial size and expertise. Together these factors invite, though do not require, a relationship of adhesion. In such a potential relationship, the usual rule found in the Civil Code that the parties may make law between themselves by contract, and are free to include virtually whatever is not prohibited in such an agreement, is not entirely appropriate. Rather one finds the parameters of the bargaining arena between the insurer and, Lathe insured sharply limited and carefully patrolled by regulatory authorities.
Given the intense interest by government in this particular type of contract, some of the principles that we encounter in this subject matter are easily explainable. For example, it is easy to see why the principles having to do with interpretation that are mentioned in the next section have developed, and why a court might be willing to reform a contract as discussed in the section following that. It is also easy to see why the legislature requires that certain provisions be included in the various insurance contracts, or provisions more favorable to the insured. Sometimes the legislature will mandate that certain types of coverage be offered in conjunction with basic coverages, and will presume that the insured opted for such coverage unless it is clear that he rejected it. The law may also require, for example, that if a certain medical expense is reimbursable when performed by a physician, it cannot be rejected when done by another health care provider with his licensed authority.
*367Cancellations are rigorously regulated; forfeiture of built up values are protected; penalties and attorney’s fees for arbitrary denial of claims are mandated. The list could go on and on, but the theme becomes very clear. This is not an area of the law in which the legislature or the courts have been willing to leave the players to their own devices. Either because of the substantial monetary investment by citizens, or of the perils to which they would be exposed without the coverage they may have thought they were purchasing, or of the disparity between the size and expertise of the contracting parties, or perhaps for all three reasons, the playing field is sharply circumscribed, and closely umpired. (Emphasis added.)
The people of Louisiana have found insurance so important they have given constitutional status to the office of Commissioner of Insurance and LaDOI by providing for them in the Executive Branch of state government. La. Const. art. IV, §§ 1 and 11. In particular, La-DOI is one of twenty departments in the Executive Branch of state government. La. Const, art. IV, §§ 4(B). Finally, the legislature has provided for the organization, structure, powers, and functions of LaDOI and the powers and functions of the Commissioner in La. R.S. 36:681, et seq.
The legislature has dedicated an entire Title of the Louisiana Revised Statutes for the Louisiana Insurance Code. La. R.S. 22:1-3312. Health and | mAccident Insurance has been classified as a specific type of insurance and has been defined, in part, as “[ijnsuranee of human beings against bodily injury, disablement, or death by accident or accidental means, or the expense thereof, or against disablement, or expense resulting from sickness or old age....” La. R.S. 22:6(2)(a). HMOs are specially provided for in La. R.S. 22:2001-2027.
For the purpose of La. R.S. 22:2001 et seq. (1) an enrollee is “an individual who is enrolled in a health maintenance organization”; (2) a provider is “any physician, hospital, or other person, organization, institution, or group of persons licensed or otherwise authorized in this state to furnish health care services”; and (3) a subscriber is a “person who is responsible for payment to a health maintenance organization or whose employment or other status, except for family dependence, is the basis for eligibility for enrollment in the health maintenance organization.” La. R.S. 22:2002(4), (8) and (9). The function of an HMO is to “provide or arrange for the provision of basic health care semces to enrollees.” La. R.S. 22:2002(7).
A review of La. R.S. 22:2001 et seq. reflects a very strong public policy for the protection of the rights of enrollees when they contract with HMOs for health care services. The enrollee application form is provided for in extensive detail in La. R.S. 22:2026. Enrollee grievance procedures are provided for in La. R.S. 22:2022. La. R.S. 22:2018 A(l) and C require that HMO-provider contracts shall set forth that “in the event the health maintenance organization fails to pay for covered health services ..., the subscriber or enrollee shall not be hable to the provider for any sums owed by” the HMO and that “(n)o contracting provider ... may maintain any action at law against a subscriber or en-rollee to collect sums owed by” the IfflHMO.47 La. R.S. 22:2007 A provides that any director, officer, or employee of an HMO who receives, collects, disburses, or *368invests funds in connection with the activities of an HMO “shall be responsible for such funds in a fiduciary relationship to the” HMO. La. R.S. 22:2007 C provides that no asset of an HMO may be encumbered, pledged, or utilized to secure a loan or to confer a personal benefit on any officer, director, employee, agent, stockholder, or any beneficiary of any trust of any other person responsible to the HMO. See also La. R.S. 22:2, 20, 2010, and 2012-15. Finally, the legislature has conferred upon the Commissioner of Insurance the policymaking power to “promulgate such rules and regulations, as may be necessary or proper to carry out the provisions of this Part.” La. R.S. 22:2014. Pursuant to La. R.S. 22:2013 F, “[t]he commissioner shall be authorized to issue appropriate regulations to implement an orderly procedure to wind up the affairs of any financially troubled health maintenance organization.” (Emphasis added.) See 37 ADC Pt. XIII, §§ 1305-1307.
Louisiana has a vital interest in the liquidation of insolvent insurance companies which operate in the State. Brown v. ANA Insurance Group, 2007-2116, p. 4 (La.10/14/08), 994 So.2d 1265, 1267, reh’g denied, (La.1 1/21/08). Liquidation proceedings are designed to protect creditors, policyholders, and the general public. Id. The obvious purpose and public policy for the provisions on rehabilitation, liquidation, conservation, dissolution, and administrative supervision of HMOs in the Insurance Code is to ensure the HMOs give their enrollees the health care Ifiiservices contracted for, or, if not, to conserve the assets of the failing HMO as much as possible for the benefit of the enrollees.
The public policy reflected by the Louisiana constitutional provisions on insurance and the enabling legislation that has been enacted pursuant thereto reflects an extremely strong public policy to protect the basic health care needs of the people of Louisiana. This is particularly true with reference to legislation enacted to protect the health care of health insurance insureds and HMO enrollees. Lack of good health diminishes the ability of a person to enjoy life and his or her assets.
On October 7, 2002, the trial court judge rendered a judgment in the Louisiana actions that provided, in pertinent part, as follows:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Commissioner be and hereby is granted all legal and equitable relief as may be necessary to fulfill his duties as Liquidator and for such other relief as the nature of the case and the interests of AmCare’s [sic] member, enrollees, subscriber, policyholders, providers and other creditors, or the public, may require, including but not limited to the Receiver’s appointment and authorization to prosecute all action which may exist on behalf of policyholders, members, stockholders or creditors of the insurer against any existing or former officer, director or employee of Am Care [sic] or any other person.
See La. R.S. 22:733 B, 22:734, 22:734.1 and 22:736 B and C. This judgment implements the strong Louisiana public policy pertaining to insurance in general and to health care matters in particular. This judgment has not been contested in this appeal.
Because the insurance industry in Louisiana is so pervasively affected by public policymaking and is so heavily regulated, Louisiana law should be applied to an action brought by a Louisiana Receiver and/or the Louisiana Commissioner in a Louisiana court “on behalf of [Louisiana] policyholders, stockholders or creditors,” unless for a particular issue the totality of the circumstances in an exceptional in*369stance indicates that the policies of | (i2another state would be more seriously impaired than those of this state if the law of that state was not applied to that particular issue. We arrive at this conclusion after considering the following: (1) the laws of Louisiana, Oklahoma, and Texas; (2) the relationship of each of those states to the parties and the disputes; (3) the policies upholding the justified expectations of the parties; (4) minimizing the adverse consequences of subjecting a party to the law of more than one state; (5) the contacts of each state to the parties and the events that gave rise to the disputes; (6) the state in which a relationship between parties was centered; (7) the general policy of each state for deterring wrongful conduct; and (8) the general policy of each state for repairing the consequences of the injurious acts.
After considering La. C.C. arts. 3515, 3542, 3543-3544 and 3547, the following factors are most important in reaching this result. Public policy for regulating insurance in general, and that for regulating health insurance in particular, is state-specific. In an action instituted by a state insurance regulator against a person whose conduct is subject to the state’s regulations and/or against those persons who aid, abet, counsel, or procure the person regulated, it reasonably can be expected that the law of the state imposing the regulations will be applied. This is particularly true when a person engaged in providing health care coverage chooses to conduct business operations in multiple states. Cf. Boutte v. Firemen’s Fund, 2006-0034, pp. 27-28 (La.App. 3 Cir. 5/10/06), 930 So.2d 305, 322, writs denied, 2006-1482, 1484 (La.9/29/06), 937 So.2d 864; CXY Chemicals U.S.A. v. Gerling Global General Insurance Co., 991 F.Supp. 770, 777 (E.D.La.1998). Making a choice-of-law decision on this basis minimizes the consequences of subjecting a party to the law of more than one state in each state. Finally, this policy will tend to discourage forum shopping on state-tspecific^ issues like insurance. Official Revision Comments— 1991(c) for La. C.C. art. 3515; Marchesani v. Pellerin-Milnor Corp., 269 F.3d 481, 488 (C.A.5 (La.) 2001).
3. Law Applicable in the Oklahoma Case
We will apply Oklahoma law in the Oklahoma case in the same manner that we will apply Louisiana law in the Louisiana ease. AmCare-OK was incorporated in and had its principal place of business in Oklahoma. It is alleged that Health Net, AmCareco, and the Oklahoma HMO transacted business in Oklahoma and incurred obligations from activity within that state. The unpaid claims complained of in the Oklahoma case are owing and due in Oklahoma.
A keystone of the Oklahoma legal system is that liability follows tortious conduct and remedy is afforded for every wrong. The Constitution of the State of Oklahoma provides, in pertinent part:
The courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice.
Okla. Const, art. II, § 6.
The people of Oklahoma have placed regulatory supervision of the business of insurance under the jurisdiction of the Oklahoma Department of Insurance. Okla. Const, art. VI, § 22; 36 Okla. Stat. § 301. The Insurance Department is charged with the execution of all law in relation to insurance and insurance companies doing business in the state. Id. The Commissioner of Insurance is a member of *370the Executive Branch of Oklahoma state government. Okla. Const, art. VI § 1. The Insurance Commissioner is the chief executive officer of the Insurance Department. 36 Okla. Stat. § 301.
^JfijjThe system for regulating insurance conducted within the state of Oklahoma is state-specific. 36 Okla. Stat. § 301 et seq. Oklahoma insurance companies “have come to be looked upon as at least quasi-public in nature, subject to state control for the general benefit of not only the policyholders but of the public.” Oklahoma Benefit Life Association v. Bird, 1943 OK 103, ¶ 12, 135 P.2d 994, 997. Oklahoma considers the insurance industry to be a unique industry in that, unlike ordinary business corporations, insurance is highly regulated by the State. Crain v. National American Insurance Co., 52 P.3d 1035, 1039-40 (Okla.Civ.App. Div. 2, 2002). Regulation of the insurance industry is contained in 36 Okla. Stat. § 301 et seq. and reflects a strong public policy for protection of the insurance needs of the people of Oklahoma. Finally, Oklahoma has a comprehensive Health Maintenance Organization law. 36 Okla. Stat. §§ 6901 to 6936.
After consideration of the La. C.C. art. 3515 et seq. factors in the determination of which state’s law should be applied, we conclude that Oklahoma’s law should be applied to the action brought by the Oklahoma Receiver. Oklahoma is the place of the alleged conduct in the Oklahoma action wherein claims by enrollees, providers and other creditors of AmCare-OK were left unpaid, and Oklahoma is the state in which the relationship between the AmCare-OK enrollees and AmCare-OK was centered. Oklahoma has a strong policy for regulating the insurance industry, deterring wrongful conduct, and repairing the consequences of injurious acts.
The Oklahoma Receiver, jointly with the Louisiana Receiver, filed a consolidated, amended, and restated petition in these proceedings. This pleading does not cite any Oklahoma law. In the Oklahoma Receiver’s |li5appellee brief, the only Oklahoma law cited is the statutory law pertaining to the right of the Oklahoma Receiver to act on behalf of Oklahoma policyholders, members, stockholders, and creditors herein. 36 Okla. Stat. §§ 1902, 1903 and 1921.
Louisiana Code of Evidence Article 202 A was enacted by Acts 1988, No. 515, effective January 1, 1989, and provides as follows:
Mandatory. A court, whether requested to do so or not, shall take judicial notice of the laws of the United States, of every state, territory, and other jurisdiction of the United States, and of the ordinances enacted by any political subdivisions within the court’s territorial jurisdiction whenever certified copies of the ordinances have been filed with the clerk of that court. (Emphasis added.)
Comments (a) and (b) to Article 202 provide, in pertinent part, as follows:
(a) This Article essentially follows prior Louisiana law.
[[Image here]]
(b) The term “law” as used in Paragraph A of this Article includes common law as well as statutory law thus incorporating all judicial decisions that are authoritative in their respective jurisdictions, and embraces decisions that interpret or apply both the common law and statutes.[ 48]
*371As previously indicated, when construing a law, the word “shall” universally is considered to mean mandatory.
Prior to enactment of Article 202, the issue of judicial notice of the laws of other states was provided for in La. C.C.P. art. 1391, which was repealed by 1988 La. Acts No. 515 § 7. In Gathright v. Smith, 368 So.2d 679, 687 (La.1978), Article 1391 was interpreted as follows:
The first two paragraphs of art. 1391, provide us with the authority to inform ourselves, on our own initiative, and take judicial notice of foreign law, even when the foreign law’s applicability has not been called to the attention of the trial court. But see Cambre v. St. Paul Fire & Marine Ins. Co., 331 So.2d 585 (1st Cir.1976), writ denied, 334 So.2d 434 [, |66435] ([La.] 1976) (where the foreign law was not cited or relied upon in brief or oral argument). Furthermore, we recognize that the reason often stated for demanding notice in those states which require that the foreign law be pleaded, see Annot., 23 AX.R.2d 1437, 1449, is that without such notice the opponent would not be warned beforehand that the court may take judicial notice of foreign law and might not be able to prepare himself on that law. Respondent in the instant case, although not given notice of relators’ intention to rely on California law on the trial level, has been given sufficient opportunity to research the relevant law since the argument was raised in brief in the appellate court. Consequently, we may refer to. California law to determine the status of funds derived from the sale of the California property.
See also Mahmud v. Mahmud, 444 So.2d 774, 776 (La.App. 4 Cir.1984); Cambre v. St. Paul Fire & Marine Insurance Co., 331 So.2d 585, 591 (La.App. 3 Cir.1976), writs denied, 334 So.2d 434, 435 (La.1976).49
In Gill v. Matlack, Inc., 94-2546, p. 3 (La.App. 1 Cir. 10/6/95), 671 So.2d 395, 398, this Court construed Article 202 as follows:
The worker’s compensation insurance policy in this case was issued to C & S Trucking, a Mississippi corporation, by a national company, Liberty Mutual, through a Mississippi insurance agency. In contrast, Louisiana’s contact arose only after the insurance policy had been issued and after Liberty Mutual took actions to cancel the policy. Louisiana’s sole connection with this case occurred when Mr. Gill, a Louisiana resident, filed his claim in Louisiana against Matlack, a Louisiana corporation.
In light of these principles, we find that Mississippi law should be applied in determining whether this insurance policy was properly canceled.FN6
See also Kirby v. Kirby, 579 So.2d 508, 514 (La.App. 4 Cir.1991), writ denied, 582 So.2d 1308 (La.1991). The Third Circuit still follows the Cambre case. Iberia Par*372ish School Board v. Sandifer & Son Construction Co., 98-0319, p. 3 (La.App. 3 Cir. 10/28/98), 721 So.2d 1021, 1022; E & L Lumber Co., Inc. v. Ashy Enterprises, Inc., 594 So.2d 948, 949 (La.App. 3 Cir.1992).
In Maraist & Lemmon, 1 La. Civ. Law Treatise, Civil Procedure, § 11.7(5), p. 289, appears the following:
Although the Code of Civil Procedure originally provided that “[e]very court of this state shall take judicial notice of the common law and statute of every state,” the courts often held that if the law of another state applies and the parties do ■ not offer proof of that law, the court will presume that the law of the foreign state is the same as that of Louisiana. The code of Evidence now provides that “[a] court, whether requested to do so or not, shall take judicial notice of the laws of ... every state.... ” This legislative repudiation of the judicial “presumption” may, like its predecessor, have fallen upon deaf judicial ears. (Footnotes deleted.)
See also F. Maraist, 19 La. Civ. Law Treatise, Evidence and Proof, § 4.1, p. 63 (2d ed.2007).
Article 202 A is clear and unambiguous. By using the paragraph title of “Mandatory” and the verb “shall,” Article 202 requires us to take judicial notice of the laws of Oklahoma insofar as they are applicable under our conflict of laws analysis. The doctrine of jurisprudence con-stante does not require that we follow the Cambre or any other jurisprudence if it conflicts with Article 202. In our civilian system, legislation trumps jurisprudence. La. C.C. arts. 1, 2, 3 and 4; Willis-Knighton Medical Center v. Caddo-Shreveport68 Sales & Use Tax Com’n., 2004-0473, pp. 21, 25-26, 32 (La.4/1/05), 903 So.2d 1071, 1084-85, 1087-88, 1091.
D. Conclusion
Because we have ruled that Louisiana law applies in the Louisiana case and Oklahoma law- applies in the Oklahoma case, the trial court has committed reversible error by applying Texas law in those cases unless: (1) the laws of Texas and Louisiana or Texas and Oklahoma on an issue are substantially the same; (2) Texas is the only state that has an interest in the application of its law to the particular issue; (3) the policies of the State of Texas would be most seriously impaired if its law were not applied to the issue; or (4) the error is harmless.
Our decision to apply the laws of the three states as described hereinabove is fortified by the fact that Louisiana, Oklahoma, and Texas each has its own version of an HMO law. La. R.S. 22:2001 et seq.; V.T.C.A. Ins.Code § 843.001 et seq.; 36 Okla. Stat. § 6901 et seq.
VI. STANDARD OF REVIEW OF FACTS IN THE TEXAS CASE
(Assignments of error TX-1, 2, 3, 4, 5, 6, 7, 9, 11,12, 13, 14,15,16,17, 29, 33, 34 and 36)50
The standard of apfoellate review of facts in the Texas case will be determined in part by the correctness of the jury instructions that were given and by the failure to *373give essential instructions. Health Net has asserted nineteen (19) assignments of error pertaining to the jury instructions. These |,inassignments of error fall into two categories: (1) failure to properly instruct on an issue; and (2) failure to instruct on an issue.
A. The Trial Court’s Duty to Instruct a Jury
Louisiana Code of Civil Procedure Article 1792 B provides that “[ajfter the trial of the case and the presentation of all the evidence and arguments, the court shall instruct the jurors on the law applicable to the cause submitted to them.” (Emphasis added.) La. C.C.P. art. 1812 A pertaining to special jury verdicts provides, in pertinent part, that “[t]he court shall give to the jury such explanation and instruction concerning the matter submitted as may be necessary to enable the jury to make its findings upon each issue.” (Emphasis added.)
Finally, La. C.C.P. art. 1813 A pertaining to general jury verdicts provides, in pertinent part, that “[t]he court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict.” (Emphasis added.) Implicit in this language is that “... the trial court give accurate and necessary instructions based upon the facts and evidence of the case.” (Emphasis added.) Berg v. Zummo, 2000-1699, p. 13 n. 5 (La.4/25/01), 786 So.2d 708, 716 n. 5. See also Held v. Aubert, 2002-1486, p. 5 (La.App. 1 Cir. 5/9/03), 845 So.2d 625, 630; Maraist & Lemmon, 1 La. Civ. Law Treatise, Civil Procedure, § 11.10, p. 303. Because of the use of the word “shall” in these Code of Civil Procedure articles, a trial court judge has a mandatory duty to accurately instruct the jury on all necessany factual issues that the jury is required to decide based upon the facts and evidence of the case.
|7nIn Adams v. Rhodia, Inc., 2007-2110, pp. 6-8 (La.5/21/08), 983 So.2d 798, 804-05, appears the following:
Adequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues. The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury. If the trial court omits an applicable, essential legal principle, its instruction does not adequately set forth the issues to be decided by the jury and may constitute reversible error. Doyle v. Picadilly Cafeterias, 576 So.2d 1143, 1152 (La.App. 3 Cir.1991).
Correlative to the judge’s duty to charge the jury as to the law applicable in a case is a responsibility to require that the jury receives only the correct law. Melancon. v. Sunshine Construction, Inc., 97-1167, p. 6 (La.App. 1 Cir. 5/15/98), 712 So.2d 1011, 1016; Doyle, 576 So.2d at 1152.
Louisiana jurisprudence is well established that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions. Trial courts are given broad discretion in formulating jury instructions and a trial court judgment should not be reversed so long as the charge correctly states the substance of the law. The rule of law requiring an appellate court to exercise great restraint before upsetting a jury verdict is based, in part, on respect for the jury determination rendered by citizens cho*374sen from the community who serve a valuable role in the judicial system. We assume a jury will not disregard its sworn duty and be improperly motivated. We assume a jury will render a decision based on the evidence and the totality of the instructions provided by the judge.
However, when a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. In the assessment of an alleged erroneous jury instruction, it is the duty of the reviewing court to assess such impropriety in light of the entire jury charge to determine if the charges adequately provide the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its deliberation. Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. Nicholas v. Allstate Insurance Company, 99-2522, p. 8 (La.8/31/00), 765 So.2d 1017, 1023; see also Brown v. White, 405 So.2d 555, 560 (La.App. 4 Cir.1981), rev’d on other grounds on reh’g, 430 So.2d 16 (La.1983) (the question is whether the jury was misled to the extent that it was prevented from doing justice) and Jones v. Liberty Mutual |71 Insurance Company, 568 So.2d 1091, 1094 (La.App. 5 Cir.1990), writ denied, 572 So.2d 72 (1991) (reversible error occurs when the jury is misled to such an extent as to prevent it from doing justice).
Determining whether an erroneous jury instruction has been given requires a comparison of the degree of error with the jury instructions as a whole and the circumstances of the case. See Belle Pass Terminal, Inc. v. Jolin, Inc., 634 So.2d 466 (La.App. 1 Cir.), writs denied, 638 So.2d 1094 (La.1994). Because the adequacy of jury instruction must be determined in the light of jury instructions as a whole, when small portions of the instructions are isolated from the context and are erroneous, error is not necessarily prejudicial. Furthermore, the manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts. Thus, on appellate review of a jury trial the mere discovery of an eiTor in the judge’s instructions does not of itself justify the appellate court conducting the equivalent of a trial de novo, without first measuiing the gravity or degree of error and considering the instructions as a whole and the circumstances of the case. Brown, 405 So.2d at 558.
B. The Trial Court’s Duties to Rule on Requests for Jury Instructions and to Inform the Parties of Proposed Jury Instructions Prior to Arguments to the Jury
(Assignment of Error TX-33)
Health Net asserts that “[t]he trial judge clearly erred by failing to provide the parties with jury instructions and interrogatories prior to closing argument.” The Texas Receiver responds by asserting that “Health Net was given the opportunity to discuss and object to the charge the evening before the jury was charged and prior to the time that the jury was charged. Health Net’s characterization of the extent and nature of the charge conference misstates the record.” Health Net responds that it “Did Not Waive Its Right to Challenge Judge Clark’s Manifestly Defective Instructions” and it “Preserved its Objections to Judge Clark’s Instructions.”
*375This assignment of error will be discussed in three sections: (1) the right of a party to submit jury instructions; (2) the duty of a trial court to inform the parties of the jury instructions it intends to give and the verdict |7!>form it intends to use prior to giving oral arguments; and (3) the right of a party to object to proposed jury instructions.
1. Right to Submit Jury Instructions51
The Texas Receiver asserts that “Health Net waived the right to complain of any failure to submit any requested instruction, because Health Net failed to comply with the Pretrial Order for submitting its requested instructions and issues.” Health Net responds that the “actions of the court and parties reflected the fact Judge Clark had not entered an order fixing a date for submission of jury charges on pain of waiver,” “on June 28, 2005, the Receiver filed objections to Health Net’s proposed charges, but did not object on the grounds they had been untimely filed” and “the Receiver waived his right to raise this issue.”
Louisiana Code of Civil Procedure Article 1793 A provides as follows:
At the close of the evidence, or at such earlier time as the court reasonably directs, a party may file written requests that the court instruct the jury on the law as set forth in the requests. (Emphasis added.)
Louisiana Code of Civil Procedure Article 1551, entitled “Pretrial and scheduling conference; order,” provides, in pertinent part, as follows:
A.In any civil action in a district court the court may in its discretion direct the attorneys for the parties to appear before it for conferences to consider any of the following:
[[Image here]]
(8) Such other matters as may aid in the disposition of the action.
B. The court shall render an order which recites the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and which limits the issues for trial to those not disposed of by admissions or agreements of counsel. Such order controls the subsequent course of the 173action, unless modified at the trial to prevent manifest injustice.
C. If a party’s attorney fails to obey a pretrial order, or to appear at the pretrial and scheduling conference, or is substantially unprepared to participate in the conference or fails to participate in good faith, the court, on its own motion or on the motion of a party, after hearing, may make such orders as are just, including orders provided in Article 1471(2), (3), and (4). In lieu of or in addition to any other sanction, the court may require the party or the attorney representing the party or both to pay the reasonable expenses incurred by noncompliance with this Paragraph, including attorney fees.
Louisiana Code of Civil Procedure Article 1631 A, entitled “Power of the court over proceedings; exclusion of witnesses; mistrial,” provides as follows:
The court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done.
*376According to the Rules of the 19th Judicial District Court, all civil matters require a pretrial procedure which includes an order signed by the judge that states “TRIAL BRIEFS/SPECIAL JURY CHARGES AND VERDICT FORMS are to be submitted to the Court not later than _” with space to fill in the date for submission. The Rules also provide that no amendments to the pretrial order shall be made except by signed consent of all counsel or after a contradictory hearing.
The record contains numerous case management orders (CMO) issued by the trial court judge. The first mention of a CMO in the record refers to a March 11, 2004 CMO which assigns the matter for bench trial on September 28, 2004. At this time, Health Net was only a named party defendant by the Louisiana Receiver asserting contractual claims with regard to the parental guarantee. On July 14, 2004, a thirty-day extension to the CMO was ordered. On August 12, 2004, the trial court judge signed a “Judgment on J^Motions” after an August 9, 2004 “status conference.” The judgment states, “the parties will confer and submit, to the extent possible, an agreed Case Management Order for the Court’s consideration not later than September 28, 2004,” and orders a status conference be held on September 28, 2004. An “Order” memorializing the August 9, 2004 agreements was signed on August 31, 2004. The Texas intervention was filed on September 27, 2004, and Health Net was not named a party therein.
On October 7, 2004, following the September 28, 2004 status conference, a CMO was issued. Jury selection was fixed to begin on January 28, 2005, for a jury trial set for February 1, 2005. A January 25, 2005 deadline was set for the filing of a joint set of jury instructions and jury interrogatories.
Health Net was first named by the Texas Receiver as a party defendant who had tort liabilities in the Texas Supplemental and Amending Petition filed on October 15, 2004.52
On November 29, 2004, following a November 15, 2004 status conference, another CMO was issued. Jury selection was fixed to begin on April 28, 2005, and a jury trial was set for May 2, 2005. An April 22, 2005 deadline ivas set for the filing of a joint set of jury instructions and jury interrogatories. At a Monday, April 11, 2005 hearing on a motion to continue the trial date, the court set a new June 9, 2005 date for jury selection with the start of trial set for June 10, 2005. Counsel for the Louisiana Receiver stated the parties would “commit to having a revised 175CMO which backs off this date which [the trial court] can review by Wednesday.”
At a Wednesday, June 1, 2005 hearing, the trial court granted a continuance, setting jury selection for June 16, 2005, with trial on the merits to commence on June 16, 2005. The trial court stated “on June 10th [2005], the court will allow counsel to argue their verdict forms and jury charges.” Counsel for Health Net then stated, “[Counsel for the Louisiana Receiver] and I discussed this briefly yesterday and agreed to some extensions of the Case Management Order that the court has already entertained, but because the court is backing it up, could we — perhaps.... ” The court interjected, “No, no, let’s put a pin right there because there are things I want to clean up today .... [0]nce we have this streamlined trial on June 16th, it *377should go very quickly because we will have no charge conference after. We will do that beforehand. We will have all the arguments and the objections on the verdict form. You will, by that time, have submitted a consolidated verdict form. Charges twill be agreed to and writs [sic] by that point. So it will be real clean.” (Emphasis added.) Counsel for Health Net later stated, “[Counsel for the Louisiana Receiver] indicated he would submit a revision to the Case Management Order.” Counsel for the Louisiana Receiver responded, “I will do that today.” The record does not contain a submitted or signed June 1, 2005 CMO.
Health Net initially prayed for a jury trial, but on June 3, 2005, withdrew its demand. On June 9, 2005, the Texas Receiver filed a demand for trial by jury. La. C.C.P. art. 1733 C. At the Friday, June 10, 2005 conference, the trial court granted Health Net’s motion to withdraw its request and granted the Texas Receiver’s demand for a jury trial. During the June 10, 2005 conference, counsel for the Louisiana Receiver asked if the |7(icourt wanted “a formal pre-trial conference with a pre-trial order and jury instructions?” Judge Clark responded, “Yes, and I would like to have that done Tuesday [June 14, 2005].” (Emphasis added.) Counsel for Health Net added, “I think we’re supposed to submit them on Tuesday.” The trial court had ordered service of the Texas Receiver’s petition of intervention on Health Net in open court on December 28, 2004. The record does not contain additional information concerning the actual service of the Texas intervention on Health Net; however, on June 10, 2005, the trial court ordered Health Net to file its answer to the Texas intervention by June 13, 2005. Health Net filed its answer to the Texas Receiver’s intervention on June 13, 2005.
At the Tuesday, June 14, 2005 conference, counsel for the Louisiana Receiver asked Judge Clark “What is your honor’s pleasure for jury charge conference?” Judge Clark responded, “As you know, we are required by the code to have a charge conference after all the evidence has been presented, unless the parties can agree to do it at some other time. You can save some time by doing it before, before trial. Also you can save a lot of time if you agree on the — beforehand what is going to the jury, put in the bench book and let’s go with it. You can also save some time by doing a joint set of charges and a joint verdict form. And don’t put every question in America on the jury form Mr. Cullens [Counsel for the Louisiana Receiver], You need to make sure it’s real neat and real vanilla. Don’t make those jurors have to answer too many questions.” (Emphasis added.) The remainder of the June 14, 2005 conference was spent discussing stipulations on evidence, settlement negotiations with other defendants, and the admissibility of certain experts’ testimony.
177The next day, Wednesday, June 15, 2005, Health Net filed its requested jury charges. On June 16, 2005, Health Net supplemented its requested jury charges, adding one additional charge.
Before trial began on June 16, 2005, counsel for all parties signed a formal pretrial order, it was “filed into the record” and portions of it were read to the jurors. However, the record on appeal does not contain a signed pre-trial order. The record on appeal does show the parties filed original, amended and second amended proposed jury interrogatories as late as June 29, 2005, and that these proposed interrogatories were considered at a charge conference held on June 29, 2005.
The trial court’s order for a jury trial of the claims raised by the Texas Receiver *378and a bench trial for the Louisiana and Oklahoma Receivers’ claims was not issued until June 10, 2005, six clays before trial began. As late as June 14, 2005, two days before trial began, the trial judge was making suggestions to the parties concerning jury verdict forms, instructions, and a bench book for use by the jury. It is evident that at the June 14th conference, neither the trial court judge nor any of the parties believed any party had waived its right to submit jury charges. Five days after the jury trial was ordered and one day after the trial court’s comments suggesting a joint set of charges, Health Net submitted its requested jury charges. The record on appeal does not contain a pretrial order controlling the actual trial in this matter. Because the record does not show time requirements for submission of jury charges for the trial commencing on June 16, 2005, it does not support the claim that Health Net’s request for jury charges was untimely or was waived.
The trial court judge committed error by ruling otherwise.
| 7S2. Trial Court Duty to Inform Parties of Proposed Jury Instructions and Interrogatories
Louisiana Code of Civil Procedure Article 1793 B provides as follows:
The court shall inform the parties of its proposed action on the written requests and shall also inform the parties of the instructions it intends to give to the jury at the dose of the evidence within a reasonable time prior to their arguments to the jury. (Emphasis added.)
Comment — 1983(b) for Article 1793 provides as follows:
Article 1793 as amended in 1983, requires the court to inform the parties of its decision upon their written requests. The 1983 amendment also requires the court to inform the parties of the instructions it intends to give to the jury. In addition, this information is to be given to the parties in sufficient time to enable them to make the appropriate arguments to the jury. (Emphasis added.)
Louisiana Code of Civil Procedure Article 1812 B pertaining to special verdict forms provides as follows:
The court shall inform the parties within a reasonable time prior to their argument to the jury of the special verdict form and instructions it intends to submit to the jury and the parties shall be given a reasonable opportunity to make objections. (Emphasis added.)
Comment — 1983 (a) for Article 1812 provides as follows:
The 1983 amendment adds the requirements that the court inform the parties of the verdict form it intends to use and that the parties be given an opportunity to make objections. This is presently done with respect to jury instruction, and the same principles of fairness should apply to verdict forms. (Emphasis added.)
Louisiana Code of Civil Procedure Article 1813 B pertaining to general verdict forms provides as follows:53
The court shall inform the parties within a reasonable time prior to their arguments to the jury of the general verdict form and instructions it intends to submit to the jury, and the parties shall be given a reasonable opportunity to make objections. (Emphasis added.)
17<)These Code articles impose mandatory duties of fundamental fairness *379on trial court judges in the conduct of jury trials.
3. Right of a Party to Object to Proposed Jury Instructions
Louisiana Code of Civil Procedure Article 1793 C provides as follows:
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the heaving of the jury. (Emphasis added.)
In McCrea v. Petroleum, Inc., 96-1962, pp. 6-7 (La.App. 1 Cir. 12/29/97), 705 So.2d 787, 791, appears the following:
Additionally, we note that the trial court is required to instruct the jurors on the law applicable to the cause submitted to them, pursuant to LSA-C.C.P. art. 1792(B). In a jury trial, the judge has a duty to charge the jury as to the law applicable in a case and the correlative right and responsibility to require that the jury get only the correct law. It is the judge’s responsibility to reduce the possibility of confusing the jury, and he or she may exercise the right to decide what law is applicable to prevent counsel from arguing law which the trial judge deems inappropriate. (Emphasis added.)
When construed together, La. C.C.P. arts. 1792, 1793, 1812, and 1813 impose a mandatory duty of fundamental fairness on the trial court when it is instructing a jury. The parties have the right to request that the court give specified instructions to the jury. A party may recognize the necessity for giving an essential instruction when the court does not. The court has a mandatory duty to act on a proposed instruction and inform the party proposing it of the court’s action witlrin a reasonable time prior to the time the parties present their arguments to the jury. This gives the party the opportunity to timely object to the action of the court if it is necessary.
The court also has a mandatory duty to inform the parties of the instructions it intends to give the jury within a reasonable time prior to the \ mtime the parties present their arguments to the jury}54 This gives the parties the opportunity to object and give reasons for a possibly erroneous proposed jury instruction before it is given to the jury. The above procedure is designed to minimize the risk of an inappropriate and/or prejudicial instruction being given to the jury. Finally, this procedure allows the parties to tailor their arguments to the jury in accordance with the law given by the judge.
The record on appeal shows that on June 29, 2005, a charge conference was started. However, at that time, only jury interrogatories submitted by the parties were considered and discussed.
The record on appeal further shows that on June 30, 2005, the trial court judge advised the parties that “[t]he court has confected the interrogatories it intends to use. They are in very rough draft form and not typed yet but they are about ten in number and the court may modify them to a certain degree, but not a substantial degree.” The court then proceeded to read the ten proposed interrogatories to the parties. These interrogatories are es*380sentially the same as those read to the jury.55 Counsel for Health Net objected to interrogatory number 2 pertaining to the “fault” of third persons and/or companies because it provided for in globo (group) findings rather than listing each person or company. Counsel for Health Net also objected to the failure to have interrogatories on superseding cause, aiding and abetting, and judicial confession. Health Net did not object to being advised verbally of the proposed interrogatories, and it had a reasonable opportunity to make objections and did so.
|,si This portion of Health Net’s assignment of error 33 is without merit.
With reference to Health Net’s assignment of error 33 insofar as it pertains to the failure of the trial court judge to provide the parties with the jury instructions prior to closing arguments, the record on appeal shows the following:
MR. BIECK [Counsel for Health Net]: One small matter to cover the record. We would like to enter an objection to the fact that we have not handled the charges until before closing.
THE COURT: I beg your pardon? '
MR. BIECK: I said we would like to object to the failure to discuss the charges before closing.
THE COURT: Let’s stop the closing and discuss them. Proceed.
MR. BIECK: Your Honor, we don’t know what charges the court is going to submit.
THE COURT: I don’t either, but go ahead and discuss them. This is a charge conference. You may discuss them.
MR. BIECK: Your Honor, we have submitted charges yesterday, those were amended charges that basically track—
THE COURT: Untimely, untimely.
MR. BIECK: I understand. We will also have pending — we also have timely submitted charges. These are simply cleaned-up charges that—
THE COURT: All the charges were untimely submitted way after the order in the case management schedule.
MR. BIECK: Your Honor, we did submit timely charges.
THE COURT: No, Sir, they were untimely. All charges with [sic] untimely filed. Nonetheless, the court has read them, but they were untimely filed. Now tell me specifically what your objection is. Now, you’re having a charge conference. This is our second charge conference.
MR. BIECK: Yes, Your Honor. Our objection is that we have not determined what the charges are piior to closing.
ls2THE COURT: Well, go ahead. You determined what you wanted to submit. You only did that yesterday.
MR. BIECK: No, we submitted an initial round of charges timely, I believe, several weeks ago, in keeping with the court’s order.
THE COURT: They were due way more than several weeks ago. But, in any event, I don’t want to waste a lot of the jury’s time on this, so go ahead and put your objections on the record, which laws you do not think apply and what you think applies. Just go right ahead.
MR. BIECK: Your Honor, we have submitted charges—
THE COURT: Make your record. I’m letting you make a record.
MR. BIECK: That’s what I am doing. We submitted charges one hundred through one hundred and three, and ive object to the failure to specify *381which■ of those charges i-uill or will not be submitted to the jury.
THE COURT: What does one hundred say? You go down all of them because I want to make sure that the record reflects what the court is actually faced with at this juncture.
MR. GEORGE [Counsel for the Texas Receiver]: They submitted those charges Friday last, during trial.
MR BLACK [Counsel for Health Net]: We did submit timely originally, Your Honor. We supplemented just like they did during the trial.
THE COURT: They were untimely. All the pleadings have been submitted untimely on both sides, counselor. The good news is that the court has stamped them all in and the court of appeal will be able to see they were untimely filed. This case management order was issued several months ago. The court did not extend it, did not extend it, and these pleadings are untimely filed.
But, nonetheless, the court did read them and, considered them and, still considered, them, but there is only so much you can do simultaneously. This court was in session last night until almost eight o’clock. The court started this morning [at] quarter to seven. So put your complaints on the record one by one. Go down them.
MR. BLACK:' I’m sorry, Your Hon- or. It’s just hard to know what to object to when, we don’t know what, the charges are that you’re going to present to the jury.
IssiTHE COURT: Well, that, is exactly ■what you presented to the court. Let’s go doum them, one by one.
MR BLACK: Yes, ma’am.
MR BIECK: All right. Defendants requested charge number one. We object to not—
THE COURT: What does number one say?
MR BIECK: When you retire for your deliberations, you may take with you, if you wish, a complete copy [of] all my instructions to you, or you may ask for a copy to be sent to you later. You may also ask to have in the jury room any document that has been admitted into evidence if you think physical examination of that document or object will help you reach a verdict.
THE COURT: Well, you may be advised that the substance of that will be conveyed to the jury.
MR. BIECK: Charge number two, you must deliberate on this case without regard to sympathy, prejudice, or passion for or against any party to this suit. This means—
THE COURT: You may be advised further that the substance of that will be included in the court’s general charges.
MR BEICK: Charge number three, the evidence which you are to consider consists of the testimony of the witnesses and the documents that have been admitted into evidence and any—
THE COURT: Here’s what you, need, to do. You look at Alston Johnson’s charges and you, go down them and, delete those that do not comport with those and we will go on from there and, pick this up. Meanwhile. I’m going to let Mr. George do his opening statement but you can go d,o that. All right Mr. Bailiff, let’s bring the jury in. It’s a quarter to ten and I had wanted to start early today so they would have a chance.
REPORTER’S NOTE: Jury in, polling waived by all counsel. (Emphasis added.)
After the jury returned, the parties gave their closing arguments. When the closing arguments were concluded, the jury was released to go to lunch. The court re*382mained in session, and the trial court judge advised the parties that “[t]he next matter we need to address is the final law to be read to the jurors.” During this session of court, counsel for Health Net objected |s4to the fact that the proposed jury interrogatories did include interrogatories pertaining to prescription or per-emption. Thereafter, the record on appeal reflects the following:
THE COURT: Let the record also reflect I have not received that one. I got a copy of the amended, the second amended, and I went through the last two hours again of proposed instructions and interrogatories and I didn’t see a peremption one. Be that all as it may, I think the court is constrained to read to the jury that which will fairly place the evidence at issue and I think the court is prepared to do so. Ready to proceed?
MR BLACK: [Counsel for Health Net] Have you finished the jury charges?
THE COURT: No.
MR. BLACK: Okay. I was just wondering if we could see them before we start.
THE COURT: No, but you can pull your code out. I’m going to integrate them as I go.
MR. BLACK: Okay.
MR. BIECK: [Counsel for Health Net] I think we need to go on the record out of the hearing of the jury about the jury charges, do we not, under Article 1793?
THE COURT: I think you have been on the record, counselor, on the same issue.
MR. BIECK: Your Honor, as I read Article 1793, and the jurisprudence, we have to make specific objections to the charges given or charges omitted, otherwise we waive them.
THE COURT: Make your objection. I thought you made an objection.
MR. BLACK: Your Honor, we didn’t know what the jury charge is going to say. We don’t know what you are going the [sic] read to the jury.
THE COURT: All right. So what is your objection?
MR. BIECK: Well, under Article 1793 of the code, we have an obligation to object prior to the charges being given to the jury and we have to give specific objections.
THE COURT: Give them.
[ ¡¿MR. BIECK: But ive don’t know what you’re going to read.
THE COURT: Counselor, you can put any objection specifically on the record that you deem expedient.
MR. BIECK: Your Honor, I will be as brief as possible, but I have got a lot.
THE COURT: Go ahead and put them on the record.
MR. BIECK: To the extent the court will not give or does not give proposed jury charge number fourteen, we object on the grounds-—
THE COURT: What does number fourteen say?
MR. BIECK: Fourteen says that if a party makes an admission in a document filed with the court in the case it’s called a judicial confession. It means the admission made in that type of document is full proof against the party making it. Therefore, when a defendant has admitted a fact that has been alleged by a plaintiff in a document filed with the court in this case, that admission is binding on both the plaintiff and defendant.
THE COURT: Well, the court will not read that instruction being firmly of the opinion that that is not the law in this case.
*383MR. BIECK: The authority is Hibernia National Bank v.—
THE COURT: You know, Mr. Bieck, I’m not going to let you waste all this jury time. You may be seated and once the case goes to the jury, the court will allow you to go on the record and malee all the objections you ivant. Right now it’s grossly unfair to keep that jury waiting.
MR. BIECK: We object to not being able to make our objections prior to the jury being charged. I will sit down.
THE COURT: All right. Bring in the jury, please, Mr. Jackson.
REPORTER’S NOTE: Jury in, polling waived by all parties.
THE COURT: Court will come to order. (Emphasis added.)
|R(jThe trial court judge then gave the charges to the jury. After the jury was retired to deliberate, the trial court judge instructed the clerk “to fully reduce to writing and transcribe the charges that have been read to the jury, certify them and give a copy to all counsel.”
While the jury was deliberating, there was a request from the jury for a copy of the instructions, several exhibits, and a witness’s testimony. The jury was given the instructions and the exhibits but not the testimony. Deliberation continued and the jury subsequently propounded a question to the court pertaining to one of the interrogatories, and the court provided an answer. While the juiy continued to deliberate, Health Net made numerous objections to the jury instructions. The jury instructions were not amended and no other instructions were given to the jury prior to the time that the verdicts were returned.
Louisiana Code of Civil Procedure Article 1798 B is clear and unambiguous in providing that “[t]he court ... shall ... inform the parties of the instructions it intends to give to the jury at the close of the evidence within a reasonable time pri- or to their arguments to the jury.” (Emphasis added.) This is a mandatory duty. The trial court judge refused to comply with this duty even though she was repeatedly asked to do so. Health Net was unable to properly comply with La. C.C.P. art. 1793 C because of the trial judge’s conduct. This is prejudicial error, and this portion of assignment of error has merit. In the particular factual posture of this case, Health Net did not waive its right to object to a particular instruction and all of the objections made by Health Net immediately after the charge and thereafter are timely. Davis v. United Parcel Serv., Inc., 427 So.2d 921, 924 (La.App. 3 Cir.1983), writ denied, 433 So.2d 1053 (La.1983).
This portion of the assignment of error has merit.
|S7C. Patent Jury Instruction Error
As previously indicated, a trial court judge has a mandatory duty to accurately instruct the jury on all essential factual issues it is required to decide based upon the evidence in the case. Whether this is done is a question of law. Thus, where there is a “plain and fundamental” (patent) error in the giving or not giving of an essential jury instruction or interrogatory, the contemporaneous objection rule does not apply and an appellate court may recognize and review the issue de novo. Adams, 2007-2110 at pp. 6-8, 983 So.2d at 804-05; Berg, 2000-1699 at p. 13, 786 So.2d at 716; Nicholas v. Allstate Ins. Co., 99-2522, pp. 6-10 (La.8/31/00), 765 So.2d 1017, 1022-1024; Held v. Aubert, 2002-1486, pp. 4-5 (La.App. 1 Cir 5/9/03), 845 So.2d 625, 630; Jones v. Peyton Place, Inc., 95-0574, pp. 10-11 (La.App. 4 Cir. 5/22/96), 675 So.2d 754, 760-761. Cf. Branch-Hines v. Hebert, 939 F.2d 1311, *3841317 (C.A.[La.] 1991); Colburn v. Bunge Towing, Inc., 883 F.2d 372, 377 (C.A.[Miss.] 1989). Such a ruling is issue specific. Knight v. First Guar. Bank, 577 So.2d 263, 270 (La.App. 1 Cir.1991), writs denied, 581 So.2d 688 and 690 (La.1991).
D. Jury Instruction and Interrogatory Errors
1. Failure to Give Instruction
a. Sham Sale
(Assignment of Error TX-9; Proposed TX Jury Instructions 35, 62, 72 and 85)
As will be discussed in greater detail in Part IX of this opinion, the factual issue of whether the Stock Purchase Agreement executed by Health Net and AmCareco on November 4, 1998 is a sham is one of the most important factual issues in this case. If this contract is not valid, the legal relations between Health Net and AmCare-TX and its creditors are substantially different than if it was valid.
IsaHealth Net asserts that it “proposed numerous instructions distinguishing the pre-sale versus post-sale time periods regarding such critical matters as duties, conduct, causation and damages ... because each liability claim contained two chronologically distinct theories: one based on the 1999 sale, and the other based on Health Net’s status years later as a supposed controlling shai'eholder.” Health Net further asserts that “the Receiver claims the whole trial was about whether any sale ever occurred.... ” Although “the Receiver pursued two conceptually and chronologically distinct theories regarding each of her claims,” the trial court judge submitted only a single, comin-gled interrogatory on each claim to the jury. Health Net asserts this was error because without separate disjunctive interrogatories (alternative, “or”), there is no way to know “which component of each claim the jury relied on, making it impossible to determine whether it based its findings on a proper legal theory.”
The Texas Receiver responded, in part, as follows:
Because the date and even the nature of the transaction were disputed issues at trial, the Court could not have devised the instructions and interrogatories desired now by Health Net. Those instructions and interrogatories would have required or at least implied Health Net’s position — that it successfully “sold” its liability in the HMO to AmCa-reco on a particular date. Judge Clark correctly refused to make these implicit factual rulings and left the issue to the jury. (Emphasis added.)
After noting that “the form in which instructions and jury interrogatories are given is probably a matter of procedure to be governed by Louisiana law,” out of an abundance of caution, the Texas Receiver cited the following Texas authorities to support her argument: (1) Rule 277 of the Texas Rules of Civil Procedure; (2) Crown Life Ins., Co. v. Casteel, 22 S.W.3d 378, 388 (Tex.2000); and (3) Formosa Plastics Corp. v. Kajima Int’l, Inc., 216 S.W.3d 436, 455 (Tex.App.-Corpus Christi 2006).
IsoThe Texas Receiver correctly observes that “the nature of the transaction” was a disputed factual issue. However, we do not agree that the trial court judge “could not have devised the instructions and interrogatories” appropriate for the jury to decide this factual issue (sham) and those other factual issues that are controlled by whether or not the transaction is a sham.
Rule 277 of the Texas Rules of Civil Procedure provide, in pertinent part, as follows:
In all jury cases the court shall, whenever feasible, submit the cause upon *385broad-form questions. The court shall submit such instructions and definitions as shall be 'proper to enable the jury to render a verdict.
[[Image here]]
The court may submit a question dis-junctively when it is apparent from the evidence that one or the other of the conditions or facts inquired about necessarily exists. (Emphasis added.)
In the Opinions of the Subcommittee on Interpretation of Rules following Rule 277 appear the following opinions:
Disjunctive submission
Although Rule 277 provides that “the court may submit disjunctively in the same question two inconsistent issues” where it is apparent that one or the oth&r of the facts inquired about necessarily exists, such issues may be submitted disjunctively in two separate questions, since under Rule 1 the new rules should be given a liberal construction. For example, in a workmen’s compensation case, an issue may be submitted inquiring if the disability is permanent, followed by a separate issue inquiring if the disability is temporary, prefacing the issue by: “If you have answered the foregoing question ‘yes’ you need not answer the following issue, but if you have answered the foregoing question ‘no’ you shall answer the following issue.” 8 Texas B.J. 281 (1945).
Instructions and explanations
In a case where the fact issue is whether an instrument is a mortgage or a deed, the trial court would not be authorized to instruct the jury “You are instructed that evidence relied on for the pmpose of affixing the character of a mortgage to a deed 19aabsolute must be clear, strong and convincing.” Rule 277 does not contemplate such a general charge. Johnson v. Zurich General Accident & Liability Co., 1947, 146 T. 232, 205 S.W.2d 353, 11 Texas B.J. 276(1948). (Emphasis added.)
It is arguable that the law of Texas and that of Louisiana are essentially the same on this particular issue. Pursuant to Rule 277 “[t]he court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict.” As previously indicated in Part VI, Sections B and C of this opinion, in Louisiana a trial court judge has a mandatory duty to accurately instruct the jury on all essential factual issues it is required to decide based upon the evidence in the case. As previously indicated, if the law of both states is the same, there is no conflict and the law of either state applies.' Further, even though the instructions given by a trial court judge are an accurate statement of the law on a particular issue, if facts are presented at trial that require more precise charges be given for the jury to properly do its duty, the trial court is obligated to give those instructions. Boncosky Services, Inc. v. Lampo, 98-2239, pp. 7-12 (La.App. 1 Cir. 11/5/99), 751 So.2d 278, 284-287, writ denied, 2000-0322 (La.3/24/00), 758 So.2d 798. The issue of whether the transaction is a sham and other issues in this case are such issues.
If there is a conflict between the laws of Texas and Louisiana on the question of how to instruct the jury and submit the issue to it, Louisiana law applies. In Wooley, 2005-2025 at p. 17, 944 So.2d at 678, appears the following:
When an action is filed in a state asserting that a cause of action accrued in another state, the applicable state law is determined by whether the issue involved is a matter of substance (right) or a matter of procedure (remedy). The substantive rights of the parties are determined by the law of the state where the cause of action arose; matters of pro*386cedure are determined by the law of the forum, i.e., the place where the action is filed. The court of the forum, subject to the limitations 191of the federal constitution, determines whether the question involved is one of substance or procedure.
[[Image here]]
Substantive laws establish or change substantive rules, rights and duties; procedural laws prescribe a method for enforcing a substantive right and relate to the form of the proceeding or the operation of the laws. (Citations omitted.)
As discussed in Part VI, Sections A and B of this opinion, civil jury trials in Louisiana are provided for in Chapter 7 — Jury Trial, of Title V — Trial, of the Louisiana Code of Civil Procedure. In particular, charging the jury is provided for in Section 4 — Procedure in Jury Trials, of Chapter 7 and jury verdicts are provided for in Section 5 — Verdicts, of Chapter 7. The issues of charging the jury and the form and content of the jury verdict are issues pertaining to how the litigation is conducted (how the substantive law is presented to the jury for their factual findings) and are procedural issues determined by the law and jurisprudence of the forum (Louisiana). The Boncoskij case previously cited is the latest expression of this Circuit this issue of jury charging and verdict questions, and it will be followed hereinafter.
The parties have conceded and the record reflects that the issue of whether the transaction was a sham was factually disputed at trial. The trial court judge refused to submit this critical factual dispute to the jury for a decision. Nevertheless, as will be discussed in greater detail hereinafter, the trial court judge based her judgments against Health Net in the Louisiana and Oklahoma cases on the factual conclusion that the transaction was a sham. Obviously, the trial court judge considered this an essential factual issue in the case; we agree.
The common law sham transaction and the Louisiana absolute simulation are essentially the same for purposes of these proceedings. Each [i)2is a contract that produces no legal effects between the parties. Corbin on Contracts, § 58.19; 37 Am.Jur. 2d, Fraudulent Conveyances and Transfers, § 37; 67 Am.JüR. 2d, Sales, §§ 293 and 420; Black’s, supra at 1380 and 1389; La. C.C. art.2025 et seq.
During the trial, the plaintiffs presented the testimony of Philip Preis, who was qualified as an expert witness in the field of corporate finance and complex corporate transactions and who testified that the sale was a sham transaction. Neither the Texas Receiver nor Health Net submitted a written request for a jury interrogatory on the sham issue. During oral argument, counsel for the Texas Receiver argued to the jury that the sale was a sham. The trial court did not instruct the jury on the law of what constitutes a sham transaction or submit an interrogatory to the jury on the sham issue.
However, the trial court judge did submit the following two interrogatories to the jury:
1. Do you find by the preponderance of the evidence that the defendant Health Net, Inc. was at fault in the transactions at issue with the Texas HMO?
[[Image here]]
2. Do you find by the preponderance of the evidence that any other person or company was at fault in the transactions at issue with the Texas HMO? (Emphasis added.)
While it was deliberating, the jury propounded several questions to the Court. One question pertained to “the actual sale *387transaction” and the record shows the following:
THE COURT: You may be seated. The jury propounds the following question to the court. The transactions at issue with the Texas HMO, is this the actual sale transaction along with all transactions that occurred after?
MR. PERCY: [Counsel for Health Net] Your Honor, if you recall that is why we had a problem with the interrogatory as stated.
| n,MR. HOHMANN: [Counsel for the Louisiana Receiver] The transactions.
MR. PERCY: They don’t know what the transactions are.
THE COURT: That’s for them to decide.
MR. PERCY: Transactions, I think is the question, what transactions.
THE COURT: The transactions at issue with the Texas HMO, is this the sale, they put quote marks, transaction along with all transactions that occurred after.
MR. GEORGE: [Counsel for the Texas Receiver] What is the question?
THE COURT: The question is the jury propounds the following question, number one, the transactions at •issue with the Texas HMO, is this the actual, quote, sale, 'unquote, transaction along with all the transactions that occurred after.
MR. GEORGE: And the answer is?
THE COURT: That is what we are talking about here.
MR. GEORGE: I think it is yes.
THE COURT: I think it is.
MR. HOHMANN: I do too.
MR. PERCY: We obviously don’t and that’s why we had a 'problem with way [sic] the interrogatory ivas — if you get a yes answer, what is the answer to ivhich transaction?
THE COURT: The question is the transactions at issue with the Texas HMO, is this the actual, quote, unquote sale transaction along with all transactions that occurred after.
MR. McKERNAN: [Counsel for the Texas Receiver] Yes.
THE COURT: This case is about the deal between plaintiff and defendant with respect to—
MR GEORGE: The whole thing.
MR. HOHMANN: All dealings.
THE COURT: That’s what I thought.
JaMR. PERCY: Well obviously, Judge, there are not allegations about any other dealings after the sale and, that was the issue.
THE COURT: The problem is they have to define when the sale was. There is testimony that the sale occurred on April 30th and then there is testimony that the sale occurred on May 3rd and then there’s testimony that the sale occurred on May 4th. They have to make the determination of what is before and after. It would have been patently unfair for this court to propound an interrogatory to them saying, number one, this is a sale, this is a loan, this occurred on that date and this occurred on tltat date. And I didn’t want to do that. That is prejudicial to the defendants and I would not be put in that position. So ivhether it’s a sale or not is for them to decide. I don’t know if it’s a sale.
MR. PERCY: All I am suggesting is that the interrogatory is confusing to the jury for that reason.
THE COURT: All right
MR. PERCY: It’s obviously confusing to the jury for that reason. That’s my only objection.
*388THE COURT: I just think they want a clarification, which is not unusual. They normally send four or find notes out for clarification. So the reason we are having this discussion is to make a determination as to how they should be further instructed. I think the answer would be yes, but I thought it would be better to say that includes — the deal is between plaintiff and defendant surrounding this event.
MR. PERCY: Then, perhaps, as you originally stated, that is for the jury to decide. And maybe the response to the jury is, that is for you to decide.
THE COURT: I have no problem with doing that if both sides agree. Both sides agree?
MR. McKERNAN: Yes. To say yes?
THE COURT: Mr. Percy suggests that we advise the jury that that is for them to decide.
MR. GEORGE: I don’t have — that is ultimately what it is. The transaction includes all transactions involved in this case but you can say that is yes or that you have to decide what all the transactions are.
THE COURT: All right, Mr. Percy?
JmMR. PERCY: I’m sony, Your Honor. Could he repeat that?
MR. GEORGE: You have to decide what all the transactions are.
MR. PERCY: Then the problem there in if there are various issues depending on what the transaction is, there should be separate questions as to each transaction.
THE COURT: Well, it didn’t say that in this code, Mr. Percy. It didn’t say that.
MR.McKE RNAN: That is why you should say yes. I don’t think we should start breaking it down like that this late.
THE COURT: Bring in the jury.
REPORTER’S NOTE: Jury in, polling waived by all parties.
THE COURT: Ladies and gentlemen of the jury, question one is propounded to the court by the jury and is as follows. The transactions at issue with the Texas HMO, is this the actual, quote, sale transaction along with all transactions that occurred after? The court has discussed tins matter with counsel and counsel agrees that is for you to decide. All right? You may be retired. (Emphasis added.)
Determining factually whether the sale was a sham transaction is critically important in fixing Health Net’s exposure for liability in its capacity as a shareholder in AmCare-TX or AmCareco. In Texas, a major purpose of the corporate structure is to shield shareholders from the liabilities of the corporation in which they own shares and a person (natural or juridical) may incorporate a business for the sole purpose of escaping liability for the debts of the corporation. Willis, 199 S.W.3d at 271-73. The exposure for liability of a controlling or other type of shareholder in a corporation in Texas is very limited. Tex. Bus. Corp. Act art. 2.21, recodified as Tex. Bus. Org. §§ 21.223-226 (hereinafter referred to as Article 2.21). See the detailed discussion of liability pursuant to Article 2.21 in Part VI, Section D2a of this opinion.
| ¡MjPrior to the effective date of the sale, FHC (Health Net’s predecessor) owned one hundred percent (100%) of the stock in the Texas HMO. In this corporate posture, FHC’s exposure for liability as a shareholder was that provided for in Article 2.21. If the sale was valid and not a sham, the legal relations between Health Net, AmCare-TX, and AmCareco were changed and the following things occurred when the sale became effective: (1) Health Net transferred the ownership of all of its *389stock in AmCare-TX to AmCareco; (2) Health Net ceased to be a shareholder in AmCare-TX and ceased to be exposed to liability as a shareholder of AmCare-TX pursuant to Article 2.21; (3) Health Net acquired ownership of forty-seven percent (47%) of the shares of stock of AmCareco; and (4) Health Net became exposed to liability as a shareholder in AmCareco pursuant to Article 2.21.
The Texas Receiver brought the Texas action “on behalf of AmCare-TX, AmCare Management, the claimants who assigned their proof of claims, and the other creditors of AmCare-TX and AmCare Management.” Tex. Ins.Code art. 21.28. This action ivas not brought on behalf of AmCa-reco and its creditors. In this action, Health Net has no exposure for liability to AmCareco or its creditors because no claim has been made herein by, or on behalf of, AmCareco and/or its creditors.
If the sale was a sham and did not change the legal relations between Health Net, AmCare-TX, and AmCareco, the following legal relations remained in effect after the effective date of the agreement: (1) Health Net still owned one hundred percent (100%) of the AmCare-TX stock; (2) Health Net’s exposure for liability as a shareholder in AmCare-TX was as provided for in Article 2.21; (3) Health Net was not a shareholder in |g7AmCareco; and (4) AmCare-TX was not a -wholly-owned subsidiary of AmCareco.56
As set forth in greater detail in Part IX of this opinion, there is conflicting evidence in the record concerning the issue of whether the contract is a sham. The jury in the Texas case could not have factually concluded that the sale was a.sham because it was not instructed on the legal definition of a sham and was not given an interrogatory to factually reach that conclusion; the case necessarily was decided by the jury on other factual grounds. However, the trial court judge in her reasons for judgment in the Louisiana and Oklahoma cases stated the following factual conclusions: (1) AmCareco57 was “a shell corporation created for the sole purpose of divesture of the three orphan HMOs”; (2) Health Net “simulated a transfer encroached in terms of sale”; and (3)“Health Net wholly owned the HMOs before, during, and after the purported sale.”
The trial court judge found the sham issue to be factually essential and controlling in the Louisiana and Oklahoma cases; the jury did not consider it. As previously indicated, a trial court judge has a mandatory duty to correctly instruct the jury on all essential factual issues necessary to decide the case. The jury should have been given this issue to decide in the Texas case.
Failure to do so was patent error.
b. Piercing the Corporate Veil — Single Business Enterprise
(Assignment of error TX-7; proposed TX Jury Instructions 16, 34 and 37)
| asThe trial court judge’s factual findings and reasons for judgment in the Louisiana and Oklahoma cases reflect that in response to the question of what are “the legal and factual basis for holding the HMOs were a single business enterprise,” the court responded “[T]his court finds that Health Net, Am,Careco operated as a single business enterprise.” The record on appeal further reflects that the trial court judge did not instruct the jury on *390what constituted a single business enterprise (hereinafter sometimes referred to as “SBE”) and did not submit an interrogatory to the jury on this issue. This SBE issue is relevant in two disjunctive (alternative) factual settings: (1) when the sale is a sham; and (2) when the sale is not a sham.
Health Net asserts that the trial court judge erred by refusing to instruct the jury that AmCareco and the three HMOs operated as a single business enterprise and that the $8.5 million investor capital raised by AmCareco was available to decide “whether the HMOs were solvent.” If the jury had been so instructed “they would have had to conclude the HMOs were not statutorily impaired.” Further, “throughout the proceedings the three Receivers had asserted AmCareco and the HMOs were a single business enterprise” and at a pretrial hearing “Judge Clark ‘found’ that AmCareco and the HMOs were a single business enterprise, and used that finding as the foundation for her decision to apply Texas law in all three cases.” However, Health Net points out the Receivers were allowed to claim that the solvency of each HMO had to be determined by its assets only and “Health Net was not permitted to aggregate the assets of the fourth member of the enterprise, AmCareco, to demonstrate there was no shortfall.” Since the Texas Receiver has asserted the single business enterprise doctrine “offensively” to prove liability on the part of Health Net, Health Net argues 1 Mshe has opened the door for Health Net to use this doctrine “defensively” to show that there is no liability.
The Texas Receiver responds that “Health Net’s suggestion that the HMOs met the statutory minimum capital requirements after the cash sweep is not supported by any evidence adduced at the trial.” The Texas Receiver then asserts that even if the HMOs were part of a “single business enterprise” based in Texas, they were still individually regulated by their respective states and were each required to maintain the net unrestricted assets required by the particular state that regulated them, so that each HMO individually could be assured of paying the claims submitted to that particular HMO by its providers, em-ollees and creditors.
The Texas Receiver further contends that “[e]ven if assets are aggregated, however, the evidence clearly shows that the HMOs were still rendered insolvent by the cash sweep.” The Texas Receiver then concludes that “[finally, even if the assets of the various AmCare entities could be aggregated and even if after aggregation, the HMOs were not immediately insolvent after the case sweep, the fact remains that because of Health Net’s fraud and self-dealing, the HMOs were left with millions of dollars less in capital than Health Net had.”
The only issue in this assignment of error is whether there is sufficient evidence of record to justify giving the instruction. The single business enterprise theory in Texas is an equitable doctrine used to disregard the separate existence of corporations for liability purposes when the corporations are not operated as separate entities and integrate their resources to achieve a common business purpose. If a single business enterprise factually exists, and legally applies in a particular case, the corporations involved in the enterprise are jointly and/or vicariously liable |innfor the obligations of each other. Southern Union Company v. City of Edinburg, 129 S.W.3d 74, 86-90 (Tex.2003); Formosa Plastics Corp. v. Kajima International, Inc., 216 S.W.3d 436, 459-464 (Tex.App.Corpus Christi-Edinburg 2006); 2 Tex. Prac. Guide Bus. & Com. Litig. §§ 13:52, 13:53 and 13:66; Prosser & Kee-*391ton on the Law of Torts § 72 (5th ed.1984). The laws of Texas and Louisiana on what constitutes a single business enterprise are substantially the same. Bujol v. Entergy Services, Inc., 2003-0492, pp. 13-14 (La.5/25/04), 922 So.2d 1113, 1127-1128; Town of Haynesville v. Entergy Corp., 42,019 (La.App. 2 Cir. 5/2/07), 956 So.2d 192, 196; Andry v. Murphy Oil, U.S.S., Inc., 2005-0126, pp. 15-16 (La.App. 4 Cir. 6/14/05), 935 So.2d 239, 249-250, writ denied, 2006-2256 (La.12/8/06), 943 So.2d 1093; Amoco Production Co. v. Texaco, Inc., 2002-240, pp. 13-17 (La.App. 3 Cir. 1/29/03), 838 So.2d 821, 832-34, twits denied, 2003-1102, 2003-1104 (La.6/6/03), 845 So.2d 1096; Grayson v. R.B. Ammon and Associates, Inc., 99-2597, pp. 15-23 (La.App. 1 Cir. 11/3/00), 778 So.2d 1, 13-16, writs denied, 2000-3270, 2000-3311 (La.1/26/01), 782 So.2d 1026, 1027 (holding that clear and convincing evidence is required to prove a single business enterprise). Simplistieally, the Receivers want to use the SBE doctrine to make Health Net vicariously liable for any torts committed by AmCareco and the three HMOs, and Health Net wants to use it to show that collectively AmCareco and the three HMOs were solvent and initially met regulatory financial requirements. SBE also was asserted as relevant to maximize the number of persons to whom fault had to be individually allocated.
In Fomiosa Plastics Corp., 216 S.W.3d at 460, appears the following:
| l01 Factors to be considered in determining whether separate corporations should be treated as one enterprise include: (1) common employees; (2) common offices; (3) centralized accounting; (4) payment of wages by one corporation to another corporation’s employees; (5) common business name; (6) services rendered by the employees of one corporation on behalf of another corporation; (7) undocumented transfers of funds between corporations; and (8) unclear allocation of profits and losses between corporations.
In Southern Union Co., 129 S.W.3d at 86-87, the Texas Supreme Court observed as follows:
This Court has never considered the “single business enterprise” concept in any detail. The only decision in which we have had occasion to comment at all on such a theory was in George Grubbs Enterprises, Inc v. Bien.mm In that case, the sole issue we addressed was whether it was proper to instruct the jury that in assessing punitive damages against a corporation, it could consider the “wealth or profitability” of a corporate entity related to the defendant even though that related corporate entity was not a party to the case, if the jury concluded that the defendant and its affiliate were “operated as and constitute a single business enterprise.” In that case, the jury was instructed that a “ ‘single business enterprise’ exists when two or more corporations associate together and, rather than operate as separate entities, integrate their resources to achieve a common business purpose.” In relating the procedural history, we said:
Prior to submission of the case to the jury, the defendants objected to this instruction on the grounds that it erroneously omitted the factors necessary to determine whether Grubbs Enterprises and Auto Park constituted a single business enterprise.
FN33. 900 S.W.2d 337 (Tex.1995).
We then said: “Assuming without deciding that it would ever be proper for the jury to consider the wealth of a related corporate entity which had not been joined as a defendant, we find that the instruction was inadequate for the *392reasons stated in the defendants’ objection to the charge.” We then explained that exemplary damages “rest on justifications similar to those for criminal punishment,” that if corporate structures were to be disregarded, there must be “a fact-specific analysis of each case, ” and that disregarding the corporate structure “demands jury instructions that advise the jury concerning all the factors bearing on their decision.” We held that “[bjecause this ‘single business enterprise’ instruction seeks to disregard the corporate structure, the failure to submit all relevant factors to guide the 1 mg jury’s consideration was error.” We said nothing in this opinion to indicate that a “single business enterprise” theory was different from other theories already recognized to disregard corporate structure and hold one corporation liable for the debt or tort of another. We certainly said nothing in George Grubbs to indicate that a “single business enterprise” theory could be used to view the contracts of distinct corporations as the contracts of a single, amalgamated entity.
We need not decide today whether a theory of “single business enterprise” is a necessary addition to Texas law regarding the theory of alter ego for disregarding corporate structure and the theories of joint venture, joint enterprise, or partnership for imposing joint and several liability. That is because whatever label might be given to the City’s attempt to treat the Valero entities as a single entity, article 2.21 of the Texas Business Corporation ActFmo controls, and the questions submitted to the jury were intended to embody the requirements of article 2.21.
FN40. TEX. BUS. CORP. ACT art. 2.21.
Since 1993, article 2.21 has provided that, with certain exceptions that do not apply in this case, section A of article 2.21 is the exclusive means for imposing liability on a corporation for the obligations of another corporation in which it holds shares. (Emphasis added; some footnotes omitted.)
In PHC-Minden v. Kimberly-Clark Corp., 235 S.W.3d 163, 173 and 175 (Tex.2007), the Texas Supreme Court observed that “[h]ere, the court of appeals held that Province and Minden operated a single business enterprise — a theory we have never endorsed — and, therefore, Province’s Texas contacts could be imputed to Minden” and that “fraud — which is vital to piercing the corporate veil under section 21.223 [Article 2.21] of the Business Organizations Code — has no place in assessing contacts to determine jurisdiction.”
Subsequently, in Academy of Skills & Knowledge, Inc., v. Charter Schools, USA, Inc., 260 S.W.3d 529, 538-39 (Tex.App.-Tyler 2008), appears the following:

Summary Judgment-Single Business Enterprise

[main its fifth issue, ASK argues that the trial court improperly granted summary judgment as to all matters brought by ASK based upon breaches of contractual or common law duties allegedly committed by LC. According to ASK, the matters were brought pursuant to the “ ‘single business enterprise’ doctrine.” ASK argues that a genuine issue of material fact existed as to the applicability of this doctrine and that, as such, summary judgment was not proper.
The single business enterprise doctrine is not a cause of action, but rather a theory for imposing liability where two or more business entities act as one. Under the doctrine, when businesses are not operated as separate entities but rather integrate their resources to achieve a common business purpose, *393each business may be held liable for wrongful acts done in pursuit of that purpose. The single business enterprise doctrine is not synonymous with the doctrine of “alter ego.” PHC-Minden, L.P. v. Kimberly-Clark Corp., 202 S.W.3d 193, 200 (Tex.App.-Tyler 2005), rev’d on other grounds, 235 S.W.3d 163 (Tex.2007). Although the alter ego doctrine and the single business enterprise doctrine are both based on principles of equity, an important distinction is that the alter ego doctrine generally involves proof of fraud. Id. No proof of fraud is required under the single business enterprise doctrine. Id. Because of this significant difference between the two doctrines, we must address the viability of the single business enterprise doctrine under Texas law.
Texas law presumes that two separate corporations are distinct entities. BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 798 (Tex.2002). The Fifth Circuit has noted that
[m]any wholly-owned subsidiaries and closely-held corporations are not factually distinct from their owners. Many are in fact controlled and operated in close concert with the interests of the owners, and do not have a distinct factual existence: separate employees, offices, or properties; consolidated financial reporting and tax returns; and the like. Such conduct is perfectly natural and proper and provides no basis for ignoring legal independence.
Gibraltar Sav. v. LDBrinkman Corp., 860 F.2d 1275, 1287 (5th Cir.1988). Further, we have stated that “[t]he separate entity [nature] of corporations will be observed by the courts even in instances where one may dominate or control, or may even treat it as a mere department, instrumentality, or agency, of the other.” These statements are also applicable to the relationship between a parent corporation and its subsidiary limited liability company. Cf. PHC-Minden, 202 S.W.3d at 200 (implicitly reaching a similar conclusion).
| in4The supreme court recently noted that the single business enterprise doctrine is “a theory [it had] never endorsed.” PHC-Minden, L.P. v. Kimberly-Clark Corp., 235 S.W.3d 163, 173 (Tex.2007). Taking the entirety of Texas law into consideration, and considering the supreme court’s explicit lack of endorsement for the single business enterprise doctrine, we lurid that the doctrine does not exist under Texas law. But see, e.g., SSP Partners v. Gladstrong Invs. (USA) Corp., 169 S.W.3d 27, 43 (Tex.App.-Corpus Christi 2005, pet. granted); El Puerto de Liverpool, S.A. de C.V. v. Servi Mundo Llantero S.A. de C.V., 82 S.W.3d 622, 636 (Tex. App.-Corpus Christi 2002, pet. dism’d w.o.j.); N. Am Van Lines, Inc. v. Emmons, 50 S.W.3d 103, 119 (Tex.App.Beaumont 2001, pet. denied); Paramount Petroleum, 712 S.W.2d at 536. Therefore, we hold that summary judgment was proper. We overrule ASK’s fifth issue. (Emphasis added.)
After reviewing Article 2.21 A(2) and the Southern Union Co., PHC-Minden, and Academy of Skills & Knowledge cases, it appears that: (1) alter ego rather than single business enterprise is the proper description for piercing the corporate veil in Texas; (2) for purposes of shareholder liability the corporate veil may be pierced in Texas only if the plaintiff alleges and proves that the defendant (whether a natural or juridical person) “caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee [plaintiff] primarily for the direct personal benefit of the” shareholder; (3) proving actual fraud *394is a condition precedent to piercing the corporate veil; and (4) when the corporate veil is pierced the fault of the corporate defendants is imputed to (vicariously imposed on) the shareholder.
In her First Supplemental and Amending Petition in Intervention, the Texas Receiver alleged, in pertinent part, the following:
A. The Control Group
19.
From May 1, 1999 until April 2002, Lucksinger, Mudd, Pearce, Jhin, Galt-ney, Rosow and Health Net/Foundation (sometimes the “Control Group”) conspired to and did operate AmCare-TX, AmCare-OK, and AmCare-LA (the HMO’s) | iQflthrough their control of Am-Careco. Each member of the control group was either an actual or de facto director of AmCareco and the single business entity. The Control Group did operate each of these entities to perpetuate a fraud on those who have assigned their claims to the SDR and did perpetuate this fraud for their own benefit. AmCareco completely controlled and dominated the operations of the HMO’s. The Control Group operated the AmCa-reco entities in a coordinated fashion, and those entities became and 'were operated as a single business entity. (Emphasis added.)
In its answer, Health Net responded, in pertinent part, as follows:
19.
The allegations of paragraph 19 are denied, except the following is admitted:
From April 30, 1999 until April 2002, Thomas Lucksinger (“Lucksinger”), John Mudd (“Mudd”), Michael Jhin (“Jhin”), William F. Galtney (“Galtney”), Steve Nazarenus (“Nazarenus”), and Michael Nadler (“Nadler”) conspired to and did operate AmCare-TX, AmCare-OK and AmCare-LA (the HMOs) through their control of AmCareco.
Lucksinger, Mudd, Jhin, Galtney, Na-zarenus and Nadler were each either an actual or de facto officer/director of Am-Careco and the single business entity.
AmCareco completely controlled and dominated the operations of the HMOs.
Lucksinger, Mudd, Jhin, Galtney, Na-zarenus and Nadler operated the AmCa-reco entities in a coordinated fashion, and those entities became and were operated as a single business entity.
As previously indicated in Part V, Section B of this opinion the trial court judge stated “[tjhat being the case, it appears to this court that there is a single business enterprise very akin in the criminal law to....”
During Health Net’s direct examination of Byron Jones, who was qualified as an expert CPA, the following occurred:
Q. [By Mr. Percy, Counsel for Health Net] And you’re aware that the plaintiffs have actually alleged that Am-Careco and all of the HMOs were operated as a single business entity, are you not?
lnmA. Yes.
Q. And that’s actually no longer a disputed fact in this case, to your knowledge, is it?
A. Correct.
MR. GEORGE [Counsel for Texas Receiver]: Objection.
THE COURT: What is the objection?
Mr. GEORGE: The objection is he doesn’t know what the disputed issues of fact are or not. I mean I haven’t told him. He only knows from Mr. Percy and it’s one sided.
MR. PERCY: I will be happy to share that.
*395THE COURT: I will allow you to recross him on that issue, Mr. George.
The Texas Receiver proposed a jury interrogatory that stated “Did AmCareco, Inc., AmCare Management, AmCare-LA, AmCare-OK, and AmCare-TX operate as a single business enterprise?” Health Net proposed its jury charge 16 that provided as follows:
The Texas Receiver says that after the sale of the three HMOs to AmCare-co, AmCareco and the three HMOs were treated as a single business entity. What that means is that AmCareco and the three HMOs were treated by their management as one company, instead of separate companies. Health Net agrees with the Texas Receiver on this issue and therefore, I instruct you that AmCa-reco and all of the AmCareco companies, including the three HMOs, are to be viewed by you as one single company. I will refer to this later in these instructions as the “single business entity.”
However, the trial court judge did not submit the interrogatory to the jury and did not instruct the jury on the law of what constituted a single business enterprise.
Whether Health Net was engaged in a single business enterprise with AmCareco and AmCare-TX also is a critical factual issue if the sale is not a sham. As previously indicated, in that legal posture, Health Net is no longer a shareholder in AmCare-TX and is only exposed to liability as a | m7shareholder in AmCareco pursuant to Article 2.21. If Health Net, AmCa-reco, and AmCare-TX operated a SBE, Health Net would be exposed to (1) liability for actual fraud pursuant to Article 2.21, (2) liability for unfair or deceptive acts or practices in violation of Tex. Ins.Code Article 21.21 and (3) Tex. Ins.Code § 843.401 (formerly Article 20A.08).
In her reasons for judgment the trial court judge ruled as follows:
(K) THE LEGAL AND FACTUAL BASIS FOR HOLDING THE HMOS WERE A SINGLE BUSINESS ENTERPRISE.
This court finds that Health Net, Am-Careco operated as a single b?isiuess enterprise in accordance with Health Net’s stipulation on the record and in regards to the following particulars:
A) Fiduciary duty was owed from Health Net to the three HMOs each; that Health Net together with AmCare-co and Thomas Lucksinger confected a design and an enterprise predicated upon fraudulent documents, transfers, half-truths in affidavits, which were drafted in Texas to have impact in several other states, and where damage occurred in other states, such as, to the HMOs in Louisiana and Oklahoma. (Emphasis added.)
As set forth in greater detail in Part X of this opinion, there was conflicting evidence on this issue. The jury in the Texas case could not have factually concluded that Health Net was engaged in a single business enterprise with AmCareco and AmCare-TX because it was not instructed on the legal definition of a single business enterprise and was not given an interrogatory to reach that factual conclusion; therefore, it is reasonable to infer that the case was decided by the jury on other grounds.
The trial court judge found the single business enterprise issue a factually controlling one in the Louisiana and Oklahoma cases; the jury in the Texas case was not allowed to consider it.
In this case, piercing the corporate veil is relevant (1) to the liability of Health Net as asserted by the Receivers and (2) to the issues of comparative | 1<)8faidt and allocation of fault of AmCareco and its officers, directors, agents, and shareholders individ*396ually as asserted by Health Net. There is sufficient evidence in the record to require that a properly tailored disjunctive instruction on this issue be given to the jury. The trial court judge failed to do so.
This assignment of error has merit,
c. Superseding Cause
(Assignments of Error TX-1, 2, 20 and 21; Proposed Texas Jury Instructions 81 and 82)
On April 4, 2005, Health Net filed a motion for summary judgment asserting, among other things, that “[p]laintiff cannot establish that any damages are attributable to Health Net.” In particular, Health Net argued as follows:
Assuming arguendo that Health Net’s actions within the months leading up to the sale of the HMOs to AmCareco and its exercise of its rights in receiving the cash payment and ultimately calling the letter of credit securing its put rights were somehow tortious conduct, those actions did not damage AmCare-LA. Rather, AmCareco’s mismanagement of the HMO’s claims payment system, including the overpayment of claims in the amount of $44.2 million, was a separate, independent and intervening cause of AmCare-LA’s damages. The overpayment of claims by $45 million, all of which AmCare-LA’s own experts attribute solely to AmCareco’s management, put in motion a new chain of events, and became the independent and primary cause of any injuries suffered by Am-Care-LA. Thus, even assuming ar-guendo that Health, Net’s actions 'were so-meho'w tortious conduct, it was Am-Careco’s memagement, and, not Health Net, that is chargeable tvith all legal responsibility for AmCare-LA’s damages.
Utilizing the reports from AmCare-LA’s own experts, it is clear that the superseding cause of the HMOs’ insolvency is AmCareco’s gross mismanagement of the claims payment process. If AmCareco had not grossly mismanaged the claims, the HMOs would have had an additional $44.2 million with which to pay claims. In shmi, the entire insolvency of the HMOs was caused by gross mismatiagemeut of claims by the management of the HMOs and AmCareco, and not by Health Net. (Emphasis added.)
| m;)This motion was heard on April 25, 2005, and the motion was granted in part as to the issue of “Superseding and Intervening Cause.”
On May 3, 2005, counsel for the Louisiana, Oklahoma, and Texas plaintiffs filed a motion to reconsider Health Net’s motion for partial summary judgment regarding subsequent intervening cause or, in the alternative, motion for a new trial. The memorandum supporting this motion was submitted by the attorneys for all of the plaintiffs and contains the following pertinent observations:
Given this direct testimony of [Billy] Bostick [the assistant receiver for Am-care-OK] and [J.D.] Barringer [the deputy receiver for AmCare-LA], and drawing all factual inferences in favor of the non-mover as this Court must do in the context of a MSJ, there is clearly an issue of fact regarding — not only the amount of actual overpayments made by AmCare-LA — but also whether any actual overpayments made by AmCare-LA resulted from the type of “mismanagement” that would allow Health Net to argue — much less establish as a matter of law — that this intervening negligence constitutes a superseding cause which limits its potential damages.
[[Image here]]
CAUSATION ISSUES ARE FACTUAL IN NATURE AND SHOULD NOT *397BE RESOLVED BY SUMMARY JUDGMENT
According to well-established Louisiana law, causation is an issue of fact that is generally decided at the trial on the merits.... Here, numerous factual disputes exist concerning the nature, extent, and cause of any overpayments made by the AmCare entities; therefore, Health Net’s motion for partial judgment regarding this discreet issue of causation should be reconsidered and denied.
MATERIAL ISSUES OF FACT EXIST REGARDING WHETHER HEALTH NET CONSPIRED WITH AmCARECO AND THE D & O DE-. FENDANTS TO DEFRAUD PLAINTIFFS
This Court has already ruled that genuine issues of material fact relating to Health Net’s alleged fraudulent conduct and participation in a conspiracy exist for trial. According to Your Honor:
Well, the Court is of the opinion that there is [sic] genuine issues of material fact as to whether | linor not they [Health Net and the AmCare entities] acted in concert, deliberately, or negligently in an effort to maintain the operation of a business to the deü'iment of the policyholders and whether or not it was an attempt to obfuscate the material presented to the regulator. Therefore, the court is going to deny the motion for summary judgment.
Once Health Net is proven to have acted fraudulently in concert with Am-Careco and/or the D & 0 defendants, it logically follows that Health Net may be liable for all damages sustained by these HMO’s [sic] and their policyholders and creditors — whether caused by mismanagement or not. Any attempt to separate this co-conspirator’s actions versus that coconspirator’s actions as an intervening cause necessarily fails. And for present purposes, even assuming such an exercise is possible, there are numerous unresolved issues of material fact which would preclude summary judgment.
MATERIAL ISSUES OF FACT EXIST REGARDING WHETHER HEALTH NET CONTROLLED Am-CARECO AND THE AmCARE HMO’S [sic]
Similarly, this court has already ruled that genuine issues of material fact relating to Health Net’s alleged control party status exist for trial. Once Health Net is proven to have acted as a controlling party of the AmCare entities, both prior to and after the 1999 acquisition, it logically follows that Health Net may be liable for all damages sustained by these HMO’s [sic] and their policyholders and creditors — -whether caused by mismanagement or not. Again, in any event, there are numerous issues of material fact involved in this analysis and summary judgment is inappropriate.
NUMEROUS ISSUES OF MATERIAL FACT REMAIN REGARDING THE NATURE AND EXTENT OF THE OVERPAYMENTS ACTUALLY MADE BY THE HMO’S [sic], WHETHER ANY SUCH OVERPAY-MENTS WERE THE RESULT OF MISMANAGEMENT, AND TO WHAT EXTENT HEALTH NET (AS EITHER CO-CONSPIRATOR OR CONTROL PARTY) IS LEGALLY RESPONSIBLE FOR ANY ACTUAL OVERPAYMENTS
As is laid bare by the attached affidavits of Tharp, Barringer, Bostick, and Johnson, along with the attached deposition testimony of Barringer, Bostick, Tharp, and Lucksinger, at least the fol-*398loiving genuine issues of material fact remain disputed:
• The amount, if any, of any overpay-ments/duplicative payments actually made by AmCare-LA;
• The amount, if any, of any overpay-ments/duplicate payments actually made by AmCare-OK;
|U1* The amount, if any, of any over-payments/duplicate payments actually made by AmCare-TX;
• Whether any actual overpay-ments/duplicate payments made by any of the AmCare HMO’s [sic] were the result of mismanagement that is outside the normal, expected parameters of a typical HMO;
• Whether Health Net, as a fraudulent co-conspirator, is jointly and severally liable along with any other AmCare actors responsible for actual overpayments/duplicate payments made by any of the AmCare HMO’s [sic];
• Whether Health Net, as a controlling party of the AmCare enterprise, is legally responsible for actual overpayments/duplicate payments made by any of the AmCare HMO’s [sic].
Given these disputed issues ofmateri.a.1 fact, partial summarry judgment is not appropriate. (Emphasis added.)”
This motion was heard on May 27, 2005. During the hearing, counsel for the Louisiana Receiver observed, in pertinent part, as follows, “Issues of causation are rarely, if ever, good issues for determination on summary judgment. That’s a factual issue. The jury should hear it.” The trial court judge initially took the issue under advisement but subsequently granted the reconsideration prior to the end of the court proceedings for the day. On June 14, 2005, the trial court rendered a written judgment stating “the Motion to Reconsider Health Net’s Motion for Partial Summary Judgment Regarding Subsequent Intervening Cause, ... filed herein by AmCare-OK, AmCare-LA, and AmCare-TX is GRANTED.”
At the charge conferences held on June 29-30, 2005, Health Net presented for consideration two proposed jury instructions and a proposed jury interrogatory on the superseding cause issue. The record on appeal contains jury instructions requested by the Texas Receiver and includes “Plaintiff’s Second Supplemental Special Jury Instructions,” which asked the trial court to instruct the jury as follows:
A superseding or intervening cause is a cause which comes into active operation in producing a result after the actor’s negligent ln2act or omission has occurred, A defendant ordinarily will not be relieved of liability by intervening cause which could reasonably have been foreseen nor by one which is [a] normal incident of risk created, but will be relieved only by unforeseeable and abnormal intervening cause which produces [a] result which could not have been foreseen. A superseding or intervening cause does not relieve the initial tort-feasor of consequences of his negligence, unless the superseding or intervening cause superseded [sic] original negligence and alone produced injury. (Emphasis in original.)
Health Net submitted Requested Jury Charge No. 82, which provided as follows:
Even if you find Health Net was at fault, you must still find in Health Net’s favor if you also find that its fault was superseded, or followed, by the acts of another party, such as the mismanagement of the HMOs, and the superseding or “new and independent” acts were unforeseeable and were such that without *399them the injury would not have occurred.
A “new and independent cause” is defined as an act or omission of a separate and independent agency, not reasonably foreseeable, that destroys the causal connection, if any, between the acts of omissions inquired about and the occurrence in question and thereby becomes the immediate cause of such occurrence.
The second paragraph of this proposed instruction essentially tracks the instruction contained in Texas Pattern Jury Charge (hereinafter sometimes referred to as “PJC”) 3.1. The Comment for PJC 3.1 provides as follows:
When to use — given in lieu of PJC 2.4. PJC 3.1 should be used in lieu of the usual definition of proximate cause (see PJC 2.4) if there is evidence that the occurrence was caused by a new and independent cause. See Tarry Warehouse & Storage Co. v. Duvall, [131 Tex.466,] 115 S.W.2d 401, 405 (Tex.1938); Phoenix Refining Co. v. Tips, [125 Tex.69,] 81 S.W.2d 60, 61 (Tex.1935). Submission if there is no such evidence is improper and may be reversible error. Galvan v. Fedder, 678 S.W.2d 596, 598 (Tex.App.-Houston [14th Dist] 1984, no writ). See also James v. Kloos, 75 S.W.3d 153, 162-63 (Tex.App.-Fort Worth 2002, no pet.).
Because a new and independent cause is in the nature of an inferential rebuttal, it should be submitted by instruction only. Tex.R. Civ. P. 277. For elements to consider when determining whether a new and independent cause exists, see Phan Son Van v. Pena, 990 S.W.2d 751, 754 (Tex.1999), and Teer v. J. Weingarten, Inc., 426 S.W.2d 610, 613 (Tex.Civ.|App.-Houston113 [14th Dist.] 1968, writ ref'd n.r.e.). For a recent discussion of “new and independent cause,” see Dew v. Crown Derrick Erectors, Inc., 208 S.W.3d 448, 49 Tex. Sup.Ct. J. 851 (June 30, 2006).
Definition. The above definition of “new and independent cause” was recognized by the Texas Supreme Court in Dillard v. Texas Electric Cooperative, 157 S.W.3d 429, 432 (Tex.2005).
Modify if “ordinary care” not applicable to all. If “ordinary care” is not the standard applicable to all whose conduct is inquired about (see PJC 2.2 and 2.3), the phrase the degree of care required, of him should replace the phrase ordinary care in the second sentence of this definition of “proximate cause.” See Rudes v. Gottschalk, [159 Tex. 552,] 324 S.W.2d 201, 206-07 (Tex.1959).
After the trial court judge advised the parties of the jury interrogatories that she intended to give, the following appears in the record on appeal:
MR. BLACK [Counsel for Health Net]: Your Honor, just for the record, one more objection. We would object to the fact that there is not a specific interrogatory on intervening and superseding cause.
MR. McKERNAN [Counsel for the Texas Receiver]: May I be heard on that?
THE COURT: You may.
MR. McKERNAN: We filed a supplemental memorandum which we think lays that out clearly and we wanted to file it with this court. We have filed it downstairs in the record, that that particular defense, or whatever you want to call it, is not available in this case, particularly since they have accused other parties, third parties as well as other situations as being at fault. And we know that the law is on that it must be the sole cause, the sole cause. And by their own admission, it’s not the sole cause.
*400THE COURT: Well, the court considered that and still considers that the jury may very well decide there is a supervening [sic] or intervening cause and may do so within the context of these interrogatories because it allow[s] them to allocate fault to any other person. They have plenty of room to write in here what they want to. (Emphasis added.)
_[r¡4The trial court judge did not instruct the jury specifically on superseding cause or submit a jury interrogatory on it. After the jury charge was given, Health Net objected “to the failure to give charge [proposed instruction] eighty-two on intervening and superseding cause based on Texas Pattern Jury Instruction 2.4.”
On appeal, Health Net asserts that “[pjerhaps Judge Clark’s most egregious error was her refusal to instruct at all on the defense of superseding cause.” Health Net asserts the Texas Receiver advanced a theory of recovery that was overreaching and weak; “it essentially attributed $52 million in unpaid claims to (at most) a modest shortfall in statutory capital at closing.” Health Net contends the massive losses were caused by the gross mismanagement and admitted fraud of AmCa-reco. “AmCareco had systematically cooked its books, acquired other distressed health plans, filed multiple false regulatory reports, and, through ineptitude, systematically over- and double-paid its claims.” Health Net argues adequate instructions would have allowed the jury to properly consider this factual issue. Finally, Health Net argued as follows:
And it is no answer, as Judge Clark apparently thought, that the jury could have somehow considered superseding causation in the course of “allocat[ing] fault to any other person.” To begin with, although fault allocation and superseding causation at times may involve related factual inquiries, conceptually the two doctrines involve starkly different principles. Allocation of fault involved dividing responsibility amongst culpable parties. Superseding causation, on the other, involves an inquiry into whether the alleged tort-feasor is responsible at all for some or all of the losses in question.
Instructing the jury it could allocate fault as it saw fit did not inform it that the actions of others might relieve Health Net of some or all responsibility for the HMO’s losses. And even if the jury could have divined that it could consider superseding causation in allocating fault, it was never instructed how to do so. (Record and case citations deleted.)
In..¡The Texas Receiver now responds that there was no legal basis for the jury to consider whether there was a superseding cause because the intervening acts alluded to by Health Net were not superseding in nature. The Texas Receiver contends the jury was instructed that it could find Health Net liable only if it caused damage, and that it could allocate fault to other parties, and accordingly “No special instruction on superseding cause was necessary.” The Texas Receiver contends the conditions created by any initial wrongdoing would continue to contribute to the resulting, injuries and the original wrongful act remained a proximate cause. The actions of AmCareco, the Texas Receiver asserts, flowed directly from and were set in motion by, the original wrongful acts of Health Net. The Texas Receiver maintains the finding of causation by the judge and unanimous jury were not clearly wrong; they were clearly right.
In a reply brief, Health Net asserted the following:
Had AmCareco lived up to its obligations, there never would have been a *401statutory insolvency and thus (even under the Receivers’ expansive theory) no damages attributable to Health Net. And because the record contains no evidence Health Net had any reason to believe AmCareco would not honor its obligation, its failure to do so was an “unforeseeable” and “new and independent act” that broke any causal chain between Health Net’s actions and the alleged injury.
In Texas, superseding cause is an inferential rebuttal instruction. In this case, it is potentially necessary in multiple factual settings depending on how the factual issues of sham sale and single business enterprise are resolved. If (1) the sale is valid, (2) Health Net is not in a single business enterprise with AmCareco, and (3) there was no fraud involved in securing any one or more of the three regulatory authorities, it then would be arguable that the intentional misconduct of AmCareco after the sale was a superseding cause. Disjunctive (alternative) jury instructions and | nfiinterrogatories should have been drafted to recognize these alternative factual possibilities so that the jury could be properly advised. Assuming the facts presented at the trial by the parties resulted in factual disputes on these issues, the jury interrogatories and jury charges should have been crafted to accommodate all of these potential factual results.
After reviewing the pleadings of the parties and the facts in the record as will hereinafter be discussed in Part X of this opinion, we conclude that reasonable factual disputes were raised by the evidence pertaining to the superseding cause issue. The trial judge committed prejudicial error when she (1) refused to submit an interrogatory on this issue to the jury and (2) failed to instruct the jury on this issue pursuant to PJC 3.1 as requested.
These assignments of error have merit.
d. Texas Business Corporation Act Article 2.21
(Assignment of Error TX-12; Proposed Texas Jury Instructions 27.1 and 103)
Health Net asserts, “The trial court clearly erred by not instructing the jury that Health Net could not be liable as [a] shareholder unless it was proven that it used AmCareco to perpetuate actual fraud” as provided for in V.A.T.S. Bus. Corp. Act art. 2.21, citing Kingston v. Helm, 82 S.W.3d 755, 764-765 (Tex.App.2002).
The Texas Receiver responds that Article 2.21 does not apply in this case because Health Net itself was actually liable for its own conduct and this is not an alter ego liability case. Further, “Health Net itself actually entered the contracts at issue; Health Net hired Shattuck Hammond that drafted many of the deceptive documents; Health Net actually signed the documents that changed the deal after regulatory approval; its CEO, as a director of the HMO, actually approved the sweep, and Health Net actually |117took the money that led to the failure of AmCare-TX.” Finally, the Texas Receiver argues even if the failure to instruct on Article 2.21 was error, the jury found actual fraud as the basis of liability for Health Net, and, in this posture, the error was not prejudicial and cannot support reversal.
For the reasons set forth in Part VI, Sections D2a (Fiduciary Duty) and D2b (Fraud) of this opinion this assignment of error has merit.
2. Erroneous Instructions
a. Fiduciary Duty
(Assignment of Error TX-17; Texas Proposed Jury Instructions 20, 22, 24, 27, 27.1, 28, 29, 30, 31, 32, 35, 56, 60, 62, 63, 64, 65, 66 and 67)
*402The trial court gave the following instructions on fiduciary duty:
Gross negligence means an act or omission by the entities or individuals that breached their fiduciary duty, which when viewed objectively from the standpoint of the entities or individuals that breach them fiduciary duty at the time of the occurrence, involved an extreme degree of risk considering the probability and magnitude of the potential harm to others, and of which the entities and individuals that breached their fiduciary duty had actual subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of others.
Malice or gross negligence. Malice must be proven by clear and convincing evidence. Clear and convincing means that measure or degree of proof that produces in your mind a firm belief or conviction as to the truth of the allegations sought to be established. Malice means a specific intent by the entities or individuals that breached their fiduciary duty to the HMO and their creditors to cause substantial injury or harm to the HMOs and their creditors.
Malice means a specific intent to cause substantial injury or an act or omission which, when viewed objectively from the standpoint of plaintiff at the time of the occurrence, involved an extreme degree of risk considering the probability and magnitude of the potential harm to others, and of which the defendant had actual subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.
To prove gross negligence a plaintiff must show the act or omission, when viewed objectively from defendant’s standpoint at the time it occurred, involved an extreme degree |mof risk considering the probability and magnitude of the potential harm to others, and that the defendant had actual subjective awareness of the risk but still proceeded with a conscious indifference of the rights, safety, or welfare of others.
[[Image here]]
You are instructed that the controlling or dominating shareholders of a corporation, as well as the corporation’s officers and directors, have fiduciary duties to the corporation and, when the corporation is insolvent or in the zone of insolvency, to the corporation’s creditors and potential creditors as well.
Fiduciary duty means that as [sic] fiduciaries, directors, officers, and controlling shareholders must act with the highest degree of loyalty, care, trust, and allegiance toward the corporation and, when the corporation is insolvent, toward the corporation’s creditors and potential creditors.
A controlling or dominating shareholder officer or director with fiduciary duties to the corporation and its creditors must prove by a preponderance of the evidence that transactions that the corporation enters into or transactions the controlling or dominant shareholder, officer, or director enters into, that affect the corporation or its creditors are inherently fair to the corporation and its existing or prospective creditors, and do not expose the corporation or its creditors or prospective creditors to a[sic] unreasonable risk of loss, and ■were entered into after full and complete disclosure to the creditors and prospective creditors.
A shareholder is a controlling or dominant shareholder if that shareholders [sic] possesses directly or indirectly the power to direct or cause the direction of *403the management and policies of a corporation whether through the ownership of voting securities, by contract or otherwise, and has assumed a role in the formulation of strategic policy or a role in operational decisions.
A corporation is insolvent when it is unable to pay its debts as they become due or when the corporation has liabilities in excess of the reasonable market value of its assets.
A corporation is in the zone of insolvency when the corporation is close enough to insolvency that a reasonable person would know that its ability to pay creditors is significantly threatened.
If a regulated corporation like an HMO is required to maintain minimum capital and surplus amounts and/or minimum net worth amounts and it fails to meet these minimum levels at any time, it is considered statutorily insolvent.
1119....
An exception to the general rule that the corporations owe no duties to creditors arises when a corporation is insolvent. When a corporation is insolvent, the duty oived by the officers and directors, but not by a shareholder, of the corporation expands to include a duty to the creditors. Accordingly, when a corporation is insolvent, officers and directors of an insolvent corporation have a fiduciary duty to deal fairly with the corporations’ creditors and that duty includes preserving the value of the corporate assets to pay corporate debts without preferring one creditor over another or preferring themselves to the injury of other creditors.

However, a creditor may pursue corporate assets and hold officers and director's, but not shareholders, liable only for that portion of the assets that would have been available to satisfy his debt if they had been distributed pro rata to all creditors.

This duty to creditors does not apply to shareholders of a corporation unless the shareholder is also an officer or director of the corporation or unless the shareholder is in actual control of the management of the corporation and, therefore, is a controlling shareholder as previously outlined.
Plaintiff has no right to recover from a defendant if the defendant did not breach a legal duty oived to plaintiff. Accordingly, plaintiff must establish that defendant owed a legal duty to it or to its creditors and that defendant breached the duty and that plaintiff or its creditors sustained damages as a result of the breach.[58] (Emphasis added.)
Health Net asserts that it did not owe any fiduciary duties to the HMOs before or after the sale of the HMOs to AmCare-eo. Health Net argues before the sale, the HMOs were wholly-owned subsidiaries, and a parent corporation owes no fiduciary duties to its wholly-owned subsidiaries or their creditors. Health Net maintains the sale of the HMOs to AmCareco was not a sham transaction. Health Net asserts the proper remedy to have a contract declared a sham is the law of fraudulent transfer found in 11 U.S.C. 112p§ 544(b)(1) and Texas Bus. & Comm.Code §§ 24.005 and 24.006, and the plaintiffs did not plead or prove such a claim. Health Net contends when a corporation is in the zone of insol*404vency, the officers and directors of the corporation must( discharge their fiduciary-duties to the corporation and its shareholders by exercising their business judgment in the best interest of the corporation for the benefit of the shareholders (the business judgment rule). Health Net argues, the creditors of a corporation have no cause of action for breach of a fiduciary duty unless the corporation (1) is actually insolvent and (2) has ceased doing business. Health Net asserts that after the sale it had no ownership interest in the Texas HMO which then was wholly owned by AmCareco. Health Net argues any post-sale fiduciary duty claim against Health Net had to derive through AmCa-reco, and there was no such duty as a matter of law. According to Health Net, any fiduciary duties owed by a parent to a subsidiary were owed by AmCareco unless Health Net, as a minority shareholder, actually exercised control over AmCareco as a controlling shareholder, which it did not. Health Net argues the trial court erroneously instructed the jury that pursuant to V.A.T.S. Insurance Code Article 21.49-1, § 2(d), (repealed by Acts 2001, 77th Leg., Ch. 1419, § 31(a), effective June 1, 2003), Health Net was a controlling shareholder for the purpose of liability for the tort of breach of a fiduciary duty. Health Net argues this law applies only to matters pertaining to the regulatory approval of a change in control of an- insurance company regulated, in Texas provided in Article 21.49-1. Finally, Health Net asserts that the trial court instruction on the fairness duty owed by a fiduciary is “incomprehensible” and wrong as a matter of law.
The Texas Receiver responds that, at the time of the Health Net-AmCareco sale of the Texas HMO, Jay Gellert, Health Net’s Chief 1121Executive Officer (CEO) was a director of the Texas HMO; Gellert owed fiduciary duties to the HMO; Health Net was liable for Gellert’s actions; and Gellert breached his fiduciary duties to the HMO when he approved the cash sweep that “left the Texas HMO actually insolvent.” Further, the Texas Receiver asserts “there is ample evidence that the [sale] was a sham, ... and there is also ample evidence that Health Net’s conduct with respect to the [sale], including the ‘cash sweep’, was at least a cause of the damages suffered by the HMOs.” The Texas Receiver maintains Health Net owed a fiduciary duty to the Texas HMO pursuant to Tex. Ins.Code Article 20A.08 (now § 843.401), and Health Net “breached its fiduciary duty by taking action benefiting the parent corporation (the cash sweep) knowing it would render the HMOs (the subsidiaries) unable to meet their statutory and other legal obligations.” The Texas Receiver argues the HMOs were insolvent prior to the sale. Health Net injected money into the HMOs, according to the Texas Receiver, “to make the HMOs temporarily ‘solvent’ for regulatory purposes.” Thus, “[b]ecause the three HMOs were already insolvent prior to the sale to [Am-Careeo], Health Net owed pre-sale fiduciary duties to the creditors of the HMOs.” The Texas Receiver contends the majority rule in Texas is that “Health Net owed fiduciary duties to the creditors of the HMOs once they entered the ‘zone of insolvency’.” The claim that Texas law does not impose fiduciary duties on the directors of an insolvent, but still operating corporation, in favor of creditors is a minority position, according to the Texas Receiver. Pursuant to V.A.T.S. Ins.Code Article 21.49-1, § 2(d), [repealed by Acts 2001, 77th Leg., Ch. 1419, § 31(b)(13), effective June 1, 2003], Health Net was a controlling shareholder after the sale and continued to owe fiduciary duties to the creditors of the HMOs, argues the Texas Receiver. Finally, “[t]hese fiduciary *405duties required Health Net to |ia2assure that the HMOs were operated in a manner that did not defraud the creditors or cause them an unreasonable risk of harm, and especially to refrain from engaging in or allowing activities that benefited Health Net at the expense of these creditors.”
(1) What is a fiduciary duty?
A fiduciary duty is defined, in general, as follows:
A duty of utmost good faith, trust, confidence, and candor owed by a fiduciary (such as a lawyer or corporate officer) to the beneficiary (such as a lawyer’s client or a shareholder); a duty to act with the highest degree of honest and loyalty toward another person and in the best interests of the other person (such as the duty that one partner owes to another).
Black’s, supra at 523.
Fiduciary duties are imposed in Texas on some relationships because of their special nature. However, it is impossible to give a definition of fiduciary duty that is comprehensive enough to cover all cases. Generally speaking, it is owed by any person who occupies a position of peculiar confidence towards another. It refers to integrity and fidelity. It contemplates fair dealing and good faith. Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Tex. 565, 571, 160 S.W.2d 509, 512 (Tex.1942). Cf. Schlumberger Technology Corp. v. Swanson, 959 S.W.2d 171, 176-77 (Tex.1997); Crim Truck & Tractor Co. v. Navistar International Transp. Corp., 823 S.W.2d 591, 593-94 (Tex.1992).
(2) Cause of Action for Breach of Fiduciary Duty
The elements of a claim for breach of fiduciary duty are: (1) the existence of the duty; (2) breach; (3) causation; and (4) resulting damages. Jones v. Blume, 196 S.W.3d 440, 447 (Tex.App.-Dallas 2006); 3A West’s Tex. Forms, Business Litigation, Chapter 9.6, Introduction. (2d ed.) A person in the position of a fiduciary is charged with unique duties and _Jj£3burdens not present in an arms-length transaction. A fiduciary duty contemplates fair dealing and good faith rather than legal obligation and requires the fiduciary to place the interest of the other party before his own. In determining the liability of a person for breach of a fiduciary duty, the first, and most important, question is whether the defendant is a fiduciary of the plaintiff. There are two forms of fiduciary relationships: (1) formal; and (2) informal. Id. The fiduciary relationships of corporate officers, directors, and controlling shareholders are formal. Id.
(3)Fiduciary Duty Owed by a Parent Corporation to a Wholly-Owned Subsidiary Corporation
It appears well settled that parent corporations do not owe fiduciary duties to wholly-owned subsidiaries. Trenwick America Litigation Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 173-74 (Del.4/10/06), affirmed sub nom., 931 A.2d 438 (Del.Supr.8/14/07); Anadarko Petroleum Corp. v. Panhandle Eastern Corp., 545 A.2d 1171, 1174 (Del.1988); VFB LLC v. Campbell Soup Co., 482 F.3d 624, 634-35 (C.A.3d. Cir. [Del.] 3/30/07); Resolution Trust Corp. v. Bonner, 1993WL414679 (S.D. Tex-Houston 1993). The reason for this is discussed in VFB LLC, pp. 634-35, as follows:
VFB’s second claim against Campbell is that Campbell aided and abetted a breach of the VFI directors’ duty of loyalty to VFI when it entered into the spin transaction knowing that the VFI directors were simultaneously serving as officers of Campbell. New Jersey im*406poses civil liability for knowingly aiding and abetting an agent’s breach of a duty of loyalty to its principal. (Citations omitted.) To hold Campbell liable, VFI must of course show, among other things, that the VFI directors did in fact breach a duty of loyalty to VFI. (Citations omitted.) It is here that the district court rejected VFB’s claim, holding that VFI’s directors breached no fiduciary duty because VFI was solvent at the time of the spin.
Corporate directors must act in their shareholders’ best interests and not enrich themselves at their expense. (Citations omitted.) The law enforces this duty of loyalty by subjecting | ^certain actions to unusual scrutiny. Where a director acts while under an incentive to disregard the corporation’s interests, she must show her “utmost good faith and the most scrupulous inherent fairness of the bargain.” (Citations omitted.)
VFB urges that VFI’s pre-spin directors had an incentive to and admittedly did disregard VFI’s best interests in the context of the spin because they were simultaneously officers of Campbell. Normally, simultaneously serving two transacting companies will trigger heightened scrutiny. (Citations omitted.) However, scrutiny is unnecessary when the two companies are a parent and its ivholly-owned, solvent corporate subsidiary. (Citations omitted.) Directors must act in the best interests of a corporation’s shareholders, but a wholly-owned subsidiary has only one shareholder: the parent. There is only one substantive interest to be protected, and hence “no divided loyalty” of the subsidiary’s directors and no need for special scmtiny of their actions. (Citations omitted.) The VFI directors looked out only for Campbell’s interest because, substantively, that was their duty; whether they thought they were acting in the interest of VFI or Campbell “seems inconsequential.”
VFB argues that Bresnick [v. Franklin Capital Corp., 10 N.J. Super 234, 77 A.2d 53 (App. Div.1951)] and Anadarko have not been followed and are bad law, urging that they would deny a wholly-owned subsidiary standing to sue its directors for a breach of fiduciary duty. But the two cases do not address the subsidiary’s distinct legal existence and standing to enforce its directors’ duties, a bedrock principle of corporate law. Rather, they address the distinct question of what duties a director owes the subsidiary. (Citations omitted.) Corporate duties should be as broad as their purpose requires, but it makes no sense to impose a duty on the director of a solvent, wholly-owned subsidiary to be loyal to the subsidiary as against the parent company. None of the cases VFB cites convinces us that the New Jersey Supreme Court would impose such a duty.
A duty of loyalty against the parent should arise whenever the subsidiary represents some minority interest in addition to the parent. That could happen if the subsidiary were not wholly-owned, (Citations omitted.) but VFB concedes that Campbell was VFPs sole stockholder at the time of the spin. It could also happen if the subsidiary were insolvent. Directors normally owe no duty to corporate creditors, but when the corporation becomes insolvent the creditors’ investment is at risk, and the directors should manage the corporation in their interests as well as that of the shareholders .... (Emphasis added.)
Although a parent corporation may not owe a fiduciary duty to a wholly-owned subsidiary corporation, it may owe a fiduciary duty to the 1 ^employees, enrollees, *407providers, and creditors of a subsidiary HMO corporation.
In Interrogatory 5 submitted to the jury in the Texas case, the jury was asked to determine whether “HealthNet, Inc. [sic] breached a fiduciary duty that caused damage to the Texas HMO or its creditors?” The jury responded, “Yes.” The judgments rendered in the Louisiana and Oklahoma cases show that the trial court found that Health Net breached a fiduciary duty that próxima,tely caused damage to the Louisiana and Oklahoma HMOs and their creditors.
Prior to the sale, the Texas HMO was a wholly-owned subsidiary of Health Net and, in that factual posture, Health Net owed no fiduciary duty to the Texas HMO corporation. If the sale was a sham, then that legal relationship continued to exist at all times pertinent to these proceedings. If the sale was valid, then the Texas HMO because a wholly-owned subsidiary of Am-Careco, Health Net became only a shareholder in AmCareco, and Health Net was not a shareholder in and owed no fiduciary duty to the Texas HMO.59
The trial court judge committed error by failing to instruct the jury about these distinctions.
(4) Fiduciary Duties of Corporate Officers, Directors and Shareholders in General
Whether a duty exists is a question of law. See Bradford v. Vento, 48 S.W.3d 749, 755 (Tex.2001).
Because a corporation is a juridical person and can act only through its officers or agents, a corporation is liable for the actions of a corporate [ ^officer or agent on its behalf that are authorized and not ultra vires. Holloway v. Skinner, 898 S.W.2d 793, 795 (Tex.1995).
A fiduciary relationship is an extraordinary one and will not be lightly created; the mere fact that one subjectively trusts another does not alone indicate that confidence is placed in another in the sense demanded by fiduciary relationships because something apai't from the transaction between the parties is required. Hoggett v. Brown, 971 S.W.2d 472, 488 (Tex.App.-Houston 1997), review denied, (1/16/98).
In Texas, corporate officers and directors owe fiduciary duties to the corpoi'ation and must exercise their powers for the benefit of the corporation and its shareholders. Directors and officers owe fiduciary duties to shareholders because corpoi'ate property has been entrusted to them to be managed for the shareholders’ benefit. The fiduciary duty of directors and officers runs to the corporation as a whole, not to the individual shai’eholders or even to a majority of the shareholders. Generally, shareholders do not owe fiduciary duties to each other. Flanary v. Mills, 150 S.W.3d 785, 794 (Tex.App.-Austin 9/30/04); see also Aitlqaid v. Soussan, 2001 WL 301430, p. 3 (Tex.App.-Houston 3/29/01); Hoggett, 971 S.W.2d at 488; Kaspar v. Thorne, 755 S.W.2d 151, 155 (Tex.App.-Dallas 1988, no writ); Schoellkopf v. Pledger, 739 S.W.2d 914, 920 (Tex.App.-Dallas 1987), rev’d on other grounds, 762 S.W.2d 145 (Tex.1988). However, a majority shareholder may owe a fiduciary duty to minority shareholder. See Hoggett v. Brown, 971 S.W.2d 472, 488 n. 13 (Tex.App.-Houston [14th Dist.] 1997, pet. denied).
*408It appears that the majority view under Texas common law is that a corporation and its officers and directors do not owe a fiduciary duty to corporate creditors until (1) the corporation becomes insolvent and (2) | t27ceases doing business.60 Hixson v. Pride of Texas Distrib. Co., Inc., 683 S.W.2d 173, 176 (Tex.App.-Fort Worth 1985); State v. Nevitt, 595 S.W.2d 140, 143 (Tex.App.-Dallas 1980); Fagan v. La Gloria Oil & Gas Co., 494 S.W.2d 624, 628-29 (Tex.App.-Houston 1973); 15 Tex. Jur.3d, Corporations, § 426. See the excellent discussion of this issue in Floyd v. Hefner, 2006 WL 2844245, pp. 10-16 (S.D.Tex.2006). The Texas HMO did not cease doing business until December 16, 2002.
(5) Fiduciary Duties of Health Net as a Shareholder of a Corporation Pursuant to Tex. Bus. Corp. Act Article 2.21 (recodified at V.T.C.A. Business Organizations Code §§ 21.223-226)
Article 2.21. Liability of Subscribers and Shareholders
A. A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate thereof or of the corporation, shall be under no obligation to the corporation or to its obligees with respect to:
[[Image here]]
(2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, otmer, subscriber, or affiliate is or was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to peipetrate a fraud, or other similar theory, unless the obligee demonstrates that the holder, owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetróte an actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, subscriber, or affiliate^]
[[Image here]]
B. The liability of a holder, owner, or subscriber of shares of a corporation or any affiliate thereof or of the corporation for an obligation that is limited by Section A of this article is exclusive and preempts any other liability imposed on a holder, owner, or subscriber of shares of a corporation or any affiliate thereof or of the corporation for that obligation under common Urn or otherwise, except that nothing contained in this article shall limit the obligation of a holder, owner, subscriber, or affiliate to an obli-gee of the corporation when:
I i2s(l) the holder, owner, subscriber, or affiliate has expressly assumed, guaranteed, or agreed to be personally liable to the obligee for the obligation; or
(2) the holder, owner, subscriber, or affiliate is otherwise liable to the obligee for the obligation under this Act or another applicable statute. (Emphasis added.)
In Willis, 199 S.W.3d at 271-73, the Texas Supreme Court discussed the public policy reasons for Article 2.21 as follows:
As a matter of law, the corporate shield from liability should operate in these circumstances. A bedrock principle of coiporate law is that an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation’s contractual obligations.FN11 Avoidance of personal liability is not only sanctioned by the law; it is an essential *409reason that entrepreneurs like Willis choose to incorporate their businesses. Not surprisingly, Willis testified that his intent always “was for the corporation to be bound by this agreement and not me individually.” Donnelly’s own counsel, in his opening statement to the jury, argued that Willis scratched his name off the agreement because he “didn’t want to have anything to do with it in an individual capacity.”
In Castleberry v. Branscum, we stated that incorporation normally protects shareholders, officers, and directors from liability for corporate obligations, “but when these individuals abuse the corporate privilege, courts will disregard the corporate fiction and hold them individually liable.” 721 S.W.2d at 271. We also stated that “[w]e disregard loathe corporate fiction, even though corporate formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result.” Id. The business community was displeased with the flexible approach to piercing the corporate veil embraced in Castleberry, and in response the Legislature in 1989 narrowly prescribed the circumstances under which a shareholder can be held liable for corporate debts.FN12
Castleberry, in particular its use of constructive fraud as a basis of piercing the corporate veil, was considered by many practitioners to be incorrectly decided. Further, while questionable in the context of tort claims, the use of constructive fraud as a means of piercing the corporate veil created a cloud on the sanctity of contract and the public policy of recognizing corporations as separate entities apart from their shareholders. In response to Castleberry, Article 2.21 of the TBCA was amended in 1989 to establish a clear legislative standard under which the liability of a shareholder for the obligations of a corporation is to be determined in the context of contractual obligations and all matters relating thereto. TEX. BUS. CORP. ACT ANN. art. 2.21 cmt. (Vernon 2003) (recodified at TEX. BUS. ORGS. CODE §§ 21.223-21.226).
Under current law, by statute, a shareholder “may not be held liable to the corporation or its obligees with respect to ... any contractual obligation of the corporation ... on the basis that the holder ... is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory .... ” The liability of a shareholder for *410a contractual corporate debt under this statute “is exclusive and preempts any other liability imposed for that obligation under common laiv or otherwise.” There is a statutory exception to this rule where the shareholder “caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the” shareholder. The jury rejected Donnelly’s fraud claim.
1130....
To impose liability against the Willises under a common law theory of implied ratification because they accepted the benefits of the letter agreement would contravene the statutory imperative that, absent actual fraud or an express agreement to assume personal liability, a shareholder may not be held liable for contractual obligations of the corporation. We hold that characterizing the theory as “ratification” rather than “alter ego” is simply asserting a “similar theory” of derivative liability that is covered by the statute. (Emphasis added; some footnotes omitted.)
The language of Article 2.21 is clear and unambiguous. A shareholder (Health Net) “shall be under no obligation to the corporation” in which it holds shares (Texas HMO or AmCareco) with respect to “any contractual obligation ... or any matter relating to or arising from the obligation” of the corporation (Texas HMO or AmCa-reco) on the basis that the shareholder (Health Net) “was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to perpetuate fraud, or other similar theory ” unless the obligee (the Texas HMO and/or its creditors as represented by the Texas Receiver) proves the following elements: (1) the shareholder (Health Net) caused the corporation (Texas HMO and/or AmCare-co) to be used to perpetuate actual fraud on the obligee (Texas HMO and/or its creditors); and (2) this conduct was primarily “for the direct personal benefit ” of the shareholder (Health Net). (Emphasis added.)
In Archer v. Griffith, 390 S.W.2d 735, 740 (Tex.1964), the distinction between actual fraud and constructive fraud was defined as follows:
The issue here is constructive or legal fraud and not actual fraud. Actual fraud usually involves dishonesty of purpose or intent to deceive, whereas constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests.
[ mSee discussion of the interrelationship between constructive fraud and a fiduciary duty in Chien v. Chen, 759 S.W.2d 484, 494-96 (Tex.App.-Austin 1988).
Subsidiary corporations and parent corporations are separate and distinct “persons” as a matter of law, and the separate entity of corporations will generally be observed by the courts even where one company may dominate or control the other company, or treats the other company as a mere department, instrumentality, or agency. Valero South Tex. Processing Co. v. Starr County Appraisal Dist., 954 S.W.2d 863, 866 (Tex.App.-San Antonio 1997, pet. denied). The “single business enterprise” theory is an equitable doctrine used to disregard the separate existence of corporations when the corporations are not operated as separate entities, but rather integrate their resources to achieve a common business purpose. Old Republic Insurance Co. v. EX-IM Services Corp., 920 S.W.2d 393, 395-96 (Tex.App.-Houston [1st Dist.] 1996, no writ).
*411In Texas-Ohio Gas, Inc. v. Mecom, 28 S.W.3d 129, 137 (Tex.App.-Texarkana 2000), the court interpreted the “any contractual obligation of the corporation or any matter relating to or arising from the obligation” language contained in Article 2.21. Texas-Ohio Gas, Inc. is an action arising out of a contractual agreement for the sale of natural gas where the plaintiff alleged others misrepresented facts concerning a merger between two separate entities which induced the plaintiff to allow credit purchases of natural gas by one of the corporations. This led the plaintiff to believe it was doing business with a larger and financially more secure corporation. When the purchaser entered bankruptcy proceedings, the plaintiff filed suit against one of the solvent entities and its officers alleging fraud, fraudulent inducement, negligent misrepresentation, and tortious interference with a contract. The 1132plaintiff alleged the defendants participated in a scheme that induced the plaintiff to sell the natural gas to an insolvent entity. The court dismissed the corporate officers, stating, “All of [the plaintiffs] claims are attempting to hold shareholders personally liable for a ‘matter relating to or arising from’ a contractual obligation of the corporation.” Texas-Ohio Gas Inc., 28 S.W.3d at 137. The court went on to note “Article 2.21 limits liability for contractual obligations of the corporation and also limits liability for torts ‘relating to or arising from’ such, contractual obligations.” Texas-Ohio Gas Inc., 28 S.W.3d at 137, n. 8. As authority, the court cited Menetti v. Chavers, 974 S.W.2d 168, 174 (Tex.App.-San Antonio 1998).
Menetti was a ease brought by plaintiffs against a construction company and its shareholders for damages arising from faulty construction. The shareholders were eventually held personally liable and they appealed. The Menetti court stated the following:
In 1993, the TBCA was revised to state that no contractual liability could be found under alter ego or “similar” theories unless there was also a finding that the individual to be charged used the corporation to perpetuate and did perpetuate actual fraud on the obligee of the contract, primarily for the personal benefit of the individual. See Tex. Bus. Corp. Act. Ann. art. 2.21(A)(2) (Vernon Supp.1998). Prior to these amendments, commentators and courts agreed that all claims that were not contractual were governed by Castleberry, which required only a showing of constructive fraud in order to pierce the corporate veil. See James Gerard Gaspard, II, A Texas Guide to Piercing and Preserving the Corporate Veil, 31 Bull. Bus. L. See. St. B. Tex. 24, 34 (Sept1994) (1993 amendments in no way limited alter ego tort claims); see also Stewart & Stevenson Serv., Inc. v. Serv-Tech, Inc., 879 S.W.2d 89, 107 (Tex.App.-Houston [14th Dist.] 1994, writ denied) (considering alter ego claim under Castleberry, without requiring showing of actual fraud, where parties had not entered into contract, and claim was in tort). Traditionally, Texas cases have attempted to treat contract claims and tort claims differently in determining whether to pierce the corporate veil. See Lucas v. Texas Industry, Inc., 696 S.W.2d 372, 375 (Tex.1984) (pointing out differences between tort and contract alter ego cases). The 1989 amendments to article 2.21 apparently tried to keep this distinction alive.
[ 13SOne commentator has suggested that this distinction has existed because, in contract cases, the parties have voluntarily come together to conduct business, but in tort cases there is no such voluntariness: “The theory of the statute is that the Texas Business Corporations Act should be more stringent in *412contract cases than in tort cases because in contract cases the plaintiff had the opportunity to select the entity with which he deals as opposed to tort cases in which no such choice exists.” Gas-pard, A Texan Guide to Piercing and Preserving the Corporate Veil, at 34.
Under 1997 amendments, article 2.21(A)(2) appears to blur the distinction between contractual obligations and other claims. The provision now states that it covers all contractual obligations of the corporation “or any matter relating to or arising from the obligation.” Tex. Bus. Corp. Act Ann. art. 2.21(A)(2) (Vernon Supp.1998) (amended by Act of May 1, 1997, eh. 375, § 7, 1997 Tex. Sess. Law Serv. 1522-3) (emphasis added). The amendment took effect on September 1, 1997, and applies to all corporations, regardless of the date of them incorporation. Act of May 1, 1997, ch. 375, § 125, 1997 Tex. Sess. Law Serv. 1610. For all matters covered by this provision, the corporate veil may not be pierced absent a showing of actual fraud. The commentary following the 1990 amendments suggests that the actual fraud requirement slumld be applied, by analogy, to tori claims, especially those arising from contractual obligations. See Tex. Bus. Corp. Act. Ann. art. 2.21 comment (Vernon Supp.1998).
In the case before the court, both contract and tort claims have been brought against the Menettis. Whether a showing of actual fraud is required to pierce the corporate veil in this case is, we believe, a question of some difficulty. However, after surveying the case law and the legislation, which seem to be somewhat at odds on the entire issue of corporate-veil piercing, we conclude that the claims before us do relate to or arise from a contractual obligation and therefore fall under the amended article 2.21. (Emphasis added.)
Menetti, 974 S.W.2d at 173-74.
The court found that the evidence did not establish actual fraud by the Menettis. “Because [A]rticle 2.21 requires a fraud finding to pierce the corporate veil by the methods outlined in the statute and by ‘other similar’ theories, this finding eliminates individual liability for all the other theories pleaded by the [plaintiffs].” Men-etti, 974 S.W.2d at 175.
1 VMBy the express terms of the statute, Article 2.21 is the exclusive means of imposing liability. In Metal Building Components, LP v. Raley, 2007 WL 74316, p. 12 (Tex.App.-Austin 2007), the court stated: '
Texas law precludes holding individual shareholders liable for corporate debts except in narrowly prescribed circumstances. Willis v. Donnelly, 199 S.W.3d 262, 271-72 (Tex.2006). A shareholder “may not be held liable to the corporation or its obligees with respect to ... any contractual obligation of the corporation ... on the basis that the holder ... is or was the alter ego of the corporation or on the basis of actual fraud or constructive fraud, a sham to perpetuate a fraud, or other similar theory.” Tex. Bus. Orgs.Code Ann. § 21.223(a) (West Supp.2006) (previously codified at Tex. Bus. Corp. Act Ann. art. 2.21(A) (West 2003)). Liability of a shareholder under section 21.223 “is exclusive and preempts any other liability imposed for that obligation under common law or otherwise.” Id. § 21.224 (West Supp. 2006). The only exceptions to this rule are where the shareholder “caused the corporation to be used for the purpose of perpetuating and did perpetuate an actual fraud on the obligee primarily for the direct personal benefit of the shareholder,” or where the shareholder “expressly ... agrees to be personally liable to the obligee for the obligation.” *413Id. §§ 21.223(b), .225(1) (West Supp. 2006). (Emphasis added.)
In Sarratt v. Alamo Square, Inc., 1997 WL 271702, 4 (Tex.App.-Amarillo 1997), the court observed as follows:
For instance, she likens the circumstances at bar to those addressed in Castleberry v. Branscum, 721 S.W.2d 270 (Tex.1986). There, the Texas Supreme Court discussed the means by which one could pierce the corporate veil to impose liability for corporate debt upon the entity’s shareholders. For the most part, it held that such could occur when the “corporate form has been used as part of a basically unfair device to achieve an inequitable result.” Id. at 271. Yet, Castleberry is no longer controlling law. In 1989, the state legislature amended article 2.21 of the Texas Business Corporation Act to negate portions of Castleberry. Now, the only way a shareholder may be held liable for the contractual obligations of a corporation is through article 2.21. Tex. Bus. Corp. Act Ann. art. 2.21 (Vernon Supp.1997) (1996 Comment of Bar Committee). As staled, in the statute, the “liability of a [shareholder ... of a, corporation for an obligation that is limited, by Section A of this article is exclusive and, preempts any other liability imposed on a holder, owner, or subscriber of shares of a corporation ... under common, law or otherwise ....” Id. at art. 2.21(B).FN6 Thus, if the shareholder is not liable as per article 2.21 or other statute, he is not liable. It is no longer enough to merely invoke the | isr,arcane theories of Castleberry and proffer the amorphous concept of inequity.FN7
Finally, as previously indicated in Southern Union Co., 129 S.W.Sd at 87, n. 40, the following appears:
Since 1993, article 2.21 has provided that with certain exceptions that do not apply in this case, section A of article 2.21 is the exclusive means for imposing liability on a corporation for the obligations of another corporation in which it holds shares. (Emphasis added; footnote omitted.)
To paraphrase, pursuant to Article 2.21B, the liability of Health Net as a shareholder of either the Texas HMO or AmCareco for any obligation that is covered by Section A of Article 2.21 is exclusive and preempts any other \ pliability imposed on Health Net for that obligation under common laiv or othenvi.se. The only exceptions are that Health Net may be obligated to an obligee of the Texas HMO or AmCareco if: (1) Health Net *414“assumed, guaranteed, or agreed to be personally liable to the obligee for the obligation,” or (2) Health Net “is otherwise liable to the obligee for the obligation under this Act or another applicable statute.” (Emphasis added.) The record on appeal does not reflect that Health Net has assumed, guaranteed, or agreed to be personally liable for any obligation of the Texas HMO or its creditors. The Texas Receiver has asserted causes of action against Health Net for unfair and deceptive acts and practices pursuant to Tex. Ins.Code Article 21.21 and breach of fiduciary duty pursuant to Tex. Insurance Code § 843.401.
(6) Fiduciary Duties of a Director, Officer, Shareholder or Other Person to an HMO Pursuant to Tex. Ins. Code § 843.401 (formerly Article 20A.08)
Section 843.401 of the Texas Insurance Code provides as follows:
A director, officer, member, employee, or partner of a health maintenance organization who receives, collects, disburses, or invests funds in connection with the activities of the health maintenance organization is responsible for the funds in a fiduciary relationship to the enrollees.
This provision is located in Subchapter L—Financial Regulation of Health Maintenance Organizations, of Chapter 843— Health Maintenance Organizations, of Subtitle C-Life, Health, and Accident Insurers and Related Entities, in the Texas Insurance Code.61
[ mAs previously indicated, prior to the sale, the Texas HMO corporation was a wholly-owned subsidiary of the Health Net corporation. Health Net was the sole shareholder of the Texas HMO. Section 843.401 is clear and unambiguous in imposing fiduciary responsibilities on the directors, officers, members, employees, and partners of a Texas HMO; it is also clear and unambiguous in not imposing fiduciary responsibility on a shareholder of a Texas HMO (like Health Net).
The time-honored rule of statutory construction of Expressio Unius est Exdusio Alterius (expression of one thing implies the exclusion of another) dictates that when the Texas legislature specifically enumerated a series of things, the legislature’s omission of other items, which easily could have been included, is deemed intentional. CKB & Associates, Inc. v. Moore McCormack Petroleum, Inc., 734 S.W.2d 653, 655 (Tex.1987); State, Dep’t of Public Safety & Corrections v. Louisiana Riverboat Gaming Comm., 94-1872, p. 17 (La.5/22/95), 655 So.2d 292, 302; Lamonica & Jones, 20 La. Civ. Law Treatise, Legislative Law and Procedure, § 7.6, pp. 147-48, Thus, prior to the sale, Health Net individually did not owe a fiduciary duty to the Texas HMO enrollees because it was not one of the types of persons listed in § 843.401. Further, because the Texas legislature provided for the fiduciary duty to flow from specified persons to HMO en-rollees only, it is arguable that no fiduciary duty flows to HMO employees, providers, and other creditors (who were not named). Cf. Ransome v. Ransome, 2001-2361, p. 6-7, (La.App. 1 Cir. 6/21/02), 822 So.2d 746, 753.
The evidence in the record on appeal indicates that, prior to the sale, Jay Gel-*415lert, Health Net’s CEO, was on the boards of directors of the HMOs and Michael Jansen, Health Net’s vice president, assistant general counsel | i3Sand assistant secretary, was the secretary of each of the HMOs. Section 843.401 provides that only specified persons owe a fiduciary duty to enrollees and then only if they collect, disburse, or invest funds in connection with the activities of the Texas HMO. The record on appeal does not indicate that Gellert, acting as a director of the Texas HMO, or Jansen, acting as the secretary of the HMOs, engaged in any of these activities prior to the sale. Therefore, neither Gellert nor Jansen owed a fiduciary duty to the HMO enrollees prior to the sale. Accordingly, prior to the sale, in the Texas case Health Net could not be vicariously liable through Gellert and/or Jansen for a fiduciary duty owed to an enrollee as a matter of law.
The trial court instructions and interrogatory on fiduciary duty did not properly explain these various factual contingencies to the jury or obtain an appropriate response from them. The facts presented at the trial pertaining to this issue required that a more precise charge with alternative interrogatories be given to the jury. Bon-cosky Services, Inc., 98-2339 at pp. 10, 751 So.2d at 286.
If the sale was not a sham, the legal relations between the parties were modified when the sale was executed. In this factual posture, Health Net is a shareholder in AmCareco, is not a shareholder in the Texas HMO, is not a director, officer, member, employee, or partner of the Texas HMO and does not owe a fiduciary duty to the enrollees of the Texas HMO pursuant to Section 843.401 as a matter of law. AmCareco, as the parent corporation, would have the same liability exposure as Health Net had prior to the sale.
(7) Fiduciary Duties Owed by Shareholders of Corporations that are Solvent, Insolvent or in the Zone of Insolvency
The trial court judge gave the Texas jury extensive instructions concerning the fiduciary duty by a shareholder in a corporation that was 113flsolvent, insolvent, or in the zone of insolvency. These instructions were based on the Texas common law and not on Article 2.21 or § 843.401. Pursuant to Article 2.21B, Article 2.21A provides an exclusive remedy and preempts the Texas common law. The only pertinent exception to this rule in Article 2.21B(2) is if the shareholder is liable under another applicable statute. Section 843.401 is such a statute, and it does not provide for the distinction between solvent and insolvent corporations.Thus, the extensive trial court instructions erroneously instructed the jury on Texas law pertaining to the fiduciary duty owed by a shareholder in a corporation that is solvent, insolvent, or in the zone of insolvency.
(8) Conclusion
Common law causes of action in Texas against Health Net for breach of a fiduciary duty are preempted by Article 2.21. The only tort duty Health Net had as a shareholder according to Article 2.21 was a duty not to commit actual fraud. The cause of action for breach of fiduciary duty in § 843.401 is not preempted. The trial court judge instructed the Texas jury in accordance with the Texas common law on this issue and did not instruct the jury in accordance with Article 2.21 or § 843.401. This was prejudicial legal error.
These assignments of error have merit.
b. Fraud
(Assignments of Error TX-13, and 14; TX Proposed Jury Instructions 27.1, *41641, 42, 44, 45, 46, 47, 49, 52, 53, 54, 55, 57 and 103)
The trial court judge gave the following jury instruction on fraud by misrepresentation and omission:
You are instructed that fraud occurs when a partj fails to disclose a material [float within the knowledge of that party, that the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth or the party intends to induce the other to take some action by | ^failing to disclose a fact or the party suffers injury as a result of the act of acting without knowledge of the undisclosed fact.
In addition, fraud includes the successful use of cunning, deception, or artifice to cheat another to them [sic] injury. (Emphasis added.)
Health Net asserts that the second paragraph of this instruction purports to define fraud by misrepresentation (conventional fraud) and “omits virtually every element required to prove fraud under Texas law.” Health Net argues that the instruction does not include the elements of “(1) a statement by the defendant; (2) falsity; (3) knowledge of falsity; (4) intent to induce reliance; and (5) reasonable reb-anee.” Further, the instruction fails to have supporting “instructions correctly defining critical terms such as materiality, reliance, misrepresentation, and recoverable damages.”
Health Net asserts that the first paragraph of this instruction that purports to define fraud by omission (fraud by concealment or by failure to disclose when there is a duty to disclose) was based on PJC 105.4 but “it deviated from 105.4 in two critical respects, making it prejudicially erroneous.” First, the trial court judge used the disjunctive conjunction “or” rather than the conjunctive conjunction “and” (as used in PJC 105.4) to separate the last two elements of the tort from the first two elements. In this posture, the jury was instructed that it could find that fraud by omission occurred if only two of the four essential elements were found and could reach that conclusion three different ways, namely: (1) elements a and b; (2) elements a and c; and (3) elements a and d. Second, pursuant to the facts in this case, the only way that Health Net could commit this type of fraud was if it had a duty to disclose and the trial court judge failed to instruct the jury about this condition precedent.
| uiThe Texas Receiver responds that “[T]he fraud instruction was proper under Texas law.” She asserts that for the instruction pertaining to fraud by misrepresentation, “Numerous Texas cases have approved jury instruction that contained this latter definition of fraud.” She further asserts that, with reference to the instruction on fraud by omission, it is the province of the court to determine whether there is a duty of a person to speak or disclose, and, thus, this is a question of law and not a question of fact for the jury. Finally, she argues that Health Net cannot assert error in the fraud by omission instruction because it did not object to the instruction at trial as required by La. C.C.P. art. 1793 C.62
In Ernst & Young, L.L.P. v. Pacific Mutual. Life Ins. Co., 51 S.W.3d 573, 577 (Tex.2001), appears the following:
To prevail on its fraud claim, Pacific must prove that: (1) Ernst & Young made a material representation that was *417false; (2) it knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) it intended to induce Pacific to act upon the representation; and (4) Pacific actually and justifiably relied upon the representation and thereby suffered injury. (Emphasis added.)
See also Johnson v. Brewer & Pritchard, 73 S.W.3d 193, 211, n. 45 (Tex.2002).
In Custom Leasing, Inc. v. Texas Bank & Trust Co. of Dallas, 516 S.W.2d 138, 142-43 (Tex.1974), the following appears:
The elements of actionable fraud in Texas were stated in Wilson v. Jones, 45 S.W.2d 572 (Tex.Comm.App.1932, holding approved), as follows:
The authorities announce the general rule that to constitute actionable fraud it must appear: (1) That a material representation was made; (2) that it was false; (3) that, when the speaker made it, be [sic] knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) that he made it with 1142the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; and (6) that he thereby suffered injury. The gist of an action based upon fraud is found in the fraud of defendant and damage to plaintiff. Each of these elements must be established with a reasonable degree of certainty, and the absence of any one of them will prevent a recovery. 26 C.J. pp. 1062, 1063, 1064, and 1065; Wortman v. Young[J (Tex.Civ.App.) 221 S.W. 660.3
See also New Process Steel Corp. v. Steel Corp. of Texas, Inc., 703 S.W.2d 209, 213-14 (Tex.App. 1 Dist.1985); Compaq Computer Corp. v. Ergonome, Inc., 2001 WL 34104826, **5-6, 2001 U.S. Dist. LEXIS 23485, pp. 16-17 (2001); Prosser & Keeton, supra, § 105, p. 728.
Texas Pattern Jury Charge 105.2 provides as follows:
Fraud occurs when—
a. a party makes a material misrepresentation,
b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,
c. the misrepresentation is made with the intention that it should be acted on by the other party, and
d. the other party relies on the misrepresentation and thereby suffers injury.
“Misrepresentation” means:
[A false statement of fact [or ]
A promise of future performance made with an intent, at the time of the promise was made, not to perform as promised [or ]
A statement of opinion based on a false statement of fact [or ]
A statement of opinion that the maker knows to be false [or ]
An expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion.] [From PJC 105.3A-E.] (Emphasis added.)
| i4SThe trial court judge failed to properly instruct the jury on the elements of fraud by misrepresentation and committed error. The Texas Receiver’s argument to the contrary is without merit.
In Schlumberger Technology Corp. v. Swanson, 959 S.W.2d 171, 181 (Tex.1997), the Texas Supreme Court observed that *418“[fjraud by nondisclosure is simply a subcategory of fraud because, where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts.” See also Cone v. Fagadau Energy Corp., 68 S.W.3d 147, 170 (Tex.App.-Eastland 2001). In Insurance Co. of North America v. Morris, 981 S.W.2d 667, 674 (Tex.1998), the Texas Supreme Court stated that “Generally, no duty of disclosure arises without evidence of a confidential or fiduciary relationship. Fiduciary duties arise as a matter of law in certain formal relationships, including attorney-client, partnership and trustee relationships.” (Emphasis added.)
In American Tobacco Co., Inc. v. Grinnell, 951 S.W.2d 420, 436 (Tex.1997), the Texas Supreme Court observed that “Similarly, when circumstances impose upon a party a duty to speak and the party remains silent, the silence itself can be a false representation. Just as with affirmative misrepresentations, the allegedly defrauded party must have reasonably relied on the silence to his detriment.”
Texas Pattern Jury Charge 105.4 on fraud by omission provides as follows:
Fraud occurs when—
a. a party fails to disclose a material fact within the knowledge of that party,
b. the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,
c. the party intends to induce the other party to take some action by failing to disclose the fact, and
|1<Md. the other party suffers injury as a result of action without knowledge of the undisclosed fact. (Emphasis added.)
This charge on fraud by omission (failure to disclose when there is a duty to disclose) reflects the law of Texas on this issue that is cited in the Comment for the charge. This charge is clear and unambiguous and shows 'that the four elements of proof are connected with the conjunctive conjunction “and” and that all four elements must be proven to succeed on this cause of action. Liability cannot be proven based on only two elements. Because the trial court judge improperly replaced the conjunction “and” with two disjunctive conjunctions “or”, the substantive meaning of the charge was radically and prejudicially modified. The word “or” is used to express an alternative or to give a choice of one among two or more things.63 The trial judge committed error by changing “and” to “or”, and, thus, improperly instructed the jury on the elements of fraud by omission.
As previously indicated, pursuant to Tex. Bus. Corp. Act Article 2.21, the only fraud duty owed by Health Net was actual fraud for its personal benefit. The instruction given did not instruct the jury on this issue. See PJC 108.4 and its Comment.
Finally, as previously indicated, the trial court judge has a mandatory duty to correctly instruct the jury on the law on all essential factual issues neeessaiy to decide the case. The trial court judge did not instruct the jury on Tex. Bus. Corp. Act article 2.21. The subject instruction on *419fraud is not such an instruction; it is fatally flawed. This is patent error.
1145These assignments of error have merit.
c. Unfair or Deceptive Acts or Practices in Violation of Article 21.21 of the Texas Insurance Code64
(Assignment of Error TX-16; Proposed Texas Jury Instructions 68, 69, 70, 71, 72, 73 and 74)
For this jury instruction, the trial court judge essentially tracked the language of Tex. Ins.Code Article 21.21, §§ 4(2), 4(5)(a) and 4(5)(b) that defined what constituted some unfair or deceptive acts or practices.65
| ^Health Net asserts that, although the trial court “correctly instructed on acts that constitute unfair practices under the Texas Insurance Code,” the trial court “otherwise failed to instruct adequately on the claim.” Health Net argues Article 21.21, § 2 defines a “person” for purposes of that Article as “any individual, corporation, association, partnership ... and any other legal entity engaged in the business of insurance, including agents, brokers, adjusters and life insurance counselors.” (Emphasis added.)
Health Net contends it was not engaged in the business of insurance either before or after the sale; only AmCare-TX was. “The evidence at trial showed that AmCa-reco exclusively operated and managed the HMOs following the sale ... The Receivers introduced no contrary testimony.” Health Net argues it was not liable based on this cause of action as a matter of law. “[T]he jury was permitted to find Health Net liable for violating a statute without first finding the statute even applied to it — a finding it could not have made based on the evidence in the record.”
The Texas Receiver responds that “Health Net proposed to instruct the jury *420that its pre-transaction conduct was irrelevant. “Such assertion is directly contrary to abundant evidence adduced at trial, which proved that it was Health Net’s pre-transaction conduct that made the demise of the HMO inevitable.”
The basic issue in this assignment of error is whether, as a matter of law, Health Net is a “person” for the purposes of Article 21.21. Whether there is sufficient evidence to support giving the instruction becomes at issue only if Article 21.21 applies; if Article 21.21 does not apply as a matter of 1147law, the sufficiency of the evidence to support giving the instruction is irrelevant.
Article 21.21 is found in Subchajoter B— Misrepresentation and Discrimination, of Chapter Twenty-one — General Provisions, of the Texas Insurance Code. Section 2(a) of Article 21.21 entitled “Definitions” provides as follows: .
Sec. 2. When used in this Article:
(a) “Person” shall mean any individual, corporation, association, partnership, reciprocal exchange, inter-insurer, Lloyds insurer, fraternal benefit society, and any other legal entity engaged in the busviess of insurance, including agents, brokers, adjusters and life insurance counselors. (Emphasis added.)
Section 3 of Article 21.21 is entitled “Unfair Methods of Competition or Unfair and Deceptive Acts or Practices Prohibited” and provides as follows:
Sec. 3. No person shall engage in this state in any trade practice which is defined in this Act as, or determined pursuant to this Act to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance. (Emphasis added.)
Section 1 of Article 21.21 is entitled “Declaration of Purpose” and provides as follows:
(a) The purpose of this Act is to regulate trade practices in the business of insurance by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.
(b) This Article shall be liberally construed and applied to promote its underlying purposes as set forth in this section. (Emphasis added.)
As previously indicated, the rules for interpretation of laws in Texas are substantially the same as those in Louisiana.
| ^isArticle 21.21, § 2(a) is clear and unambiguous in providing that a corporation and its agents, brokers, and adjusters can be “persons” engaged in the business of insurance and subject to liability for engaging in an unfair or deceptive act or practice as defined in Section 4 of the Article. AmCare-TX was such a “person,” as well as its agents, brokers, and adjusters.
However, prior to the sale, AmCare-TX was a wholly-owned subsidiary of Health Net. As the sole shareholder in the Am-Care-TX corporation, was Health Net engaged in the business of insurance? In Liberty Mutual Insurance Co. v. Garrison Contractors, Inc., 966 S.W.2d 482 (Tex.1998), the question was whether an insurance company employee was engaged in the business of insurance for purposes of Article 21.21. In Liberty Mutual Insurance Co., 966 S.W.2d at 486, the following appears:
We emphasize, however, that not every employee of an insurance company is a “person” under Article 21.21 and therefore subject to suit under section 16. To come within the statute, an employee must engage in the business of *421insurance. In this case, Garrett personally carried out the transaction that forms the core of Garrison’s complaint. Garrett testified that his job responsibilities included soliciting and obtaining insurance policy sales and explaining policy terms to prospective buyers. He was also responsible for explaining premium calculations to consumers. Garrett was thus required to have a measure of expertise in the field, which was necessary to perform his job. Clearly, Garrett was engaged in the business of insurance. On the other hand, cm employee, who has no responsibility for the sale or servicing of insurance policies and no special insurance expertise, snch as a clerical worker or janitor, does not engage in the insurance business. (Emphasis added.)
By analogy, if a corporate employee who has no responsibility for the sale or servicing of insurance policies is not in the insurance business, then a natural or corporate (juridical) “person” (Health Net) who is only a shareholder in an insurance business corporation (AmCare-TX) and has no responsibility for the sale or servicing of insurance policies is also not in the insurance business.
_J_yc)Further, Section 2 of Article 21.21 is clear and unambiguous in providing that for purposes of “this Article,” the “persons” to whom the article applies are any (1) individual, (2) corporation, (3) association, (4) partnership, (5) reciprocal exchange, (6) inter-insui'er, (7) Lloyds insurer, (8) fraternal benefit society or (9) other legal entity engaged in the business of insurance including the (10) agents, (11) brokers, (12) adjusters, and (13) life insurance counselors of those legal entities. Although this is an extensive listing of those to whom Article 21.21 applies, the list does not include natural or corjrorate shareholders of a legal entity. As previously indicated, it is a time-honored rule of statutory construction that the expression of one thing in a statute implies the exclusion of another. This rule dictates that, when the Texas legislature specifically lists a series of things, the omission of other things which easily could have been included is deemed intentional.
Accordingly, because natural or corporate shareholders were not included in this listing, they were intentionally excluded. Therefore, as a matter of law, Article 21.21 does not apply to Health Net as a shareholder in AmCare-TX unless it had responsibility for the sale or servicing of AmCare-TX policies. The trial court judge failed to so advise the jury of this, and, thus, committed patent prejudicial error.
This statutory construction is consistent with the very strong public policy in Texas concerning the liability of shareholders for corporate torts expressed in Tex. Bus. Corp. Act article 2.21 as interpreted by the Texas Supreme Court in Willis v. Donnelly.
The preceding discussion pertains to the factual scenario where the sale was determined to be a sham. As previously indicated, if the sale was not a sham, the legal relations between Health Net, AmCa-reco, and | ianAmCare-TX are substantially changed. In that factual posture, Am-Care-TX is a wholly-owned subsidiary of AmCareco, AmCareco is the sole shareholder in AmCare-TX, and Health Net is a shareholder in AmCareco. Unless Health Net acted jointly with or conspired with AmCareco and/or AmCare-TX to violate Article 21.21 or was engaged in a single business enterprise with them, it could not be liable for violation of Article 21.21, and the jury should have been so instructed. These facts and the law mandated, that the trial court give a more precise and/or a disjunctive charge to the jury than that *422which was given and failure to do so was error. Boncosky Services, Inc., 98-2239 at p. 10, 751 So.2d at 285.
This assignment or error has merit.
d. Conspiracy; Intentional Tort; Specific Intent
(Assignment of Error TX-15; TX Proposed Jury Instructions 57, 58, 59 and 60)
The trial court judge gave the following jury instruction on the issue of conspiracy:
You are instructed that a conspiracy is a meeting of minds or agreement by two or more persons or corporations to accomplish an unlawful act or a lawful act by illegal means. To be part of a conspiracy, at least two parties must have had knowledge of, agreed to, and, intended a common objective or course of action that resulted in the damage to plaintiff.
One or more person involved in a conspiracy must have performed some act or acts to further the conspiracy. One of [sic] more persons must commit an unlawful act in connection with the conspiracy.
[[Image here]]
Defendant maintains — excuse me. The plaintiff maintains that the defendant participated in a conspiracy with PriceWaterhouseCoopers, Tom Luck-singer, Michael Nadler, Stephen Nazar-enus, John Mudd, Michael Jihn [sic], William Galtney, Proskauer Rose, Stuart Rosow to accomplish an unlawful purpose or to use unlawful means to accomplish a lawful purpose.
Conspiracy is a derivative claim meaning it requires a[sic] underlying intentional lorong. To hold Health Net liable 11fi1for conspiracy, you must find an underlying intentional wrong occurred. (Emphasis added.)
Health Net asserts that “[although this instruction was based on Texas PJC 109.1, it failed to adequately instruct on specific intent.” Health Net argues this was error because the jury “was not required to find specific intent as Texas law requires, namely that Health Net ‘intended to cause injury or was aware of the harm likely to result from the wrongful conduct’ ”, citing Triplex Communications, Inc. v. Riley, 900 S.W.2d 716, 720 (Tex.1995).
The Texas Receiver responds that the instruction given substantially tracks PJC 109.1 and that “[Conspiracy liability does not require a finding that Health Net ‘intended to cause the injury’.” Further, the Texas Receiver asserts that “Health Net waived any complaint as to the trial court’s conspiracy instruction by failing to object to those instructions at trial,” citing La. C.C.P. art. 1793 C.66
In Insurance Co. of North America, 981 S.W.2d at 675, the following appears:
To prevail on their conspiracy theory, the Investors had to establish the following elements: (1) a combination of two or more persons; (2) an object to be accomplished (an unlawful purpose or a lawful purpose by unlawful means)[;] (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.
Pattern Jury Charge 109.1 and its pertinent comments provide as follows:
Question and Instruction on Conspiracy QUESTION_
I reconditioned on findings of a statutory violation or a tort (other than *423negligence) that proximately caused damages.]
Was Connie Conspirator part of a conspiracy that damaged Paul Payne?
To be part of a conspiracy, Connie Conspirator and another person or persons must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in the damages to Paul Payne. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.
Answer:_
COMMENT
When to use. PJC 109.1 submits the question of conspiracy to accomplish the unlawful objective of harming another by committing a statutory violation or a tori (other than negligence). See comment below, “Conspiracy to accomplish lawful objective by unlawful means,” for the situation involving a conspiracy to employ an unlawful means to accomplish a lawful objective. Civil conspiracy to unlawfully harm another is a derivative tort. Liability is dependent on participation in some underlying statutory violation or a tort (other than negligence ). It is a means for imposing joint and several liability on persons in addition to the actual perpetrators(s) of the underlying tort.
[[Image here]]
Knowledge, intent, and agreement.. To be liable for conspiracy, a party must be shown to have intended to do more than engage in the conduct that resulted in the injury. It must be shown that from the inception of the combination or agreement the party intended, to cause the injury or ivas aware of the harm likely to result from the wrongful conduct. Triplex Communications, Inc. [v. Riley], 900 S.W.2d at 720; Great National Life Insurance Co. v. Chapa, 377 S.W.2d 632, 635 (Tex.1964). Thus, a party must be shoum to have knoivn the object and purpose of the conspiracy and to have had a meeting of the minds with the other conspirators to accomplish that object and purpose, intending to bring about the resulting injury. [Schlumburger Well Surveying Corp. v.] Nortex Oil & Gas Corp., 435 S.W.2d [854] at 857 [Tex.1969],
Unlawful act. A defendant’s liability for conspiracy is based on participation in the statutory violation or underlying tort (other than negligence) that would have been actionable against at least one of the conspirators individually. Tilton v. Marshall, 925 S.W.2d 672, 681 (Tex.1996); International Bankers Life Insurance Co. v. Holloway, 368 S.W.2d 567, |153581 (Tex.1963). An act or declaration by a conspirator not in pursuance of the common objective is not actionable against coconspirators. Chapa, 377 S.W.2d at 635. Likewise, an improper motive in performing a lawful action will not support liability for conspiracy. Kingsbery v. Phillips Petroleum, Co., 315 S.W.2d 561, 576 (Tex.Civ.App.-Austin 1958, writ ref'd n.r.e.). The injury must have been caused by the tort or statutory violation that the conspirator agreed with the perpetrator to bring about while intending the resulting harm. Triplex Communications, Inc., 900 S.W.2d at 720; Nortex Oil & Gas Corp., 435 S.W.2d at 857. Once a civil conspiracy is found, each co-conspirator is responsible for the actions of any coconspirator in furtherance of the conspiracy. Thus each element of the underlying tort or violation is imputed to each participant. Akin v. Dahl, 661 S.W.2d 917, 921 (Tex.1983), cert. denied, 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984). (Emphasis added.)
*424A cause of action for civil conspiracy in Texas has vicarious, derivative, and joint liability elements. The tortfeasor in a civil conspiracy action is vicariously liable because he is liable for the acts of others with whom he conspires by operation of law. Maraist & Galligan, supra, § 1.07, p. 1-8.1. This type of liability is sometimes called imputed liability. See definition of “imputed negligence” in Black’s, supra at 1057. The liability is derivative because it is dependent upon participation in some underlying statutory violation or a tort (other than negligence). The liability is joint, rather than concurrent, because the tortfeasors act together to cause damage, rather than acting independently to cause damage. 53 Tex. Jur.3d Negligence § 27; Prosser & Keeton, supra, § 46, pp. 322-24; cf. Black’s, supra at 1056-57. Finally, because a civil conspiracy requires a specific intent, parties cannot engage in a civil conspiracy to be negligent. K. Nunnally & R. Franklin, 2 Tex. Guide Torts § 8:120.67
In proposed Instruction 59, Health Net requested the trial court, in pertinent part, to instruct the jury that “[t]he Texas Receiver must therefore |154offer proof that Health Net had a specific intent to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. Because negligence by definition is not an intentional wrong, one cannot agree or conspire to be negligent.” This is a correct statement of the law. The trial court judge refused to give this charge.
This issue is part of a broader problem in the jury instructions. The underlying torts asserted by the Texas Receiver are actual fraud, breach of a fiduciary duty, and unfair and deceptive acts and practices in violation of Tex. Ins.Code Article 21.21 §§ 4(2), 4(5)(a) and 4(5)(b), Actual fraud and Article 21.21 §§ 4(5)(a) and (b) involve intentional torts with specific intents. The Texas Receiver also seeks exemplary damages.
Malice is one of the necessary conditions to award of exemplary damages, and it involves an intentional act with a specific intent. A review of the trial court’s instructions shows that the jury was advised of the elements of simple negligence and gross negligence but was not advised as to what constituted an intentional tort or a specific intent. See, for example Restatement (Second) of Torts § 8A (1965); Bazley v. Tortorich, 397 So.2d 475, 480-82 (La.1981); Maraist & Galligan, supra, § 2.01(1), pp. 2-3 and 2-4; H. Johnson, 18 La. Civ. Law Treatise, Civil Jury Instructions, § 14.01, p. 306 (2d ed.2001).
The instruction on simple negligence was not relevant because the cause of action for negligent misrepresentation was not given to the jury or reduced to a judgment in the Texas case. The instruction on gross negligence only pertained to the exemplary damages issue. Tex. Civ. Prac. & Rem. § 41.003(a)(3). Without instructions on the elements of an intentional tort and/or a specific intent, the jury only had the negligence and [ lfiSgross negligence instructions to decide the causes of action that required proof of an intentional act and/or a specific intent.
Civil conspiracy is a common law cause of action in Texas. Pursuant to Tex. Bus. Corp. Act article 2.21 A(2), a shareholder, like Health Net, may be liable for damages for actual fraud when it causes the corporation in which it owns shares “to be used for the purpose of perpetrating and did *425perpetrate an actual fraud on the obligee primarily for the direct personal benefit of ...” itself. Pursuant to Tex. Bus. Corp. Act article 2.21 B, this liability is exclusive and preempts any other liability imposed on the shareholder for such an obligation under the common law or otherwise. The exceptions are that the shareholder may be liable for (1) obligations for which it has expressly assumed, guaranteed, or agreed to be personally liable; or (2) obligations for which it is liable under Article 2.21 or another applicable statute.
Thus, civil conspiracy, as a common law tort, has been preempted by the exclusive effect of Article 2.21.
This assignment of error has merit,
e. Allocation of Fault
(Assignments of Error TX-3, 21 and 34; TX Proposed Jury Instruction 86)
Chapter 33 of the Texas Civil Practice and Remedies Code requires the trier of fact to engage in a comparative fault analysis and to determine the percentage of responsibility among various persons who could be held liable for damages sustained by a plaintiff in a tort action.
Texas Civil Practice & Remedies Code § 33.003(a) provides:
Determination of Percentage of Responsibility
The trier of fact, as to each, cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, for the following persons with respect to each \ ^person’s causing or contributing to cause in any •way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applieable legal standard, or by any combination of these:
(1) each claimant;
(2) each defendant;
(3) each settling person; and
(4) each responsible third party who has been joined under Section 33.004.68 (Emphasis added.)
A “settling person” means a person who at the time of submission has paid or promised to pay money or anything of monetary value to a claimant at any time in consideration of potential liability concerning personal injury, property damage, death, or other harm for which recovery of damages is sought V.T.C.A. § 33.011(5).
Rule 277 of the Texas Rules of Civil Procedure provides, in pertinent part, as follows:
In any cause in which the jury is required to apportion the loss among the parties the court shall submit a question or questions inquiring what percentage, if any, of the negligence or causation, as the case may be, that caused the occurrence or injury in question is attributable to each of the persons found to have been culpable. The court shall also instruct the jury to answer the damage question or questions without any reduction because of the percentage of negligence or causation, if any, of the person injured. The court may predicate the damage question or questions upon affirmative findings of liability.
The comments to PJC 110.32 instruct as follows:
For causes of action based on tort accruing on or after September 1, 1995, and in all such suits filed on or after September 1,1996, the trier of fact must determine the percentage of responsibility of each defendant, claimant, settling *426person, or responsible third party with respect to each person’s causing or contributing to cause the harm for which damages are sought. (Emphasis added.)
1157The comments add “PJC 110.32 is conditioned on findings that the acts or omissions of more than one person caused the damages or injury, because otherwise no comparison is possible.”
Health Net submitted to the trial court requested Charge Number 86, which provided:

APPORTIONMENT

If you find that Health Net is at fault and has caused some damage to Am-Care-TX or the creditors of AmCare-TX, there are also other persons or companies whose fault you must consider. As I told you in the beginning, the Texas Receiver has judicially confessed that the following people/companies are responsible for AmCare-TX’s damages: Price WaterhouseCoopers, LLP, Thomas S. Lucksinger, Michael D. Nadler, Stephen J[.] Nazarenus, John P Mudd, Michael K. Jhin, William Galtney, and Proskauer Rose, LLP, and Stuart Ro-sow are responsible for the Texas Receiver’s damages.
If you should find that Health Net is liable to the Texas Receiver, you must also consider the fault of every other person or company that contributed to the damages claimed by the Texas Receiver. Thus, in addition to those whom the Texas Receiver has judicially confessed to be at fault, the fault of the following must also be considered by you: Vinson and Elkins, L.L.P., AmCa-reco, Inc., Susan Conway, Shattuck Hammond, Lee Pearce, AmCare-OK, AmCare-LA, AmCare-TX and Am-Care-Management, the Louisiana Department of Insurance, the Texas Department of Insurance, the Oklahoma Department of Insurance, the Oklahoma Department of Health, Mike Benzen, Hershell Goldfield, Lawrence Budish, and Scott Westbrook.
Thus, because the Texas Receiver has judicially confessed the fault of the following parties, you must allocate a percentage of the fault to the following parties for any damages you might award in this case: (1) PriceWaterhou-seCoopers, LLP, (2) Thomas S. Luck-singer, (3) Michael D. Nadler, (4) Stephen J[.] Nazarenus, (5) John P. Mudd, (6) Michael K. Jhin, (7) William Galtney, (8) Proskauer Rose, LLP and (9) Stuart Rosow.
In addition, you must apply these jury instructions to the following persons, and determine whether or not fault for damages should be allocated to them as well: (1) Vinson and Elkins, L.L.P., (2) AmCareco, Inc., (3) Susan Conway, (4) Shattuck Hammond, (5) Lee Pearce, (6) AmCare-OK, (7) AmCare-LA, (8) Am-Care-TX, (9) AmCare-Management, (10) the Louisiana Department of Insurance, (11) the Texas | lssDepartment of Insurance, (12) the Oklahoma Department of Insurance, (13) the Oklahoma Department of Health, (14) Mike Ben-zen, (15) Hershell Goldfield, (^Lawrence Budish, and (17) Scott Westbrook.
Health Net cited Tex. Civ. Prac. & Rem. §§ 33.003-.017 as authority for the requested instruction.
The trial court judge’s instructions included the following:
THE COURT: Ladies and gentlemen of the jury, we come to the portion of this case that it becomes my duty to tell you the law that applies to this case and it’s your duty, as I mentioned at the beginning of this trial, to follow the law as I shall state it for you.
[[Image here]]
*427... The law to be applied, the substantive law, will be Texas substantive law.
[[Image here]]
More than one act may be the proximate cause of the same injury. Therefore, if you find that the acts of more than one person caused the injuries to the plaintiff that the plaintiff complains of, then that person or persons would also be liable for the injury.
[[Image here]]
... The plaintiff maintains that the defendant participated in a conspiracy with PriceWaterhouseCoopers, Tom Lucksinger, Michael Nadler, Stephen Nazarenus, John Mudd, Michael Jihn [sic], William Galtney, Proskauer Rose, Stuart Rosow to accomplish an unlawful purpose or to use unlawful means to accomplish a lawful purpose.
When the trial court judge permitted objections to the jury instructions into the record, counsel for Health Net stated, “We object to the failure to give jury Charge Number 86 on apportionment based on Texas Civil Practice and Remedies Code, section 33.0001[sic] through 017.”
The jury interrogatories on allocation of fault that were given to the jury were as follows:
1. Do you find by the preponderance of the evidence that the defendant, Health Net, Inc. was at fault in the transactions at issue with the Texas HMO?
_Yes _.No
11M2. Do you find by the preponderance of the evidence that any other person or company was at fault in the transactions at issue with the Texas HMO?
_Yes _No
3. What percentage of fault if any, do you assign?
Defendant Healthnet [sic] _%
Any other person(s) %
Any other Company %
Must total 100 %
Question numbers two and three, asking if others were at fault and the percentage of their fault, were not in correct form. Question two asked the jury if any other person or company was at fault and Question three asked the jury to find a percentage of fault for “Any other person(s)” and “Any other Company.” The trial court judge grouped each claimant, each defendant, each settling person and each responsible party into two categories and failed to ask the jury to identify each person and assign a percentage of responsibility to each as mandated by the Texas law.
In Perez v. Weingarten Realty Investors, 881 S.W.2d 490, 494-95 (Tex.App.-San Antonio 1994), writ denied, June 15, 1995, rehearing of writ of error overruled (Aug. 1, 1995), the court construed the application of § 33.003 as follows:
A substantially correct negligence question would have inquired about the negligence of each specific defendant, as named in the pleadings, for which there was some evidence of negligence. Furthermore, a substantially correct percentage of responsibility question would have asked the jury to place the percentage on each specific defendant found to be responsible. Perez failed to do this in her requested negligence questions.
[[Image here]]
Perez’ requested jury questions attempted to lump all of the defendants together: ‘ownership of Summerplace Apartments acting through its employees, agents or servants.’ By phrasing the requested questions in this manner, Perez achieved simplicity at the expense of specificity. There is something to be said for this effort and this Court is not *428saying | 1li0it is always incorrect to clo so. If there is no dispute as to which of the named defendants are responsible for the negligent act, or if there is no dispute that all are responsible for the negligent act, a single generic submission may be proper with an appropriate contribution percentage question. It would, be improper in tins ease as there was a fact issue raised as to who had the responsibility for providing the security and who should properly get the blame for not doing so. See Alvarez v. Missouri-Kansas-Texas Railroad Co., 683 S.W.2d 375, 377 (Tex.1984).
When there is such a fact issue raised, there is no choice but to submit the question, as to each defendant separately. Tins is more cumbersome, but must be done. (Emphasis added.)
Like the jury questions in Perez, the jury interrogatories in the instant case “lumped” any and all possible responsible persons together when there were fact issues as to the fault of each.
The failure to submit to the jury the name of each possible responsible person and assess his or its individual percentage of fault was prejudicial error.
These assignments of error have merit.
E. Inconsistencies Between the Texas Jury Verdicts and JNOV and the Judgments and Reasons for Judgment in the Louisiana and Oklahoma Cases
1. Negligent Misrepresentation
(Proposed Texas Jury Instruction 43)
Essentially, the tort of negligent misrepresentation is a less culpable version of fraud by intentional misrepresentation. The elements of a cause of action for this tort are: (1) a representation is made by a defendant in the course of his business or in a transaction in which he has a pecuniary interest; (2) the defendant supplies false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. Federal Land Bank Association of Tyler v. Sloane, 825 S.W.2d 439, 442 |161(Texas 1991). The laws of Texas and Louisiana establishing the elements of negligent misrepresentation are substantially the same. Kadlec Medical Center v. Lakeview Anesthesia Associates, 527 F.3d 412, 418 (5th Cir. [La.] 5/8/08), cert. denied, — U.S. -, 129 S.Ct. 631, 172 L.Ed.2d 611, 2008 WL 4343227 (2008); Maraist & Galligan, supra, § 5.07[8], p. 5-31 to 32, n. 73.
The Texas Receiver asserted negligent misrepresentation in her petition. The Texas Receiver submitted a proposed jury interrogatory on negligent misrepresentation. Health Net submitted a proposed jury interrogatory asking, “Did Health Net engage in any negligent conduct that caused damage to AmCare Health Plans of Texas?” The trial court judge instructed the jury on what constituted negligence. The trial court judge did not instruct the Texas jury on negligent misrepresentation or submit a jury interrogatory on it to the jury. There has been no finding of liability for negligent misrepresentation against Health Net in the Texas case.
In the Louisiana and Oklahoma cases, the trial court judge rendered judgments in favor of the plaintiffs and against Health Net finding it “liable for negligent misrepresentations” that caused damage to the Louisiana and Oklahoma HMOs and their creditors. In her reasons for judgment the tidal court judge described the negligent representations as follows:
*429(D) HOW HEALTH NET MADE NEGLIGENT REPRESENTATIONS THAT CAUSED DAMAGE TO THE HMOS.
Health Net directed Shattuck Hammond, investment agent, and Vinson & Elkins, attorneys, to draft schedules, documents and filings that would obfuscate their true intentions and induce regulators to rely upon the falsified contents. Health Net induced Thomas Lucksinger to continue to use blind-eye tactics with the regulatory personnel in Texas.[69]
11B2The record on appeal does not reflect why there is a difference between the manners in which this claim was adjudicated in the Texas case and in the Louisiana and Oklahoma cases.
2. Proximate Cause
(Proposed TX Jury Instructions 79 and 80)
The elements of a tort cause of action in Texas are a duty, a breach of that duty, and damages proximately caused by that breach of duty. The components of proximate cause are cause-in-fact and foreseeability. The test for cause-in-fact is whether the tortious act or omission was a substantial factor in bringing about injury, without which the harm would not have occurred. Foreseeability requires that a person of ordinary intelligence should have anticipated the danger created by a tor-tious act or omission. Doe v. Boys Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 477-78 (Texas 1995).
A review of the trial court’s “FINAL JUDGMENT REGARDING LOUISIANA PLAINTIFF” shows that the court held as a matter of law that the breach of a fiduciary duty, fraud, negligent misrepresentations, unfair, or deceptive acts or practices and conspiracy of Health Net were the proximate cause of damage to the “Louisiana HMO or its creditors.” These rulings are consistent with the trial court’s erroneous ruling that Texas law rather than Louisiana law applied in the Louisiana case.
With the advent of the use of the duty/risk analysis for tort cases in Louisiana, the legal concept of proximate cause used in the common law is no longer in prevalent use. See the excellent discussions in Maraist & Galligan, supra, §§ 3.01-.04, pp. 3-1 to 3-7 and §§ 5.01-.05, pp. 5-1 to 5-10; W. Crawford, 12 La. Civ. Law Treatise, Tort Law, §§ 4.2 and 4.3, pp. 76-81 (2000). In the duty/risk analysis, the foreseeability element of proximate |1(acause is subsumed into the scope of the duty element and becomes part of a question of law of whether the particular risk falls within the scope (ambit of protection) of the duty. Foreseeability is not a question of fact in Louisiana. Roberts v. Benoit, 91-0394, p. 26 (La.5/28/92), (an rehearing), 605 So.2d 1032, 1054; Smith v. Roussel, 2000-1028, p. 8 (La.App. 1 Cir. 6/22/01), 809 So.2d 159, 166.
The trial court judge committed patent legal error by using the concept of proximate cause to decide the Louisiana case.
3. Fraud
In the Texas case, the jury responded “Yes” to Interrogatory 6 that stated “Do you find by the preponderance of evidence that defendant HealthNet, Inc. [sic], committed fraud that proximately caused damage to the Texas HMO?” (Emphasis added.)
*430In the Louisiana and Oklahoma judgments, the trial court judge stated that “the plaintiff sustained its burden of proving by clear and convincing evidence that Health Net, Inc. committed fraud that proximately caused damage to the Louisiana [and Oklahoma] HMO or its creditors ... ”.70 (Emphasis added.)
The record on appeal does not reflect why different burdens of persuasion were used for the fraud issue in the Texas case and in the Louisiana and Oklahoma cases or why the phrase “or its creditors” used in the Louisiana and Oklahoma judgments was omitted in Interrogatory 6 in the Texas case.
4. Allocation of Fault
The petition of the Texas Receiver asserted fault by AmCareco’s seven officers and directors, its accounting firm, its law firm, and its 11Mindividual lawyer. FHC and Health Net also were listed as defendants. Health Net answered and admitted that the other defendants were at fault but denied that it and FHC engaged in any wrongful conduct.
The joint petition of the Louisiana and Oklahoma Receivers asserted fault by Am-Careco’s seven officers and directors, its accounting firm, its law firm, and its lawyer. Scott Westbrook, as an officer and director of AmCare-LA, five insurance companies, AmCareco, FHC, and Health Net also were named as defendants. Health Net filed an answer that essentially was a general denial in this case.
During the trial, the.Receivers presented the testimony of Edward W. Buttner, IV, a certified public accountant who was qualified as an expert witness in the field of statutory accounting. Buttner testified, in pertinent part, as follows:
Q. You also stated in your deposition that you think that everyone associated with what happened with these HMOs bears some responsibility for what happened with the failure of the HMOs; isn’t that coirect?
A. Ido.
Q. And when you say everybody associated with these HMOs, you’re talking about Tom Lucksinger, the president of the HMOs?
A. I am.
Q. And of AmCareco. Michael Na-dler who was, I believe, the secretary of the HMOs?
A. I believe, right, he was one of the executive officers.
Q. One of the executive officers. Stephen Nazarenus who is the CFO of the HMOs.
A. Absolutely.
Q. After the sale now I’m talking about.
A. Absolutely.
| |fi5Q. Scott Westbrook who was one of the salesmen for the Louisiana HMO after the sale.
A. I don’t recall his name.
Q. Okay. Michael Jhin who was a director of the HMOs after the sale by Health Net; is that correct?
A. That’s correct.
Q. William Galtney who was a director of the HMOs after the sale; is that correct?
A. Yes, sir.
Q. John Mudd, a director of the HMOs after the sale.
A. Yes, sir.
Q. PriceWaterhouseCoopers [auditor for AmCare entities in 1999, 2000, and 2001]?
*431A. Absolutely.
Q. And we will talk about them in a second. Michael Benzon who was a partner at PriceWaterhouseCoopers who audited the HMOs after the sale?
A. Yes, sir.
Q. Proskauer Rose, AmCareeo’s attorney?
A. Yes, sir.
Q. Stuart Rosow who is partner at Proskauer Rose, AmCareco’s attorney?
A. Yes, sir.
Q. Vinson & Elkins, LLP, [law firm representing AmCareco to state regulators] the law firm that submitted the cash payment calculation, which is your appendix D?
A. Yes, sir.
Q. Susan Conway, who is an attorney at Vinson & Elkins who wrote the letter to the Texas Department of Insurance that submitted this calculation?
A. Yes, sir.
|1fifiQ. So all those — Shattuck Hammond [investment banking firm engaged by Health Net to find a buyer for the HMOs]?
A. Shattuck Hammond, yes, sir.
Q. Shattuck Hammond was an investment banker [sic] who assisted with the sale of the HMOs to AmCareco; is that correct?
A. Yes, sir.
Q. Eñe Cobum, who we heard from Friday who worked for Shattuck Hammond; is that correct?
A. Yes, sir.
Q. So it’s your testimony that all those folks bore some responsibility for this?
A. As well as others.
Q. And what others are you referring to?
A. I would refer to Health Net as those others.
Q. Now—
A. And there may be others there as well. I mean as we sit here.now, there are — there are — there may be others. You know, again I haven’t spoken with the regulators. I don’t know if there is [sic] other parties that they may have gotten some data from that was less than accurate.
Q. Your expert report addressed in great measure PriceWaterhouseCoop-ers, correct?
A. Yes, sir.
Q. PriceWaterhouseCoopers was the auditor after the sale to the Health Net — Pm sorry, after the sale by Health Net to AmCareco, correct?
A. Yes, sir.
Q. And they audited these AmCare HMOs after the sale, correct?
A. Well, they audited them beginning for 1999 which went back to the beginning of the year, which would have predated the sale as well.
[ uwQ- But PñceWaterhouseCoopers was not a Health Net auditor, correct?
A. That’s correct, they were not.
Q. And it was not an auditor of the HMOs while Health Net aimed, them, correct?
A. That’s correct.
Q. Now in looking at your report, you decided that PriceWaterhouseCoop-ers ivas negligent in their auditing of the HMOs, correct?
A. Yes, sir. (Emphasis added.)
During the charge conference held on June 29, 2005, the parties considered what would be an appropriate jury interrogatory for the allocation of fault issue. The condition precedent for inclusion of the name of a person in this interrogatory is *432that sufficient evidence must be introduced to submit the issue of the particular person’s fault to the jury. Tex. Civ. Prac. & Rem.Code § 33.003(b). The Texas Receiver submitted a proposed interrogatory that provided as follows:
JURY INTERROGATORY No. 16
For each of the following that you find to be at fault in causing any damages to AMCARE-TX (WHICH INCLUDES AMCARE MGT) or its creditors, state the percentage of the total damages caused by that person’s or entity’s fault.
William F. Galtney %
Health Net %
Michael K. Jhin %
Thomas S. Lucksinger _%
John P. Mudd %
Steven [sic] J. Nazarenus %
Michael D. Nadler %
M. Lee Pearce %
PriceWaterhouseCoopers, LLP '_%
Proskauer Rose, LLP .%
Stuart Rosow %
Scott Westbrook %
TOTAL 100 %
You should only assign percentages to the persons or entities you find caused the damages. The percentages you | Kisfind must total 100 percent. The percentages must be expressed in whole numbers.
Health Net submitted the following allocation of fault interrogatory:
Jury Interrogatory No. 12
For each of the following people and entities that you found to be at fault in causing damages to AmCare Health Plans of Texas, please state the percentage of the total damages caused by that person’s or entity’s fault:
Thomas S. Lucksinger %
Stephen J. Nazarenus %
Michael D. Nadler %
John P. Mudd %
Michael K. Jhin %
William F. Galtney %
Scott Westbrook %
Proskauer Rose, LLP %
Stuart Rosow %
Herschel Goldfield %
PricewaterliouseCoopers, LLP [sic] _%
Mike Benzon %
Vinson & Elkins, LLP %
Susan Conway .%
Shattuck Hammond Partners _%
Lee Pearce %
AmCareco %
AmCare Health Plans of Texas %
Texas Department of Insurance _%
You should only assign percentages to the persons or entities you find caused the damage to AmCare Health Plans of Texas. The percentages must be expressed in whole numbers. The percentages must total 100%. (Emphasis added.)

Health Net’s list contains the nam.es of all of the persons listed by the Texas Receiver.

During the discussion on the interrogatories, the following exchange took place between the counsel for the Texas Receiver and the Court:
THE COURT: Is there any evidence of Lucksinger fault?
Mr. McKERNAN: [Counsel for the Texas Receiver]: Yes, they need to be on it.
THE COURT: All right. Is there any evidence of Nazarenus fault?
| mMr. McKERNAN: Yes.
THE COURT: Is there any evidence of Nadler fault?
Mr. McKERNAN: Yes.
THE COURT: Any evidence of John P. Mudd fault?
Mr. McKERNAN: Yes. (Emphasis added.)
Thereafter, there was further discussion and the trial court judge ultimately ruled that the persons to which fault could be allocated (other than Health Net) would be lumped into two categories, namely: (1) “Any other person(s)” and (2) “Any other Company” and would not be itemized.
The jury allocated fault at eighty-five percent (85%) for Health Net, zero percent (0%) for “Any other person(s),” and fifteen *433percent (15%) for “Any other Company” in Interrogatory 3.71
Health Net filed a motion for a JNOV. The trial court granted the JNOV in part and rendered a judgment that states that “[t]he Court apportions fault to ‘other persons’ in the full sum of fifteen percent (15%).” (Emphasis added.) In reasons dictated into the record, the trial court judge stated the following to support her ruling:
The testimony in this case that this jury heard involved conduct by sophisticated businessmen, accountants, lawyers, liquidators, receivers, people who are well positioned, well educated, and focused. The jury found, after extensive deliberation and weeks of testimony and hundreds of exhibits, that the defendants were liable based upon that evidence and that there should be an allocation of fault to others.
1170There is evidence in the record that other entities were at fault, and there is also evidence in the record that other persons tvere at fault and, therefore, should be allocated some degree of fault.
This court recalls very vividly the testimony of Mr. Lucksinger, Mr. Na-zarenus and their efforts to take these orphan HMOs and adopt them; thereafter, mistreated them. This court is firmly of the opinion that that conduct requires some allocation of fault.
The court heard the testimony of Susan Conway, high-powered counsel, less than honest, less than exemplary, less than candid. Many actors, many actors in this case all ivith a view towards lining their pockets, receiving some benefit under the pain of some unsuspecting patients and policyholders and state agencies.
The court is of the opinion that there should be apportionment of fault to other persons in the full sum of fifteen per cent. The court hereby imposes that sum and grants the motion for JNOV specifically answering the interrogatory and specifically assessing whether or not reasonable men and women, viewing the evidence in the light most favorable to the non-moving party, could reach a contrary result. (Emphasis added.)
Subsequently, the trial court rendered judgment in the Louisiana and Oklahoma cases and allocated fault at seventy percent (70%) for Health Net, fifteen percent (15%) for “Any other Persons(s)” and fifteen percent (15%) for “Any other Company”.
Pursuant to timely filed requests for written findings of fact and reasons for judgment and by order of this Court, the trial court judge provided reasons that addressed the issue of “[ajllocation of fault with an itemization of each person and company at fault in the ‘lump sum’ categories of ‘Any other Persons(s)’ and ‘Any other Company’.” In written reasons dated August 20, 2007, the trial court judge stated in pertinent part, as follows:
(A) Allocation of fault with an itemization of each person and company at fault in the lump sum categories of “Any other Persons” and “Any other Company.” Health Net 70%, *434AmCareco 15%, Thomas Lucksinger 15%.
1171 ....
(D) How Health Net made negligent representations that caused damage to the HMOs.
Health Net directed Shattuck Hamr mond, investment agent, and Vinson & Elkins, attorneys, to draft schedules, documents and filings that would obfuscate their true intentions and induce regulators to rely upon the falsified contents. Health Net induced Thomas Lucksinger to continue to use blind-eye tactics with the regulatory personnel in Texas, (Emphasis added.)72
The ruling of the trial court judge in the Louisiana and Oklahoma cases that AmCa-reco and Lucksinger were the only parties (other than Health Net) who were at fault is in direct conflict with her reasons for judgment granting the JNOV in the Texas case and her reasons for judgment in the Louisiana and Oklahoma cases. As previously set forth in those reasons, the trial court judge stated “There is evidence in the record that other entities were at fault, and there is also evidence in the record that other persons were at fault” and Shat-tuck Hammond, Vinson & Elkins, Luck-singer, Nazarenus and Susan Conway were specifically listed. (Emphasis added.) '
5. Existence of Pledged Capital for an HMO by Health Net
In paragraph (K) B) of her August 27, 2007 Reasons for Judgment in the Louisiana case, the trial court judge stated that, “Neither AmCareco nor Health Net, however, ever pledged their own capital in place of the statutory capital required that the strained HMOs were forced to deplete.” (Emphasis added.)
However, on November 4, 2005 in the Louisiana case, the trial court judge rendered judgment against Health Net for $9,511,624.19 pursuant to a_J¿¡¿parental guarantee in which Health Net “guarantees that it shall provide sufficient capital to [AmCare-LA] to insure that [Am Care-LA] maintains the minimum amounts of paid capital and surplus required for an HMO under Louisiana law.” (Emphasis added.)
6. Conclusion
The trial court judge committed error by not reconciling these differences. De novo appellate review appears to be the proper method for reconciling conflicting decisions when a bifurcated trial is held in a trial court. Fontenot v. Patterson Ins., 2006-1624, pp. 4-7 (La.App. 3 Cir. 12/5/07), 972 So.2d 401, 406-08, judgment rev’d on other grounds, 2008-0414 (La.12/12/08), 997 So.2d 529; see Thornton v. Moran, 343 So.2d 1065, 1065 (La.1977); Aubert v. Charity Hosp. of La., 363 So.2d 1223, 1226-27 (La.App. 4 Cir.1978).
F. Recapitulation of Errors Affecting the Texas Jury Verdict
The trial court judge committed the following prejudicial errors pertaining to the verdicts in the Texas case:
1. Erroneously ruled that the proposed jury instructions submitted by the parties were untimely, pursuant to La. C.C.P. art. 1793 A;
2. Refused to inform the parties of the instructions she intended to give the jury within a reasonable time prior to their arguments to *435the jury, in violation of La. C.C.P. art. 1793 B;
3. Failed to give the jury an interrogatory and instruct them on the issue of sham contract;
4. Failed to give the jury an interrogatory and instruct them on the issue of single business enterprise;
5. Failed to instruct the jury on V.A.T.S. Ins.Code art. 2.21;
6. Erroneously instructed the jury on the fraud issue;
| m7. Committed legal error by instructing the jury on the fiduciary duty issue;
8. Erroneously instructed the jury on the unfair or deceptive acts or practices under the Texas Insurance Code issue;
9. Erroneously instructed the jury on the conspiracy issue; and
10.Erroneously instructed the jury on the allocation of fault issue.
G. Conclusion
As previously indicated, a trial court judge is mandated to instruct the jury on the correct principles of law applicable to the issues presented by the pleadings and the evidence. Adequate instructions are those which fairly and reasonably point up the issues presented by the pleadings and evidence and which provide correct principles of law for the jury’s application thereto. As previously indicated, in addition to prejudicial errors of law, on many issues in this case, the facts presented required that more precise and disjunctive charges be given. See Boncosky Services, Inc., 98-2239 at pp. 9-10, 751 So.2d at 285-86, a case analogous to the instant case in that respect.
After reviewing the entirety of the jury charge and the other errors, we conclude that (1) the charges did not adequately provide correct principles of law as applied to the issues framed in the pleadings and the evidence, (2) the jury was not adequately guided in its deliberations, and (3) the jury instructions misled the jury to the extent that it was prevented from properly dispensing justice.
Accordingly, we set aside the jury verdicts and judgments in the Texas case and will decide the Texas case pursuant to a de novo review.
VII. STANDARD OF REVIEW OF FACTS IN THE LOUISIANA AND OKLAHOMA JUDGE TRIAL CASES
(Assignments of Error LA-6 and 18; LA-Supp-1,12 and 13; OK-6 and 11)
1174A. Proximate Cause in the Louisiana Case73
A review of the final judgment in the Louisiana case shows that the trial court rendered judgment that breach of a fiduciary duty, fraud, negligent misrepresentations, engaging in an unfair or deceptive act or practice, and a conspiracy with other persons by Health Net “proximately caused damage to the Louisiana HMO or its creditors.” As explained in Part VI, Section E2 of this opinion, the application of the common law concept of proximate cause in this Louisiana tort case is error.
B. The Tort of Conspiracy in the Louisiana Case74
Conspiracy is not a substantive tort in Louisiana. La. C.C. art. 2324 A *436provides, “He who conspires with another person to commit an intentional or willful act is answerable, m solido, with that person, for the damage caused by such act.” This particular provision, along with La. C.C. art. 2324 B, provides for loss distribution and allocation of fault rather than substantive liability which, in Louisiana, is provided for generally in La. C.C. art. 2315. The trial court judgment finding-liability for the substantive | i7.-,tort of conspiracy is legally erroneous but harmless in the context of the Louisiana case.
C. Unfair or Deceptive Acts or Practices in Violation of the Texas Insurance Code
(Assignment of error LA/OK-13, TX-Supp-4)
As explained in Section V of this opinion, the insurance law of Texas does not apply in the. Louisiana or Oklahoma cases. Application of Texas insurance law to the Louisiana and Oklahoma cases was patent legal and prejudicial error.
D. Allocation of Fault
(Assignment of Error LA/OK-4, LA-Supp-3)
As previously indicated, the trial court in its judgments in the Louisiana and Oklahoma actions failed to name those individual persons or companies that were responsible for a percentage of fault. The court, in both instances, rendered judgment fixing lump sum percentages of fault as follows:
Defendant Health Net O C-**
Any other Person(s) LO y — l
Any other Company to T““t
TOTAL 100%
Louisiana Civil Code Article 2323 provides, in pertinent part,
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all •persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a noupaity, and regardless of tibe person’s insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that tibe other person’s identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss 117(iasserted under any law or legal doctrine or theory of liability, regardless of the basis of liability. (Emphasis added.)
Louisiana Code of Civil Procedure Article 1917 B provides, in pertinent part:
*437In nonjury cases to recover damages for injury, death or loss, whether or not requested to do so by a party, the court shall make specific findings that shall include, those -matters to which, reference is made in Paragraph C of Article 1812 of this Code. (Emphasis added.)
Louisiana Code of Civil Procedure Article 1812 C provides:
In cases to recover damages for injury, death, or loss, the court at the request of any party shall submit to the jury special written questions inquiring as to:
(1) Whether a, party from whom damages are claimed, or the person for whom such party is legally responsible, was at fault, and, if so:
(a) Whether such fault was a legal cause of the damages, and, if so:
(b) The degree of such fault, expressed in percentage.
(2)(a) If appropriate under the facts adduced at trial, whether another party or nonparty, other than the person suffering injury, death, or loss, was at fault, and, if so:
(i) Whether such fault was a. legal cause of the damages, and, if so:
(ii) The degree of such fault, expressed in percentage.
(b) For purposes of this Paragraph, non-party means a person alleged, by any party to be at fault, including but not limited to:
(i) A person who has obtained a release from liability from the person suffering injury, death, or loss.
(ii) A person who exists but whose identity is unknown.
(iii) A person who may be immune from suit because of immunity granted by statute.
1177(3) If appropriate, whether there was negligence attributable to any party claiming damages, and, if so:
(a) Whether such negligence was a legal cause of the damages, and, if so:
(b) The degree of such negligence, expressed in percentage.
(4) The total amount of special damages and the total amount of general damages sustained as a result of the injury,, death, or loss, expressed in dollars, and, if appropriate, the total amount of exemplary damages to be awarded. (Emphasis added.)
Under La. C.C.P. arts. 1917 and 1812, the trial judge in a non-jury case dealing with delictual damages has a mandatory duty to make specific findings concerning the apportionment of fault. Boudreaux v. Farmer, 604 So.2d 641, 649 (La.App. 1 Cir.1992), writs denied, 605 So.2d 1373, 1374 (La.1992); Porche v. Point Coupee General Hospital, 554 So.2d 1345, 1347 (La.App. 1 Cir.1989); Martino v. Sumrall, 554 So.2d 1343, 1345 (La.App. 1 Cir.1989); Scott, v. State, 525 So.2d 689, 691 (La.App. 1 Cir.1988), writ denied, 558 So.2d 1128 (La.1990). It is legal error for the trial court to fail to assess percentages of fault. Turner v. D'Amico, 96-0624, p. 3 (La.App. 1 Cir. 9/19/97), 701 So.2d 236, 238, writ denied, 97-3034 (La.2/13/98), 709 So.2d 750. It is legal error for the trial court to fail to identify all parties and nonparties at fault for purposes of allocation of fault. See La. C.C.P. art.1917 and 1812; Williams v. Louisiana Power & Light Co., 590 So.2d 786, 789 (La.App. 5 Cir.1991), writ denied, 595 So.2d 656 (La.1992).
In assigning percentages of fault attributable to each tort feasor, a court should consider both the nature of each party’s conduct and the extent of the relation between that conduct and the damages suffered. Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.*4381985). In | ^Watson, 469 So.2d at 974, the Louisiana Supreme Court indicated the factors that should be considered to apportion fault:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
No matter what the theory of liability being asserted by the plaintiff, a percentage assessment of fault must be allocated to each person (natural or juridical)75 shown to be at fault in causing injuries to a plaintiff, regardless of whether the person is a party to the lawsuit and regardless of any immunity to which the person may be entitled. Robinson, D.W., Love and Fury: Recent Radical Revisions to the Law of Comparative Fault, 59 La. L.Rev. 175, 175-79 (Fall 1998).76
The failure of the trial court judge to (1) identify and name each responsible person or entity in the judgment and (2) assess each with his percentage of fault was error.
E. Refusal to Provide Adequate Written Findings of Fact and Reasons for Judgment
(Assignments of Error LA-18, LA-Supp 1, 12 and 13; OK-11, OK-Supp 1, 11 and 12)
1. Facts
IitoAs previously indicated, these consolidated actions were tried in June of 2005. The Texas action was a jury trial and the Louisiana and Oklahoma actions were bench trials. On June 30, 2005, the jury in the Texas action returned verdicts that found Health Net at fault on several different causes of action, determined Health Net to be eighty-five percent (85%) at fault and “Any other Company” fifteen percent (15%) at fault, and awarded compensatory and punitive damages. The Louisiana and Oklahoma actions were taken under advisement.
On July 26, 2005, Health Net filed a motion requesting written findings of fact and reasons for judgment (hereinafter referred to as “reasons”) in the Louisiana and Oklahoma actions. La. C.C.P. arts. 1917,1812 and 1813.
On August 19, 2005, a hearing was held on Health Net’s motion for a judgment notwithstanding the verdict (JNOV) in the Texas case. The judgment on the JNOV was rendered on November 3, 2005. In it, the trial court judge (1) assigned fifteen percent (15%) fault to “other persons ” (which reduced Health Net’s fault to seventy percent (70%)), and (2) reduced the *439Texas punitive damage' award by thirty percent (30%).
On November 4, 2005, the trial court rendered judgments separate in favor of each Receiver in the Louisiana and Oklahoma cases.77 In each judgment, the trial coui’t found Health Net at fault under several causes of action, fixed the allocation of fault for Health Net at seventy percent (70%), for “Any other Persons(s)” at fifteen percent (15%), and for “Any other Company” at fifteen percent (15%). In that judgment, the trial court also | infixed the amount of the compensatory damages and found Health Net liable for reasonable attorney fees, punitive damages, and potentially treble compensatory damages. In the Louisiana case, Health Net also was found liable for contractual damages.
On November 10, 2005, Health Net filed a second request for reasons.
At the commencement of a hearing held on November 21, 2005, appears the following colloquy between the trial court judge and Health Net’s attorney:
MR. PERCY [Counsel for Health Net]: One preliminary matter on our list, your Honor. Has the court had an opportunity to prepare written reasons and conclusions of law in connection with the Louisiana and Oklahoma judgment.
THE COURT: The final judgment?
MR. PERCY: The final judgment, yes, your Honor.
THE COURT: Yes, but it’s not ready yet. The court has had ample oppoytu-nity. As you know the court signed judgment about five days ago. And I have thirty days from the signing to do it. I intetid to finish it shortly.
MR PERCY: I just needed to know because we are rolling into some issues that are obviously governed by the judgment. I just wanted to know—
THE COURT: I noticed token I received it there was a second request. It was denominated second request for written reasons. And I recall when I got the first request it tuas premature because I hadn’t even signed, a judgment. So as soon [sic] I signed the judgment. I began to work on it. So it will be complete shortly.
MR. PERCY: Thank you, your Hon- or.78 (Emphasis added).
The record on appeal shows that in the Louisiana and Oklahoma actions, motions for suspensive appeals were filed by Health Net on December 6, 2005, the sus-pensive appeal bonds were filed on December 19, 2005, and the appeal orders were signed on February 2, 2006.
| IR1Nineteen (19) months later, on June 11, 2007, Health Net filed a motion in this Court for a limited remand pursuant to Rules 2-8.1 and 2-8.2, Uniform Rules— Courts of Appeal, asserting the “Trial Court Refused to Provide Reasons for Judgment despite being twice asked to do so and ... the Trial Judge failed to allocate fault among all potential parties” in violation of La. C.C.P. arts. 1812 and 1917. Health Net argued that a remand was necessary to compel the trial judge to follow the law.
On July 10, 2007, we granted the relief prayed for in the request for reasons for judgment with the following observation:
As evidenced by the judgments hereinafter discussed, the trial court ren*440dered multiple “ultimate” fact rulings. Many of these factual findings involve complex factual issues. Accordingly, comprehensive written findings of fact and reasons for judgment are essential herein for a proper review pursuant to the manifest error — clearly wrong standard for the appellate review of facts, if that standard applies. Finally, such reasons may preclude the necessity for one or more assignments of error. (Footnote omitted.)
Thereafter, we issued the following order to the trial court judge:
ORDER
It is ordered that:
(1) This matter is remanded to the trial court for the limited purpose of obtaining the trial court’s written findings of fact and reasons for judgment (reasons) prepared in accordance with the following instructions and for supplementing the record on appeal with the written findings and reasons;
(2) The trial court judge shall file the reasons with the Clerk of the 19th Judicial District Court and shall transmit copies to the parties herein no later than August 10, 2007, and shall order the Clerk of the district court to supplement the record on appeal with this document not later than four days thereafter;
(3) The reasons shall have a separate section pertaining to each issue listed hereinafter;
(4) Each issue discussed shall state the factual findings of the court on the issue and the pertinent constitutional provision, law and/or jurisprudence that controls;
| m(5) Each factual finding shall cite the pages in the record that contain the evidence that supports the factual finding;
(6) Each Louisiana case citation shall be in conformity with Section VIII of the Louisiana Supreme Court General Administrative Rules;
(7) Heath Net may file additional assignments of error with appropriate briefing, to be received by this Court no later than September 7, 2007;
(8) The appellees may file briefs in response to any additional assignments of error filed by Health Net, to be received by this Court no later than September 26, 2007;
(9) The trial court shall address the following issues in the reasons:
(a) allocation of fault with an itemization of each person and company at fault in the “lump sum” categories of ‘Any other Person(s)’ and ‘Any other Company’;
(b) how Health Net breached a fiduciary duty that caused damage to the Louisiana and Oklahoma HMOs (HMOs);
(c) how Health Net committed fraud that caused damage to the HMOs;
(d) how Health Net made negligent misrepresentations that caused damage to the HMOs;
(e) how Health Net engaged in unfair or deceptive acts or practices that caused damage to the HMOs;
(f) how Health Net conspired with other persons to cause damage to the HMOs;
(g) how Health Net acted with malice and gross negligence that caused damage to the HMOs;
(h) the legal basis for Health Net’s liability for reasonable attorney fees to the HMOs;
(i) the legal basis for Health Net’s liability for punitive damages to the HMOs;
*441(j) the legal basis for Health Net being liable for an award of treble compensatory 11S3damages or punitive damages at the option of the Louisiana and Oklahoma HMOs;
(k) the legal basis for holding the HMOs were a single business enterprise;
ffi the legal and factual basis for granting a JNOV and changing the fault allocation to ‘other persons’ from 0% to 15% in the Texas HMO case;
(m) the legal and factual basis for granting a JNOV and finding the punitive damage award in the Texas HMO case excessive and reducing it by 30%;
(n) the legal and factual basis for holding that Health net was liable pursuant to a ‘parental guarantee’ for the whole compensatory damage aware of $9,511,624.19 in the Louisiana HMO case; and
(10) Concurrently with the transmission of this order to the trial court judge, the Clerk of this Court shall transmit all original exhibits filed in this matter to the Clerk of the 19th Judicial District Court for the sole and exclusive use of the trial court for preparing the reasons ordered herein. When the reasons are filed with the Clerk of the district court, he shall return such items to this Court. (Emphasis added.)
On the 9th day of August, 2007, the trial court judge requested a ten-day extension of time to comply with the order, which request was granted on the same day. Subsequently, on August 17, 2007, the trial court judge requested guidance from this Court on the issue of whether the trial court had “to maintain its original reasons for granting the judgment notwithstanding the verdict with respect to the allocation of fault and reduction of the punitive damage award, or may it also consider the reasons adduced having reviewed all exhibits and evidence transmitted by the Court of Appeal?” On August 17, 2007, the trial court’s request was denied with the observation that this Court’s order was “clear and unambiguous, and speaks for itself.”
| ]S4The trial court judge filed “Written Reasons for Judgment” in the trial court on August 22, 2007, and supplied this Court with a copy on the same day. On August 28, 2007, the trial court judge filed “Reasons for Judgment, Part II” in the trial court and supplied this Court with a copy the same day. The trial court judge’s initial reasons complied with the requirements of La. C.C.P. art. 1812 C to identify all parties’ and nonparties’ percentage of fault. The reasons contain reference to the first ten issues mandated to be included by our Order. However, the reasons state factual conclusions and do not adequately state factual findings and, except for citing the Texas statutory authority for punitive and treble damages, do not contain the law, jurisprudence, or record citations as ordered. The trial court’s “Reasons for Judgment, Part II” contains a discussion concerning three additional issues without providing law, jurisprudence, or record citation. The parental guarantee judgment was not addressed in either document.79
In its August 20, 2007 reasons, the trial court judge stated the following:80
The requests for written reasons apparently were filed with the Clerk of Court on July 26, 2005 and November *44210, 2005, respectively. However, they were never presented to the court by the moving party, nor was the court favored with notice as evidenced from the certificate of service. Because the pleading contained no order, the Clerk of Court, in accordance with local rules and practice, had no reason to present the pleading to the court until the order of remand was issued.
The July 26, 2005 request was made prematurely because no judgment had been signed. The November 10, 2005 request was made after the trial court had granted the |1Rñorder of appeal on November 7, 2005, thereby divesting itself of jurisdiction prior to the request having been filed.
Despite this consequence, this court has labored arduously for the last few weeks, together with its staff, to reconstruct facts from a ten-day trial which occurred more than two years ago, after two years of motion practice.
Nonetheless, the court has now reviewed hundreds of documents and exhibits, has read transcripts, briefs, and memoranda in a painstakingly, though belated, effort to comply with the order of the court of appeal, and its own obligation to render justice for the litigants, counsel, and the public at large, all while maintaining its ambitious docket, its public, administrative, and quasi-judicial functions. Resultantly, any errors or omissions should be viewed in that context and under those constraints.
2. Supplemental Assignments of Error
On September 12, 2007, Health Net filed supplemental assignments of error pertaining to the validity of the reasons. Health Net asserts that the manifest error-elearly wrong standard for review of facts does not apply to the Louisiana and Oklahoma actions in this appeal and this Court should review the facts in those actions de novo because the trial court judge “Failed to Issue Legally Sufficient Findings and Reasons,” citing Bloxom v. Bloxom, 512 So.2d 839, 843 (La.1987). Health Net contends that: (1) the trial court “made no serious effort to comply” with this court’s order; (2) the trial court’s legal conclusions are unsupported by any citations to governing law; (3) the trial court’s factual findings are unsupported by any record citations; (4) the trial court failed to specify the facts that supported the factual conclusions; and (5) the elements of the various causes of action are not set forth and there are no specific facts given to support the ultimate factual conclusions.
The plaintiffs respond that “failure to abide by every nuance [of] this Court’s July 10 order ... is not ‘error’.” Further “[t]he evidentiary, statutory and jurisprudential bases for Judge Clark’s extensive judgments and her | isiirecent Reasons for Judgment are readily implied by the record which fully supports each and every one of her findings.” The plaintiffs contend that “[w]hile Judge Clark’s findings and reasons are admittedly not in full compliance with that Order, they are nevertheless sufficient under the law and are entitled to full deference”, citing Leal v. Dubois, 2000-1285, p. 4 (La.10/13/00), 769 So.2d 1182, 1185. Finally, the plaintiffs observe that “the Receivers and the numerous policyholders, health care providers and creditors whose interests they represent are not responsible for this nineteen month delay and therefore should not be prejudiced by the same.”
3. Applicable Law
Louisiana Code of Civil Procedure Article 1918 provides as follows:
*443A final judgment shall be identified as such by appropriate language. When written reasons for the judgment are assigned, they shall be set out in an opinion separate from the judgment. (Emphasis added.)
A judgment and written reasons for judgment are two separate and distinct documents. Greater New Orleans Expressway Commission v. Olivier, 2002-2795, p. 3 (La.11/18/03), 860 So.2d 22, 24.
Louisiana Code of Civil Procedure Article 191781 is entitled “Findings of the court and reasons for judgment” and provides as follows:
In all appealable contested cases, other than those tried by a jury, the court when requested to do so by a party shall give in writing its findings of fact and reasons for judgment, provided the request is made not later than ten days after the signing of the judgment.
In nonjury cases to recover damages for injury, death or loss, whether or not requested to do so by a party, the court shall make specific findings that shall include those matters to which reference is made in Paragraph C of Article _|j¡¡¡1812 of this code. These findings need not include reasons for judgment. (Emphasis added.)82
Louisiana Code of Civil Procedure Article 1812 C provides as follows:
In cases to recover damages for injury, death, or loss, the court at the request of any party shall submit to the jury special written questions inquiring as to:
(1) Whether a party from whom damages are' claimed, or the person for whom such party is legally responsible, was at fault, and, if so:
(a) Whether such fault was a legal cause of the damages, and, if so:
(b) The degree of such fault, expressed in percentage.
(2)(a) If appropriate under the facts adduced at trial, whether another party or nonparty, other than the person suffering injury, death, or loss, ivas at fault, and, if so:
(i) Whether such fault was a legal cause of the damages, and, if so:
(ii) The degree of such fault, expressed in percentage.
(b) For purposes of this Paragraph, nonparty means a person alleged by any party to be at fault, including but not limited to:
(i) A person who has obtained a release from liability from the person suffering injury, death, or loss.
(ii) A person who exists but whose identity is unknown.
(iii) A person who may be immune from suit because of immunity granted by statute.
(3) If appropriate, whether there was negligence attributable to any party claiming damages, and, if so:
(a) Whether such negligence was a legal cause of the damages, and, if so:
(b) The degree of such negligence, expressed in percentage.
11SS(4) The total amount of special damages and the total amount of general *444damages sustained as a result of the injury, death, or loss, expressed in dollars, and, if appropriate, the total amount of exemplary damages to be awarded. (Emphasis added.)
The duties provided for in La. C.C.P. arts. 1812 C and 1917 are mandatory.
The above cited procedural provisions implement the substantive provisions of La. C.C. arts. 2323 A and 2324 B. La. C.C. art. 2323 A is entitled “Comparative fault” and provides as follows:
In any action for damages where a ‘person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person’s insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person’s identity is not knoum or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss. (Emphasis added.)
Louisiana Civil Code Article 2324 is entitled “Liability as solidary or joint and divisible obligation” and provides, in pertinent part, as follows:
A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
B. If liability is not solidary pursuant to Paragraph A, then liability for dam,ages caused by two or more persons shall be a joint and divisible obligation. A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarity liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person’s insolvency, ability to pay, degree of fault, immunity by statute or otherwise, including but not limited to immunity as provided in R.S. 23:1032, or that the other person’s identity is not knoiun or reasonably ascertainable. (Emphasis added.)
11Si)Finally, in Maraist & Lemmon, 1 La. Civ. Law Treatise, Civil Procedure, § 11.1, p. 259, appears the following:
The judge in a bench trial must provide reasons for judgment in two situations. In all cases, the judge must provide findings of fact and reasons for judgment if a party makes a timely request. Eve'll, if no party requests such findings, the judge in a nonjury suit to recover damages for “injury, death or loss” must make specific findings of (1) whether the particular party ivas at fault, (2) whether that fault was the legal cause of the damages sought, (3) the degrees of fault, expressed in percentages, and (4) the total amount recoverable as damages. Other than Article 1917, the law does not prescribe the scope of a judge’s findings of fact. Presumably, the findings could include (1) the judge’s credibility determinations; (2) the judge’s choice of conflicting inferences, particularly those which determine critical primary facts; (3) the primary facts the judge has found; (4) the judge’s resolution of the mixed questions oflau) and fact; and (5) the rules of law to ivhich the judge applied the *445fact-findings. (Emphasis added; footnotes omitted.)
Findings of fact are the recordation of essential and determining facts upon which the trial court rests its conclusions of law. 89 C.J.S. Trial § 1073, p. 686 (2001). Findings of fact should provide a clear understanding of the trial court’s decision. 89 C.J.S. Trial § 1074, p. 687. Findings of fact must be clear, concise, definite, and certain. 89 C.J.S. Trial § 1097, p. 720. The trial court has a fundamental duty to make all findings necessa,ry to support its conclusions, resolve the issues before it, and provide an adequate basis for appellate reviera 89 C.J.S. Trial § 1096, p. 718. When credibility of the witnesses is at issue, the trial court should specify which witnesses were not credited and why. Id.
In Bloxom, 512 So.2d at 843, the Louisiana Supreme Court stated the following:
The trial court found that the exhaust system in Lonnie Bloxom’s car as manufactured, and particularly as it related to the catalytic converter, was unreasonably dangerous to normal use. However, we are unable to give this finding the usual deference attributed to the decisions of triers of fact at the trial level. The trial court’s reasons do not articulate the |inntheory or the evidentiary facts upon which its conclusion is based.. Nor can we infer from the trial court’s reasons and the record the theory under which the tried court found the product to be unreasonably dangerous to normal use. Although we may accord deference to a decision of less than ideal clarity if the trial court’s path may reasonably be discerned, such as when its findings, reasons and exercise of discretion are necessarily and clearly implied by the record, we will not supply a finding from the evidence or a reasoned basis for the trial court’s decision that it has not found or that is not implied. (Emphasis added.)
In Milstead, 95-2446 p. 8, 676 So.2d at 96, Bloxom was further defined as follows:
The defendant argues that even if the state standard of review is applicable, the appellate court erred in failing to conduct a de novo review of this case under Bloxom v. Bloxom, 512 So.2d 839 (La.1987). Therein, we declined to accord the usual degree of deference to a trial court’s findings because the underlying theory could not be discerned from either its reasons or from the record. Bloxom, 512 So.2d at 843. However, this is an exceptional remedy available only when the trial court’s “findings, reasons and exercise of discretion are [not] necessarily and clearly implied by the record.” Bloxom, supra. Such is not the case here. After reviewing the record and evidence presented, we agree with the court of appeals conclusion that the “ ‘trial court’s path may reasonably be discerned’ and that the trial court’s factual findings are entitled to be reviewed under the manifest error standard.” Milstead, 663 So.2d at 143.
In Palmer v. Schooner Petroleum Services, 2002-0397, p. 6 (La.App. 3 Cir. 12/27/02), 834 So.2d 642, 646-647, unit denied, 2003-0367 (La.4/21/03), 841 So.2d 802, appears the following:
However, in the present case the WCJ did not articulate the evidentiary facts she relied upon for her conclusion that an accident did not occur, nor did the WCJ articulate the facts she relied upon to conclude that Palmer did not suffer an injury while in the course and scope of his employment ivith Schooner. When a trial court’s reasons do not articulate the theory or the evidentiary facts upon which its conclusion is based, and the trial court’s findings of fact and, reasons are not clearly implied by the *446record, deference is not owed. Bloxom v. Bloxom, 512 So.2d 839 (La.1987). The WCJ articulated reasons for only the La.R.S. 23:1208 violation and the refusal to award supplemental earnings benefits (SEB) to Palmer. Thus, with regard to the issue of | ^whether an accident occurred and the issue of whether Palmer was injured while within the course and scope of his employment, we will accord no deference to the WCJ’s judgment and review the record d,e novo, (Emphasis added; page citation deleted.)
See also Anders v. Boudion, 93-0894, pp. 3-4 (La.App. 5 Cir. 3/29/94), 636 So.2d 1029, 1031.
In Leal, 2000-1285 at pp. 3-4, 769 So.2d at 1185, the Louisiana Supreme Court defined when Bloxom does not apply. Therein the court observed as follows:
While the court of appeal acknowledged this standard of review, it relied on our opinion in Bloxom v. Bloxom, 512 So.2d 839 (La.1987), for the proposition that appellate courts may afford less deference to the district court’s factual findings when the lower court fails to articulate the theory or evidentiary basis for its conclusions. The court of appeal reasoned that because the district court did not explain its reasons for not attributing plaintiffs injuries to the accident, it was not required to give deference to the district court’s findings.
We find the court of appeal misinterpreted our decision in Bloxom. In that decision, we carefully explained that deference should be accorded to the trial comi’s decision, even if that decision is of less than ideal clarity, if the tria,l court’s path may be reasonably discerned,, such as when its findings, reasons and exercise of discretion are necessarily and clearly implied by the record. Bloxom, 512 So.2d at 839.
After review, we conclude the district court’s reasons for finding plaintiff did not sustain personal injuries as a result of the accident are necessarily and clearly implied by the record. The record demonstrates that the bulk of the evidence connecting the accident with plaintiffs personal injuries came from plaintiff herself. In mitten reasons for judgment, the district court clearly implied that it did not find, plaintiff to be a, credible witness, stating that she “did not prove, by a, preponderance of the evidence, that she sustained any personal injuries as a result of this accident.” The district court’s finding of plaintiffs lack of credibility is further supported by the oral reasons given by the court in connection with its denial of plaintiffs motion for new trial:
I sat and heard the case. This was a case-and it was a case of believability and it was a case of credibility. And I found the plaintiff not to be credible .... I did not believe her testimony. And the injuries were not consistent tvith the testimony. \wiAnd, as such, I did not find, the plaintiffs injuries to be related, to the accident. And, as such, I still don’t.
Under these circumstances, the court of appeal erred in failing to give deference to the district court’s factual findings, which were unequivocally based on a credibility determination. (Emphasis added.)
4. The Trial Court’s Reasons for the Nineteen (19) Month Delay
In the reasons dated August 20, 2007, the trial court judge stated that the requests for reasons “were never presented to the court by the moving party, nor was the court favored with notice as evidenced from the certificate of service.” Rule 9.8(c) of the Uniform Rules for Civil Pro-*447eeedings in District Courts provides, in pertinent part, as follows:
Any motion that may be decided ex parte must be accompanied by a proposed order, except a motion for the court to give in uniting its findings of fact and, reasons for judgment under La.Code Civ. Proc. Art. 1917. (Emphasis added.)
Further, the transcript of the November 21, 2005 hearing in the record on appeal contains the following:
THE COURT: I noticed when I received it there was a second request. It was denominated Second Request for Written Reasons. And I recall when I got the first request it teas premature because I hadn’t even signed a judgment (Emphasis added.)
The trial court judge further asserted that the July 2005 request for reasons was premature, and the November 2005 request for reasons was filed after the court was divested of jurisdiction. La. C.C.P. art.1917 provided, at the relevant time, that a request for reasons must be made “not later than ten days after the signing of the judgment.” This merely fixes the latest date on which the request may be filed; it does not prohibit filing the request at an earlier date. Even if the request is considered “premature” if made before the judgment is signed, that prematurity is cured when the | ^¿judgment is signed. It is a common practice to file requests for reasons with initial pleadings. La. C.E. art. 201 B.
The trial court judgments in the Louisiana and Oklahoma cases were rendered on November 4, 2005. The second request for reasons was filed on November 10, 2005, within the ten-day period provided for in Article 1917. The record on appeal shows that motions for suspensive appeals were filed by Health Net in the Louisiana and Oklahoma actions on December 6, 2005, the suspensive appeal bonds were filed on December 19, 2005, and the orders of appeal were signed on February 2, 2006. La. C.C.P. art. 2088 provides, in pertinent part, that “The jurisdiction of the trial court over all matters in the case reviewable under the appeal is divested, and that of the appellate court attaches, on the granting of the order of appeal and the timely filing of the appeal bond, in the case of a suspensive appeal ....” (Emphasis added.). At the time the second request for reasons was made, the suspensive appeal bonds had not been filed, the order granting the appeal had not been signed, and the trial court was not divested of jurisdiction as a matter of law. The second request was timely and valid.
Finally, at the November 21, 2005 hearing, the trial court judge stated the following:
THE COURT: Yes, but it’s not ready yet. The court has had ample opportunity. As you know the court signed the judgment about five days ago. And I have thirty days from the signing to do it. I intend to finish it shortly ... [s]o as soon [as] I signed the judgment. I began to work on it. So it will be complete shortly. (Emphasis added.)
Health Net reasonably could assume that the trial court judge would comply with her mandatory duty.
5. The Trial Court’s Failures to Comply with the Order to Provide Written Findings of Fact and Reasons for Judgment
1194A review of the trial court’s final judgments in the Louisiana and Oklahoma cases reveals that judgments were rendered on the following causes of action: (1) fraud; (2) negligent misrepresentation; (3) violations of a fiduciary duty; (4) unfair *448or deceptive acts or practices; and (5) malice or gross negligence which resulted in causes of action for (a) reasonable attorney fees; (b) punitive damages; and/or (c) treble compensatory damages. These causes of action were asserted against numerous persons and corporate entities. Potentially, the substantive laws of the States of Louisiana, Oklahoma, and Texas could be applicable herein when Louisiana’s conflict-of-law Civil Code articles are properly applied. The pleadings, documentary evidence, and trial transcript in the record on appeal are extraordinarily extensive. As a matter of law, a judgment is not a written finding of fact and reasons for judgment.
For these reasons the trial court judge was ordered to: (1) have a separate section in the reasons for each of the fourteen (14) issues listed in the order (which essentially represented each of the final judgments rendered); (2) state the factual findings of the court on each issue and the pertinent constitutional provision, law and/or jurisprudence that pertained to the issue; and (3) cite the pages in the record that contain the evidence that supports each factual finding. Compliance loith this order would articulate the legal theory and evidentiary facts upon which the trial couri’s judgments were based and provide an adequate basis for appellate review. The trial court’s reasons fail to comply with the order since they: (1) do not cite any constitutional provision, law, or jurisprudence (except for issues pertaining to exemplary damages and attorney fees); (2) do not list the elements of the various causes of action; (3) do not cite any place in the extensive record where pertinent evidence may be found; (4) are essentially conclusions of |1flBfact with no supporting factual reasons; and (5) do not address the judgment on the Louisiana parental guarantee.
The trial court’s mandatory duty to provide reasons when requested to do so is a fundamental duty to make all findings necessary to support its conclusions, resolve the issues before it, and provide an adequate basis for appellate review. Because the trial court refused to properly perform its mandatory duty, the basis for appellate review by the parties and by the court has been impaired. The appellant was required to “shotgun” its assignments of error because it did not know precisely what issues to contest, and, therefore, must contest all possible issues. The appellees did not know exactly what issues to defend and, therefore, must defend against all of the issues contested by the appellant. Finally, the reviewing court does not have the benefit of the trial court’s factual determinations of weight, credibility, and/or inferences and must speculate on what law was applied. This result is in derogation of the obvious intent of La. C.C.P. arts. 1812 and 1917.
6. Conclusion
The facts, issues, and circumstances of this case are more analogous to the Blox-om case than they are to the Leal case. The failure of the trial court judge to provide adequate written findings of fact and reasons for judgment has interdicted the factual findings in the Louisiana and Oklahoma actions.
F. Application of Erroneous Texas Law in the Louisiana and Oklahoma Cases
As previously indicated in Part V, Section D of this opinion, the trial court judge erroneously applied Texas law to decide the Louisiana and Oklahoma cases. Further, as previously indicated in Part VI, Section D2 of |1%this opinion, the trial court judge committed various errors of law when she instructed the Texas jury on *449the issues of fiduciary duties and fraud. As previously indicated in Section E of this Part of this opinion, the trial court judge was ordered by this Court to provide written findings of fact and reasons for judgment that required for “[e]aeh issue discussed shall state the factual findings of the court on the issue and the pertinent constitutional provision, law and/or jurisprudence that controls.”
Finally, as previously stated in this section, except for issues pertaining to exemplary damages and attorney fees, the trial court judge has refused to cite the constitutional provisions, law, and/or jurisprudence upon which she relied to decide the Louisiana and Oklahoma cases as ordered by this Court. Because of this, it reasonably can be inferred that the trial court judge used the same erroneous Texas law that she used to instruct the Texas jury when- she decided the Louisiana and Oklahoma cases. This has interdicted the factual conclusions she reached in the Louisiana and Oklahoma cases on the fiduciary duty and fraud issues.
G. Conclusion
For the foregoing reasons, the trial court’s findings of fact in the Louisiana and Oklahoma cases have been interdicted and we will conduct a de novo appellate review in those cases.
VIII. PRESCRIPTION/PEREMPTION: STATUTES OF LIMITATIONS AND REPOSE
(Assignments of Error TX-10 and 11, LA/OK-8; Proposed Jury Instructions 74, 75, 76, 84 and 85)83
Health Net has asserted the prescription/peremption issue in objections of prescription raised in peremptory exceptions, in motions for {^summary judgment and as an affirmative defense in its answers. The exceptions and motions for summary judgment were tried on their pleadings. The trial court overruled the exceptions, denied the motions for summary judgments and refused to submit the issue to the jury in the Texas case. Health Net asserts that the prescription-peremption issue is controlled by La. C.C. art. 3549 for choice-of-law purposes, pursuant to that code article Louisiana law applies and the causes of action alleged by the Receivers are perempted by the three-year period of La. R.S. 12:1502. In particular, Health Net asserts that “[a]ll of the Receivers’ claims against Health Net arise out of acts or omissions that occurred in connection with the April 30, 1999 sale of the three HMOs to AmCareco,” and “[t]he first petition was not filed until June 30, 2003, which is more than 10 months too late.”
The Louisiana Receiver responds that, because the trial court held that Texas substantive law applies in all three actions, pursuant to La. C.C. art. 3549(B)(1) Texas law applies to this issue rather than Louisiana law, maintaining this action is warranted because of “compelling considerations of remedial justice” and, in any event, these actions “should be maintained if either Louisiana or Texas law would maintain it.” (Emphasis added.) The Louisiana Receiver further asserts the following: (1) the claims for breach of fiduciary duties are not prescribed under the ten-year prescriptive period provided by Louisiana law; and (2) the Louisiana one-year prescriptive period for the negligence and fraud claims was suspended by the doctrines of contra non valentern, continuing tort, adverse domination, and La. R.S. *45022:735(B).84 The Louisiana Receiver asserts that Health Net’s reliance on | i^La. R.S. 12:1502 is misplaced for the following reasons: (1) it is facially inapplicable to the claims of the Oklahoma and Texas Receivers because it only applies to claims against directors, officers, and shareholders of business corporations formed under the laws of Louisiana and does not apply to the Texas or Oklahoma HMO or AmCa-reco, which are not Louisiana corporations; (2) it establishes a prescriptive period rather than a peremptive period; (3) it “is trumped by the more specific provisions of La. R.S. 22:735(B)”; and (4) it “does not apply even to the Louisiana Receiver because, although AmCare-La was nominally incorporated in this state, it was in fact a part of a single business enterprise incorporated in and based in Texas.” (Emphasis added.)
Finally, the Louisiana Receiver asserts that “This action is likewise not barred by the two-year prescriptive period for general torts in Tex. Civ. Prac. & Rem.Code § 16.003(a) or the four-year prescriptive periods for fraud and breach of fiduciary duty in Tex. Civ. Prac. & Rem.Code § 16.004(a)(4)-(5), particularly given the applicability of the discovery rule, the adverse domination doctrine, and other tolling doctrines.” Because “the Receivers specifically alleged that they did not discover the facts underlying their causes of action until a date well within the applicable prescriptive period,” they argue Health Net had the burden of proving the causes of action were prescribed and failed to meet this burden. The Receivers | ^contend the trial court’s rulings on the prescription/peremption issue “is not manifestly erroneous and should be upheld.”85
A. The Proper Procedure to Assert Prescription/Peremption
The petition of the Louisiana Receiver and the Incidental Actions (Interventions) of the Texas and Oklahoma Receivers are ordinary proceedings provided for in Book II of the Code of Civil Procedure. Pursuant to La. C.C.P. art. 851, the code articles in Book II “govern ordinary proceedings, which are to be used in the district courts in all cases, except as otherwise provided by law.” Pursuant to La. C.C.P. art. 852, exceptions, written motions, and answers are separate and distinct types of ordinary pleadings allowed in civil actions such as those consolidated herein. Exceptions are provided for in La. C.C.P. art. 921 et seq. which is Chapter 3, of Title I (Pleading) of Book II; mitten motions (motion for summary judgment) are provided for in La. C.C.P. art. 961 et seq. which is Chapter 4 of Title I; answers are provided for in 1001 et seq. of Chapter 5 of Title I. Peremptory exceptions are provided for in La. C.C.P. art. 927; motions for summary judgment are provided for in La. C.C.P. art. 966; affirmative defenses must be filed in an answer and are provided for in La. C.C.P. art. 1005.
Peremption extinguishes the existence of a right. La. C.C. art. 3458. A review of the jurisprudence pertaining to the is*451sue of how peremption should be procedurally raised reflects that the following procedural vehicles have been used: (1) peremptory exception raising the objection of prescription, La. C.C.P. art. 927 A(l); (2) peremptory exception raising the objection of peremption, La. C.C.P. art. 927 A; (3) peremptory exception | appraising the objection of no cause of action, La. C.C.P. art. 927 A(4); and (4) motion for summary judgment, La. C.C.P. art. 966. Wong v. Hoffman, 2005-1483, p. 5 (La.App. 4 Cir. 11/7/07), 973 So.2d 4, 7-8, writ denied, 2007-2373 (La.2/1/08), 976 So.2d 724; Bardwell v. Faust, 2006-1472, pp. 6-14 (La.App. 1 Cir. 5/4/07), 962 So.2d 13, 16-21, writ denied, 2007-1174 (La.9/21/07), 964 So.2d 334. In these actions, Health Net also has raised the issue as an affirmative defense in its answers. La. C.C.P. art. 1005.
These procedural vehicles are decided by different rules of evidence, are asserted at different times in the proceedings, have different burdens of proof, and are subject to different types of appellate review. Accordingly, it is essential that the proper procedural vehicle be used to adjudicate this issue. When determining this, we will apply the rule that the nature of a pleading must be determined by its substance and not by its caption. La. C.C.P. arts. 852, 853, 854 and 865; State ex rel. Lindsey v. State, 99-2755, p. 1 (La.10/1/99), 748 So.2d 456; Smith v. Cajun Insulation, Inc., 392 So.2d 398, 402, n. 2 (La.1980); St Romain v. State, Department of Wildlife & Fisheries, 2003-0291, p. 3, n. 4 (La.App. 1 Cir. 11/12/03), 863 So.2d 577, 581, n. 4, writ denied, 2004-0096 (La.3/26/04), 871 So.2d 348; Belser v. St. Paul Fire & Marine Ins. Co., 542 So.2d 163, 165-66 (La.App. 1 Cir.1989).
1. Affirmative Defense
The procedural purpose of an answer is: (1) to admit or deny the allegations of the petition; (2) state in short and concise terms the material facts upon which the defenses to the action asserted are based; and (3) set forth all affirmative defenses as required by La. C.C.P. art. 1005. La. C.C.P. art. 1003. La. C.C.P. art. 1005 provides as follows:
| am The answer shall set forth affirmatively arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, division, duress, error or mistake, estoppel, extinguishment of the obligation in any manner, failure of consideration, fraud, illegality, injury by fellow servant, transaction or compromise, and any other matter constituting an affirmative defense. If a party has mistakenly designated an affirmative defense as an incidental demand, or an incidental demand as an affirmative defense, and if justice so requires, the court, on such terms as it may prescribe, shall treat the pleading as if there had been a proper designation. (Emphasis added.)
Tin affirmative defense is a new matter that will defeat the plaintiffs recovery even though the plaintiff proves the allegations of his petition. Generally, the defendant has the burden of proving the affirmative defense. Failure to plead an affirmative defense may result in it not being considered at trial. Webster v. Rushing, 316 So.2d 111, 114-15 (La.1975); Maraist & Lemmon, 1 La. Civ. Law Treatise, Civil Procedure, § 6.9, pp. 150-53. Finally, if the peremption issue is an affirmative defense it may be decided by either the judge or a jury. La. C.C.P. arts. 1731 and 1732; C.J.H. Johnson, 18 La. Civ. Law Treatise, Civil Jury Instructions, § 19.01, pp. 388-89 (2d ed.2001).
However, Official Revision Comments — 1960 (b) for Article 1005 provides as follows:
*452The language of the source provision was changed to employ civilian, rather than common law, terminology. Thus “extinguishment of the obligation in any manner” covers payment and release specified by the federal rule as well as all of the modes of extinguishing obligations provided in Art. 2130, Civil Code, except prescription. Compensation may also be urged through the re-conventional demand (see Art. 1062, infra); while prescription is pleaded through the peremptory exception (see AH 927, supra). Similarly res judicata is pleaded through the peremptory exception (see Art. 927, supra). (Emphasis added.)
Article 1005 and its Comment (b) were enacted by 1960 La. Acts, No. 15, which adopted the present Louisiana Code of Civil Procedure. The [ ^enacting clause and the beginning of Section 1 of 1960 La. Acts, No. 15, provide as follows:
BE IT ENACTED BY THE LEGISLATURE OF LOUISIANA:
Section 1. The Louisiana Code of Civil Procedure, as set forth hereinafter in this section, is hereby adopted and enacted into law .... (Emphasis added.)
The enacting clause is mandated by the constitution and separates those portions of the act that are not laio from those that are. La. Const. of 1921 art. III, § 7; La. Const. art. Ill, § 14; Smith v. Department of Public Safety, 254 So.2d 515, 520 (La.App. 4 Cir.1971); Lamonica & Jones, 20 La. Civ. Law Treatise, Legislative Law and Procedure, § 3.4, p. 48; La. R.S. 1:13 B and 1:14. La. C.C.P. art. 1005 and Comment (b) are provided for in Section 1 of the Act and, thus, both are law, unless otherwise provided for in the act in which it is contained or by some other law.
Louisiana Code of Civil Procedure article 5057 provides as follows:
The headings of the articles of this Code, and the source notes and cross references thereunder, are used for purposes of convenient arrangement and reference, and do not constitute parts of the procedural law.
The clear and unambiguous language of Article 5057 does not exclude the comments in the Louisiana Code of Civil Procedure from being parts of the procedural law. Lamonica & Jones, 20 La. Civ. Law Treatise, Legislative Law and Procedure, § 7.6, pp. 147-148, and the cases cited therein. Therefore, as a matter of law, prescription is not an affirmative defense and, as will be hereinafter shown, in 1960 peremption was considered a species of prescription.
The trial court judge correctly refused to treat either prescription or peremption as an affirmative defense and correctly refused to instruct the jury on them.
Ii)032. Objection of No Cause of Action
As previously indicated, there is jurisprudence that permits the raising of the issue of peremption as an objection of no cause of action in the peremptory exception. The rationale of these decisions apparently is that peremption extinguishes the right (cause of action; right to enforce an obligation) and, therefore, the cause of action is legally nonexistent and the plaintiff has no cause of action.
The objection of no cause of action is raised by the peremptory exception. La. C.C.P. art. 927 A(4). The court’s inquiry on this objection is limited to determining whether the km provides a remedy to anyone if the facts alleged are true; if the law does not grant anyone the remedy sought under the facts alleged, the objection should be sustained and the action dismissed. Maraist & Lemmon, 1 La. Civ. Law Treatise, Civil Procedure, § 6.7(2), pp. 122-27. The procedural foundation for *453the objection of no cause of action is found in La. C.C.P. arts. 421-428. The substantive law for the objection is found generally in La. C.G. arts. 1756-1758. The legal question is whether a cause of action exists; it is not who may assert the cause of action (no right of action), whether the cause of action has accrued (prematurity), or whether the cause of action be asserted in, or extinguished, or defeated by, an affirmative defense. For a general discussion of the objection of no cause of action see Wooley, 2006-1167-1169 at pp. 4-6, 961 So.2d at 1231-32.
There are two conceptual reasons why peremption should not be raised in the objection of no cause of action. First, there are a multitude of ways in which obligations can be extinguished besides prescription and peremption. La. C.C. arts. 621, 631, 751, 1854 et seq., 2013 et seq.; La. R.S. ] 20413:4231; S. Litvinoff, 5 Louisiana Civil Law Treatise, The Lem of Obligations, § 13.1, pp. 400-02 (2001).
Second, no evidence may be introduced at any time to support or controvert the objection that the petition fails to state a cause of action. La. C.C.P. art. 931. For purposes of the objection, all facts pleaded are accepted as true. Mayer v. Valentine Sugars, Inc., 444 So.2d 618, 620 (La.1984). In this procedural posture, the objection of no cause of action must be overruled if evidence is required to show the basis for the peremption (extinguishment) of the cause of action. Accordingly, unless the plaintiff pleads himself out of court, the objection of no cause of action will not be available for the introduction of evidence to establish peremption.
3. Summary Judgment
The motion for summary judgment provided for in La. C.C.P. art. 966 is a written motion, La. C.C.P. art. 961, that is adjudicated in a summary proceeding, La. C.C.P. art. 2592(3). It is designed to secure the just, speedy, and inexpensive determination of every action. La. C.C.P. art. 966 A(2). It can be used to dispose of a particular issue, theory of recovery, cause of action, or defense. La. C.C.P. art. 966. It may be utilized by either a plaintiff or a defendant. La. C.C.P. art. 966 A(l). In Bardwell, 2006-1472 at p. 17, 962 So.2d at 23, appears the following pertaining to motions for summary judgment:
The mover has the burden of proof that he is entitled to summary judgment. If the mover will not bear the burden of proof at trial on the subject matter of the motion, he need only demonstrate the absence of factual support for one or more essential elements of his opponent’s claim, action, or defense. La. C.C.P. art. 966(C)(2). If the moving party points out that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense, then the non-moving party must produce factual support sufficient to satisfy his evidentiary burden at trial. La. C.C.P. art. 966(C)(2). If the mover has put forth supporting proof through affidavits or 12n.-,otherwise, the adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. La. C.C.P. art. 967(B).
Conventional evidence cannot be taken to support or resist a motion for summary judgment and the moving party cannot prevail unless there is no issue of material fact and the mover is entitled to judgment as a matter of law.
As previously indicated, a motion for summary judgment is a written motion as provided for in La. C.C.P. art. 961 et seq. Article 961 provides as follows:
*454An application to the court for an order, if not presented in some other pleading, shall be by motion which, unless made during trial or hearing or in open court, shall be in writing. (Emphasis added.)
La. R.S. 24:177 B(l) provides, “The text of a law is the best evidence of legislative intent.” The text of La. C.C.P. art. 961 is clear and unambiguous. In Maraist & Lemmon, 1 La. Civ. Law Treatise, Civil Procedure, § 6.8, pp. 134-35, appears the following:
It is arguable that the motion may not be used to obtain relief which is specifically provided for by one of the other-designated pleadings, such as an exception. Thus a motion to dismiss a claim because it is presented may be beyond the scope of Article 961, since such relief is expressly provided for by Article 927. However, Article 961 provides that an application to the court for an order, if not presented in some other pleading, shall be by motion. A permissible construction under Louisiana’s liberal rules of procedure is that a request for relief may be sought by motion, even though it may be raised by some other pleading. (Emphasis added.)
The motion, however, may not be used to present an objection which has been waived by failure to file timely some other pleading such as a declinatory exception.
As previously indicated, the nature of a pleading must be determined by its substance and not by its caption. Accordingly, we will consider LnsHealth Net’s motions for summary judgment as asserting objections of prescription and/or peremption in peremptory exceptions as provided for in La. C.C.P. art. 927.
4. Prescription/Peremption
The objection of prescription is raised by the peremptory exception. La. C.C.P. art. 927(1). An exception is a means of defense to an action, other than denial or avoidance of the demand, used by a defendant to retard, dismiss or defeat the demand. La. C.C.P. art. 921. In particular, the function of the peremptory exception is to have the plaintiffs action declared legally nonexistent or barred by the effect of laiv. The function of the objection of prescription is to show that because of the passage of a period, of time either the plaintiff’s cause of action is extinguished (and, thus, legally nonexistent) or the plaintiffs action is procedurally barred. La. C.C. arts. 3446, 3447, 3448 and 3458; Maraist & Lemmon, 1 La. Civ. Law Treatise, Civil Procedure, § 6.7(3), p. 127.
Louisiana Code of Civil Procedure Article 927 A(l) (prescription), Article 927 A(4) (no cause of action), Article 966 (summary judgment) and Article 1005 (affirmative defenses) came into existence simultaneously with the adoption of the Louisiana Code of Civil Procedure in 1960 La. Acts, No. 15. Article 1005 (affirmative defenses) refers to the extinguishment of an obligation in any manner; Article 966 (summary judgment) refers to every action where there is no issue of material fact and a party is entitled to judgment as a matter of law; Article 927 A(4) (no cause of action) refers to all actions where the law does not grant a remedy to anyone. However, Article 927 A(l) (prescription) only applies in the limited, situation where, because of the passage of time, the plaintiff’s cause of action is extinguished or is procedurally barred.
^Pursuant to the general rules of statutory construction, where two or more statutes deal with the same subject matter, they should be harmonized if possible; and, even if they are in conflict, the statute more specifically directed, to *455the matter at issue must prevail as an exception to a statute more general in character. Pumphrey v. City of New Orleans, 2005-0979, pp. 10-12 (La.4/4/06), 925 So.2d 1202, 1209-1210; Smith, 392 So.2d at 402; Richie, Richie & Oberle, L.L.P. v. Louisiana Insurance Guaranty Association, 2004-2522, p. 5 (La.App. 1 Cir. 12/22/05), 928 So.2d 15, 18, writ denied, 2006-0183 (La.4/24/06), 926 So.2d 546. Accordingly, Article 927 A(1) (prescription) applies to these proceedings because it is more issue specific than the other procedural devices.
This result is confirmed by the legislative history of the substantive Civil Code articles on prescription. In 1960 when the Code of Civil Procedure articles under consideration herein were adopted, the substantive law pertaining to prescription was located in Book III (Modes of Acquiring Ownership of Things), Title XXIV (Prescription) of the Civil Code. At that time, the Civil Code only provided for three types of prescription: acquisitive, libera-tive and nonuse. Revision Comments— 1982 (b) and (c) for La. C.C. art. 3445. These types of prescription were the basis for the objection of prescription raised by the peremptory exception provided for in La. C.C.P. art. 927 A(l). At that time, although the doctrine of peremption was not codified in the Civil Code, it was well established in Louisiana jurisprudence. Conerly v. State of Louisiana ex rel. the Louisiana State Penitentiary and the Department of Comctions, 2002-1852, pp. 6 and 8, n. 7 (La.App. 1 Cir. 6/27/03), 858 So.2d 636, 643 and 644, n. 7, writ denied, 2003-2121 (La.11/14/03), 858 So.2d 432; Revision Comments — 1982(a) for La. C.C. art, 3458. The legislature at various times has enacted hybrid hnslaws that combine elements of prescription and peremption. See, for example, La. R.S. 49:112 discussed in the Conerly case cited above.
By 1982 La. Acts, No. 187, effective January 1, 1983, the doctrine of peremption was made statutory in La. C.C. arts. 3458 et seq. and was located in Section 2— Peremption, of Chapter 1 — General Principles, of Title XXIV — PRESCRIPTION, of the Civil Code. In Pounds v. Schorl, 377 So.2d 1195, 1198-99 (La.1979), the Louisiana Supreme Court discussed how the doctrine of peremption in the jurisprudence was perceived conceptually prior to the time it was made late, as follows:
Our jurisprudence has long recognized a major distinction between a statute of limitations (prescription) and a peremption. It has been repeatedly held that prescription bars the remedy sought to be enforced and teiminates the right of access to the courts for enforcement of the existing right. A peremptive statute, however, totally destroys the previously existing right with the result that, upon expiration of the prescribed period, a cause of action or substantive right no longer exists to be enforced.
[[Image here]]
Recently, in Flowers, Inc. v. Rausch, La., 364 So.2d 928 (1978) we held that peremption is but a form, or species of prescription possessing the differentiating characteristic that peremption does not admit of interruption or suspension. Flowers, above, involved cancellation of a state tax assessment for failure to reinscribe.
In Flowers, above, we recognized that peremption is a common law term that has infiltrated our jurisprudence. We noted also that peremption is, in reality, the civil law equivalent of “forfeiture”. We so held on the basis of 28 G. Bau-dry-Lacantinerie & A. Tissier, Traite Theorique et Pratique, De droit Civil, Secs. 38-39, Louisiana State Law Institute Translation, First Part A, Chapter II, General Provision IV, Difference Be*456tween Prescription and Forfeiture, pages 23-30,1972. In short, we adopted the Baudry-Lacantinerie & A. Tissier concept that there is little if any doctrinal difference between forfeiture and prescription.
We reiterate the following pronouncement in Flowers, above:
“There is indeed a difference between prescription and peremption as noted by the Court of Appeal and as pointed out in the Succession of \2mPizzillol 223 La. 328, 65 So.2d 783 (La.1953)], supra. Nevertheless we conclude that peremption is but a form of prescription, a species thereof but with the characteristic that it does not admit of interruption or suspension, and we determine that the constitutional provision barring prescription bars prescription in all its forms, including peremption.”
The basic contention in Flowers, above, was that the statute in question was peremptory and that peremption runs against the state despite constitutional provision that prescription does not run beyond the state unless otherwise provided by the Constitution or expressly by law. We applied the principles above mentioned and concluded that peremption, being merely a species of prescription, does not run against the state unless otherwise provided either in the state constitution or expressly by law. La. Const.1974, Article XII, Section 13; La. Const. 1921, Article XIX, Section 16. We then found statutory authority for the running against the state of the tax assessment reinscription limitation provided by La.R.S. 9:5161-5162. (Some case citations omitted; emphasis added.)
Insofar as the doctrine of peremption is concerned, 1982 La. Acts, No. 187, made statutory that which previously had been jurisprudential.86 The prior jurisprudential peremption is now statutory peremption provided for in La. C.C. arts. 3458-3461. Revision Comments — 1982 (a) for Article 3458 provides that “This provision is new. It is based on Louisiana jurisprudence. It does not change the law.” (Emphasis added.)
Finally, the name of Title XXIV is “PRESCRIPTION.” This title was included in Section 1 of 1982 La. Acts, No. 187, and Section 1 appears immediately after the enacting clause. Thus, the Title number and Title name are law unless excluded as such by another section of the act or another law.
12iflSection 6 of Act 187 provides as follows:
The Expose de motif, the a,Hide head-notes, and the comments in this Act are not part of the law and are not enacted into law by virtue of their inclusion in this Act. (Emphasis added).
Compare La. R.S. 1:13; La.C.Cr.P. art. 10; La Ch.C. art. Ill; La. C.C.P. art. 5057. Section 6 is clear and unambiguous. This enumeration of things that are not enacted into law by the adoption of Section 6 of Act 187 does not include the Civil Code Section, Chapter, Title and Book headings. The time-honored rule of statutory construction of Expressio Unius est Exclusio Alterius (expression of one thing implies the exclusion of another) dictates that when the legislature specifically enumerates a series of things, the legislature’s *457omission of other items, which easily could have been included in the statute, is deemed intentional. State, Department of Public Safety & Corrections v. Louisiana Riverboat Gaming Commission, 94-1872, p. 17 (La.5/22/95), 655 So.2d 292, 802; Lamonica & Jones, 20 La. Civ. Law Treatise, Legislative Law and Procedure, § 7.6, pp. 147-48. Although Section 6 of Act 187 specifically refers to Civil Code article headnotes and other things, Civil Code Title, Chapter, Section, and Book headings are not mentioned, and thus, they are enacted into the law. Therefore, denominating the Title XXIV as “PRESCRIPTION” and placing the articles on peremption therein is substantive,87 Accordingly, for all of the above reasons, peremption is a species of prescription and it is properly asserted in the objection of prescription raised in the peremptory exception Ian pursuant to La. C.C.P. art. 927 A(l).88 Pursuant to 2008 La. Acts, No. 824, effective January 1, 2009, peremption has been classified as an objection that may be raised in the peremptory exception pursuant to La. C.C.P. art. 927.
We will proceed on this procedural basis.
B. Choice-of-Law
The Louisiana choice-of-law provision for prescription is La. C.C. art. 3549 entitled “Law governing liberative prescription” which provided,89 in pertinent part, as follows:
When the substantive law of this state would be applicable to the merits of an action brought in this state, the prescription and peremption law of this state applies.
When the substantive law of another state would be applicable to the merits of an action brought in this state, the prescription and peremption law of this state applies, except as specified below:
(1) If the action is barred under the law of this state, the action shall be dismissed unless it would not be barred in the state whose law would be applicable to the merits and maintenance of the action in this state is warranted by compelling considerations of remedial justice.
(2) If the action is not barred under the law of this state, the action shall be maintained unless it would be barred in the state whose law is applicable to the merits and maintenance of the action in this state is not warranted by the policies of this state and its relationship to the parties or the dispute nor by any compelling considerations of remedial justice.
I212AS previously indicated, we have ruled that the trial court committed error by not applying Louisiana and Oklahoma law to the Louisiana and Oklahoma cases.
*4581. Liberative Prescription or Per-emption in the Louisiana Case
As previously indicated, Health Net asserts that these actions are per-empted pursuant to the provisions of La. R.S. 12:1502. The Louisiana Receiver responds that the statute creates a prescriptive period rather than a peremptive one. This statute was enacted by 2001 La. Acts, No. 1126, effective June 28, 2001. The title of this Act and Section 1 thereof provide as follows:
AN ACT
To enact Chapter 24 of Title 12 of the Louisiana Revised Statutes of 1950, to be comprised of R.S. 12:1501 and 1502, relative to business organizations; to provide for filing of actions against persons who control business organizations; to provide for prescription; to provide for applicability; and to provide for related matters.

Be it enacted by the Legislature of Louisiana:

Section 1. Chapter 24 of Title 12 of the Louisiana Revised Statutes of 1950, comprised of R.S. 12:1501 and 1502, is here enacted to read as follows:

CHAPTER U. PRESCRIPTIVE PERIODS APPLICABLE TO BUSINESS ORGANIZATIONS

§ 1501. Applicability

The provisions of this Chapter shall be applicable to all business organizations defined in R.S. 12:1502(B), except as provided in R.S. 12:92(D). 93(D), or 1328(C).

§ 1502. Actions against persons who control business organizations.

A. The provisions of this Section shall apply to all business organizations formed under the laws of this state and shall be applicable to actions against any officer; director, shareholder; member, manager, general partner, limited partner, managing partner, or other person similarly situated.
lamB. The term “business organization” includes any entity formed under the laws of this state engaged in any trade, occupation, profession, or other commercial activity including but not limited to professions licensed by a state or other governmental agency. This Section shall apply without limitation to corporations, incorporated or unincorporated associations, partnerships, limited liability partnerships, partnerships in commendam, limited liability companies, or cooperative associations or other entities formed under the laws of this state.
C. No action for damages against any person described in Subsection A of this section for an unlawful distribution, return of an unlawful distribution, or for breach of fiduciary duty, including without limitation an action for gross negligence, but excluding any action covered by the provisions of Subsection D of this Section, shall be brought unless it is filed in a court of competent jurisdiction and proper venue within one year from the date of the alleged act, omission, or neglect, or within one year pom the date that the alleged, act, omission, or neglect, or' within one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered, but in no event shall an action covered by the provisions of this Subsection be brought more than three years from the date of the alleged act., omission, or neglect.
*459D. No action for damages against any person listed in Subsection A of this section for intentional tortious misconduct, or for an intentional breach of a duty of loyalty, or for an intentional unlawful distribution, or for acts or omissions in bad faith, or involving fraud, or a knowing and intentional violation of law, shall be brought unless it is filed in a coui't of competent jurisdiction and proper venue within two years from the date of the alleged act or omission, or within two years from the date the alleged act or omission is discovered or should have been discovered, but in no event shall an action covered by the provisions of this Subsection be brought more than three years from the date of the alleged act or omission.
E. The time limitations provided in this Section shall not be subject to suspension on any grounds or interruption except by timely suit filed in a court of competent jurisdiction and proper venue.
F. This Section shall be applied both retrospectively and prospectively as to claims to which a vested right has |2i4not attached; however, as to any alleged act, omission, or neglect for which the time period for bringing an action would otherwise be shortened by Subsection C of this Section, such action shall be filed in a court of competent jurisdiction and proper venue on or before the earlier of the end of the time period for bringing such action prior to the effective date of this Section or September 1, 2002. Any claim or alleged act or omission for which the time period for bringing an action would otherwise be shortened by Subsection D of this section shall be filed in a court of competent jurisdiction and proper venue on or before the earlier of the end of the time period for bringing such action prior to the effective date of this Section or September 1, 2002, in any case without regard to the date of discovery of the alleged act or omission. (Emphasis added.)
In G. Morris & W. Holmes, 7 La. Civ. Law Treatise, Business Organizations, § 22.17, 2007 Pocket Part, appears the following:
§ 22.17 Prescriptive rules applicable to business organizations
In 2001, the Louisiana Legislature enacted a comprehensive set of rules defining the prescriptive period applicable to actions against management and owners of business organizations for wrongful actions. The new rules of action apply to all causes of action except liability for wrongful distributions in the LB CL and limited liability company act.
The new statute begins by defining its scope as applying to “all business organizations” formed under Louisiana law, including all actions against “any officer, director, shareholder, member, general partner, limited partner, managing partner, or other person similarly situated.” Business organization is defined to include all entities farmed under Louisiana law “engaged in any trade, occupation, profession, or other commercial activity including but not limited to professions licensed by a state or other-governmental agency.” Illustratively but not exclusively, the statute lists “corporation, incorporated or unincorporated associations, partnerships, limited liability partnerships, partnerships in commendam, limited liability companies, or cooperative associations or other entities” formed under Louisiana law.
*460The time limitations imposed differentiate between non-intentional and intentional acts. Thus, generally, actions for unlawful distributions, return of unlawful distributions, or breaches of fiduciary duty (including without limitation actions for gross negligence) must be brought within one year from the date of the alleged act, omission or neglect, or within one yearjjisof the time it was or should have been discovered, but in all events such actions must be brought within three years of the act, omission, or neglect.
However, if the conduct involves intentional tortious misconduct, intentional breach of a duty of loyalty, an intentional unlawful distribution, acts or omissions in bad faith, fraud or a knowing and intentional violation of law, then any action must be brought within two years of the act or omission, or two years from the time it was or should have been discovered, but in all events within three years of the act or omission.
The foregoing time limitations cannot be suspended or interrupted except by timely suit in a court of competent jurisdiction and proper venue. The statute applies both retrospectively and prospectively. (Emphasis added; footnotes deleted.)
In determining whether La. R.S. 12:1502 has enacted a liberative prescriptive period or a peremptive period, we must consider the applicable rules of statutory construction. In Pumphrey v. City of New Orleans, 2005-0979, pp. 10-11 (La 4/4/06), 925 So.2d 1202, 1209-10, appears the following:
The fundamental question in all cases of statutory interpretation is legislative intent and the ascertainment of the reason or reasons that prompted the Legislature to enact the law. The rules of statutory construction are designed to ascertain and enforce the intent of the Legislature. 'Legislation is the solemn expression of legislative will, and therefore, interpretation of a law involves primarily a search for the Legislature’s intent. La.Rev.Stat. § 1:4 (2004); La. Civ.Code art. 2 (2004).
When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the Legislature. When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law, and the words of law must be given their generally prevalent meaning. La. Civ.Code arts. 10 and 11 (2004). When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole, and laws on the same subject matter must be interpreted in reference to each other. La.Rev. Stat. § 1:3 (2004); La. Civ.Code arts. 12 and 13.
1mThe meaning and intent of a law is determined by considering the law in its entirety and all other laius on the same subject matter and placing a construction on the provision in question that is consistent with the express terms of the lato and with the obvious intent of the Legislature in enacting it. The statute must, therefore, be applied and interpreted in a manner, which is consistent with logic and the presumed fair purpose and intention of the Legislature in passing it. (Emphasis added; some citations omitted.)
Further*, the lawmaker is presumed to have enacted each law with deliberation and with full knowledge of all existing laws on the same subject. Cham*461pagne, 2003-3211 at p. 21, 893 So.2d at 786; Hoag v. State, 2001-1076, p. 9 (La. App. 1 Cir. 11/20/02), 836 So.2d 207, 216, writ denied, 2002-3199 (La.3/28/03), 840 So.2d 570; Lamonica & Jones, 20 La. Civ. Law Treatise, Legislative Laiv and Procedure, § 7.3, p. 136. Finally, prescription statutes are strictly construed against prescription and in favor of the obligation sought to be extinguished or procedurally barred by it. Wimberly v. Gatch, 93-2361, p. 7 (La.4/11/94), 635 So.2d 206, 211; Amoco Production Co. v. Texaco, Inc., 2002-0240, p. 7 (La.App. 3 Cir. 1/29/03), 838 So.2d 821, 829, writs denied, 2003-1102, 2003-1104 (La.6/6/03), 845 So.2d 1096.
Prescription generically is provided for in Title XXIV of Book III of the Civil Code. The first Chapter of Title XXIV has two Sections, namely: (1) Prescription; and (2) Peremption. As previously indicated, peremption is a species of prescription generically. In Section 1, three types of prescription are provided for: (1) acquisitive prescription; (2) liberative prescription; and (3) prescription of nonuse. La. C.C. art. 3445. A review of La. R.S. 12:1502 clearly shows that it is not intended to pertain to acquisitive prescription or prescription of nonuse. Therefore, it must provide for either liberative prescription or peremption, or both (hybrid).
IznLiberative prescription is a mode of barring actions as a result of inaction for a period of time. La. C.C. art. 3447. Per-emption is a period of time fixed by law for the existence of a right, and, unless timely exercised, the right is extinguished upon the expiration of the peremptive period. La. C.C. art. 3458. Liberative prescription can be renounced, interrupted, and suspended. La. C.C. arts. 3449-3451, 3462-3472. Peremption may not be renounced, interrupted, or suspended. La. C.C. art. 3461.
Pursuant to La. Const, art. Ill, § 15(A), all acts of the legislature “... shall be confined to one object” and “[e]very bill shall contain a brief title indicative of its object.” (Emphasis added.) Although the title of the Act that adopted La. R.S. 12:1501-1502 appears before the Act’s enacting clause, it may be considered for the purposes of determining legislative intent. Louisiana Associated General Contractors, Inc. v. Calcasieu Parish School Bd., 586 So.2d 1354, 1367 (La.1991); Green v. Louisiana Underwriters Ins. Co., 571 So.2d 610, 614, n. 6 (La.1990); Conerly v. State of Louisiana ex rel. the Louisiana State Penitentiary & the Department of Corrections, 2002-1852, pp. 5-6 (La.App. 1 Cir. 6/27/03), 858 So.2d 636, 642-43. The title of the Act is clear and unambiguous and states that it intends “to provide for prescription.” It does not state that the Act intends to provide for peremption.
2001 La. Acts, No. 1126, enacts Chapter 24 of Title 12 of the Revised Statutes comprised of R.S. 12:1501 and 1502. Immediately following the enacting clam.se is the title to Chapter 24 which is “PRESCRIPTIVE PERIODS APPLICABLE TO BUSINESS ORGANIZATIONS.” (Emphasis added.) Because this title is after the enacting clause and in Section 1 of the Act, it is law. Cf. La. R.S. 1:13 and 1:14. Thus, this statute does not provide for a peremptive period as a matter of law.
| .¿^Paragraphs C and D of La. R.S. 12:1502 provide, in pertinent part, that any action brought must be filed within one or two years “from the date the alleged act of omission is discovered or should have been discovered.” This language is known as the discovery rule or doctrine. See Ma-raist & Galligan, supra, § 10.04(3), pp. 10-10 to 10-14. This language is modified by the phrase that “but in no event shall an action covered by the provisions of this Subsection be brought more than three *462years from the date of the alleged act, omission, or neglect.” This limitation is sometimes referred to as the three-year cap on discovery. In Campo v. Correa, 2001-2707, pp. 7-9 (La.6/21/02), 828 So.2d 502, 508-09, the Court interpreted similar language found in La. R.S. 9:5628 pertaining to medical malpractice and concluded that “La.Rev.Stat. § 9:5628 is in both of its features noted above a prescription statute, with only the single qualification that the discovery rule is expressly made inapplicable after three years from the act, omission, or neglect.” (Emphasis in original.)
Pursuant to La. C.C. art. 3461, peremption cannot be renounced, interrupted, or suspended. Paragraph E of La. R.S. 12:1502 only provides that its time limitations are not subject to suspension or in-tex-ruption; it does not mention renunciation.
La. R.S. 12:1502 E provides that “The time limitations provided in this Section shall not be subject to suspension on any grounds or interruption except by timely suit filed in a court of competent jurisdiction and proper venue.” Language similar to this was interpreted by this Court in Conerly, 2002-1852 at p. 8, 858 So.2d at 644:
The period of limitation contained in LSA-R.S. 49:112 clearly has some aspects of a peremptive period. Most notably, as the State points out in its brief to this court, the statute provides that there will be no interruption or suspension of the time period. The Louisiana Supreme Court has recognized this 12i9as a characteristic of peremption. Flowers v. Rausch, 364 So.2d 928, 931 (La.1978). However, the Legislature is free to enact statutes containing prescriptive periods and to dispense with exceptions to those prescriptive periods. See Hebert [v. Doctors Memorial Hosp.], 486 So.2d [717] at 724 [La. 1986]. Moreover, had the Legislature meant for the time period to be peremptive, it could have expressed its intent in the title or text of the act enacting LSA-R.S. 4-9:112 or in the language of LSA-R.S. 49:112 itself.
Basically, LSA-R.S. 49:112 creates a hybrid time period, as concerns actions against the State. Despite having some characteristics in common with peremp-tive time periods, we find that the time period set forth in LSA-R.S. 49:112 is, as the legislature described it, a prescriptive period, with the qualifications that the prescriptive period is not subject to interruption or suspension. (Emphasis added; footnote deleted).
Further, if the legislature had intended for this to be a peremptive statute, it simply could have said so. Had that been done, the above quoted sentence would have been unnecessary because La. C.C. art. 3461 already provides that peremption cannot be interrupted or suspended. See La. R.S. 9:5605 B pertaining to legal malpractice as interpreted in Perez v. Trahant, 2000-2372 (La.App. 1 Cir. 12/28/01), 806 So.2d 110, rndts denied, 2002-0847, 2002-0901 (La.8/30/02), 823 So.2d 953.
For the reasons set forth hereinabove, we conclude that La. R.S. 12:1501-1502 is a hybrid liberative prescriptive statute, and we will apply it accordingly. Borel v. Young, 2007-0419, pp. 28-29 (La.7/1/08), 989 So.2d 42, 69.
a. Burden of Proof
In Louisiana, the law of evidence is provided for in the Louisiana Code of Evidence. La. C.E. art. 101 et seq. Generally, the party seeking relief bears the burden of proof. La. R.S. 15:439; F. Maraist, 19 La. Civ. Law Treatise, Evidence and Proof, § 4.2, p. 48 (1999). Official Comment (1997)(b) for La. C.E. art. 302 provides as follows:
*463_j220The term “burden of persuasion” as here defined is to be contrasted with the terms “burden of proof’ and “burden of producing evidence.” The burden of producing evidence is the lesser burden of a party to come forward with evidence sufficient to avoid a directed verdict. The term “burden of proof" is generally used as encompassing both the burden of persuasion and the burden of producing evidence. (Emphasis added.)
For choice-of-law purposes, rules of evidence are part of the law of the remedy, are procedural, and are supplied by the law of the forum. 15A, C.J.S., Conflict of Laivs, § 105, pp. 306-07 (2002); H. Goodrich & E. Scoles, Handbook of the Conflict of Laws, § 84, pp. 149-52 (4th ed.1964).
Ordinarily, the exceptor bears the burden of proof at the trial of a peremptory exception. However, if prescription is evident on the face of the pleadings, the burden shifts to the plaintiff to show that the action has not prescribed. Campo, 2001-2707 at p. 7, 828 So.2d at 508; SS v. State ex rel. Department of Social Services, 2002-0831, p. 7 (La.12/4/02), 831 So.2d 926, 931; W. Crawford, 12 La. Civ. Law Treatise, Tort Law, §§ 10.10 and 10.11, pp. 170-71(2000).
b. Objection of Prescription
The record reflects the following dates relating to the issue of prescription:
(1) Petition for rehabilitation of Am-Care-LA filed — September 23, 2002;
(2) Petition for Liquidation of AmCare-LA filed — October 7, 2002;
(3) Order of Liquidation entered — November 12, 2002;
(4) Action filed by the Louisiana Receiver against AmCareco, AmCare-MGT and their officers and directors— June 30, 2003; and
(5)Consolidated, amended, and restated petition of the Louisiana and Oklahoma Receivers naming Health Net as a party defendant filed — October 15, 2004.
122iPursuant to La. R.S. 22:735(B), the filing of suit “by the commissioner of insurance seeking an order of liquidation shall interrupt the running of prescription as to all such claims from the date of the filing of such proceeding for a period of two years, if an order of liquidation is granted.”
The first issue to be decided is whether it is evident on the face of the pleadings that , the Louisiana Receiver’s claims are prescribed. If not, the burden of proving prescription is on Health Net.
The following are paragraphs in the • Louisiana and Oklahoma Receivers’ petition that are relevant to this issue:
6.
AmCareCo [sic] and its wholly owned subsidiaries, AmCare-LA, AmCare-OK, AmCare-TX, and AmCare-MGT, had overlapping officers and directors who ran the operations of those entities in a coordinated, co-dependent and intertwined manner. The said entities were all undercapitalized at all relevant times. Funds, bogus receivables and bogus payables were routinely shifted and moved between the said entities without legal right or necessary regulatory approval from the HMO regulators, and with no business justification except to make individual HMO’s appear solvent at specific times for the purpose of misleading the regulators. The enterprise ivas insolvent by May 3.1999, practically from the moment it came into existence, and remained insolvent (indeed, the insolvency deepened) until the HMO’s and their management com*464pany were all placed in receivership in late 2002 and early 2003.
7.
AmCare-LA, AmCare-OK and Am-Care-TX, the three licensed AmCare HMO’s, each contractually undertook to provide for the healthcare for many thousands of citizens in their respective states of incorporation. They each failed miserably in their contractual obligations to their members, causing many of their members to go without greatly needed healthcare and leaving others with huge unpaid medical bills. The three HMO’s each also failed miserably in their contractual obligations to the health care providers with whom they contracted causing thousands of costly medical procedures and materials to go unreimbursed. Other creditors of the HMO’s went unpaid as well. These failures have led to many millions of dollars in claims against the receivers for the three HMO’s.
12228.

The liquidators and receivers for Am-Care-LA, and AmCare-OK seek damages for the losses caused to AmCare-LA, and AmCare-TX and their members, policyholders, claimants and creditors through the fraudulent, grossly negligent and/or negligent acts and omissions of the defendants named in Paragraph 18 below.

9.
The three AmCare HMO’s failed because of their gross undercapitalization, their statutory insolvency within a business day after their sale to AmCareCo, their growth through the acquisition of bad books of business without adequate capitalization to support those books of business, and their abysmal mismanagement of claims, all of which were caused in the first instance by the fraudulent, grossly negligent, or negligent acts and omission of the “D & 0 Defendants” named in Paragraph 18. Further, millions of dollars of much-needed cash were withdrawn from the three AmCare HMO’s and paid improperly to the controlling shareholder of AmCareco (the “Found,ation/HealthNet Defendants ” named in paragraph 18); these cash payments to an insider and controlling party, implemented or at least allowed by the D & 0 Defendants, served to cause and then to deepen the insolvency of the three regulated HMO’s. Meanwhile, PriceWaterhouseCoopers, LLP (“PWC”), the auditor for AmCareCo and its subsidiaries, allowed the insolvency of the enterprise to continue wtire-ported for several years and indeed, appears to have been fully knowledgeable of and complied in the D & 0 Defendants’ constant efforts to cover up that insolvency. Alternatively, PWC was negligent in the handling of its audits and breached the applicable standards of care applicable to PWC as auditor. The acts and omissions of the D & 0 Defendants were also aided, abetted and conspired in by Stuart Rosow and Pros-kauer Rose, LLP, the attorneys for the AmCare entities, or in the alternative, those attorneys were at least negligent and breached their fiduciary duties by involvement in the said acts and omissions.
10.
As will be discussed in more detail below, the D & 0 Defendants successfully hid the insolvency of the AmCare enterprise from Louisiana, Oklahoma and Texas HMO regulators for several years. They did so by implementing and allowing misleading, inaccurate *465and/or fraudulent accounting practices, through the creation of bogus inter-company accounts receivable which had no reasonable chance of ever being paid and were completely without documentation or substance, and through cash-shuffling among the various components of the ^enterprise designed to make individual HMO’s look solvent as needed in what was, in essence, a persistent and ongoing kiting scheme among AmCare-Co and its subsidiaries.
11.
The bogus accounts receivable described in the preceding paragraph caused non-admitted assets (those that should not be counted as assets under relevant accounting standards) to be listed on quarterly and annual balance sheets of the HMO’s as admitted assets, rendering the appearance to the individual state regulators that the individual HMO’s met their minimum capital and surplus requirements, when in truth the said receivables were not admitted assets under applicable accounting standards and the HMO’s were in fact statutorily insolvent. The cash shuffles described in the preceding paragraph were timed so as to make it seem that a particular HMO had sufficient cash at specific moments to meet its obligations, thus misleading and misrepresenting facts to the individual state regulators, when the entire enterprise was in fact insolvent at all times and was simply “robbing Peter to pay Paul.” These misleading accounting and cash-shuffling maneuvers were known by, aided by and conspired in by PWC, Rosow and Proskauer Rose, or they certainly should have been known by and prevented or advised against by them. PWC nevertheless repeatedly issued audit reports asserting that the financial statements of the HMO’s fairly represented their true financial condition, allowing the improper and misleading practices to continue and cause further and further harm.
12.
The insolvent business enterprise rvas kept alive for a little over three years through what amounted to a Ponzi scheme. Despite the insolvency of the enterprise and its inability to pay the claims of its existing members as they came due from existing premiums, the AmCare HMO’s — controlled by the D & 0 Defendants herein and the Foundation/HealthNet Defendants herein — continued soliciting and selling memberships to new members and collecting neiu premiums, as well as buying new books of business without regard to loss history. The new premiums thus collected were used to pay the claims of earlier members, and still more members were recruited and books of business were purchased to pay the claims of those members, and so forth. Ultimately, however, as with all pyramid schemes, the pyramid collapsed.
[[Image here]]
77.
The D & 0 Defendants, the Foundation/HealthNet Defendants, Rosow, Proskauer Rose and PWC agreed to and | ¡¿¿conspired in a scheme to operate insolvent HMO’s and to disguise the insolvency by showing on the books of those HMO’s accounts receivables from an insolvent parent and insolvent affiliates. Each agreed to the scheme for those insolvent insurance companies to sell health insurance, to accept premiums, to contract with healthcare providers while the insurance companies’ insolvency was being hidden from regulators and tvithout disclosing the insol*466vency to the people and entities these HMO’s did business with.
78.

Each of the D & 0 Defendants, Foundation/HealthNet Defendants, Rosow, Proslcauer Rose and PWC aided and abetted breaches of applicable statutes and regulations, breaches of fiduciary duty and fraud by the others and willfully conspired with the others in connection with the wrongful conduct outlined in this Petition.

79.

The D & 0 Defendants, Foundation/HealthNet Defendants, Rosow, Proslcauer Rose and PWC used, Am-CareCo, AmCare-TX, AmCare-LA, AmCare-OK, and AmCare-MGT to perpetuate an actual fraud on the policyholders, members, creditors and claimants of the three HMO’s primarily for their own direct personal benefit.

80.
Alternatively, to the extent any particular D & 0 Defendant, Foundation/HealthNet Defendant, Rosow, Pros-kauer Rose or PWC did not willfully participate in fraud and/or conspiracy, that defendant was guilty of gross negligence or at least negligence in connection with the acts and omissions outlined in this Petition, and each aided and abetted the acts of the others.
[[Image here]]
87.
Plaintiffs show that AmCareCo and its subsidiaries, including AmCare-LA, AmCare-OK and AmCare-TX, were adversely dominated by the D & 0 Defendants and Foundation/HealtliNet Defendants named herein, who concealed the bases for the causes of action stated herein, with the active and intentional participation or at least the negligent assistance of PWC. As a result, the Plaintiffs did not discover the causes of action stated herein until shortly before the respective receiverships of the HMO’s ivere established. Furthermore, the Plaintiffs had no ability to bring these actions prior to receiving authority as a result of the receivership and _]22sliquidation orders entered for the respective HMO’s. Further, none of the creditors, claimants, policyholders or members of the HMO’s knew or- had any reason to know of any cause of action for the acts and omissions described in this Petition until after the respective receiverships were established.
88.
Plaintiffs further show that the activities of the defendants herein constituted, continuing torts which began in May 1999 and continued unabated until shortly before the receiverships were established for the respective HMO’s. (Emphasis added.)
Pursuant to the continuing tort doctrine, a prescriptive period cannot begin to run as long as the operative tor-tious behavior continues and this behavior continues to cause damage. There must be a continuous duty owed to the plaintiff and a continuing breach of that duty by the defendant. Prescription does not commence for a continuing tort until the last act occurs or the conduct is abated. Bustamento v. Tucker, 607 So.2d 532, 539 and 542-43 (La.1992); Miller v. Conagra, Inc., 2007-0747, pp. 6-7 (La.App. 3 Cir. 12/5/07), 970 So.2d 1268, 1273; Maraist & Galligan, supra, § 10.04(5), pp. 10-16 to 10-17.
A review of the pertinent portions of the petition shows that it alleges a continuous *467course of tortious activity that caused increasing insolvency and damage that extended from approximately April of 1999 until “shortly before the receiverships were established” in 2002. This action was filed on June 30, 2003. It is not evident from the face of this pleading that the causes of action are prescribed. Accordingly, the burden of proving otherwise is on Health Net.
As indicated by the facts discussed in greater detail in Part XI, Section B1 of this opinion, in May of 2000 Luck-singer, Nazarenus, Nadler, AmCareco, AmCare-MGT, and the three HMOs commenced booking “cashless” intercompany receivables as capital contributions to show | ^¡statutory compliance with the capital and surplus requirements with each of the three HMOs. This conduct continued until at least September of 2001 and the damages caused by this conduct accrued until the HMOs were placed in rehabilitation, receivership, or liquidation in 2002 or 2003. Accordingly, we conclude that Health Net has failed to show that these actions have prescribed. La. R.S. 12:1502; La. R.S. 22:735 B.
c. Conclusion
For the foregoing reasons, we hold in the Louisiana case: (1) the proper procedural device for pleading prescription or peremption is the objection of prescription raised in the peremptory exception; (2) the limitation period in La. R.S. 12:1502 is a hybrid liberative prescriptive period; (3) the petition adequately pleads continuing torts and prescription is not evident on the face of this pleading; (4) Health Net has failed to prove that prescription has accrued; and (5) the trial court correctly overruled Health Net’s peremptory exceptions raising the objection of prescription in the Louisiana action.
This portion of the assignments of error is without merit.
2. The Texas and Oklahoma Exceptions
Since the Louisiana action is not barred (prescribed) under the law of this state, the Texas and Oklahoma actions should be maintained unless they would be barred in those states and “maintenance of the action in this state is not warranted by the policies of this state and its relationship to the parties or the dispute nor by any compelling consideration of remedial justice.” La. C.C. art. 3549. Revision Comments — 1991(g) for Article 3549 provides as follows:
Actions not barred under Louisiana law: The rule and its exception. The opening sentence of subparagraph (2) of the second paragraph of this Article reaffirms the basic rule of the | aa7lex fori for actions that have been filed timely under Louisiana prescription or peremption law. Here the rationale for following that rule is that entertaining such actions promotes whatever substantive policies this state has in not providing for a shorter prescriptive period and preserves to the plaintiff the opportunity to fully pursue his judicial remedies as long as he does so within the time specified by the law of this state. These substantive mid procedural policies underlying Louisiana prescription law are entitled to preference in a Louisiana court, unless it is amply demonstrated that neither set of policies is actually implicated in the particular ease and that the opposing substantive policies of another state, that of the lex causae, are implicated more intimately. Only then may Louisiana law be displaced.
These are essentially the three grounds for the exception to the rule of the lex fori which is enunciated in the *468balance of subparagraph (2). Again, all three grounds must be satisfied before this exception is utilized. Before dismissing an action that has been timely filed under Louisiana law, the court must be satisfied that the action has prescribed in the state of the lex causae, and that neither the substantive nor the procedural or remedial policies of the forum state would be served by maintaining the action. Only then would the policy of providing a forum be outweighed by the policy of discouraging forum, shopping. The very fact that all three hurdles must be overcome before this exception is utilized indicates that this exception is not expected to be applied often. (Emphasis added.)
A review of Health Net’s Louisiana, Oklahoma, and Texas briefs on the prescription/peremption issue shows that essentially the same argument is asserted for all three states. That argument is: (1) the issue is controlled by La. C.C. art. 3549 pertaining to prescription for choice-of-law purposes; (2) pursuant to that code article, Louisiana law applies in the Texas and Oklahoma cases; and (3) the causes of action alleged by the Texas and Oklahoma Receivers are perempted by the three year period of La. R.S. 12:1502.
We have previously held that, in general, the substantive law of each of these three states applies in that state unless there was compelling consideration of remedial justice that indicated otherwise. Health Net has not asserted that the Texas Receiver’s action is barred or not barred under LanTexas law or that the Oklahoma Receiver’s action is barred or not barred under Oklahoma law. Health Net has not asserted or shown that maintaining the Texas and Oklahoma actions in Louisiana is not warranted by compelling considerations of remedial justice. See Revision Comments — 1991(i) and (j) for La. C.C. art. 3549.
Accordingly, we hold for the Texas and Oklahoma actions that, pursuant to La. C.C. art. 3549: (1) Louisiana law for liber-ative prescription applies to the Texas and Oklahoma actions; (2) prescription is not evident on the face of either the Texas or the Oklahoma petition; (3) Health Net has failed to prove that prescription has accrued in either case; and (4) the trial court correctly overruled Health Net’s peremptory exceptions raising the objections of prescription in the Texas and Oklahoma actions.
C. Conclusion
For the foregoing reasons, the trial court judgments overruling all of the peremptory exceptions raising the objection of prescription filed by Health Net are affirmed.
IX. SHAM SALE
(Assignment of Errors TX-9 and 20; LA-3 and LA-Supp-2; OK-3 and OK-Supp-footnote 1 by reference)
As previously discussed, whether the sale between Health Net and AmCare-co was a bona fide sale is critical to determining the obligations of the parties. The record contains pleadings by the Louisiana and Oklahoma Receivers which assert the transaction was a sale. The Consolidated, Amended, and Restated Petition filed by the Louisiana and Oklahoma Receivers on October 15, 2004, states:
31.
On that same day, April 30, 1999, which was a Friday, the three HMO subsidiaries were sold by the Foundation/Health Net Defendants to AmCare-Co [sic].
*469| .^Health Net’s answer to the Receivers’ petition states, “[Health Net] admits that the three HMO subsidiaries were sold to AmCareco on April 30, 1999.” No pleadings in these consolidated matters assert the sale was either a sham or a sham to perpetrate a fraud. The only pleading remotely suggesting the sale was a sham was contained in the Louisiana and Oklahoma Receivers’ Consolidated, Amended, and Restated Petition wherein they allege:
33.
On information and belief, the May 3, 1999 transfers [the cash sweep] described in the preceding paragraph were authorized and carried out electronically upon the instructions of [Health Net], despite the fact that [Health Net] ostensibly was no longer the owner of the HMOs from which the funds were being transferred, hence showing ... Health Net ... continued and remained in control over the financial actions of the HMOs after the sale.
It was in this filing that Health Net was first named as a defendant by the Louisiana and Oklahoma Receivers, more than two years after the Commissioner began rehabilitation of AmCare-LA.
During plaintiffs’ case in chief, Phillip W. Preis, a witness accepted as an expert in the field of corporate finance and complex corporate transactions, opined:
Q. In your opinion, was this a sham sale?
A. Yes, sir.
Later, during redirect of this witness, appears the following:
Q. In your opinion, Mr. Preis, was this a sale?
A. No, sir, it wasn’t.... It was a sham transaction.
During closing arguments to the jury in the Texas case, counsel for the Texas Receiver asserted several times the sale was a sham, Health Net had not divested itself of the HMOs, and Health Net was still in control of | ^pthe HMOs after the transaction. Counsel for Health Net, in its closing, countered that Health Net sold the HMOs, money changed hands, and there was no evidence of a sham. The jury was not instructed on this issue and the interrogatories did not provide for a finding of whether the transaction was a bona fide sale. As stated earlier, in her reasons for judgment in the Louisiana and Oklahoma cases, the trial judge found as factual conclusions that AmCareco was a shell corporation, Health Net simulated a transfer, and Health Net wholly owned the HMOs before, during, and after the sale.
Under the common law, a sham transaction or an actual fraudulent conveyance is a transfer made with actual intent to hinder, delay, or defraud another. 37 C.J.S. Fraudulent Conveyances § 8, p. 543 (1997). A common law transfer that is constructively fraudulent is one for which the debtor does not receive reasonably equivalent value and which is made when the debtor is insolvent or which renders the debtor insolvent. See for example Tex. Bus. & Com.Code Ann. § 24.001 et seq.; 6 Del. C. § 1301 et seq.; 24 Okla. St. Ann. § 112 et seq. The remedy available to creditors of a fraudulent transfer is the avoidance of the transfer or obligation to the extent necessary to satisfy the creditor’s claim. 6 DeLC. § 1307(a)(1). A sham or a sham to perpetrate a fraud are terms used extensively in Texas jurisprudence and statutes as grounds for disregarding a corporate structure and holding individual officers, directors, or shareholders liable on the obligations of a corporation. Bell Oil & Gas Co. v. Allied Chemical Carp., 431 S.W.2d 336, 340 (Tex.1968); Drye v. Eagle Rock Ranch, Inc., 364 S.W.2d 196, 202 (Tex.1962); Pace Corp. v. Jackson, 155 Tex. 179, 284 S.W.2d 340 *470(1955); V.T.C.A. § 21.223(a)(2); V.A.T.S. Bus. Corp. Act art. 2.21 A(2); and see Y.T.C.A. § 200.161.
Louisiana Civil Code Article 2025 defines a simulation as follows:
| an A contract is a simulation when, by-mutual agreement, it does not express the true intent of the parties.
If the true intent of the parties is expressed in a separate writing, that writing is a counterletter.
A claim of simulation is directed to a feigned, or pretended, sale. Such a sale has no real existence. The true intention of the parties is that no transfer takes place, the property remaining that of the supposed seller and no price being actually paid. Since the property is still owned by the ostensible seller, a simulated sale is an absolute nullity. Successions of Webre, 247 La. 461, 472, 172 So.2d 285, 288-89 (La.1965). In Spiers v. Davidson, 233 La. 239, 246, 96 So.2d 502, 504 (La.1957), the Supreme Court stated, “a simulated contract is one which has no substance at all, or is purely fictitious and a sham, an act of mere pretense without reality. Such a contract, although clothed in concrete form, is entirely without effect and may be declared a sham at any time at the demand of any person in interest.” See also Maddox v. Butchee, 203 La. 299, 311, 14 So.2d 4, 8 (La.1943); Houghton v. Houghton, 165 La. 1019, 1022-23, 116 So. 493, 495 (La.1928); Ideal Savings & Homestead Ass’n. v. Gould, 163 La. 442, 448, 112 So. 40, 42 (La.1927); Hibernia Bank & Trust Co. v. Louisiana Ave. Realty Co., 143 La. 962, 969, 79 So. 554, 556 (La.1918).
The Louisiana jurisprudence distinguishes “sham transactions,” which have no effect at all, from “disguised donations,” which are intended by the parties to be valid, but are not represented as donations on their face. La. C.C. art.2026, Revision Comments — 1984 (a) and cases cited therein. In an absolute simulation, the parties pretend to transfer property from one to the other, but they intend that the transferor retain ownership. In a relative simulation, a sale appears to be valid on its face but is intended by the parties to be a gift rather than a sale. Scoggins v. Frederick, 98-1815, pp. (La.App. 1 Cir. 9/24/99), 744 So.2d 676, 685, writ denied, 99-3557 (La.3/17/00), 756 So.2d 1141; Ridgedell v. Succession of Kuyrkendall, 98-1224, pp. 7-8 (La.App. 1 Cir.1999), 740 So.2d 173, 178-79. Simulated and fraudulent sales are distinguished in that a simulated sale is a nullity which may be disregarded, but a fraudulent sale is an actual sale which must be set aside by a court. 37 C.J.S. Fraudulent Conveyances § 24, p. 558.
Indicia of fraud are suspicious circumstances which, if unexplained, may warrant an inference of fraud. 37 C.J.S. Fraud,ulent Conveyances § 54, p. 588. Among the more common indicia of a fraudulent purpose at the time of a transfer are: (1) a close relationship among the parties to the transaction; (2) a secret and hasty transfer not in the usual course of business; (3) inadequacy of consideration; (4) the transferor’s knowledge of the creditor’s claim and the transferor’s inability to pay it; (5) the use of dummies or fictitious parties; (6) retention of control of property by the transferor after the conveyance; (7) actual or threatened litigation against the debtor; (8) a purported transfer of all or substantially all of the debtor’s property; (9) insolvency or other unmanageable indebtedness on the part of the debtor; (10) the general chronology of the events and transactions under inquiry; and (11) an attempt by the debtor to keep the transfer a secret. See In re Acequia, Inc., 34 F.3d 800, 806 (9th Cir.1994); In re *471Wattman, 301 F.3d 3, 8 (1st Cir.2002); In re OODC, LLC, 321 B.R. 128, 140 (Bankr.D.Del.2005).
To determine if the transaction was a sham, we look first to the Letter of Intent dated April 17, 1998, between Health Net and AmCareco that set forth the potential terms of the proposed transaction and provided for further negotiations between the parties. According to the Letter of Intent, the negotiations were for the “purchase of all of the outstanding stock” of the | ¡¡mHMOs for a purchase price consisting of “a number of shares of Class A Preferred Stock90 of [AmCareco] ... equal to the adjusted book value ... less ... the [Health Net] Cash Sweep.” During the discussion period, Health Net was prohibited from negotiating with anyone other than AmCareco with respect to acquisition of the HMOs.
On November 4, 1998, the stock purchase agreement that had been agreed upon by the parties was signed. According to the express terms of the contract:
1) Health Net would sell to AmCareco and AmCareco would purchase from Health Net all of the outstanding shares of the HMOs.
2) The HMOs would pay to Health Net an amount of cash, the “cash payment.” (The formula for determining the exact amount of cash was included and provided for an estimated balance sheet which reflected the aggregate of particular items, such as cash and property of the HMOs, not to exceed a certain amount.)
3) For the balance of the purchase price, AmCareco would issue to Health Net the number of its shares of Class A Preferred Stock equal to a certain amount to be determined by a formula that was included.
4) All intercompany accounts would be settled.91
5) Health Net and AmCareco retained redemption rights92 on the Class A Preferred Stock.
6) As security for Health Net’s redemption rights, AmCareco was to procure a letter of credit in the amount of $2,000,000.00.
7) The date of closing was set for January 31,1999.
JCW2348) AmCareco would prepare a final balance sheet at the one-year anniversary of the closing “utilizing the same methodologies and procedures,” to allow for any adjustments (the true-up).93
*4729)Other particular guarantees and warranties were made, such as Health Net had paid all federal, state, and local taxes, the HMOs had no undisclosed liabilities, the property of the HMOs was free and clear of all liens, and there were no undisclosed actions, suits, or other proceedings against the HMOs.
10) Each party would file applications for approval that were required by regulatory authorities in Louisiana, Oklahoma, and Texas. (AmCareco prepared and submitted the Form-A applications to the respective state regulators.)
11) If approval of the acquisition from the respective state regulatory agencies was not given, the transaction would not occur.
12) Health Net had the right of first refusal if AmCareco received an offer for the purchase of all AmCare-co’s outstanding stock.
13) Health Net retained “preemptive rights” or protection against the dilution of its percentage of ownership.94
14) The Stock Purchase Agreement would be governed by and construed in accordance with the law of the State of Delaware, without regard to Delaware’s conflict of laws provisions.
On the same day the Stock Purchase Agreement was signed, Health Net and AmCareco also agreed to the Side Letter. The Side Letter provided AmCareco would attempt to acquire additional investment funds and AmCareco would not incur additional indebtedness without Health Net’s consent. In addition, the Side Letter provided that if the closing was delayed beyond January 15, 1999, and Health Net was required to loan funds for the 12-iñHMOs’ PDRs,95 the parties would negotiate a mechanism whereby Health Net would receive back all of the cash loaned for the PDRs of the HMOs.
Pursuant to these agreements, the parties completed a sale. The sale was evidenced by the Stock Purchase Agreement, with certain additional terms and conditions provided for in the Side Letter.
Louisiana Civil Code Article 3540, entitled “Party autonomy,” generally gives contracting parties the freedom to choose which state’s law will govern disputes arising out of the contract. It provides:
All other issues of conventional obligations [besides capacity and form][96] are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537.
Louisiana Civil Code Article 3537 states the general rule applicable to conventional obligations:
Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
*473That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multi-state commercial intercourse, and of protecting one party from undue imposition by the other.
Louisiana Civil Code Article 3515, in turn, contains the general and residual choice-of-law rule pertinent to all types of cases, not just those involving conventional obligations. It provides that:
laaiiExcept as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.
In considering the factors listed both in Article 3537 and in Article 3515 concerning the corporate stock of each particular HMO, the law of the states of Louisiana, Oklahoma, Texas, or Delaware could arguably be the state’s law that “would otherwise be applicable” in the absence of a choice-of-law provision in the contract. Each of these states have some interest in having their law apply to the contract: Delaware because Health Net and AmCa-reco are Delaware corporations; Texas because AmCareco had its principal place of business in Texas and one of the HMOs is incorporated in Texas; and Louisiana and Oklahoma because one of the HMOs is incorporated in each of those states: In the absence■ of á choice-of-law provision by the parties, Louisiana, Oklahoma, and Texas each has an interest in protecting its citizens, insured members (enrollees), providers, and other creditors. Each state also has an interest in policing, to some extent, those companies who do business within its borders and who enter into agreements with its citizens.
It is well established that where the parties stipulate the state law governing the contract, Louisiana choice-of-law principles require that the stipulation be given effect, unless there is statutory or jurisprudential law to the contrary or strong public policy considerations justifying the refusal to honor the contract as written. La. C.C. art. 3540 and its Revi-sionJ^Comments. See also Continental Eagle Corp. v. Tanner & Co. Ginning, 95-295, pp. 2-3 (La.App. 3 Cir. 10/4/95), 663 So.2d 204, 206; Francis v. Travelers Ins. Co., 581 So.2d 1036, 1041 (La.App. 1 Cir.), writs denied, 588 So.2d 1114, 1121 (La.1991). A choice-of-law provision in a contract is presumed valid until it is proved invalid. The party seeking to prove such a provision is invalid bears the burden of proof. Mobil Exploration & Producing U.S. Inc. v. Certain Underwriters Subscribing to Cover Note 95-3317(A), 2001-2219, pp. 38-39 (La.App. 1 Cir. 11/20/02), 837 So.2d 11, 42-43, writs denied, 2003-0418 (La.4/21/03), 841 So.2d 805, and 2004-*4740417, 2004-0427, 2004-0438 (La.5/16/03), 843 So.2d 1129-30; Continental Eagle Carp., 95-295 at p. 3, 663 So.2d at 206.
In this case, no party asserted that selecting Delaware law as the governing law is invalid due to an express legislative or constitutional prohibition or a showing that a sale of third-party corporate stock between Health Net and AmCareco contravenes a social, moral, or public interest. If two Delaware corporations chose Delaware law to control their transaction, such a decision is not unreasonable based on the geographic nexus between all of the parties and Delaware’s leadership in the field of corporate law. See for example Millan v. Chase Bank USA, NA, 533 F.Supp.2d 1061, 1067 (C.D.Cal.2008); In the Matter of Prudential Ins. Co. Derivative Litigation, 282 N.J.Super. 256, 272, 659 A.2d 961, 969 (1995). Accordingly, we will apply Delaware law to determine the validity and interpretation of the Stock Purchase Agreement.
6 Delaware Code § 2708 provides, in pertinent part:
(a) The parties to any contract, agreement or other undertaking, contingent or otherwise, may agree in writing that the contract, agreement or other undertaking shall be governed by or construed under the laws of this State, without regard to principles of conflict of laws, or that the laws of this State shall _[23sgovern, in whole or in part, any or all of their rights, remedies, liabilities, powers and duties if the parties, either as provided by law or in the manner specified in such writing are, (i) subject to the jurisdiction of the courts of, or arbitration in, Delaware and, (ii) may be served with legal process. The foregoing shall conclusively be presumed to be a significant, material and reasonable relationship with this State and shall be enforced whether or not there are other relationships with this State.
Under Delaware law, contract construction is a question of law. Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co., 616 A.2d 1192, 1195 (Del.1992). When interpreting a contract, the court strives to determine the parties’ shared intent, “looking first at the relevant document, read as a whole, in order to divine that intent.” Matulich v. Aegis Communications Group, Inc., 2007 WL 1662667 at p. 4 (Del.Ch. May 31, 2007), judgment affirmed, 942 A.2d 596 (Del.2008) (citing Kaiser Aluminum Corp. v. Matheson, 681 A.2d 392, 395 (Del.1996)). If the contractual language is “clear and unambiguous,” the ordinary meaning of the language generally will establish the parties’ intent. Brandywine River Properties, Inc. v. Maffet, 2007 WL 4327780 at p. 3 (Del.Ch. Dec.5, 2007); Comrie v. Enterasys Networks, Inc., 837 A.2d 1,13 (Del.Ch. Sept.4, 2003). Therefore, where there is an unambiguous integrated written contract, the language of that contract will control. American Legacy Foundation v. Lorillard Tobacco Co., 886 A.2d 1, 19 (Del.Ch. Aug.22, 2005), judgment affirmed, 903 A.2d 728 (Del.2006). Additionally, when interpreting a contractual provision, a court attempts to reconcile all of the agreement’s provisions when read as a whole, giving effect to each and every term. See, e.g. West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC, 2007 WL 3317551 at p. 11 (Del.Ch. Nov.2, 2007), cert. denied, 2007 WL 4357667 (Del.Ch. Dec.06, 2007), appeal refused, 941 A.2d 1019 (Del.2007); Council of the Dorset Condominium Apartments Gordon, 801 A.2d 1, 7 (Del.2002). In doing so, courts apply the well-settled principle that “contracts must be interpreted in a manner that does not render any provision ‘illusory or meaningless.’ ” Delta & Pine *475Laud Co. v. Monsanto Co., 2006 WL 1510417 at p. 4 (Del.Ch. May 24, 2006).
“When interpreting a contract, the court’s ultimate goal is to determine the parties’ shared intent. Because Delaware adheres to the objective theory of contract interpretation, the court looks to the most objective indicia of that intent: the words found in the written instrument.” Sassano v. CIBC World Markets Corp., 948 A.2d 453, 462 (Del.Ch. Jan.17, 2008) (citations omitted).
According to Delaware law, the essential elements to a contract are as follows:
(1) a promise on the part of one party to act or refrain from acting in a given away; (2) offered to another, in a manner in which a reasonable observer would conclude the first party intended to be bound by the acceptance, in exchange for; (3) some consideration flowing to the first party or to another; (4) which is unconditionally accepted by the second party in the terms of the offer, which may include (a) a verbal act of acceptance; and (b) performance of the sought-after act. Hunter v. Diocese of Wilmington, Del. Ch., C.A. No. 961, Allen, C, mem. Op. at 11-12 (Aug. 4,1987).
Hughes v. Frank, 1995 WL 632018, p. 3 (Del.Ch. Oct.20, 1995) (footnote omitted), reargument denied, 1996 WL 74729 (Del.Ch. Feb.16,1996).
The essential elements to a contract are all present in this case. No party asserts a lack of capacity to contract. See 6 Del.C. § 2705. There was a promise by Health Net to transfer ownership of all of the shares of stock of the HMOs to AmCareeo by written act in exchange for cash and shares of stock in AmCareeo, which was unconditionally accepted by AmCareeo by a written act of acceptance and, in fact, the actual issuance of the AmCareeo stock and payment of the cash.
|24íA “sale” has been defined as “[t]he transfer of property or title for a price.” Black’s, supra at 1337. It lists four elements necessary to make a sale: “(1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid or promised.” Id.; Willis v. City of Rehoboth Beach, 2005 WL 1953028, p. 5 (Del.Super. June 24, 2005). A sale may be defined to be a transfer of ownership in property from one person to another, for valuable consideration. State v. Delaware Saengerbund, Inc., 28 Del. 162, 177, 91 A. 290, 296 (Del.Gen.Sess.1914), affirmed by, 29 Del. 47, 95 A. 1078 (Del. Supr. June Term 1915). The common law definition of a sale is the passage of title for money or consideration. Franklin Fibre-Lamitex Corp. v. Director of Revenue, 505 A.2d 1296, 1298-99 (Del.Super.1985), judgment affirmed, 511 A.2d 385 (Del.Supr. June 4, 1986). The Uniform Commercial Code perpetuates this definition by defining “sale” as “the passing of title from the seller to the buyer for a price.” 6 Del.C. § 2-106(1).
Following the common-law rule, conditional sales contracts have been uniformly held to be valid and enforceable in Delaware, both before the passage of the Uniform Conditional Sales Act (6 Del.C. § 901 et seq. (repealed 1967) and the U.C.C. (6 Del.C. § 2-106(1)), which expressly provides for both a contract for sale (present sale) and a contract to sell (at a future time). See also V.T.C.A. Bus. & Com. Code § 2.106(a); 12A Okl. St. Ann. § 2-106(1). In Louisiana, according to the express terms of the Stock Purchase Agreement, the document was a contract to sell. Louisiana Civil Code Article 2623 sets forth the requisite elements of a contract to sell, or purchase agreement:
*476An agreement whereby one party promises to sell and the other promises to buy a thing at a later time, or upon the happening of a condition, or upon performance of some l^i obligation by either party, is a bilateral promise of sale or contract to sell. Such an agreement gives either party the right to demand specific performance.
A contract to sell must set forth the thing and the price, and meet the formal requirements of the sale it contemplates.
If an obligation may not be enforced until an uncertain event occurs, the condition is suspensive. La. C.C. art. 1767. The terms of the Stock Purchase Agreement provided for Health Net to sell and AmCareco to buy all the shares of stock in the HMOs upon the approval of the acquisition by state regulators. Approval by the regulators was a suspensive condition, and upon approval, the obligation was enforceable.
The evidence offered at trial establishes that the parties to the sale were not related nor did they share a close relationship. Before the transfer, Health Net had engaged the services of a broker, Shattuck Hammond, to identify possible buyers for the HMOs. Shattuck Hammond located a group of investors headed by Lucksinger who was interested in purchasing the HMOs. The record does not indicate the parties had any prior dealings with, each other. All parties were represented both before and after the sale by experienced legal counsel, and extensive, arms-length negotiations resulted in four carefully-crafted documents: the Letter of Intent, the Stock Purchase Agreement, the Side Letter, and the Closing Agreement. The Stock Purchase Agreement was forty-six pages in length and provided specific terms for all conceivable issues associated with the sale.
The sale included the exchange of consideration. Under the law of Delaware, every contract, to be enforceable, must contain good and valid consideration. Corletto v. Morgan, 27 Del. 530, 89 A. 738, 739 (Super.Ct.1914). Consideration generally consists of a benefit to a promisor, or detriment to a promisee. First Mortgage Co. of|242 Pennsylviania v. Federal Leasing Corp., 456 A.2d 794, 795-96 (Del.1982). Delaware’s transactional perspective on consideration permits a court to inquire into, and find, consideration for an agreement anywhere in the transaction, regardless of whether it was labeled or spelled out in the contract. Equitable Trust Co. v. Gallagher, 34 Del.Ch. 76, 99 A.2d 490, 492-93 (1953), adhered to, 34 Del.Ch. 249, 102 A.2d 538 (Del.Supr. Feb.05, 1954), motion denied, 33 Del.Ch. 522, 103 A.2d 151 (Del.Ch. May 12, 1953). The Court, in enforcing contracts, does have an interest in ensuring that consideration exists, see Cabot Corp. v. Thai Tantalum Inc., 1992 WL 172678, p. 3 (Del.Ch. 1992), even though, strictly speaking, the adequacy of the consideration is not generally a question for judicial determination. Affiliated Enterprises, Inc. v. Waller, 40 Del. 28, 5 A.2d 257, 260 (1939).
Delaware’s General Corporation Law, 8 Del.C. § 271, entitled “Sale, lease or exchange of assets; consideration; procedure,” provides, in pertinent part:
(a) Every corporation may at any meeting of its board of directors or governing body sell, lease ór exchange all or substantially all of its property and assets, including its goodwill and its corporate franchises, upon such terms and conditions and for such consideration, which may consist in whole or in part of money or other property, including shares of stock in, and/or other securities of, any other corporation or corporations, as its board of directors or govern*477ing body deems expedient and for the best interests of the corporation....
Health Net’s sale of all of the stock of the HMOs to AmCareco for a cash payment plus certain other considerations, including Health Net’s redemption right security and acquisition of preferred stock in AmCareco, is clearly contemplated by the statute as an exchange of assets. The statute provides that the consideration may be money, shares of stock, or other | .¿^securities. In this instance, all three possible types of consideration were present. This is not contrary to any law.
The testimony by Preis that the transaction was a sham was offered as opinion testimony. The record does not reflect that Preis considered Delaware law in forming his opinion. Preis had no experience in the areas of buying or selling HMOs or in insurance regulatory matters. The weight to be given expert testimony depends, ultimately, on the facts on which it is based, as well as the professional qualifications and experience of the expert. Meany v. Meany, 94-0251 (La.7/5/94), 639 So.2d 229, 236. For an expert opinion to be valid and merit much weight, the facts upon which it is based must be substantiated by the record; if the facts are not substantiated by the record, the opinion may be rejected. Gould v. Gould, 28,996, p. 7 (La.App. 2 Cir. 1/24/97), 687 So.2d 685, 690. In considering expert testimony, the trier of fact may accept or reject, in whole or in part, the opinion expressed by an expert, even to the point of substituting its own common sense and judgment for that of an expert witness, where, in the faetfin-der’s opinion, such substitution appears warranted by the evidence as a whole. Bellard v. American Cent. Ins. Co., 2007-1335, p. 28 (La.4/18/08), 980 So.2d 654, 673; Green v. K-Mart Corporation, 2003-2495, p. 5 (La.5/25/04), 874 So.2d 838, 843.
At trial, an October 22, 1998 memo by auditors with Deloitte & Touche97 was introduced. The memo was prepared in anticipation of the proposed sale of the HMOs to AmCareco and framed the issue as follows: “Has a sale occurred of [the HMOs) for accounting purposes [?]”98 | ¡^According to the memo, factors considered by Deloitte & Touche auditors included whether “risks of ownership has [sic] transferred,” whether there is “continuing involvement by the seller,” and the “financial investment in the business by the buyer.” After its analysis, Deloitte & Touche found it was unable to determine if the transaction was a sale for accounting purposes99
However, there was ample evidence offered at trial and we hold that, as a matter of Delaware contract law, a sale took place on April 30, 1999, upon approval of the transaction by the state regulators. Immediately after the sale, AmCareco took actual possession of the stock of the HMOs and constructive possession of the property of the wholly-owned HMOs. There is no testimony or evidence that Health Net retained possession or control of the HMOs’ assets after the sale. For the almost three years after the sale, all major corporate decisions concerning the HMOs were made by AmCareco. During those three years, *478the state regulators dealt solely with Am-Careco and the HMOs individually regarding their operations and at no time did they contact Health Net regarding the operations. Subsequent to the sale of all of the stock of the HMOs from Health Net to AmCareco on April 30, 1999, all of the regulators recognized AmCareco as the owner of the HMOs and never contacted Health Net regarding the activities of the HMOs. The regulators did not call upon Health Net to cure the capital deficiencies that were the subject of negotiations with the HMOs and AmCareco. The fact that AmCareco and the members of its Board of Directors are parties defendant in these actions and that Lucksinger and AmCare-co have been l^found at fault is evidence of the fact that the “risk of ownership has transferred.”
At the time of the sale, Health Net and AmCai'eco entered into a “Transition Services Agreement” wherein Health Net supplied to AmCareco certain administrative services in support of the HMOs’ operations during a period of transition. According to the terms of the April 30, 1999 Transition Services Agreement and an amendment agreed to on June 8, 1999, Health Net performed certain administrative services in support of the HMOs such as “basic computer hardware, software and connectivity services,” enrollment and billing services, and business services. The Transition Services Agreement was an agreement for Health Net to “handle [Am-Careco’s] back office functions until AmCa-reco could get up and running after the closing.” The Transition Services Agreement expressly provided that “AmCareco ... shall at all times ... retain ultimate authority and responsibility regarding Am-Careco’s and [the HMOs’] respective powers, duties and responsibilities.”
Although Health Net was a stockholder in AmCai’eco, neither Health Net nor any employee of Health Net was on the Board of Directors of AmCareco or was an officer of AmCai’eco. The record does not reflect that there was a shareholders’ meeting in which Health Net exercised any controlling vote over AmCareco’s Board. Members of the AmCareco Board testified that they voted their convictions and were not influenced by Health Net. There is no evidence that Health Net made any important policy decisions for AmCareco. There is no evidence that Health Net directed the purchase or operation of the new claims computer system. There is no evidence that Health Net was responsible for the overpayment and improper payment of claims by AmCareco. There is no evidence that Health Net was | ^(¡involved in any way with the “creative accounting” used by Lucksinger, Nazarenus, and Na-dler to appear financially solvent to state regulators.
There is no evidence that Health Net played any role in the hiring, supervising or firing of any employee of AmCareco or the HMOs. There is no evidence that, after the sale, Health Net exercised control over the day-to-day activities of AmCareco or the HMOs. There is evidence that Health Net did not direct the activities AmCareco. In 2000, AmCareco issued to Health Net two non-negotiable promissory notes to be paid in October 2001, one for $673,967.00 and one for $1,750,000.00. These sums were amounts AmCareco owed Health Net after the true-up and for funds Health Net loaned to AmCareco. These notes totaled over $2 million. These notes were never paid. If Health Net had the power to exercise control over AmCareco’s activities, it is reasonable to infer that it would have ordered that these notes be paid in preference over other creditors.
The record does not reflect that any of the Receivers instituted administrative or judicial proceedings to have the sale de-*479dared a sham and to revoke the certificates of authority of the HMOs to operate on that basis. La. R.S. 22:2013; V.T.C.A. Ins.Code § 86.001; 36 Okla.St.ÁNN. § 6920 A. Instead, the record reflects that the Receivers first attempted to rehabilitate the HMOs before they liquidated them. From this conduct, it reasonably can be inferred that the Receivers did not consider the sale to be a sham.
The record does not reflect that any of the initial investors in AmCareco perceived their investment was in any corporation other than AmCareco. The record is devoid of any attempt by an AmCareco investor to assert a claim that his investment was in Health Net or that he had an ownership interest in Health Net.
| ^Health Net retained preemptive rights and the right to approve future increases of indebtedness by AmCareco. These are reasonably bargained-for rights by a seller/shareholder that do not differ from similar terms contained in a mortgage or other security device. An investor may attempt to guard his investment in a corporation against the possibility of the diminution of his proportional voting strength. See generally In re Tri-Star Pictures, Inc., Litigation, 634 A.2d 319, 330 (Del.1993). These rights, which Health Net negotiated and obtained, provided security and protection against the impairment of its interest as a creditor in a sale that was partially financed by it as a vendor.
Because Health Net obtained: (1) preferred Class A stock in AmCareco; (2) redemption rights; (3) right of first refusal of purchase of the HMOs’ stock by a third party; and (4) preemptive rights, it is reasonable to infer that Health Net had positioned itself to profit from any future success of AmCareco and the HMOs and that it did not consider the contract a sham. This is a legitimate business purpose. See for example Fina Oil & Chemical Co. v. Amoco Production Co., 95-1877, p. 9 (La.App. 1 Cir. 5/10/96), 673 So.2d 668, 674, writ denied, 96-1446 (La.9/27/96), 679 So.2d 1353; T.D. Bickham Corp. v. Hebert, 432 So.2d 228, 231 (La.1983).
In Schmeusser v. Schmeusser, 559 A.2d 1294 (Del.1989), a husband alleged his parents maintained a fifty percent (50%) equity in his businesses, which he argued removed that portion from classification as marital property subject to division upon divorce. In Schmeusser, 559 A.2d at 1299-1300, the Delaware Supreme Court stated,
Turning to the business entities, husband owns 100% of the common stock of Active Crane Rentals, Inc., and Custom Management, Inc., both Delaware corporations. Additionally, l^mhe owns 100% of the capital of Falco, a Delaware partnership engaging in real estate development. During the course of the trial, the Family Court generally characterized husband’s ownership of these entities as marital property. However, husband argued that his parents owned a 50% “equitable interest” in these companies, and that this interest should not be considered as part of the marital estate. The trial court accepted husband’s evidence and found that only 50% of these enterprises should be treated as marital property. Wife appeals that ruling.
The record, however, demonstrates that husband’s father had already sold his 50% interest in Active Crane and two other businesses to husband in 1980. In return, husband’s father and mother were to receive a lifetime income of $25,000 per year, preferred stock in Active Crane, and cash consideration. At trial, husband produced a variety of documents in order to support the legitimacy of the transaction and to bolster his contention that this sale was conducted *480with the deliberate intent to minimize the estate tax liability of his parents. All of the documents in evidence, supporting the transaction, were prepared by attorneys retained to assist husband’s parents in their estate planning-except one.
Husband produced an additional document, allegedly dated December 17, 1980, purporting to be a “side agreement” between husband and his parents. Written in tortured “legalese,” it provided that:
[d]uring the lifetime of Fred or Irene Schmeusser, should any of the assets of Falco, Active Crane Rentals, Inc., or Custom Management, Inc., be sold or disposed of, the gain from the disposition of such property shall be split fifty/fifty between Lloyd Schmeusser and Fred or Irene Schmeusser. At any time should Fred or Irene require cash for any reason, the purpose of this agreement is to establish that Fred, and Irene Schmeusser are 50% owners in the Falco, Active Crane Rental, Inc. and, Custom Management; Inc. companies, and as such are entitled to 50% of the assets of the business, if they so need it. ([E]mphasis added[.])
Admittedly, this document was composed by the husband. It is totally contrary to the estate planning strategies of his parents. Indeed, it is further admitted that there was no consideration for the agreement. As will be seen, no disclosures were made to the Internal Revenue Service nor were the required taxes paid for such a “gift” back to the parents.
It is undisputed that certain of Falco’s assets were sold in 1983 and 1984, resulting in capital gains to the partnership of 1249$1,348,199 in 1983 and $187,254 in 1984. As a result of these sales, husband claims to have paid $700,000 and still owes another $167,650 to his father, allegedly in accord with their pre-existing “side agreement.” However, the record clearly demonstrates that husband, alone, paid the taxes on all of the capital gains which accrued to the partnership as a result of these sales. His parents did not. Nor were gift taxes paid on the sums so received. It is clear that husband’s parents did not report for Federal or state tax purposes the $700,000 already received, or the additional monies due from the sale of the partnership assets. Significantly, husband could not provide a satisfactory answer under cross-examination for these manifest irregularities. Nor could his counsel at oral argument before us.
Given all of the circumstances, the Family Court’s conclusion that husband’s parents had retained a 50% equity interest in these marital properties by virtue of this “side agreement”, cannot be said to meet the tests of Wife (J.F.V.) v. Husband (O.W.V., Jr.), 402 A.2d at 1204, and Levitt v. Bouvier, 287 A.2d at 673. When considered in the total context of his fraudulent conduct, the husband’s inability to explain his actions, and those of his parents with respect to the glaring inconsistencies of the ti’ans-action, can lead to but one reasonable conclusion-this “agreement”, like the other frauds, is nothing more than a sham transaction designed to shield marital property from the wife. If ever a case demonstrated the validity of the old legal maxim, falsus in it,no, falsus in omnibus — false in one thing, false in everything — this is it. Upon remand 100% of the businesses shall be treated as marital property for purposes of dividing the marital estate.
In the instant matter, Preis’ opinion that the sale was a sham was not substantiated *481by evidence in the record or by Delaware law. Preis’ reliance on the cash sweep payment as evidence that the sale was a sham is misplaced. The cash sweep was not a unilateral act by Health Net. The cash sweep was, in part, a procedure provided for by the Stock Purchase Agreement for the return of intercompany accounts (loans) provided by Health Net to the HMOs prior to the sale.100 No party to the contract has alleged that the implementation of the terms of the cash sweep were a breach 12,-,nof the contract; in fact, it was required by the terms of the contract and the failure to do so would have been a breach of the contract. The cash sweep was the performance of a negotiated contractual right provided in the contract and was in compliance with the terms of the contract.
Preis ignored the fact or failed to give any weight to the failure of AmCareeo to pay Health Net sums due pursuant to promissory notes held by Health Net, evidencing a lack of control by Health Net to direct the activities of AmCareeo. Moreover, Preis gave no testimony concerning information that Health Net did, in fact, control the activities of AmCareeo. Preis’ opinion testimony and the trial judge’s finding that the sale was a sham are clearly wrong as a matter of law and fact.
The parties treated the completed transaction as a valid sale. The regulators in each state treated the transaction as a valid sale. There was no formal action by any party or person of interest to have the transfer declared a simulation or a fraudulent conveyance. Unlike the Schmeusser ease, there is no evidence of any verbal understanding, writing, document, or coun-terletter wherein the parties acknowledged that Health Net, rather than AmCareeo, was the true owner of the stock of the HMOs.
As required by Delaware law for the sale of the assets of a corporation, there was the transfer of ownership in property (the stock) from one person to another (Health Net to AmCareeo), upon good and valid consideration (the cash payment and the issuance of shares). We find after a careful review of the record on appeal that the contract to sell the stock of the HMOs by Health Net to AmCareeo expressed the true intent of the parties to confect a sale and ive find no evidence of fraud that ivould warrant |25irescission of the contract.101 Upon approval of the transaction by the state regulators, the suspensive condition of the contract was fulfilled. AmCareeo became the owner of the stock of the HMOs, and Health Net became a stockholder in AmCareeo. At that point in time, there was a total funding of AmCare-eo of over $22,381,000. This funding was from the issuance of Class A Preferred Stock to Health Net and through cash contributions totaling over $8 million. These contributions were from 28 investors, including $5 million from Dr. Pearce, $500,000 from St. Luke’s Healthcare System and more than $500,000 from various medical professionals. These investors clearly were investing their capital and purchasing stock in AmCareeo and were not intending to purchase stock in Health Net. It is reasonable to assume, based on *482their investments, that these investors perceived the transaction as valid.
These assignments of error have merit.
X. PIERCING THE CORPORATE VEIL — SINGLE BUSINESS ENTERPRISE
(Assignments of Error TX-6 and TX-7)
A. The Trial Court’s Reasons
In response to the order of this Court, the trial court judge provided the following reasons for judgment on the single business enterprise (SBE) issue in the Louisiana and Oklahoma cases:

This court finds that Health Net, Am-Careco operated as a single business enterprise in accordance with, Health Net’s stipulation on the record and in regards to the following particulars:

A) Fiduciary duty was owed from Health Net to the three HMOs each; that Health Net together with AmCare-co and Thomas Lucksinger confected a design and an enterprise predicated upon fraudulent documents, transfers, half-truths in affidavits, which were drafted in Texas to have impact in | ^several other states, and where damage occurred in other states, such as, to the HMOs in Louisiana and Oklahoma.
B) The operation consisted in swirling cash and capital given [sic] the illusion of adequate capitalization. Neither AmCa-reco nor Health Net, however, ever pledged their own capital in place of the statutory capital required that the strained HMOs were forced to deplete. (Emphasis added.)
As previously indicated in Part V, Section B of this opinion, the trial court relied on the single business enterprise theory in her oral reasons for ruling as a matter of law that the substantive law of Texas applied in the Louisiana, Oklahoma, and Texas actions.
The above cited written reasons for judgment state that the trial court found “that Health Net, AmCareco operated as a single business enterprise in accordance 'with Health Net’s stipulation on the record ...(Emphasis added.) The record on appeal does not reflect such a stipulation by Health Net. Instead, the record reflects the following pertaining to this SBE issue.
The Texas Receiver alleged that Health Net, AmCareco and its affiliates, and six of the AmCareco officers and directors were part of a “control group,” a “single business entity” and/or a “single business enterprise.” Health Net in its answer denied that the allegations were true insofar as they applied to it and admitted that the allegations were true insofar as they applied to the other parties defendant. The other parties answered and denied the allegations and some of them continued to deny the allegations in their settlement documents. In Health Net’s Requested Jury Charges 14, 15, and 16 it asked the trial court judge to instruct the jury that pursuant to La. C.C. art. 1853, the Receiver’s allegation about the other parties and Health Net’s admission thereof constituted a judicial confession that those parties operated a single business enterprise. The trial court judge denied this request.
_Jjj3In Assignment of Error TX-6, Health Net asserts that the trial court judge committed error in this ruling. This assignment of error is without merit. Health Net’s assertion would have merit if this were a simple one plaintiff and one defendant action. However, this assertion is not valid in multiple-party litigation in the procedural posture of the instant case. Health Net’s admission of the Receiver’s allegations pertaining to the single business enterprise of third parties who denied the allegations is not a declaration *483against interest affecting the status of these parties. In this posture, La. C.C. art. 1853 does not apply. La. R.S. 15:449-450; Cichirillo v. Avondale Industries, Inc., 2004-2894 and 2918, p. 6 (La.11/29/05), 917 So.2d 424, 428-29; Gordon v. Century 21, 2004-0654, pp. 7-8 (La.App. 3 Cir. 11/17/04), 888 So.2d 385, 390-91; Hibernia National Bank v. Orleans Regional Hospital, L.L.C., 28,982, p. 4 (La.App. 2 Cir. 11/1/96), 682 So.2d 1291, 1294, writ denied, 97-0026 (La.2/21/97), 688 So.2d 513; F. Maraist, 19 La. Civ. Law Treatise, Evidence & Proof, § 4.5, pp. 88-92 (2d ed.2007); Maraist & Lemmon, 1 La. Civ. Law Treatise, Civil Procedure, § 11.7(4), p. 287; Authors’ Notes (6) for La. C.E. art. 801.
As previously indicated in Part VI, Section D1 of this opinion, both the Texas Receiver and Health Net submitted proposed jury instructions on the SBE issue but the trial court judge did not submit the issue to the jury. As previously indicated in Part VI, Section A of this opinion, “a trial court judge has a mandatory duty to accurately instruct the jury on all necessary factual issues that the jury is required to decide based upon the facts and evidence in the ease.” The single business enterprise (piercing the corporate veil) issue is such an issue. Because the trial court judge found as a factual conclusion that Health Net and AmCareco operated as a SBE in the Louisiana and Oklahoma cases, the failure to give the instruction can be 12n,justified in the Texas case only on two grounds: (1) as a matter of law (there was no genuine issue of fact) the SBE existed; or (2) as a matter of law (there was no factual dispute) the SBE did not exist. If, as a matter of law, the SBE did not exist in the Texas case, the SBE ruling by the judge in the Louisiana and Oklahoma- cases is in conflict with this legal conclusion. If, as a matter of law, the SBE did exist in the Texas case, the trial court judge correctly refused to instruct the jury on it. However, if the SBE issue involved a genuine issue of material fact, the trial court judge committed error by not instructing the jury on it.
Finally, because we have determined that the sale was valid and not a sham, the SBE issue is presented in two pertinent factual postures: (1) did Health Net and AmCareco operate as a SBE prior to the sale; and (2) did Health Net and AmCare-co operate as a SBE after the sale.102
B. The Law
1. Texas Law
The Texas law pertaining to single business enterprise103 is set forth in Part VI, Section Dlb of this opinion. See also 2 Tex. Prac. Guide Bus. & Com. Litig. §§ 13.52, 13:53, 13:66 and 13:68; 20 Tex. Prac. Bus. Organizations (2d ed.), §§ 26.22 and 26.23; 15 Tex. Jur.3d Corporations § 173. In Texas, the factors (circumstances) to be considered in determining whether the corporate veil should be pierced and separate corporations be treated as one enterprise104 include: (1) common employees; (2) common offices; *484(3) centralized accounting; (4) payment of wages by one corporation to another corporation’s employees; (5) common business name; (6) services rendered by employees of one corporation on behalf of another corporation; and (7) unclear allocation of profits and losses between corporations. SSP Partners v. Gladstrong Investments (USA) Corp., 275 S.W.3d 444, 451 (Tex.2008); PHC-Minden, L.P. v. Kimberly-Clark Corp., 235 S.W.3d , 163, 174 (Tex.2007), judgment rev’d on other grounds, 235 S.W.3d 163 (Tex.2007).
2. Louisiana Law
Louisiana Civil Code Article 24105 provides as follows:
There are two kinds of persons: natural persons and juridical persons.
A natural person is a human being. A juridical person is an entity to which the law attributes personality, such as a corporation or a partnership. The personality of a juridical person is distinct from that of its members.
The business corporation law of Louisiana is found in La. R.S. 12:1-178. La. R.S. 12:21 provides that “[o]ne or more natural or artificial persons capable of contracting may form a corporation.” Pursuant to La. R.S. 12:22, corporations may be formed for any lawful business purpose or for such limited business purposes set forth in special laws. Pursuant to La. R.S. 12:41, a business corporation may acquire other business corporations. Pursuant to La. R.S. 22:2003 A, only “[t]hree or more artificial or natural persons capable of contracting who are citizens of the United States and a majority of whom are residents of this state, may act as incorpo-rators to form a corporation for the purpose of transacting business as a health _j2jemaintenance organization.” Pursuant to La. R.S. 22:2002(7), a health maintenance organization is “any corporation organized and domiciled in this state which undertakes to provide or arrange for the provisions of basic health care services to enrollees in return for a prepaid charge.” Thus, in Louisiana, natural and juridical persons (corporations) have the same “attributes” of personality for forming or acquiring corporations and owning stock therein.
Initially in this case, the Louisiana HMO was a wholly-owned subsidiary of Health Net. As a shareholder in the Louisiana HMO, Health Net’s liability (as a person) for the acts or omissions of the Louisiana HMO (as a person) is provided for in La. R.S. 12:93 B entitled “Liability of subscribers and shareholders” and 12:95 entitled “Actions for fraud.”106 La. R.S. 12:93 B is clear and unambiguous in providing that “[a] shareholder of a corporation organized after January 1, 1929, shall not be liable personally for any debt or liability of the corporation.” 107 (Emphasis added.) The public policy in Louisiana upon which this legislation is anchored is set forth in Bujol, 2003-0492 at p. 13-14, 922 So.2d at 1127-28, as follows:

*485
Liability for compensatory damages

The mere fact that ALSA ia the ultimate parent corporation of ALAC, albeit through four corporate levels of ownership, floes not result in the imposition of a duty upon ALSA to provide the employees of ALAC with a safe place to work. The law has long been clear that a corporation is a legal entity distinct from its shareholders and the shareholders of a Incorporation organized after January 1, 1929 shall not be personally liable for any debt or liability of the corporation. Buckeye Cotton Oil Co. v. Amrhein, 168 La. 139, 121 So. 602 (1929); La. R.S. 12:93(B). The same principle applies where one corporation wholly owns another. See Joiner v. Ryder System Inc., 966 F.Supp. 1478, 1483 (C.D.Ill.1996). While generally a parent corporation, by virtue of its ownership interest, has the right, power, and ability to control its subsidiary, a parent corporation generally has no duty to control the actions of its subsidiary and thus no liability for a failure to control the actions of its subsidiary. See Joiner, supra at 1489-90 and cases cited therein.FN15 The fundamental purpose of the corporate form is to promote capital by enabling investors to make capital contributions to corporations while insulating separate corporate and personal asset from the risks inherent in business. Smith v. Cotton’s Fleet Serv., Inc., 500 So.2d 759, 762 (La.1987); Glazer v. Commission on Ethics for Public Employees, 431 So.2d 752, 757 (La.1983). Louisiana courts have declared that the strong policy of Louisiana is to favor the recognition of the corporation’s separate existence, so that veil-piercing is an extraordinary remedy, to be granted only rarely. Glenn G. Morris and Wendell H. Holmes, Louisiana Civil Lanv Treatise, Vol. 8, Business Organizations (1999), § 32.02, p. 55 (cites omitted). “If the plaintiffs do not allege shareholder fraud, they bear a ‘heavy burden’ of proving that the shareholders disregarded corporate formalities to the extent that the corporation had become indistinguishable from them.” Id. (Cites omitted).
See also Riggins v. Dixie Shoring Co., Inc., 590 So.2d 1164, 1167-69 (La.1991); Andry v. Murphy Oil, U.S.A., Inc., 2005-0126, 0127, 0128, 0129, and 0130, pp. 15-17 (La.App. 4 Cir. 6/14/06), 935 So.2d 239, 250-51, unit denied, 2006-2256 (La.12/8/06), 943 So.2d 1093; Johnson v. Kinchen, 160 So.2d 296, 298-300 (La.App. 1 Cir.1964). The provisions of La. R.S. 12:93 B are tempered by La. R.S. 12:95 which provides as follows:
§ 95. Actions for fraud
Nothing in' this Chapter shall be construed as in derogation of | ats^ny rights which any person may by law have against a promoter, subscriber, shareholder, director or officer, or the corporation, because of any fraud practiced upon him by any of such persons or the corporation, or in derogation of any right which the corporation may have because of any fraud practiced upon it by any of these persons.
When La. R.S. 12:93 B and 12:95 are interpreted in reference to each other,108 it must be concluded that La. R.S. 12:95 is the sole means for “piercing” the corporate *486veil erected by La. R.S.12:93 B. In Louisiana, when this piercing of the corporate veil occurs, the shareholder, whether a natural or juridical person, becomes vicariously liable for the debts and/or the acts or omissions of the offending corporation. Thibodeaux v. Ferrellgas, Inc., 98-0862, p. 12 (La.App. 3 Cir. 1/6/99), 741 So.2d 34, 43, writ denied, 99-0366 (La.3/26/99), 739 So.2d 797; Maraist & Galligan, supra, § 13.03, pp. 13-21 and 13-22. However, when a corporation acts directly through an authorized officer or agent, it can be individually liable, either jointly or concurrently, just as a natural person for tortious acts or omissions. Andry, 2005-0126 at p. 15, 935 So.2d at 249-50; G. Morris & W. Holmes, 8 La. Civ. Law Treatise, Business Organizations, §§ 3.01 and 33.11, pp. 102-OS, 139-43 (1999).109
The “single business enterprise” doctrine in Louisiana is a theory for imposing liability where two or more business entities act as one. Generally, under the doctrine, when corporations integrate their resources in operations to achieve a common business purpose, each business may be held liable for wrongful acts done in pursuit of that purpose. Brown v. ANA Insurance Group, 2007-2116, p. 1, n. 2 (La.10/14/08), 994 So.2d1|2591265, 1266, n. 2. The jurisprudence interpreting the legislation has resulted in essentially two theories of recovery: (1) alter ego; and (2) single business enterprise. The alter ego theory involves piercing the corporate veil to impose personal liability for fraud on a shareholder who is usually, but not necessarily, a natural person. The SBE theory involves piercing the corporate veils between affiliated corporations whether they are parent-subsidiary or collaterally related. G. Morris & W. Holmes, 8 La. Civ. Law Treatise, Business Organizations, §§ 32.02 and 32.15, pp. 52-62, 98-101 and the cases cited therein; Town of Haynesville v. Entergy Corp., 42,019, pp. 6-7 (La.App. 2 Cir. 5/2/07), 956 So.2d 192, 196-97, writ denied, 2007-1172 (La.9/21/07), 964 So.2d 334,; Dishon v. Ponthie, 2005-0659, pp. 3-6 (La.App. 3 Cir. 12/30/05), 918 So.2d 1132, 1134-36, writ denied, 2006-0599 (La.5/5/06), 927 So.2d 317; Hamilton v. AAI Ventures, L.L.C., 99-1849, pp. 5-6 (La.App. 1 Cir. 9/22/00), 768 So.2d 298, 302-03; Hollowell v. Orleans Regional Hospital, LLC, 217 F.3d 379, 385-90 (5th Cir. [La.] 2000). See also G. Morris & W. Holmes, 8 La. Civ. Law Treatise, Business Organizations, §§ 32.01, 32.03, 32.04, 32.07, 32.08, 32.09 and 32.14; 18 C.J.S. Corporations § 16. La. R.S. 12:93 B and 12:95 do not refer to either theory.
When a party seeks to pierce the corporate veil, the totality of the circumstances must be considered and is determinative. Riggins, 590 So.2d at 1169. The following is an illustrative list of circumstances (facts) considered by various courts in Louisiana when they determined whether to pierce the corporate veil:
(1) failure to follow statutory formalities for incorporation;
(2) one corporation causing the incorporation of another one;
|2(in(3) failure to transact regular corporation business such as holding regular board of directors and shareholder meetings;
(4) commingling of corporate and shareholder funds;
(5) under capitalization;
*487(6) failure to have separate checking or other financial accounts;
(7) failure to file separate income tax returns;
(8) common corporate names;
(9) diversion of corporate assets;
(10) common use of corporate equipment;
(11) actual control;
(12) common officers and directors (interlocking boards);
(13) one corporation financing the other corporation, especially when no interest is charged and/or return payment is not required;
(14) common payment by one corporation of the other corporation’s salaries or financial losses;
(15) one corporation only does business with the other corporation;
(16) common employees;
(17) centralized accounting;
(18) undocumented transfers of funds between corporations;
(19) unclear allocation of profits and losses; and
(20) excessive fragmentation of corporate business.
Town of Haynesville, Inc., 42,019 at pp. 6-7, 956 So.2d at 196-97; Dishon, 2005-0659 at pp. 3-6, 918 So.2d at 134-36; F.G. Bruschweiler (Antiques) Ltd. v. GBA Great British Antiques, L.L.C., 2003-0792, p. 7 (La.App. 5 Cir. 11/25/03), 860 So.2d 644, 651, writ denied, 2004-0155 (La.3/19/04), 869 So.2d 859; Berg v. Zummo, 2003-0281, p. 2 (La.App. 4 Cir 7/2/03), 851 So.2d 1223, 1224-25, writ denied, 2003-2209 (La.11/21/03), 860 So.2d 546; Green, v. Champion Ins. Co., 577 So.2d 249, 257-59 (La.App. 1 Cir.1991), writ denied, 580 So.2d 668 (La.1991). Determining whether to lanpierce the corporate veil initially is a question of fact to be decided by the trial court. Sarpy v. ESAD, Inc., 2007-0347, pp. 3-4 (La.App. 4 Cir. 9/19/07), 968 So.2d 736, 738, writ denied, 2007-2056 (La.1/11/08), 972 So.2d 1170.
3. Oklahoma Law
In Sautbine v. Keller, 423 P.2d 447, 451-52 (Okl.1966) appears the following:
Plaintiffs acknowledge the general rule, expressed in Garrett v. Downing, 185 Okl. 77, 90 P.2d 636 [(1946)], that even a family corporation is a separate and distinct legal entity from its shareholders. Also see Butterick Co., Inc. v. Molen, 198 Okl. 92, 175 P.2d 311 [(1946)]. However, they assert that this rule is qualified in certain types of cases to the extent that acts of an individual shareholder may .become the act of the corporation, and the distinction between the corporation and the principal shareholder will be disregarded. Further, the doctrine of alter ego does not apply solely to instances where the corporate existence is used to do wrong, perpetrate fraud, or commit a crime. Rather this doctrine has been amplified to allow application not only for fraud or wrong, but also in cases where the facts require the court to disregard separate existence of the corporation and shareholders in order to protect rights of third persons and accomplish justice. Mid-Continent Life Ins. Co. v. Goforth, 193 Okl. 314, 143 P.2d 154 [(1943)]; Buckner v. Dillard, 184 Okl. 586, 89 P.2d 326 [(1939)].
In In re Cherry, 2006 WL 3088212, p. 17 (Bkrtcy.S.D.Tex.2006), appears the following:
Oklahoma law allows the court to disregard the corporate shield “when it is essential in the interest of justice to do so, or where the corporate shield is used to defeat an overriding public policy.” King v. Modem Music Co., 33 P.3d 947, 952 (Okla.Civ.App.2001) (citing Thomas *488v. Vertigo, Inc.[,] 900 P.2d 458, 460 (Okla.Civ.App.1995)). The corporate veil may be pierced if the corporate form was “used (1) to defeat public convenience, (2) justify wrong, (3) to perpetrate fraud whether actual or implied, or (4) to defend crime.” In re Estate of Rahill, 827 P.2d 896, 897 (Okla.Civ.App.1991). Further, Oklahoma courts have held to disregard the corporate entity when more than one corporation is involved, the movant must show either of the following:
(1) that the separate corporate existence is a design or scheme to perpetuate fraud, or (2) that |26i>one corporation is so organized and controlled and its affairs so conducted that it is merely an instrumentality or adjunct of another corporation. In other words, it must appear that one corporation is merely a dummy or sham. In such cases, the distinct corporate entity will be disregarded and the two corporations will be treated as one[.]
King, 33 P.3d at 853 (citing In re Estate of Rahill, 827 P.2d at 897).
C. Burden of Proof and Persuasion
As discussed in greater detail in Part VIII, Section Bla of this opinion, for choice of law purposes: (1) burdens of proof and persuasion are evidence rules; (2) rules of evidence are part of the law of the remedy and not the law of the substance; (3) laws of the remedy are procedural; and (4) procedural laws are supplied by the law of the forum. As also previously indicated in Part VIII, Section Bla of this opinion, in Louisiana, unless otherwise provided, the party seeking relief bears the initial burden of producing the evidence necessary to obtain the relief sought. In the instant case, the Texas Receiver has asserted the SBE theory as the basis for holding Health Net jointly and vicariously liable for the acts and omissions of AmCareco, its HMOs, and their officers and/or directors, and Health Net has asserted the SBE theory as the basis for arguing the assets of AmCareco, AmCare-MGT, and the three HMOs should be considered together to determine the solvency of the HMOs. Thus, the Texas Receiver and Health Net each had the burden of producing evidence that there was a single business enterprise as each alleged. Lopez v. TDI Services, Inc., 93-0619, p. 9 (La.App. 3 Cir. 2/2/94), 631 So.2d 679, 686, writ denied, 94-0864 (La.6/3/94), 637 So.2d 501.
Louisiana Code of Evidence Article 302(1) provides as follows:
The following definitions apply under this Chapter:
1263(1) The “burden of persuasion” is the burden of a party to establish a requisite degree of belief in the mind of the trier of fact as to the existence or nonexistence of a fact. Depending on the circumstances, the degree of belief may be by a preponderance of the evidence, by clear and, convincing evidence, or as otherwise required by law. (Emphasis added.)
Proof by clear and convincing evidence requires more than “a preponderance of the evidence,” the traditional measure of persuasion, but less than “beyond a reasonable doubt,” the stringent criminal standard. See Burmaster v. Plaquemines Parish Government, 2007-2432, p. 19 (La.5/21/08), 982 So.2d 795, 809; Chatelain v. State, Department of Transportation & Development, 586 So.2d 1373, 1378 (La.1991); Succession of Bartie, 472 So.2d 578, 582 (La.1985); Bonvillain v. Preferred Industries & LWCC, 2004-0849, p. 12 (La.App. 1 Cir. 5/27/05), 917 So.2d 1, 8; Hines v. Williams, 567 So.2d 1139, 1141 (La.App. 2 Cir.), writ denied, 571 So.2d 653 (La.1990). Proof by a preponderance requires *489that the evidence, taken as a whole, shows that the fact sought to be proved is more probable than not. Hebert v. Rapides Parish Policy Jury, 2006-2001, p. 7 (La 4/11/07), 974 So.2d 635, 642. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. Hines, 567 So.2d at 1141. The standard of persuasion by clear and convincing evidence is usually applied where there is thought to be a special danger of deception or where the comt considers that the particular type of claim should be disfavored on policy grounds. State in the Interest of J, K & T, 582 So.2d 269, 275 (La.App. 1 Cir.1991), writ denied, 583 So.2d 1145 (La.1991); Hines, 567 So.2d at 1141; McCormick on Evidence, § 340(b) (2d ed.1972).
| gilí As previously indicated, there are very strong policy reasons in Louisiana for the disfavoring of liability of natural or juridical shareholders for the acts and omissions of the business corporations in which they own stock. For that reason, a party seeking to show liability by a shareholder pursuant to the single business enterprise (piercing the corporate veil) theory must prove the existence of the SBE by clear and convincing evidence. Miller v. Entergy Services, Inc., 2004-1370, p. 7 (La.App. 4 Cir. 7/13/05), 913 So.2d 143, 148; Holly & Smith Architects, Inc., 2003-0481 at p. 11, 872 So.2d 1147 at 1156; Grayson v. R.B. Ammon & Associates, Inc., 99-2597, p. 13-14 (La.App. 1 Cir. 11/3/00), 778 So.2d 1, 17-18, writs denied, 2000-3270, 2000-3311 (La.1/26/01), 782 So.2d 1026, 1027; Cahn Electric Appliance Co., Inc. v. Harper, 430 So.2d 143, 145 (La.App. 2 Cir.1983).
Accordingly, we will apply this burden of persuasion to decide the SBE factual issue in the Louisiana, Oklahoma, and Texas cases. The trial court judge’s factual conclusions on this issue do not reflect that she applied this burden of persuasion.
D. Common SBE Circumstances Pre- and Post-Sale
As previously indicated, the transaction by which the ownership of the stock in the three HMOs was transferred from Health Net to AmCareco was a valid sale and not a sham. Accordingly, the SBE issue must be decided in the pre-sale and post-sale factual settings.
1. Pre-Sale Health Net/AmCareco SBE Issue
The record reflects that, in 1997, Health Net was a large Delaware corporation with its principal place of business in California. In the latter part of 1997 or the early part of 1998, the management of Health Net made a business decision to divest itself of the three HMOs because they were financial liabilities. It was decided that the HMOs would be divested by sale 12fisor, in the alternative, they would be closed (wind down). In 1998, Health Net hired Shattuck Hammond, a New York investment banking firm, to locate a buyer. Shattuck Hammond located a group of potential investors headed by Lucksinger. The Lucksinger group incorporated Am-Careco as a Delaware corporation with its principal place of business in Texas. The parties commenced negotiations for the future sale of the stock in the three HMOs.
On April 17, 1998, the parties executed a Letter of Intent wherein they agreed to negotiate the sale of the stock in the HMOs pursuant to various terms and conditions. Two of the terms were that both parties would negotiate in good faith and Health Net would not negotiate with another party while negotiations were proceeding with AmCareco. On November 4, 1998, the parties executed a Stock Purchase Agreement. At this time the De-*490loitte & Touche firm was the accountant for Health Net and PWC was the accountant for AmCareeo. Proskauer Rose, representing one of the AmCareeo investors, and acting through Stuart Rosow, a partner in the firm, assisted in the drafting of the instrument. This agreement provided for various terms and conditions for the final sale, among which was a provision that the sale ivould not be final and valid unless approved by the three state insurance regulator's. AmCareeo retained the law firm of Vinson & Elkins, represented by Susan Conway, to prepare the required Form-A applications required to get regulator approval in each of the three states. Conway represented AmCareeo throughout the administrative procedures that resulted in approvals by the three regulators on April 30, 1999.
During the period of time before the sale, there is no evidence in the record of the following pertinent circumstances existing between Health Net and AmCareeo: (I) failure to follow statutory formalities for incorporation; |2|;»(2) Health Net incorporated AmCai’eco or vice versa; (3) failure to transact regular corporation business; (4) commingling of corporate or shareholder funds; (5) under-capitalization; (6) failure to have separate checking or other financial accounts; (7) failure to file separate income tax returns; (8) common corporate names; (9) common use of corporate equipment; (10) actual control; (II) interlocking boards or common officers; (12) common employees and/or common payment of employee salaries; (13) one corporation only doing business with the other; (14) centralized accounting and auditing; (15) undocumented transfers of funds between the corporations; (16) unclear allocation of profits or losses; and (17) excessive fragmentation of corporate business.
Prior to the April 30, 1999 sale, the following circumstances existed between Health Net and the three HMOs. Gellert, Health Net’s CEO, was on the Boards of Directors of each of the HMOs and Jansen, Health Net’s vice president, assistant general counsel and assistant secretary, was the secretary of each of the HMOs. Health Net made $6.3 million in interest-free loans to the Louisiana and Texas HMOs so that they could maintain their PDRs prior to the sale. The sale contract provided that this money would be recovered by Health Net out of the assets of the HMOs and/or AmCareeo after the sale. Donations and loans can be legitimate contracts with a corporation when it is closely held by a natural person or affiliated with another corporation. It is common practice for a parent corporation or a natural stockholder to make interest-free loans to wholly-owned subsidiaries. Riggins, 590 So.2d at 1171; Sea Tang Fisheries, Inc. v. You’ll See Sea Foods, Inc., 569 So.2d 992, 996 (La.App. 1 Cir.1990), writ denied, 572 So.2d 89 (La.1991); Harris v. Best of America, Inc., 466 So.2d 1309, |2671315-16 (La.App. 1 Cir.1985), writ denied, 470 So.2d 121 (La.1985); Huard v. Shreveport Pirates, Inc., 147 F.3d 406, 413 (C.A.5 [La.] 1998).
Accordingly, the Receivers have failed to prove by clear and convincing evidence that Health Net and AmCareeo operated a single business enterprise prior to the April 30,1999 sale.
2. Post-Sale Health Net/AmCareco SBE Issue
After the sale there is no evidence in the record of the following post-sale circumstances (facts) between Health-Net and AmCareeo: (1) failure to follow statutory foi’malities for incorporation; (2) Health Net incorporated AmCareeo or vice versa; (3) failure to transact regular corpo*491ration business such as board of director and shareholder meetings; (4) commingling of corporate or shareholder funds; (5) under-capitalization,110 (6) failure to have separate checking or other financial accounts; (7) failure to file separate income tax returns; (8) common corporate names; (9) diversion of corporate assets; (10) common officers and directors; (11) common payment by one corporation of the other corporation’s salaries or financial losses; (12) one corporation only doing business with the other corporation; (13) centralized accounting; (14) undocumented transfers of funds between corporations; (15) unclear allocation of profits and losses; and (16) excessive fragmentation of corporate business.
The additional circumstances (facts) relevant to this SBE issue are (1) common use of corporate equipment; (2) actual control; (3) one corporation financing the other corporation; and (4) common employees.
As previously indicated in Part IX of this opinion, at the same time that the sale was approved by the regulators, the parties executed a ^Transition Services Agreement wherein Health Net agreed to perform certain administrative services for the HMOs “until AmCareco could get up and running after the closing.” This agreement specifically provided that Am-Careco would at all times retain the ultimate authority and responsibility over the HMOs.
In the Stock Purchase Agreement, Health Net was given several rights by which it could control AmCareeo’s future conduct, namely: (1) ownership of forty-seven percent (47%) of AmCareeo’s stock; (2) redemption rights for a specific period of time to require AmCareco to buy back Health Net’s stock at a certain price; (3) the right of first refusal if a third person offered to buy all of AmCareco’s stock; and (4) preemptive rights for protection against the dilution of its percentage ownership of stock rights.
Health Net partially financed the sale (in lieu of only agreeing to a cash sale) by taking redeemable stock instead of cash for part of the purchase price and by taking a promissory note instead of cash for another part of the purchase price. Health Net also reserved the right to approve future increases of indebtedness of AmCareco.
Rick McCutchen, a Health Net employee, worked for AmCareco for a short period of time after the sale to help with the transaction. During his testimony, Luck-singer stated the following:
Q. When you were first talking to Health Net in April of 1998 and you were coming up again with this plan, did you view this transaction more as a joint venture between AmCareco and Health Net?
A. I don’t know if joint venture is the right word, but it was some sort of cooperative venture, that’s for sure.
As previously indicated in Part X of this opinion, the work that AmCareco contracted with Health Net to perform in the Transition Services |2fiflAgreement and the work performed by Rick McCutchen was transitional work designed to make the transfer of control of the HMOs from Health Net to AmCareco as seamless as possible. This was not single business enterprise activity.
The control that Health Net acquired over the operations of AmCareco pursuant to the Stock Purchase Agreement is less than that which a parent corporation has *492over a wholly-owned subsidiary and does not create a single business enterprise. Riggins, 590 So.2d at 1167-68; Town of Haynesville, 42,019 at pp. 6-7, 956 So.2d at 197-98; Audry, 2005-0126 at pp. 15-17, 935 So.2d at 249-51; Shoemaker v. Giacalone, 34,809, pp. 3-5 (La.App. 2 Cir. 6/20/01), 793 So.2d 230, 233-34, writ denied., 2001-2614 (La.12/14/01), 804 So.2d 632. The evidence does not show that Health Net and AmCareco ceased to be separate juridical persons after the sale.
Finally, the record reflects that Health Net had legitimate business purposes for selling the stock in the HMOs. The HMOs were not profitable and represented a small part of Health Net’s business enterprises. The only options available in this business posture were to divest the stock by either (1) sale or (2) wind down, which was considered the more difficult of the options. AmCareco wanted to buy and Health Net wanted to sell. The parties were particularly sophisticated in these types of business matters and obviously understood what they were doing. As indicated in Part X of this opinion, there were bona fide business reasons for the terms and conditions of the agreement reached by the parties after extensive negotiations. Health Net, as the vendor, engaged in a common business practice when it financed part of the purchase price. The facts that Health Net subsequently loaned additional money to AmCa-reco and maintained a parental guarantee on the |27nLouisiana HMO are legitimate business activities and do not serve to breach the corporate separateness of the parties.
Accordingly, the Receivers have failed to prove that Health Net and AmCareco operated as a single business enterprise by clear and convincing evidence after the sale and the trial court’s holding to the contrary in the Louisiana and Oklahoma cases is wrong.111 Fina Oil & Chemical Co., 95-1877 at pp. 8-10, 673 So.2d at 674.
These assignments of error have merit.
XI. LIABILITY FOR FRAUD
(Assignments of Error TX 18, 19, 22, 23 and 27; LA-OK 1, 2, 5, 7, 9, 14 and Supp 5)
In her August 20, 2007 reasons for judgment in the Louisiana and Oklahoma cases, the trial court judge stated the following:
(C) HOW HEALTH NET COMMITTED FRAUD THAT CAUSED DAMAGE TO THE HMOs.
Without a fairness or even a legal opinion, simulated a transfer encouched in terms of sale whereby they took back 47% in preferred stock, swept $8.3 million in cash, removed the premium deficiency reserves, exercised the put option allowing themselves an additional $2 million, using artifice and design such as, *493the contorted stock purchase agreement was misleading, the side letter modifying the agreement was not sent to the regulators and had to be read in pari materia with the 3q, which had not even been drafted.
lijTiUsing pen stroke accounting, stacked assets and statutory deposits; used daily cash sheets; booked cashless capital contributions, booked receivables from parent to subsidiary to inflate equity, used creative accounting; constantly moved money between the three HMOs, resulting'in commingling which is a violation of fiduciary duty, moved money into AmCareco then out to Oklahoma HMO to satisfy statutory requirement, failed to timely pay claims that were due and owing, remained silent in the face of deepening insolvency and exhausted smoke and mirrors subterfuge in GAAP accounting and continued to accept premiums, to pay old claims, grew the company by acquisition of two additional plans resulting in 150,000 members which could not be served.112
Health Net asserts that (1) “the Receivers sought to recover for contractual obligations of the HMOs in the form of unpaid claims allegedly owed by the HMOs to their creditors,” (2) these claims were based in part, on (a) Health Net’s status as an AmCareco shareholder and (b) Health Net’s manipulation of AmCareco’s separate corporate form for its own benefit, and (3) Health Net used AmCareco for the purpose of perpetrating and did perpetrate actual fraud on AmCareco’s creditors for Health Net’s direct benefit. Health Net contends the Receivers failed to prove this. The Receivers “contended Health Net defrauded the Regulators by misrepresenting the amount of the cash sweep and/or the amount of statutory capital the HMOs would retain after the 1999 AmCareco sale” and “Health Net committed fraud in 2001 ... by not disclosing the HMOs financial condition to the Regulators or the HMOs’ claimants.” Health Net asserts the Receivers “failed to prove [the] essential elements of each claim.” Health Net argues it made no representations and did not defraud anyone regarding the sale, “AmCareco ... rather than Health Net made all representations to the Regulators regarding AmCareco’s application^] for approval of the |272sale” and “Health Net ... made no pre-sale statements or representations to the Regulators, precluding liability on the Receivers’ principal fraud theory.” Further, Health Net argues “[t]he documents filed by AmCareco with the Regulators were not misleading” and “correctly identified the amount of cash that would be, and was, swept from each of the three HMOs.” Health Net maintains it did not defraud anyone after the sale. After the sale, Health Net argues it was simply a shareholder in AmCareco, had no duty to speak on behalf of AmCareco and had no duty “to warn potential claimants of the HMOs financial condition.” In particular, Health Net argues “the Regulators learned of the HMOs’ true financial condition before Health Net did, but decided as a matter of policy to give AmCareco time to fix its problems” and “the Regulators themselves acknowledged at trial the imprudence of a shareholder contacting the corporation’s creditors.”
The fraud claim asserted by the Receivers is summarized as follows:
The transfer from Health Net to AmCa-reco, and the “cash sweep” that accompanied it, constituted a sham transaction that should have never occurred. It immediately caused the HMOs to be statutorily insolvent or at the very least in *494the zone of insolvency, and the HMOs were left undercapitalized to serve policyholders, health care providers, and the general public. Through false and misleading documents prepared and assisted in by Health Net, the regulators were tricked into approving the transaction, as will be detailed below.
It furthered was asserted by the Receivers that the PDRs were improperly reclassified as Restructuring Reserves. The Receivers contend the April 1998 Letter of Intent was improperly omitted from the Form-A applications for the Regulators’ consideration for approval of the sale of the HMOs. The Receivers contend the November 4,1998 Stock Purchase Agreement and Side Letter did not “state that any additional PDR would be taken out of the HMOs as a part of any cash sweep.... ” “The Health Net cash sweep schedules forwarded to the regulators prior to the regulatory ^approval deliberately and clearly did not include the PDR amount for 1999 ($6.3 Million) within the ‘cash sweep’ figure.” The Receivers argue after the April 30, 1999 sale, the parties executed a Closing Agreement that was not provided to the Regulators. Paragraph 3(q) of this agreement improperly classified the PDRs as Restructuring Reserves, according to the Receivers. The effect of the cash sweep, argue the Receivers, was to render the HMOs insolvent and undercapi-talized. The Receivers assert this deprivation of required capital was the legal cause of all subsequent damages suffered by the HMOs. Finally, the following is asserted by the Receivers concerning Health Net’s post-sale conduct:
Judge Clark also found that Health Net’s fraud continued after the “sale” transaction and cash sweep, when Health Net oversaw and endorsed Am-Careco’s “smoke and mirrors subterfuge” and various accounting tricks employed to give an appearance to regulators that the HMOs were solvent when they were not. ... The infamous “smoke and mirrors” memorandum ... sets forth many of these accounting tricks, and reveals the Am-Careco entities’ improper and longstanding practice of using inter-company kiting transfers to artificially inflate their net worth to deflect regulatory scrutiny. Health Net had also received a number of earlier communications from the AmCare [sic] entities regarding their practice of booking bogus receivables to maintain the appearance of regulatory compliance.... All of these misrepresentations were made to specifically deceive the regulators in order to prevent them from placing the HMOs into receivership .... As a result of these fraudulent representations, the HMOs continued to operate until the claims far outstripped the ability to pay creditors’ claims, causing the Receivers’ damages.
The fault attributed to Health Net essentially falls into two categories: (1) fraud in obtaining regulator approval of the sale contract that transferred the ownership of the corporate stock and the control and possession of the HMOs from Health Net to AmCareco; and (2) fraud in reporting the financial condition of the HMOs to the regulators after the sale.
A. Fraud in Obtaining Regulator Approval of the Sale
_j2j4Because we have found that the Stock Purchase Agreement with Side Letter was not a sham and was a valid contract and that Health Net and AmCareco were not engaged in a single business enterprise at any time, the remaining issues pertaining to Health Net’s liability involve whether Health Net is liable to the Receivers pursuant to a particular theory of tort liability.
*4951. The Stock Purchase Agreement and Side Letter Contract
It is hornbook law that valid contracts have the effect of law for the parties. A review of the contract herein shows that it is a nominate contract of sale for the corporate stock of the three HMOs for which the consideration (cause) was cash, corporate stock in AmCareco, and various reciprocal obligations. The contract is subject to multiple suspensive conditions, including one that the contract will not become effective between the parties until it is approved by the regulators of the states of Louisiana, Oklahoma, and Texas. Thus, after the sale was approved by the three regulators, the contract had the effect of law on the parties. The record does not reflect that the contract was ever rescinded or nullified and, thus, the legal relations and effects created by the contract remained in effect until they were terminated by the rehabilitations and/or liquidations. Accordingly, the parties were obligated to perform as obligated in the contract until the contract was terminated.113
The record reflects that AmCareco was unable to acquire the ownership of the stock of the HMOs by way of a cash sale and, accordingly, the parties negotiated a contract in which the vendor (Health Net) agreed to “finance” the sale by taking cash, acquiring stock in AmCareco, and _]2j5obtaining various security devices to protect its equity in the transaction.114 In the contract, the parties defined the “Required Amount” of assets and equity to be left in the HMOs by Health Net as the sum of (1) all of the liabilities of the HMOs; (2) the total of all statutory and regulatory capital and other deposit amounts required of the HMOs; (3) any additional local deposit and escrow requirements of the HMOs; and (4) an additional $3,500,000. The amount of “Cash Payment” to be made out of the assets and equity of the HMOs to Health Net was defined as the excess, if any, of all cash, cash equivalents, certificates of deposit, marketable securities, and the value of the property, plant and equipment of the HMOs that are admitted assets, provided that the value of such items shall not exceed $50,000, $250,000, and $200,000 for the Louisiana, Oklahoma, and Texas plans respectively. The Cash Payment was to be made based on a balance sheet that provided, among other things, that (1) “all non-cash restructuring and merger related liabilities and reserves (the ‘Restructuring Reserves’) shall be reversed,”115 and (2) all intercompany accounts between an HMO and Health Net, AmCareco, or an affiliate of Health Net shall be settled.
As part of the consideration for the sale, Health Net also agreed to receive from AmCareco a to-be-determined number of shares of Class A Preferred stock of Am-Careco that had a $10 par value per share, a liquidation value of $1,000 per share, and other preferences. Health Net would be entitled to the number of shares valued at $1,000 per share represented by the excess of (1) the adjusted book value of the HMOs over (2) the amount of the Cash Payment, if any.
|27fiThe Health Net and AmCareco Stock Purchase Agreement and the Side Letter were executed on November 4, 1998. The *496Stock Purchase Agreement provided a closing date for a final agreement of January 31,1999.
The first sentence of paragraph 6 of the Side Letter provides as follows:
6. In the event that it appears Closing will not take place on or before January 15, 1999 (and Seller [Health Net] will thereby likely be required to establish prior to the issuance of its 1998 audited financial statement an additional premium deficiency reserve (the “Additional PDR") for any of the Acquired, Corporations [the HMOs] as of December 31, 1998), then Buyer [AmCareco] and [Health Net] shall negotiate in good faith a mechanism (and an appropriate amendment to the Agreement including appropriate adjustments to the Cash Sweep) whereby (i) [Health Net] would be able to receive back any cash contributed to the [the HMOs] in establishing the Additional PDR (tuhether or not a Cash Sweep is othenvise available) to the extent such Additional PDR relates to periods after the Effective Time; (ii) [Health Net] would receive such cash either through the Cash Sweep procedure or the Sweep Shortfall procedure described at item 5 above; (iii) the resulting liability and any related assets contributed to [the HMOs] with respect to the Additional PDR relating to periods after the Effective Time would not be considered when determining whether the $10 million Adjusted Book Value closing condition has been met; and (iv) [AmCareco] would not have any materially adverse tax or capital consequences because of such mechanism. (Emphasis added.)
This paragraph repeatedly refers to “Additional PDR” to distinguish it from the existing PDRs with which the HMOs were operating. At this time PDRs were not required by law in Louisiana and Oklahoma; apparently the HMOs in those two states operated with PDRs by choice. La. R.S. 22:2010; 36 Okl.St.Ann. § 6913.
Paragraph 5 referred to in paragraph 6 of the Side Letter provides as follows:
5. In the event that one or more regulatory authorities do not allow [Health Net] to effectuate all or a portion of the Cash Sweep, [AmCareco] agrees that it shall pay to [Health Net] at |g77Closing as part of the purchase price for the Shares of [the HMOs] an amount of cash equal to the portion of the Cash Sweep not so allowed (the “Sweep Shortfall”), and [Health Net] agrees that the Adjusted Book Value used to calculate the number of shares of Class A Preferred Stock to be issued to [Health Net] at Closing shall likewise be reduced by the amount of such Sweep Shortfall.
As previously indicated in Part IX of this opinion pertaining to sham, pursuant to the law of Delaware when interpreting a contractual provision, a court attempts to reconcile all of the agreement’s provisions when read as a whole, giving effect to each and every term. Council of Dorset Condominium Apartments v. Gordon, 801 A.2d 1, 7 (Del.2002). When the Health Net and AmCareco contract and Side Letter are construed together pursuant to this admonition, the following pertinent contractual facts are evident: (1) a designated amount of assets and equity would remain in the HMOs; (2) Health Net would receive a cash payment out of the balance of the assets and equity left in the HMOs; (3) Health Net would receive less than a majority of the stock issued by AmCareco; (4) all intercompany accounts would be settled (the receivables would be collected and the payables would be paid); and (5) Health Net would receive back from the *497HMOs any additional PDR loaned116 to an HMO to maintain a PDR either as part of the Cash Sweep or the Sweep Shortfall procedure.
The closing did not take place on or before January 15, 1999, as provided for in the Side Letter or on or before January 31, 1999, as provided for in the Stock Purchase Agreement. Thereafter, Heath Net loaned $4,000,000 to the Texas HMO for its PDR and loaned $2,300,000 to the Louisiana HMO for its PDR.117 No additional PDR cash was loaned to the |27sOklahoma HMO. As previously indicated, donations and loans can be legitimate contracts with a corporation when the corporation is closely held by a natural person or is affiliated with another corporation.118
2. The Financial Spreadsheet For The Sale119
Health Net provided Shattuck Hammond with the financial information necessary to prepare the Form-A spreadsheet (sometimes referred to as “the balance sheet.”). Shattuck Hammond prepared several different formats of a spreadsheet and circulated them to the interested parties for their consideration. The final format utilized is entitled FHS CASH SWEEP AND PREFERRED A SHARE CALCULATION. The letters of transmittal by which the spreadsheet was sent to the three Regulators state that “[t]his schedule contains the most current estimate of what the expected book value of the three HMOs will be at the time of closing,” and that “[i]t is based on the balance sheets of each of the HMOs for the period ending March 31, 1999.” (Emphasis added.) The spreadsheet does not reflect cash received through the sale of Class B preferred and common stock. It is divided into four sections entitled Louisiana, Oklahoma, Texas, and Combined, and each section has three columns representing the balance sheet money line item number for the reporting date, the pertinent financial change resulting from the contract, and the financial balance sheet money number after the change. The general categories listed vertically for each column are: (1) total assets; (2) total liabilities & equities; (3) AMCARECO CASH REQUIREMENTS; (4) ADJUSTED CASH IN PLANS; and (5) ADJUSTED CASH IN PLANS | abased on book value. Each of the general categories listed various items. The final format used was prepared by Susan Conway, a lawyer who represented AmCareco, and the same spreadsheet was filed by her with each Form-A filed with the three state Regulators.
When the pertinent provisions of the Stock Purchase Agreement are considered with the format of the spreadsheet, the money numbers that represent those provisions are: (1) the Required Amount of assets and equity to be left in the HMOs by Health Net; (2) the Cash Payment (sometimes referred to as the FHS or Health Net Cash Sweep) to be paid to Health Net; (3) the number of shares of AmCareco Class A Preferred stock that Health Net was to receive; (4) the effect of- the intercompany settlement of accounts; and (5) the amount of money Health Net was entitled to receive in pay*498ment to settle the loans given to the Louisiana and Texas HMOs for their additional PDRs.
a. The Oklahoma Spreadsheet
The Oklahoma spreadsheet reflects the following: (1) cash result due to settlement of intercompany payables and receivables — $1,735,619; (2) payment to Health Net “Cash Contributed [loaned] by FHS to Fund Premium Deficiency” of Oklahoma HMO — $0; (3) cash increase in paid-in capital due to reversal of pre-existing PDR — $3,309,990; (4) cash “Required Amount” for AmCareeo — $4,333,021; (5) Health Net “Cash Payment” cash sweep— $2,903,761; (6) Health Net (FHS) contribution on the purchase price of AmCareeo stock — $4,599,761; and (7) book value of adjusted cash in the Oklahoma HMO— $7,503,522.
The record reflects that the Oklahoma regulating authority did not object to the format used to present this information at the time it was LsoPresented or when the application was approved. Nora House, financial analyst for the Oklahoma Department of Health in 1999 (the department charged, at that time, with oversight of HMOs in Oklahoma) testified by deposition that she reviewed AmCareeo’s Form-A application and the spreadsheet which accompanied the application. House stated the side letter and the spreadsheet revealed the reversal of the PDR, and the application disclosed the cash sweep from the Oklahoma HMO to Health Net.
b. The Texas Spreadsheet
The Texas Spreadsheet reflects the following: (1) the cash result due to settlement of intercompany payables and receivables — $2,436,109; (2) payment to Health Net of PDR loaned to Texas HMO— $2,920,123 ($4,000,000 less $1,079,877 that was amortized); (3) cash increase in paid-in capital due to reversal of pre-existing PDR — $3,584,364; (4) cash “Required Amount” for AmCareeo — $5,971,077; (5) Health Net “Cash Payment” (FHS) cash sweep — minus $1,079,877 (PDR amortization); (6) Health Net (FHS) contribution on the purchase price of the AmCareeo stock — $3,807,117; and (7) book value of adjusted cash in the Texas HMO— $6,727,240. The net amount of cash lost by the Texas HMO due to the sale was the payment to Health Net of PDR money loaned to the Texas HMO of $2,920,123 less the cash increase due to the settlement of the intercompany payables and receivables of $2,436,109 which results in $484,014, the amount agreed to by the Texas Regulator.
The order approving the acquisition and control of the Texas HMO via the sale of its stock was recommended by Licette Es-pinosa, a senior financial analyst in the Financial Monitoring Division of TxDOI and Eileen J. Shiller, a Holding Company Specialist in the Financial Division of TxDOI, and approved by Betty Patterson, Senior Associate Commissioner for the Financial Department of TxDOI, on behalf of Jose’ Montemayor, Commissioner of Insurance of TxDOI. Health Net introduced the deposition testimony of Espino-sa, Jose Daniel Saenz (head of Financial Monitoring for TxDOI), and Patterson120 at the trial.
Espinosa testified that she reviewed the Form-A submitted by Conway on behalf of AmCareeo, understood the “cash sweeps calculation and this spreadsheet,” and recommended approval of the application to Patterson. Espinosa also testified that she understood “what the estimated cash payment was going to be out of the Texas HMO to [Health Net] as of the acquisition” *499and that she was “not going to recommend approval of a Form-A application, unless ... all the requirements of the Texas Insurance Code had been satisfied.” Espi-nosa then gave the following pertinent testimony:
Q. Well, let me ask you that question then. Ms. Espinosa, do you have any reason to believe that AmCareco or anyone acting on their behalf mislead [sic] you in any [way] in the Form-A application process?
A. No.
Q. Do you have any reason to believe that AmCareco or anyone acting on them behalf withheld material information from you in connection with the Form-A process?
A. No.
Q. Do you have any reason to believe that AmCareco or anyone acting on their behalf mislead [sic] anybody at [TxDOI] in connection with the Form-A process?
A. No.
Q. Have you ever heard anyone at [TxDOI], any of your colleagues involved in the Form-A application process say that |2R2AmCareco or anyone acting on their behalf provided misleading information?
A. No, I have not.
Q. Did any of — have you ever heard of any of your colleagues at the Texas Department of Insurance that were involved in this Form-A application process, have any of them ever said to you that they learned that AmCareco or anyone acting on their behalf withheld material information in connection with the Form-A process?
A. No.
[[Image here]]
Q. But if you take a look at the side letter agreement, which is exhibit-288, and in particular paragraph six of that side letter agreement, you can see that you had at the time some information about what was going to happen if there had to be a premium deficiency reserve established and then how that would be handled in a closing agreement between AmCareco and Foundation. Do you see that?
A. Ido.
Q. And am I — as you sit here today and read that information, is it clear to you that — that if the closing didn’t take place on January 15th, 1999 — and incidentally, we know that closing didn’t take place then did it?
A. No, it did not.
Q. So if it didn’t take place by January 15th, 1999 and [Health Net] was required to have a premium deficiency reserve, that [Health Net] and AmCare-co were going to, in some way, figure out a way to get [Health Net] back the money they had to contribute to establish these premium deficiency reserves?
A. Correct.
Q. Let’s take a look at Exhibit-40. Have you got that in front of you?
A. Ido.
Q. And Exhibit-40 is a letter to Conway, AmCareco’s lawyer, wrote [sic] to you dated April 12th, 1999[. I]s that correct?
A. That’s correct.
Q. And if you look on the seventh page of the attachments to that letter, you’ll see a chart that says, AmCareco, Inc., Financial Analysis for AmCare Health Plans of Texas, Inc., ^currently know as Foundation Health, A Texas Health Plan, Ine.[ I]s that right?
A. That’s correct.
Q. And if you look at this chart, does it show you what [Health Net] ivas reporting per their annual statement for *500the year ending 12-31, 1998 for certain Financial data?
A. It does.
Q. And if you look down to the lower left-hand comer, does it show you what [Health Net] was recording as a premium deficiency reserve as of 12-31, 1998? A. It does.
Q. And ivhat was that number?

A. Four million four seventy-one six six nine.

Q. Okay. And then if you slide across, does it show you whether AmCare Health Flans of Texas was projecting— or what AmCare Health Plans of Texas was projecting for the following year 12-31, 1999 with respect to the premium deficiency reserve ?
A. It doesn’t have any amounts.
Q. All right. So your assumption would have been, that while Foundation had reported approximately U.U million for a premium deficiency reserve as of 12-31-98, AmCare Health Plans of Texas was not projecting reporting any premium deficiency reserve for 12-31-98?
A. Correct.
Q. All right. Let me also have you look at Exhibit 48-A again, and you’ll recall this was the schedule that was attached to Ms. Conway’s April 30th, 1999 letter to you?
A. Correct.
Q. And if you look at Exhibit 48-A, the blowup, you can read it a little better, if you’ve got that handy.
A. I think they’re probably about the same.
Q. And take a look under the category, Liabilities and Equities. Are you with me?
A. I am.
128<i Q' And yes, under the category, Liabilities and Equities, there is a subcategory that says, and it’s hard to read, but it says, either restricting or restructuring, and then there’s a slash, and it says, premium, and then def, period. Are you with me?
A. No, I’m not.
Q. I’m going to — I’m going to point it out to you.
A. Okay.
Q. Right there.
A. Oh, I was looking down here.
Q. I’m sorry.
A. That’s okay. Okay. I’m with you.
Q. You are with me, okay. And premium def, would you interpret that to mean premium deficiency?
A. Yes.
Q. Okay. Let me read that into the l-ecord and ask that you follow along with me. As indicated on the schedule, the closing transactions consist of a cash infusion into the Texas HMO by [Health Net] of two million four hundred thirty-six thousand one hundred nine dollars to cover the net intercompany receivable, offset by a calculated cash sweep of, and then we have the number, dollar sign, two million nine twenty one ninety-three struck through, and above it in handwriting two million nine hundred twenty one hundred twenty-three dollars. This results in a net cash withdraw from the Texas HMO by [Health Net] of, and then we have struck through, four hundred eighty-four thousand eighty-four dollars and replaced with four hundred eight-four thousand fourteen dollars, and will result in the Texas HMO having total equity of three million eight hundred seven thousand one hundred and seventeen dollars after the closing. Did I read that correctly?
A. You did. (Emphasis added.)
Saenz testified that “[w]e were aware of the — sweeps as was [sic] described by the *501applicant and we approved the order with those representations.” As the head of Financial Monitoring, Saenz would review the analyst’s (Espinosa’s) work and recommendation and, if he approved, he would bring it to Patterson for her approval. According to Saenz, important | ^considerations in acting on this application was Lueksinger’s “very good reputation” and the fact that he “had done a very good job of turning operations around at NYLCARE.” The Texas HMO was a “troubled” company because it was losing money and Health Net had apparently placed it in a “run-off’ (wind down) position; however, a sale was “much less disruptive for the industry than runoff.” Sanez stated that based on Lucksinger’s “experience with NYLCARE” that he “would do a better job than [Health Net] had done with the HMO” and that he would “try to work through all the problems that [Health Net] was having by acquiring it and attempting to turn the operations around to make it a profitable operation.” Saenz also gave the following pertinent testimony:
Q. So would you agree with me that the letter agreement, Exhibit-288, provides for [Health Net] to recover so much of the additional premium deficiency reserve established for any of the HMOs including the Texas HMO that had not been amortized as of the day before the closing of the change of control?
A. The — based on the agreed upon date of closing, right?
Q. Yes, sir.
A. Okay. Yes.
Q. So [Health Net], under this side letter and under the purchase agreement with AmCareco, ivas entitled, to get hack the unused portion of the premium deficiency reserve.
A. For any of the premium deficiency reserve that is established for — subsequent to January 15, 1999.
Q. Yes, sir.
A. Yes.
[[Image here]]
Q. So at the time that the Department approved the change of control over the Texas HMO from [Health Net] to Am-Careco, the Department Icneiv that [Health Net was] going to recover [its] equity, a portion of [its] equity in the Texas HMO plus the unamortized portion of the premium deficiency reserve.
IgjfiA. That was ivhat ivas disclosed in the application, yes.
Q. And if the Texas Department of Insurance had a problem with that, it would not have approved the Form-A, would it?
A. Yes.
Q. Yes, it would not have approved it?
A. Yes, we would not have — if—based on what we had at that point in time, we got comfortable with what was filed.
Q. There was nothing that was hidden from the Department in this — in this transaction, was there?
A. Not from — based on the application and what was submitted, no.
[[Image here]]
Q. Now let me hand you what has previously been marked for identification as Exhibit-48. I’m going to ask you to take a couple of minutes or so to familiarize yourself with the exhibit before I ask you any questions about it.
A. Okay.
Q. Now let’s look at the next paragraph in this letter. I am going to ask that you follow along as I read it into the record. As indicated on the schedule, the closing transactions consists of a cash infusion into the Texas HMO by [Health Net] of $2,436.109.00 [sic] to *502cover the net intercompany receivable, offset by a calculated cash sweep of, and then we have a number crossed out and handwritten in with a line, $2,920,123.00. This results in a net cash withdraw from the Texas HMO by [Health Net] of, and we have another number that’s crossed out and handwritten below it, $484,014.00, and will result in the Texas HMO having total equity of $3,807,117.00 after the closing. Did I read that correctly?
A. Yes.
Q. You understand that [Health Net] put a little over $2.4. million into the company, into the Texas HMO, and then took out a little over $2.9 million, for a net payment to [Health Net] of almost a half million dollars%?
A. Yes.
Q. Now if we look at the schedule— and you see there is up at the top an entry, TX 3/31?
A. Yes.
_Jjj7Q. And then there are three columns under the TX that become one column about two-thirds of way down the schedule. Are you with me?
A. Uh-huh, yes.
Q. Let’s look at the very last four rows of the third column of numbers moving from the left. You see there is a negative $4 million there?
A. Yes.
Q. And below that there is the number $1,079,877.00.
A. Yes.
Q. And if I subtract $1,07[9],877 from four million, I get $2,920,123.00 or the same amount that Ms. Conway is disclosing in the paragraph that we read into the record for the gross cash sweep by Foundation.
A. Yes.
[[Image here]]
Q. Now turning our attention to Exhibit-447 [the Closing Agreement] which at paragraph 3(q) I believe referred to treating the premium deficiency reserve as a restructuring reserve?
A. Yes.
Q. Is it inconsistent to characterize the premium deficiency reserve as a restructuring reserve with the treatment of the premium reserve as a runoff reserve or a reserve against losses to be incurred in runoff?
A. It — that could be part of their assumptions in determining the reserve, yes.
Q. Let’s go back over that a moment. I think we established in my questions to you earlier this afternoon that foundation was to receive the portion of the reserve — premium deficiency reserve that had not been amortized as of the day before closing.
A. That’s correct.
Q. And that turned out to be April 29, 1999.
A. Well, maybe I misinterpreted before when I was answering because I thought that the agreement stipulated that the closing should have occurred prior to January 15.
|2SsQ. Right, and the side letter to the a^i’eement, Exhibit-288 that you and I looked at, said that if the agreement, if the sale did not close before January 15, 1999 and if [Health Net], the parent company — strike that. And if Foundation [sic], the Texas HMO had to put in place a premium deficiency reserve, then when the sale closed the parent company [Health Net], [was] to receive the unamortized portion of the premium deficiency reserve that had been put up by the Texas HMO.
A. Well, maybe I am interpreting what — what I read in that — in compari*503son to you’re saying, because the way I am — I am interpreting it is that if [Health Net] was required to include some additional premium deficiency reserve for that period subsequent to January 15th, that date that was agreed upon, that that was the portion that they would be getting back, the unamortized portion of that. But that anything prior to that was to remain on the books.
Q. We are on the same page.
A. Okay.
Q. We’re on the same page.
A. Okay.
Q. In other words, to the extent that any of the premium deficiency reserve that [Health Net] had to put up was amortized, [Health Net] did not get that part back.
A. Okay.
Q. Right?
A. Yes.
Q. It only got the unamortized portion.
A. Okay.
Q. That is, the part that would relate to the company after the change of control to AmCareco.
A. Okay.
Q. Are you with me?
A. To a certain degree, yeah.
Q. Is that inconsistent with what Mr. George [Counsel for the Texas Receiver] had you read into the record at paragraph 3(q) in Exhibit-447?
| asa A. I don’t see a difference, no. (Emphasis added.)
Betty Patterson testified that Licette Espinosa worked under her direct supervision, she was a competent employee and she was not aware of any problems with her performance. She then gave the following pertinent testimony:
Q. All right. And you, as you sit here today, you’re certainly not testifying, are you, that somebody made a misrepresentation to the Texas Department of Insurance in connection with the Form-A application.
A. No, I’m not testifying to that.
Q. And as you sit here today, you’re not aware of anybody making any statements to the Texas Department of Insurance about this — AmCareco’s acquisition of Foundation [sic] that was in any [way] false and misleading, correct?
A. That’s correct.
The Texas Receiver called Mary Keller who was tendered as “an expert witness on the practices and the policies of the Texas Insurance Department.” After voir dire, the trial court judge expressed “the opinion that she has demonstrated and should be qualified as an expert in the field of insurance having served as the Senior Associate Commissioner of Insurance. And she may give an opinion if she has reviewed the requisite evidence, documents, [and] exhibits to place her in the position to give opinions in this case.” Subsequently, Keller gave the following opinion testimony:
Q. And I want to know first, during that period of time do you have an opinion whether or not Health Net Foundation actively participated in false, misleading, and fraudulent information being given to the Department of Insurance?
A. On this matter or any matter?
Q. In the matters relating to this HMO in the same time period. Because some are interrelated like filing the false — a financial statement preparatory to this transaction that was false.
A. Okay. Yes, I do have an opinion.
| antiQ- What is it?
A. My opinion is that the department viewed the filings of [Health Net] during the time period about this HMO to be *504false and inaccurate on a number of occasions. There is an analyst’s report, I think it was the March of 1999 filing that was subsequent to the filing, and the analyst says the report is not accurate, we’ve had to discuss this with [Health Net] on a number of occasions and they’ve had to refile it and amend it and they considered it actually a fact for a hazardous financial condition to be one of those factions is if you’re not reporting accurately and it was a trigger.
[[Image here]]
Q. And it’s an exhibit in this case and if I was a better lawyer I wbuld remember the exhibit number but I don’t. And so in that context after reviewing this, did you get some opinion as to whether or not they participated in any other way in connection with the Form-A filings itself that was false, deceptive, and dishonest?
A. Yes.
Q. What is your opinion?
A. My opinion is that the Form-A, which was the product of information given by Health Net, was false and misleading because the Form-A basically said that this HMO would be — would have the statutory minimum, would comply with all Texas law once the Form-A was approved. And so it did not comply with Texas law once the Form-A was approved, so it is my opinion that that representation to the department was a false and misleading representation.
[[Image here]]
Q. After the closing have you looked at analysis of the materials to determine whether or not, as you understand the practices of the department, Health Net remained in control?
A. Yes.
Q. Assuming that what they think happened or what they were trying to make happen actually happened, which Judge Clark or the jury may ultimately decide they were wrong, but putting that aside, let’s assume that it did happen, something like that, and they only owned forty-seven per cent with the rights we’ve talked about. What is your conclusion about whether they had control then?
A. It is my opinion that the department of insurance would consider that Health Net was still a controlling party for purposes of regulation.
1291Q* Why?
A. The essence of a controlling party is an entity that has the ability to directly or indirectly affect how something is managed. And it’s my opinion, based on the authority that Health Net retained after the transfer, that they were still a controlling party in the department’s viewpoint, that they had forty-seven percent of the stock, they had rights to basically disapprove loans that were made. They had a right to call in $2 million. They had preferential rights in tei’ms of who got paid first. Their stock was preferential stock. And when you just look at the — how, in fact, the HMO was operating and who was told about things, they were always on the list of people who were informed about the financial situation of the HMO. So they were — in my opinion, they were an entity that the HMO notified as things, well, progressively got worse, but all those things together, it would be my view that the department would consider Health Net a controlling entity.
Q. Is it about the power to direct, either power derived from contract or directly or indirectly to direct people’s activities so that a father can tell the son who owns the insurance company what to do? That’s still — even though the father doesn’t own a share, that’s still control.
A. That could be, absolutely, yes.
*505[[Image here]]
Q. Do I have it right, that to render the report that you gave to Mr. George [Counsel for the Texas Receiver], your expert report, you assumed the facts given to you by Mr. George were true?
A. I did.
Q. And you are basing your opinions on what Mr. George has told you. Is that right?
A. To a certain degree, yes.
Q. And, in fact, haven’t you said before that you’re not going to be a fact witness?
A. Well I am — I guess 1 am not going to be the person that anybody relies on specifically for facts, but I did try and verify the facts given to me so I ivas comfortable that they were true.
Q. And isn’t it also true that you’re not giving the opinion ivhether or not AmCare Health Plans of Texas immediately after its acquisition by AmCareco and the cash sweep met the statutory requirements for minimum capital in Texas?
A. I am assuming that to be true.
| g<)2Q. You’re assuming it. You’re not—
A. I am not rendering an opinion — I am, not a financial analyst. I am not rendering an opinion that the Texas HMO did not meet the standard. I assume that is the case and that that will be established for the jury. (Emphasis added.)
Keller did not discuss Tex. Bus. Corp. Act art. 2.21, Tex. Ins.Code § 843.401 or Willis v. Donnelly, 199 S.W.3d 262 (Tex.2006) 121 in her testimony. See discussions in Part VI, Sections D1 and 2 of this opinion.
The official order of the Texas Commissioner of Insurance provides, in pertinent part, as follows:
13. As of December 31,1998, [The Texas HMO] had assets of $11,000,000, net worth of $700,000, and net loss of $4,900,000. As of March 31, 1999, [The Texas HMO] had pretax income of $382,000.
14. No evidence was presented that immediately upon the change of control [the Texas HMO] would not be able to satisfy the requirements for the issuance of a new certificate of authority to operate as a health maintenance organization as it is presently licensed to do.
[[Image here]]
16. No evidence was presented that the financial condition of [AmCareco] is such as might jeopardize the financial stability of [the Texas HMO] or prejudice the interest of its enroll-ees or the interests of any remaining shareholders who are unaffiliated with such acquiring party.
17. No evidence was presented that the [AmCareco] has any plans or proposals to liquidate [the Texas HMO], sell its assets, consolidate or merge it with any person, or make any material change in its business or corporate structure or management, that are unfair, prejudicial, hazardous or unreasonable to the enrollees or shareholders of [the Texas HMO] and not in the public interest.
18. No evidence was presented that the competence, trustworthiness, experience and integrity of those per- ' sons who would control the operations of [the Texas HMO] are such that it would not be in the interest *506of the enrollees of [the Texas HMO] and of the public to permit the acquisition of control.
|29Sc. The Louisiana Spreadsheet
The Louisiana Spreadsheet reflects the following: (1) cash deficit due to settlement of intercompany payables and receivables — $980,671; (2) payment to Health Net of PDR loaned to Louisiana HMO (cash contributed by FHS to Fund Premium Deficiency) — $2,300,000; (3) cash increase in paid-in capital due to reversal of pre-existing PDR — $1,421,764; (4) cash required for AmCareco — $6,511,481; (5) Health Net (FHS) “Cash Payment” cash sweep — $243,531; (6) Health Net (FHS) contribution to the purchase price of the AmCareco stock — $5,216,488; and (7) book value of adjusted cash in Louisiana HMO — $7,760,019. The ADJUSTED CASH IN PLANS and the Book Value ADJUSTED CASH IN PLANS vertical categories specifically provided as follows:
ADJUSTED CASH IN PLANS
Cash in Plans Plus $9,055,012 •
Less Cash Contributed by FHS to Fund Premium Deficiency (2.300,000)
6,755,012
FHS Cash Sweep 243,531
ADJUSTED CASH IN PLANS Book Value $7,760,019
Less Cash Contributed by FHS to Fund Premium Deficiency (2,300,000)
FHS Cash Sweep (243,531)
Plus FHS Cash Contribution $5,216,488
The parentheses around the numbers 2,300,000 and 243,531 indicate numbers with a negative value in the Louisiana HMO; the sum of these two numbers is a negative $2,543,531, the total amount of cash that was “swept” from the Louisiana HMO.
Health Net called as a witness Gary Smith, Accountant Manager for the Accounting Department for LaDOI, who previously had worked in the ^Office of Financial Solvency and who, while there, did an Acquisition Review of AmCareco’s application for the purchase of the stock of the Louisiana HMO.122 In his testimony and in the review, Smith made the following pertinent observations: (1) “AmCareco will not pay any money to FHC [Health Net].”; (2) “The cash transferred to FHC will be taken out of FH [the Louisiana HMO] and will be in the amount of FHC’s equity in the company....”; (3) “It appears under the Sch. 2.2 financial statement (date appears to be 9/98) that FH will have $670,781 swept out at closing which will remain with FHC”; (4) “Exhibit B, 2, 8 indicates that withdrawal may occur if transaction is not completed. According to Schedules 4.3 and 7.3, FH has plans to ‘complet[e](ly) withdraw ... from the Louisiana market.’ ”; and (5) “Exhibit B, 2, 6 indicates that if closing occurs after 1/15/99, an additional premium deficiency reserve (‘PDR’) must be reported which would require negotiation for an adjustment to the cash sweep.” (Emphasis added.)
Also attached to the Louisiana Form-A Application is a memorandum from Denise Brignac, Assistant Chief Examiner, to Mike Boutwell, Company Licensing, dated April 26, 1999, that provides as follows:
A review of the Form-A application submitted by AmCareco, Inc. for the acquisition of Foundation Health, A Louisiana Health Plan, Inc. revealed a significant number of concerns as evidenced by the attached [Smith’s acquisition review],
A meeting held April 23, 1999 between this Department and representatives from both Foundation Health and Am-*507Careco alleviated most of these concerns.
However, I am still bothered by AmCa-reeo’s ability to provide future funding if Foundation Health continues to report net losses and is in need of a surplus infusion.
| ^Therefore, I recommend approval of this Form-A application only [if] Foundation Health is required to maintain a higher minimum net worth at all times. Recommended net worth requirement is $4 million.
A hearing was held on April 30, 1999, before Joe Wills, Hearing Officer for the Commissioner of Insurance, at which it was found that the “acquisition” was “in the best interest of policyholders and the citizens of this state.” The application was approved subject to the condition that “[T]he capitol [sic] of Foundation Health, a Louisiana Health Plan shall at all times remain at a minimum of $4,000,000 (Four Million Dollars)”.
Brignac, currently the Deputy Commissioner, Office of Financial Solvency, Louisiana Department of Insurance, was called as a witness by the Louisiana Receiver. She testified that she was the Assistant Chief Examiner for this application. She further testified that “[w]hen the Louisiana HMO filed its 12-31-98 annual statement, which was due March 1st of 1999, it reported surplus of approximately seven hundred thousand dollars, which was below the $3 million requirement at that time.” On or about March 12, 1999, Shawn Camper, a Health Net Staff Accountant, sent a wire transfer of $2.3 million to the Louisiana HMO and advised Brignac that it was a “$2.3 million capital infusion” or “capital contribution.” The money came from Qualmed, a Health Net subsidiary, and Brignac understood that it “was necessary to get it up to the basement minimum required by Louisiana law at that time.”
The April 23, 1999 meeting was scheduled to address the concerns raised by Gary Smith. Attending the meeting representing LaDOI were Brignac, Craig Gardiner, and Smith; Lucksinger attended representing AmCareeo; Gil Dupree attended representing the Louisiana HMO. Brignac “stated at that meeting that if the six hundred and seventy thousand dollars _j296[the proposed sweep in the application] was going to come out of the Louisiana HMO, [she was] not going to approve the transaction.” She requested that “a new cash sweep calculation be provided to the department” and that a specific amount be indicated.
At approximately 8:50 P.M. on April 29, 1999, LaDOI received the revised proposed cash sweep schedule. Susan Conway of Vinson & Elkins submitted it on behalf of AmCareeo to Mike Boutwell who gave it to Brignac. As previously indicated, the revised cash sweep was shown as “FHS Cash Sweep (243,531).” The revised schedule also continued to carry the entry of “Less Cash Contributed by FHS to Fund Premium Deficiency (2,300,000)” in two places. Brignac testified she and LaDOI got the revision and reviewed it “before any approval by the Louisiana Department of Insurance.” In response to the question “when you see something in parentheses ... what does it mean?” she responded “[I]t means you’re taking it away from the balance.” Brignac testified as follows about the $243,531 and $2,300,000 entries:
Q. [By MR. CULLENS, Counsel for the Louisiana Receiver]: Did that satisfy your concerns that you had at the April 23rd, 1999 meeting about the amount of the cash sweep?
A. Yes.
Q. Why is that?
*508A. It was not the original six seventy that they had filed. It was much less. The Department of Insurance could live with it, and it was my appreciation that the two forty-three, if it was going to be swept out, it was going to be done during the true-up period.
Q. And when — what was your understanding of when the true-up or when that two hundred and forty-three thousand was going to be swept out of the HMO?
A. At least, I think twelve months from the date of the approval.
12a7Q. So it was not your understanding that even that two hundred and forty-three thousand was coming out within the next day or so from the HMO?
A. No.
Q. And it certainly was not your understanding that 2.3 or 2.5 million was coming out of the Louisiana HMO almost immediately after the transfer?
A. No.
Q. Had you known, had you understood, Ms. Brignac, that about 2.5 mil-, lion was going to come out of the Louisiana HMO almost simultaneously with the closing or the approval of the transaction, would you have approved of this transaction?
[[Image here]]
A. I would not have recommended that the Form-A be approved, if I had known $2.3 million was going to be swept out of that plan.
Q. In fact, you had mentioned at the meeting a week before if it was as low as six hundred and seventy thousand, you weren’t going to approve it?
A. Right, if I’m concerned with six seventy, I’m definitely concerned with 2.3 million.
Q. Lei’s look, and it’s probably easier to follow along on the exhibit-568, but look at the schedule. It’s about — it’s one or two- lines. It’s right above the Ihighlighted line, [FHS] cash sweep. It reads less, I think it reads, less cash contributed by FHS to fund premium deficiency. Is everybody with me? Are you with me. Ms. Brignac?
A. Yes.
Q. . How did you, personally, as the person most involved in the approval of tins transfer, how did you interpret that line on this schedule that you got either the niglht before or the morning of the hearing relating to tins transfer?
A. The 2.3 was the amount that [Health Net] had infused into the Louisiana plan back in March of 1999.
Q. And that’s that exhibit we looked at, 881?
A. Yes.
Q. That one?
| 29sA. And when we received this schedule, and I reviewed it, I reviewed it only for the amount that ivas going to be swept out, which was the two forty-three. I did not think that the 2.3 above that •was going to be swept out.
Q. Isn’t that clear as a bell Ms. Brig-nac, that if you look at that line, that that money is coming out of those HMO’s [sic]?
A. It’s clear as a bell to me that two forty-three is going to come out. Are you talking about the two forty-three or-ibe 2.3?
Q. No, I’m talking about that less cash deficiency in the parentheses. You can’t — that’s not clear as a bell that that money is going to leave the HMO right after the approval?
A. Not to me.
[[Image here]]
[BY MR. PERCY, Counsel for Health Net]:
*509Q. And there has been what has been referred to in this litigation as the letter agreement. You’re familiar that there -was a letter agreement also submitted with the form-A application, or do you recall?

A. There ivas what we refer to or has been referred to as a side letter, yes.

Q. Okay. You do recall there was a side letter.
A. I do know that there was a side letter.
Q. Is it fair to say that you don’t recall ever having reviewed the letter agreement, what you have referred to as the side letter?
A. I don’t recall reviewing the letter agreement, no, sir.
[[Image here]]
Q. Cash in an HMO, how. does it get reduced?

A. Well. Typically they either ivrüe a check or wire it out.

Q. So a reduction of cash, occurs by sending that cash out of the plan, correct?

A. Hopefully they are sending it to a provider or a patient.

Q. But you understand ivhen you show a negative cash that means cash is leaving the plan, correct?

A. That’s right.

[[Image here]]
hoiiQ. Let me ask you this. When you got this cash spreadsheet, did you call Mr. Gary Smith in who actually reviewed the Form-A and say, Mr. Smith, you reviewed all these documents. Sit down here with me and let’s go through this cash spreadsheet and make sure everything marries up with what the agreements say. Do you remember doing that?
A. I don’t recall doing that now.
Q. Did you pull out, when you were reviewing this cash spreadsheet, did you pull out the agreements to read the agreements, the relevant sections of the agreement, to make sure the cash spreadsheet married up to the agreements?
A. I don’t recall matching the cash sweep to the stock purchase agreement.
Q. So with that in mind, what did you understand was being reflected over there? Did you understand that those were the requirements of cash to be left in the plans pursuant to that agreement?
A. I am not sure.
Q. Well, then what did you understand that whole section to be?
A. As I testified before, Mr. Percy my interest in this cash sweep statement was the amount of money the Department of Insurance thought would be leaving the Louisiana, plan. I don’t know how else I can say it. The first cash sweep said six seventy. We had a meeting and no one at the meeting disputed the six seventy. They never said 900,000, never said 2.3. They never said 2.5. They didn’t dispute our review of the cash sweep at the six seventy. That is what we thought was leaving the plan.
Q. And you got this fax and reviewed it?
A. Yes.
Q. So you don’t know what you understood the AmCareeo cash requirements to be reflecting in that section. Would that be fair?
A. Yes.
Q. And you didn’t know at that point?
A. Right.
Q. Let’s move down to the next. What’s the title of the next section?
| aonA. Adjusted cash in plans.
*510Q. What did you understand this section to be reflecting for you on this spreadsheet?
A. For the purpose of the cash sweep, they were calculating — it was calculating the cash sweep, the amount of payment that was going to be made to [Health Net] at sometime in the future.
Q. The first entry under adjusted cash in plans gives you the total amount of cash in the plans, correct?
A. That’s correct.
Q. And did you determine when you reviewed this that it married up with what ultimately was up there after the adjustments?
A. Yes.
Q. And you did — you recall making that calculation?
A. Well, I know you and I made that calculation in my deposition. But yes.
Q. You did that back then. And then—
THE COURT: What is your answer?
A. Yes.
BY MR. PERCY [Counsel for Health Net]:
Q. And after it shows the amount of cash in the plans under adjusted cash in plans, the next item is plus. Is there anything shown in the plus column?
A. No.
Q. The next item is — read the next line.
A. It says, less cash contributed by FHS to fund premium deficiency.
Q. And then it slums a number at the end of that column in parentheses [ (2,300,000) ]. I think we have already gone over this, that when you see an adjustment in parentheses, what does that mean?
A. It means it’s being deducted.
[ m Q. So you got cash in plans and then you got something being deducted. How do you deduct something from cash? What happens when you deduct something from cash?
A. Well, on this spreadsheet it’s just a book entry. If you are talking about money leaving a bank account, you have to write a check or wire it out. But this is a spreadsheet and it’s an entry on a spreadsheet. It doesn’t say it’s leaving the plan.
Q. Noto we are not going to quibble over what it says because the words are very clear to the jury what it says. It says less cash contributed by FHS to fund premium deficiency, cowed?
A. That’s cowed.
Q. Who did you understand FHS to be? Did you understand that to be Foundation?
A. Foundation Health Systems.
Q. And then at the very bottom — .first of all, after you subtract that, it gives you another number.
A. Yes.
Q. All right. And did you actually work out a calculation of how you get from that second number, that six million number to the 213,000?
A. No.
Q. You just saw 213,000, didn’t check their figures or anything like that?
A. No.
Q. Do you have any idea as we sit here today how you get to 213,000?
A. No.
Q. You didn’t go and do any of that?
A. No.
Q. And is it your testimony that token it says less cash, you didn’t understand that to mean that was an adjustment to the amount of cash in plans in the *511amount contributed by foundation for the premium deficiency?
A. I understand that this spreadsheet ivas a calculation to get to the cash s'weep. The Department of Insurance ivas under the \mimpression that two forty-three was going to be swept out. I think I have said that numerous times.
Q. All right. But you did understand or you do understand, as we sit here today, that that appears to be a reduction in the amount of cash in the plans of $2.3 million, correct?

A. For the purposes of getting to the cash sweep.

Q. All right. When you got the cash spreadsheet you didn’t ask anyone about that entry, did you?
A. No, I did not.
MR. PERCY: In connection with the witness’s testimony, your honor, I would like to offer, file, and introduce exhibit-887.
THE COURT: Without objection, let it be filed. (Emphasis added.)
Brignac also stated, “when we received this schedule, and I reviewed it, I reviewed it only for the amount that was going to be swept out, which was the two forty-three. I did not think that the 2.3 above that was going to be swept out.”
To her credit, Brignac admitted that she only “reviewed bits and pieces of the Form-A”; she did not remember discussing the spreadsheet with Gary Smith; in a spreadsheet “negative cash ... means cash leaving the plan”; she did not recall “matching the cash sweep to the stock purchase agreement”; the “adjustment in parenthesis” on the spreadsheet “means it’s being deducted” and that the reduction was for the “purpose of getting the cash sweep.” However, she refused to admit that the entry “Less Cash Contributed by FHS to Fund Premium Deficiency (2,300,-000)” found twice on the Louisiana spreadsheet represented cash transferred out of the Louisiana HMO and sent to Health Net as required by the clear and unambiguous terms of the Stock Purchase Agreement and Side Letter. Instead, she asserted that this entry was “misleading,” and she would not have approved the sale had she understood what it did.
I.VThis characterization of the entry is not persuasive and is without factual merit. As previously indicated: (1) the Stock Purchase Agreement provided for a “Cash Payment” to be made out of the assets and equity of the HMOs to Health Net (the original cash sweep); (2) reversal of the existing PDRs; and (3) and, pursuant to the Side Letter, if allowed in whole or in part by a regulatory authority, the payment of any cash loaned by Health Net to an HMO for any additionally required PDR which would be an additional cash sweep or a sweep shortfall for additional stocfc. Because the $2.3 million dollar entry was enclosed in parentheses and deducted from both the Cash in Plan and Book Value line item entries on the spreadsheet, it is obvious that this cash was leaving the Louisiana HMO and going somewhere. It is equally obvious that the cash was not going to AmCareco and the cash was described as being “Contributed by FHS [Health Net]”. There were only three juridical persons affected by the Louisiana spreadsheet: Health Net, Am-Careco, and the Louisiana HMO. Whether the cash is called a “cash infusion” or a PDR, it is still $2.3 million dollars in cash that all three parties proposed would be taken from the Louisiana HMO and sent to Health Net, and it was listed on the spreadsheet. The fact that Brignac did not understand this entry on the spreadsheet in this factual setting does not make this line item entry misleading or fraudulent.
*512Brignac testified that “somewhere around September of 1999” she discovered that “about $2.5 million had actually been swept out of the Louisiana HMO”. Brignac then testified as follows:
Q. How did you find that out?
A. AmCare had to file its second quarter financial statement, which was due August 15th, and it was during the analytical review of that quarterly filing that it was discovered that 2.5 had left the company.
|3n4Q. Were you surprised when you found that out?
A. Yeah.
Q. To say the least? What did you do when you found that out?
A. The Department of Insurance did two things. One, we contacted AmCare, because they no longer met the minimum $4 million surplus requirement.
Q. Let’s talk about that.
A. Okay.
Q. What is that $4 million amount that you’re talking about?
A. It’s — insurance companies, by law have to maintain a minimum surplus, and what your surplus is, is you have the assets of the company and you have your established liabilities, so your surplus is your assets less your liabilities, and it’s kind of a cushion.
Q. And after the cash sweep, based upon your personal involvement, your review of the quarterly filings made by AmCareco and Healthnet [sic], did the Louisiana HMO at any time after the closing meet the $4 million capital and surplus requirement?
A. No, they would not have.
Q. What else did you do, if anything, after finding an HMO did not — was not in compliance with statutory mínimums and that some $2.5 million had come out instead of two hundred and forty-three thousand, like three months after the closing? What else did you do?
A. Like I said, we contacted the insurance company by written communication indicating that they no longer met the minimal surplus requirements. We did receive a response back indicating that they were going to reverse off a premium deficiency reserve and add that amount to their surplus, which I believe brought them close to the four million. Also, there was a meeting held at the Department of Insurance with AmCare representatives. I did not attend that meeting, but our chief examiner did, because we had a current examination in process at that time.
Q. And those discussions that you had personally, those — that was Mr. Nazare-nus and Mr. Lucksinger?
A. I communicated mainly with Mr. Nazarenus.
lansQ- And it was presented to you that any premium deficiency reserve, there was no need for it, we’re just going to take it off the books?
A. That’s correct.
Q. And the effect of taking that premium deficiency reserve off of the books of the HMO, what effect did that have on the income statement of those HMO’s [sic]?
A. It increased their net income, thereby increasing their surplus.
Q. Did Mr. Nazarenus or any one with AmCareco, or anyone with Healthnet [sic] for that matter, ever provide to the Department of Insurance an independent auditor’s certificate or actuarial study indicating that a premium deficiency reserve was no longer necessary for the year 1999?
A. No.
Q. And again, when putting aside what we may know about Mr. Nazarenus now, *513at that time, did you have any reason to disbelieve him?
A. No.
[[Image here]]
Q. Why didn’t you put him into receivership, or take away their license, or do something more drastic in the fall of 1999, after you learned that you had been 'mislead [sic]?
A. You can’t regulate with a knee-jerk recollection. What we do is we afford the company opportunity to correct its problem. So %ue gave — toe turóte to the company. We gave them an opportunity to cure these surplus impairment. Like I said, tue received a response back that they 'were trying to do that. (Emphasis added.)
Edward W. Buttner, IV, the principal expert witness for the receivers, gave the following pertinent testimony concerning the AmCareco spreadsheet submitted to the regulators:123
Q. Look at section 2.1 of the stock purchase agreement. Again, this is an agreement that was submitted to the regulators four to five months before the sale occurred, correct?
A. Yes, sir. Yes, sir, it was.
lannQ. Okay. And what exhibit is your stock purchase agreement, please?
A. Mine is exhibit-765 from Coburn’s deposition.
Q. Okay, exhibit-765. Now section 2.1 of the stock purchase agreement, which was submitted to and reviewed by the regulators, says that this calculation is going to be done based on generally accepted accounting principles, doesn’t it?
A. It does. Absolutely it does.
Q. And, in fact, the calculation was done on generally accepted accounting principles, wasn’t it?
A. And again, Mr. Black, I have taken absolutely no exception to the calculation. I think the calmlation based on the stock 'purchase agreement and generally accepted accounting principles that the Loo parties agreed to, I think the math on that schediule is fine. No exceptions to the math.
[[Image here]]
Q. So, again, it goes back to it’s not that schedule that is misleading. It’s the schedule that wasn’t shown that you say is misleading.
A. No, Mr. Black, I don’t agree with that. I think that schedule is misleading for all the reasons I have articulated.
Q. Okay, Mr. Buttner. Let’s move on to your other schedule which is appendix E. Well, before we do that, Mr. Buttner, this schedule, appendix D, which was submitted by Susan Conway, AmCare-co’s attorney, does show a few things, doesn’t it? It shows exactly the amount of cash being transferred to [Health Net] as a part of the sale, doesn’t it?
A. It does. It shows the cash sweep.
Q. Okay. And it shows exactly how the cash payment was calculated, correct?
A. It does. It shows how the payment’s calculated. (Emphasis added.)
In a letter dated November 3, 1999, Ling Cai, a Financial Analyst with LaDOI, wrote to Lucksinger of AmCareco and advised as follows:
AmCare Health Plans of Louisiana, Inc. reported a net worth of $3,785,007 on its amended 1999 second quarter financial statement filed with this department. This amount is less thanj^the $4 million agreed upon as a condition for ap*514proval of the purchase of the health plan.
Please make the necessary contribution to bring the net worth up to $4 million and notify the department of the contribution as soon as possible.
In an E-mail dated March 24, 2000, Brignac advised Nazarenus of the following:
AmCare Health Plans of Louisiana is required to maintain minimum net worth of $4 million. At 12/31/99, the company reported $3.9 million which [is] below the minimum required.
The company needs to receive a net worth contribution to cure this deficiency. The contribution needs to be made prior to next Friday, March 31, 2000.
Brignac testified that, after the conduct which is alleged to be “misleading” was discovered, Health Net was not contacted. Health Net was not asked to return the $2.3 million dollars that it got out of the Louisiana HMO. The Louisiana DOI did not institute proceedings to nullify the sale or put the Louisiana HMO in supervision, rehabilitation or liquidation. This is not the type of conduct that normally would be expected from a regulatory agency that was “misled” in the amount of $2.3 million dollars.
Based on all these facts, it reasonably can be inferred that there was in fact no “misrepresentation.”
id. The Combined Spreadsheet
The Combined Spreadsheet reflects the following: (1) cash result from settlement of intercompany payables and receivables — a positive $3,191,057; (2) payment to Health Net of PDR loaned to Texas and Louisiana HMOs — $6,300,000; (3) cash increase in paid-in capital due to reversal of pre-existing PDRs — $8,316,118; (4) cash “Required Amount” for AmCareco— $16,815,579; (5) Health Net “Cash Payment” cash sweep — ¡$2,067,415;308 (6) Health Net contribution to purchase price of the AmCareco stock — $13,623,366; and (7) Book Value of the adjusted cash value in the HMOs — $21,990,781.
e. Misleading Parts of the Spreadsheet
The Receivers presented the testimony of Edward W. Buttner, IV, who was qualified as an expert witness in the field of statutory accounting. In his report dated February 1, 2005, and in his testimony given at the trial in June of 2005, Buttner centered his opinions essentially on (1) premium deficiency reserves (PDRs), (2) intercompany transactions involving affiliated companies, and (3) cashless contributions. Based on his conclusions, Buttner was of the opinion that “AmCareco and [Health Net] misled the insurance and managed care regulators to believe that the AmCare HMOs would have adequate capítol [sic] immediately after the Purchase Agreement was consummated, and the regulators approved the Purchase Transaction relying on those misleading representations.”
In particular, Buttner observed as follows in his report:
The intercompany balances were settled and the PDRs were eliminated in determining the adjusted equity for each HMO. In addition, $6.3 million of the capital contributed by [Health Net] to fund the PDRs was deducted from equity of the three HMOs as the $6.3 million was returned to [Health Net] as agreed to in the Side Letter Agreement, and the cash sweep payment to [Health Net] was also deducted from that equity. The combined Adjusted Equity of the three HMOs was represented to be $13.6 million as of March 31, 1999. Thus with a liquidation value of the Am-*515CareCo [sic] Preferred Class A shares of $1,000 per share, the number of Preferred Class A shares to be issued to [Health Net] was 13,623.
In summary, AmCareCo [sic] and [Health Net] falsely represented to the state insurance and health regulators that the three HMOs would have a combined $13.6 million of capital after the Purchase Transaction closed when, in fact, the combined net worth of the three HMOs after the Purchase Transaction closed was a deficit of ($158,000) see Appendix E. |;Wi)AmCareCo’s [sic] and [Health Net’s] representations to the insurance and health regulators were incorrect, false, and misleading for the following reasons:
• GAAP-basis124 amounts were used in the calculation of the cash payment as called for by the Purchase Agreement; however, AmCareCo [sic] and [Health Net] should have also presented the effects of the acquisition-related transactions on the statutory-basis financial statements of the AmCare HMOs.
• AmCareCo’s [sic] and [Health Net’s] presentations (see Appendix D) to the regulators included the elimination of certain restructuring reserves in arriving at adjusted equity. AmCareCo [sic] and [Health Net] had agreed that the PDRs would be considered as a “restructuring reserve” for purposes of the calculation of the cash sweep amounts under the Purchase Agreement and then reversed like other restructuring reserves. However, that agreed-upon treatment did not eliminate the necessity for the Am-Care HMOs to continue to report PDRs in their statutory-basis (GAAP-basis for AmCare-OK) financial statements subsequent to the “closing” of the Purchase Agreement.
Finally, in his testimony at trial, Buttner observed, in pertinent part, as follows:
Q. Can you tell the jury what is wrong with them?
A. Well again, as I testified when I was here I think last week, this concept of taking down these intercompany pay-ables is just not correct. And we spent a good deal of time looking at the documents as it relates to that. And, you know, I testified to a great extent when I was here before, so I don’t want to bore anybody with it again, but not only is it not right but it’s not what the company did. And so to that extent I don’t see how in the world Mr. Jones can intersperse his belief over what the company did and did consistently through the end of the year when they were audited. So that’s the first issue. The second issue is, again we had a lot of testimony about the takedown of PDR’s [sic] and that is not appropriate either. But the one thing that I think is just extremely glaring is that even in Mr. Jones’s report Texas is broke. You know, it’s broke. It’s a million four Ismbroke and all the testimony that Am-Careco coulda, woulda, shoulda, maybe put money in, it didn’t happen.
(1) Premium Deficiency Reserves
As previously indicated, a premium deficiency reserve (PDR) is the estimate of the reserve that should be established if anticipated claims and expenses are greater *516than the anticipated contract premiums that will be received.
In this case there are two types of PDRs: (1) previously existing PDRs, and (2) additional PDRs. Buttner’s report indicates that as of December 31, 1998, Health Net “reported PDRs totaling $10.5 million ($2.0 million for AmCare-LA, $4.1 million for AmCare-OK, and $4.4 million for Am-Care-TX).” These are the previously existing PDRs which are referred to in the Stock Purchase Agreement as “... all non-cash restructuring and merger related liabilities and reserves (the ‘Restructuring Reserve’)” which will be reversed. These reserves are inaccurately denominated “Restricting/Premium Def.” on the AmCa-reco spreadsheet and are correctly referred to ■ as “Premium Deficiency Reserves” on Buttner’s Exhibits D and E. The additional PDRs are those referred to in Paragraph 6 of the side letter. Pursuant to Paragraph 6, Health Net sent $2.3 million to the Louisiana HMO and $4.0 million to the Texas HMO, which sums were to be returned to Health Net as provided for in Paragraphs 5 and 6 of the Side Letter. On the AmCareco spreadsheet, the return of these funds is designated as “Less Cash Contributed by [Health Net] to Fund Premium Deficiency” and on Buttner’s Exhibits D and E they are designated as “Return Foundation PDF Contributions.” No additional PDR was sent to the Oklahoma HMO.
^[^ijPDRs are not required by laiv in either Louisiana or Oklahoma; they were provided for by the then applicable Texas Insurance Code art. 21.39 (now found in V.T.A.C. Insurance Code § 421.001).
(a) Louisiana PDRs
As previously indicated Brignac now is the Deputy Commissioner over the Office of Financial Solvency with the Louisiana DOI. She gave the following pertinent testimony concerning PDRs in Louisiana.
Q. Okay. Thank you. Now let me ask you this. GAAP. What is GAAP? We hear a lot about GAAP in this case. What do you understand GAAP to mean?
A. GAAP is generally accepted accounting principles, and that is the accounting standard for commercial and industrial type businesses.
Q. What does SAP mean?
A. SAP is statutory accounting principles, and that’s the accounting guidance for insurance companies.
Q. Now ivhat was your understanding of which of those sets of principles — let’s go back up to 568, the one that went to Ms. Brignac, the cash sweep calculation s'preadsheet. What was your ’understanding 'under ivhat set of principles the cash calculation spreadsheet was computed for purposes of calculating the cash sweep?
A. I didn’t have an understanding. I didn’t look at it to see if it was calculated under GAAP or SAP.
Q. Is there any requirement that they submit this, anything like this, under statutory accounting principles ?
A. Anything like what?
Q. Like a calculation of a cash payment like this. Are you aivare of any policy, procedure, regulation by the Department, statute that requires that this be done under statutory accounting principles?
A. To get to the cash sweep?
Q. Correct.
A. No.
|,12Q. Did you ever ask for this calculation, a reflection of the balance sheets before and after these various adjustments under statutory accounting principles?
*517A. No.
Q. You didn’t feel it ivas necessary. Noiv you didn’t understand, whether these were done under generally accepted accounting principles. GAAP, or statutory accounting principles, correct?
A. That’s correct.
Q. Did you ever go back to look and see if the agreement required which principles would be applied to put together these balance sheets?
A. No.
[[Image here]]
Q. So even today you are not familiar with a restructuring reserve?
A. No.
Q. But you did understand that in this account was a liability for premium deficiency?
A. For premium deficiency reserve.
Q. That’s what you understood at the time you reviewed this?
A. Yes.
Q. Let’s talk about what is happening with this adjustment right there. It shows a liability for premium deficiency reserves, and you understood that was a premium deficiency reserve account, correct?
A. Yes.
Q. And understood that back then.
A. Yes.
Q. What is the amount?
A. 1.4 million.
Q. And then what is the adjustment going on in that account on this?
IsiaA. There is an adjustment to eliminate the premium deficiency reserve to zero.
Q. And you understood that for purposes of this calculation of the cash payment to Health Net Foundation, you understood that that was the adjustment that was going on in the premium deficiency reserve account for this calculation, correct?
A. For the purposes of getting to the cash sweep, yes.
Q. Let me ask you, when you saw that, did you have any problem with that? A. At the time, no.
Q. Was a premium deficiency reserve required or mandated in Louisiana at the time?
A. Not by law, no.
Q. Did the reversal — would that be the same as a reversal of the premium deficiency reserve account?
A. Yes.
Q. For purposes of this calculationf?]
A. For the purposes of the calculation.
Q. Did that require commissioner approval?
A. No.
Q. But at the time you got this you, could, clearly see what ivas going on there, right?
A. That they ivere going to reverse the premium deficiency reserve.
[[Image here]]
Q. All right. You have already testified you saw it was being reversed and reduced to zero, the premium deficiency reserve, for purposes of making that cash sweep calculation, correct?
A. That’s correct.
Q. Isn’t that what this says? It’s being reversed pursuant to the agreement in order to calculate the cash, payment. A. That’s correct.
|314Q. And reversal on the spreadsheet with the closing agreement is precisely the same, is it not, Ms. Brignac, as the reversal that’s on the sheet, the cash, spreadsheet that went to you?
A. For the premium deficiency reserve.
*518Q. For the premium deficiency reserve. The same reversal as on the spreadsheet with the closing agreement, reduced to zero for purposes of calculating the cash payment—
A. That’s correct
Q. —Same reversal is being effectuated, on the spreadsheet that you got.
A. Yes.
Q. And it was all for purposes or in order to calculate the cash payment, and that is what you understood, correct?
A. Yes.
[[Image here]]
Q. Ms. Brignac, let’s go ahead and move down to the capital section. The final transaction or adjustment that is going on here is to common stock and paid in capital, comet?
A. Yes.
Q. There is an adjustment there. What is happening to that account?
A. The common stock and paid in capital is increasing.
Q. And is it increasing in exactly the same amount as the premium deficiency reserve was being reduced?

A. Yes.

[[Image here]]
Q. And Mr. Buttner has concluded that the net equity, statutory net equity was $1,371 million. But Mr. Buttner, for purposes of his calculation, added back in the premium deficiency reserve of 1.421. You’ve testified, have you not, that there is no or was no requirement for a premium deficiency reserve in Louisiana at that time, correct?
A. That’s correct.
[[Image here]]
Q. Let me see if I understand. You found out that Health Net took $2.5 million out of the plan when you only thought |31sthey were going to take 243,-000 and you allowed the HMOs to fix that by reversing the premium deficiency reserve on its books?
A. We allowed them to cure them impairment by reversing their premium deficiency reserve.
[[Image here]]
A. Like I said, we contacted the insurance company by written communication indicating that they no longer met the minimal surplus requirements. We did receive a response back indicating that they were going to reverse off a premium deficiency reserve and add that amount to their surplus, which I also believe brought them close to the four million. Also, there was a meeting held at the department of insurance with Am-Care representatives. I did not attend that meeting, but our chief examiner did, because we had a current examination in process at that time.
Q. And those discussions that you had personally, those — that was Mr. Nazare-nus and Mr. Lucksinger?
A. I communicated mainly with Mr. Nazarenus.
Q. And it tvas represented to you that any premium deficiency, reserve, there was no need for it, we’re just going to take it off the books?
A. That’s correct
Q. And, the effect of taking that premium deficiency reserve off of the books of the HMO, what effect did that have on the income statement of those HMOs?
A. It increased their net income, thereby increasing their surplus. (Emphasis added.)
Based on Brignac’s testimony, it is reasonable to infer that Brignac and LaDOI understand the law and rules in Louisiana better than Buttner with reference to the authority of LaDOI to approve the rever*519sal of PDRs and its effect on financial statements in Louisiana.
(b) Texas PDRs
Susan Conway sent the AmCareco spreadsheet to Licette Espinosa at TxDOI by letter dated April 30, 1999. This letter provided, in pertinent part, as follows:
|slfiAs indicated on the Schedule, the closing transactions consist of a cash infusion into the Texas HMO by Foundation of $2,436,109 to cover the net intercompany receivable, offset by a calculated cash sweep of $2,920,123. This results in a net cash withdraw[al] from the Texas HMO by [Health Net] of $484,014 and will result in the Texas HMO having total equity of $3,807,117 after the closing.
The Texas portion of the AmCareco spreadsheet, like the Louisiana portion of the spreadsheet, had provisions for the Texas pre-existing PDR and the Texas Additional PDR. The pre-existing PDR was reversed. The above quoted portion of Conway’s letter shows the disposition of the Additional PDR of $4,000,000. The $4,000,000 was listed under the sections of the spreadsheet entitled “ADJUSTED CASH IN PLANS” as “Less Cash Contributed by [Health Net] to Fund Premium Deficiency” in parentheses and was to be considered as a minus or negative number. From the negative $4,000,000 was subtracted the positive “[Health Net] Cash Sweep” of $1,079,877 (which represented the amortized portion of the Additional PDR); the resulting sum was a negative $2,920,123. The Texas spreadsheet also shows that the “settling” of the intercom-pany receivables and payables resulting in the sum of a positive $2,436,109, which sum was subtracted from the negative $2,920,123 and produced a negative sum of $484,014.
Lisette Espinosa, a senior financial analyst with TxDOI, reviewed the Texas Form-A and Conway’s letter and gave the following testimony:
Q. I show you exhibit number-48 and ask you to look at that, all pages in it, please. It purports to be a letter dated April 30th, 1999 from Susan Conway to you regarding the Form-A application for the acquisition of control of Foundation Health, a Texas Health Plan, by Amcareco; is that correct?
A. Correct.
Q. And did you receive this letter?
A. It appears that way, yes.
|317Q. And the same stamp, reviewed by Financial Monitoring, dated April 30, 1999, appears on the first page and, in fact, each page of that exhibit?
A. Correct.
Q. When you were examining this Form-A to recommend approval to Betty Patterson, did you — did you understand this cash sweeps calculation and this spreadsheet?
A. Yes, I’m sure at the time, yes, I did.
[[Image here]]
Q. Now, just for the record, exhibit-48 is, in reality, two letters, an April 30, 1999 letter from Ms. Conway enclosing a corrected version of an April 29, 1999 letter to you, an ownership chart and a spreadsheet titled, [Health Net] cash sweep and preferred — A share calculation, similar to some of the other spreadsheets we’ve seen earlier?
A. Correct.
Q. Having had a chance to take a look at the letters, did you understand that Ms. Conway was telling you what the estimated cash payment was going to be out of the Texas HMO to [Health Net] as of the acquisition?
A. Correct.
[[Image here]]
*520Q. What would you have done if you had had concerns about the representations made in the letter?
A. I would have addressed them to my supervisor.
Q. And in the end, you personally are not going to recommend approval of a Form-A application, unless you believe all the requirements of the Texas Insurance Code have been satisfied?
A. Correct.
[[Image here]]
Q. And what was the name of the lawyer representing Amcareco in connection with this Form-A application?
A. Susan Conway.
Q. What law firm was Ms. Conway with?
A. Vinson and Elkins, LLP.
LisQ. And in the end, you were provided enough information to make a decision about whether to recommend approval of Amcareco’s Form-A application or not?
A. Correct.
Q. And you felt comfortable personally that you could decide to recommend approval of this application?
A. Correct.
[[Image here]]
Q. And I think you also probably recall that you had some questions about the cash payment, which is also known as the cash sweep, and you even wrote a letter to Susan Conway, which is Exhibit-26, asking for some more information about these cash sweep calculations that were being made?
A. Correct
Q. And I assume what you wanted to know is, how much money is going to come out of this Texas HMO, in particular, and the other HMO’s [sic], and be paid back to Foundation’s [sic] parent company?
A. Correct.
Q. And Ms. Conway ultimately wrote you a letter, a couple of letters which we’ve looked at, and if you look at Exhibit-48, where she was trying to answer that question for you; is that right?
A. That’s correct.
Q. And there’s a spreadsheet that’s attached to Exhibit-48, and I’ve got a copy that’s been marked Exhibit 48-A, which is a little easier to read spreadsheet.
A. Okay.
Q. And that — that spreadsheet is designed to show you how much money was going to come out of the HMO’s [sic]. It shows a lot of things, but among other things, it’s going to show you how much money is going to come out of the HMO’s [sic] and go back to Foundation’s [sic] parent company?
A. Correct.
Q. And then beneath that, it shows how much money is going to come out of each of these HMO’s [sic] and be paid back to [Health Net], Foundation’s parent, and the first column under that is, less cash contributed by [Health Net] to fund premium deficiency. Do you see that?
l.si&A- I do.
Q. And then it shows how much money is going to come out of each of these HMO’s [sic] and go back to Foundation’s [sic] 'parent, and for Louisiana, for example, it’s tivo million three hundred thousand dollars; is that right?
A. That’s correct.
Q. I see what my almost error was. It shows that $1 million is going to go out of the Texas HMO to go back to Foundation’s [sic] parent, but then right beneath that there’s a positive number *521that’s going to offset that four million. Do you see that ?
A. Correct.
Q. And so, if you subtract — the number beneath that is the cash sweep number. You — that’s a little over $1 million, and so if you subtract that number out of the four million, you get a number close to $3 million that’s going to come out of the Texas HMO and go back to—
A. Correct.
Q. All right. And so you were given— your question about how much money was going to come out of the HMO’s [sic] and go back to Foundation was answered by Ms. Conway's April 30th, 1999 letter, Exhibit-48?
A. Correct.
[[Image here]]
Q. And then it also shows that for each of those positive numbers, and let’s look at Louisiana, the first one, for example, there was a premium deficiency reserve of one million four hundred and twenty-one thousand seven hundred and sixty-four dollars, but then right next to it, it has that same number in parentheses?
A. Correct.
Q. And would that tell you that that premium deficiency reserve was being eliminated?
A. That would be my assumption.
Q. And for Texas — or for Oklahoma, the next column, it shows a premium deficiency reserve of slightly over $3.3 million, and then again shows that premium deficiency reserve being eliminated?
_Jj2oA. Correct.
Q. And for Texas, it shoivs a premium deficiency reserve of — I think that’s about $3.6 million, and then it shows that premium deficiency reserve being eliminated?
A. Correct.
Q. And this was, again, part of the information Ms. Conway provided to you on April 30th?
A. Correct. (Emphasis added.)
As previously indicated, Espinosa recommended approval of the Texas Form-A to Saenz who recommended approval to Patterson who approved the application on behalf of the Texas Commissioner of Insurance. Paragraph 19 of the “Findings of Fact” section of the Official Order of the Texas Commissioner of Insurance specifically states that “[info evidence was presented that the acquisition of control would violate any laws of this State, any other state, or the United States.” (Emphasis added.)
Based on Espinosa’s testimony and the specific statement of fact of the Texas Commissioner of Insurance that the Am-Careco Form-A does not “violate any laws of this State,” it is reasonable to infer that, as a matter of fact and law, the Texas DOI understands the law and rules in Texas better than Buttner with reference to the authority of the Texas DOI to approve the reversal of PDRs and its effect on a financial statement in Texas.
(c) Oklahoma PDR
A review of the AmCareco spreadsheet for Oklahoma shows that Oklahoma had a pre-existing PDR but had no Additional PDR. The pre-existing PDR was reversed increasing the “Common Stock and Paid in Cap.” by $3,309,990. The cash sweep is listed in the 'spreadsheet as line item “FHS [Health Net] Cash Sweep”. In a letter dated April 29, 1999, toj^Lajuana Wire, Director, Managed Care Systems, Oklahoma State Department of Health, Susan Conway explained the cash sweep as follows:
*522As indicated in the Schedule, the closing transactions consist of a cash infusion into the Oklahoma HMO by [Health Net] of $1,735,619 to cover the net inter-company receivable, offset against a calculated cash sweep of $2,903,761. This results in [Health Net] receiving a net of $1,168,142 and will result in the Oklahoma HMO having total equity of $4,599,761 after the closing.
The “settlement” of the intercompany receivables and payables on the Oklahoma spreadsheet resulted in a positive $1,735,619 and, when that is subtracted from the negative cash sweep of $2,903,761, the result is a negative $1,168,142.
House, the Oklahoma analyst, gave the following testimony concerning PDRs in Oklahoma:
Q. Okay. I think I understand what you’re saying. So there wasn’t a specific regulation under the Oklahoma Department of Health that dealt with premium deficiency reserve; correct?
A. Correct.
Q. But the Oklahoma Department of Health required NAIC blank forms, and to fill those out if there was [a] requirement for a premium deficiency reserve, you would have to include it in the blank forms; correct?
A. Coi*rect.
[[Image here]]
Q. And the line item restructuring/premium deficiency, do you see that?
A. Yes, I do.
Q. Okay. And you see that the balance as of the date of this calculation, which was, if you look at the top, March 31st, 1999?
A. Yes.
Q. Based on the estimated balance sheet, you see that the restructuring/premium deficiency was $3,309,890 [sic], it looks like; correct?
laspA. Yes, correct.
Q. The you see the next column shows a negative $309,990; correct?
A. Correct.
Q. So what — so you could see in reviewing this schedule that the premium deficiency reserve was being reversed to compute the cash payment calculation; comet?
A. Correct.
Q. Okay. And that was in the letter agreement which you approved; correct?
A. Comet.
MR. HANAWALT [Counsel for the Louisiana and Oklahoma Receiver]: Object to the last question as leading.
Q. (By MR. BLACK) [Counsel for Health Net]: Okay. I’ll cure the objection. Did you approve that — did you approve the reversal of the premium deficiency reserve to compute the cash payment calculation as part of the acquisition, your authorization of the acquisition of the HMO?
A. Yes.
Q. Okay. Now, moving down the page, you can see that what’s being calculated here is the total — I’m sorry, let me start over. You see the AmCareco cash requirement section at the bottom of the page; correct?
A. Yes.
Q. And you see liabilities of 2,666,354; correct?
A. Correct.
Q. Which equals the total current liabilities under the AmCare Oklahoma line item?
A. Correct.
Q. And that includes the reversal of premium deficiency reseñe; correct?
*523A. Correct.
Q. And you can see that from reviewing this work sheet; correct?
1323N Yes.
Q. Okay. Then you see the statutory reserve requirement of 750,000 under the AmCareeo cash requirements; correct?
A. Correct.
Q. And then property, plant, equipment, reserve adjustment of $250,000, and then we can go back and look at it in a second, but that was part of the stock purchase agreement as well?
A. Yes, and I did see it when we were back in there earlier.
Q. Okay. And you see additional cash of 1,188,687 for a total of 4,332— $4,332,021 [sic] is the total AmCareeo cash requirements computing the cash payment calculation?
A. Correct.
Q. All right. Next you see the adjusted cash in plans of $7,236 — $7,236,732?
A. Yes.
Q. Then you see the amount of the cash srveep, of $2,803,761 [sic]; correct?
A. Correct.
Q. And so you can see from this how much money’s being paid to Foundation swept out of the Oklahoma HMO; correct?
A. Correct.
[[Image here]]
Q. The next document I want to show you — so going back to Exhibit 1097, Page 4, which is the cash payment calculation, the preferred share calculation.
A. Okay. I’m there.
Q. You knorv that the letter agreement says that for the purpose of the cash payment calculation we’re going to reverse the premium deficiency reserve; right?
A. Correct.
Q. So that was disclosed to you as a regulator of the Oklahoma Department of Health; correct?
A. Correct.
| o,24 Q. And then this cash payment calculation shows that the premium deficiency reserve is reversed from the balance sheet in computing the cash payment; correct?
A. Correct.
[[Image here]]
Q. Sure. And what you’re referring to is that the — the bottom of the page, adjusted cash in plans, refers for less cash contributed by [Health Net] to fund premium deficiency reserve; right?
A. Right.
Q. So it’s shoiving that deducted from the cash in the plans is the amount of cash that [Health Net] contributed for the premium deficiency reserve; correct?
A. Correct.
Q. And for Louisiana it shenos that $2.3 million is being deducted, which is the amount that’s being returned to [Health Net] for the 'premium deficiency reserve; correct?
A. Correct.
Q. It shows zero for Oklahoma?
A. Correct.
Q. It shores $[ million for Texas; correct?
A. Correct.
[[Image here]]
Q. And again, Paragraph 6 refers to the fact that [Health Net] would receive the amount of the PDR related to the time that AmCareeo was operating the company; correct?
A. Correct.
Q. Then Paragraph 6, second to last sentence on Page 3 of the letter agree*524ment, it says, “As agreed, the parties shall negotiate in good faith such a mechanism to return the additional PDR over a period of ten business days after notice [if a] party reasonably believes closing will not take place on or before January 15, 1999, and the additional PDR will likely be required.”
Okay. So the parties are going to — it’s your — based on this, you would agree that the parties are going to negotiate a mechanism to return the PDR?
IsasA- Correct.
Q. Okay. And that can be done two ways under Paragraph 6; correct? Either under the cash sweep or under the cash sweep shortfall; correct?
A. Correct.
[[Image here]]
Q. Okay. And it says, No. 4, little i, little v, “All non-cash restructuring and merger relating liabilities and reserve shall be reversed.” Okay?
A. Yes.
Q. So what effect would that have if you. reversed those liabilities for the cash payment calculation? The liabilities ivould be less: correct?
A. Correct.
Q. So that would increase the amount of cash that 'was paid; correct?
A. Correct.
Q. Okay. Now, let’s go to the closing agreement. And again, the closing agreement, Paragraph 3-Q, says that, “For purposes of receiving the refund of the premium deficiency reserve, the premium deficiency reserve will be considered a restructuring reserve pursuant to Section 2.1 of the stock purchase agreement.” Do you see that?
A. Yes, I do.
Q. So with that foundation, what effect would Paragraph 3-Q have on the cash payment calculation?
A. When reading it with 2.1, it lowers the liabilities, so it increases the potential payment.
Q. And it increases the payment by the amount of the premium deficiency reserve; right?
A. Correct.
Q. Right. And it’s true that that’s exactly what the letter agreement says; correct?
A. Correct.
MR. HANAWALT [Counsel for the Louisiana and Oklahoma Receivers]: Objection; leading.
ImbQ. (By MR. BLACK) [Counsel for Health Net]: Is that exactly what the letter agreement says?
A. Yes, it is.
[[Image here]]
Q. Bottom line is based on Section 2.1 and Section — and the letter agreement, you would agree that it was not hidden from you as a regulator that Foundation was going to receive a return of unamor-tized premium deficiency reserve; correct?
A. Correct. (Emphasis added.)
Based on Conway’s letter to Wire and House’s testimony, it is clear that PDRs are not required by law or regulation in Oklahoma, the Oklahoma Regulators were fully aware that the Oklahoma pre-existing PDR would be reversed as a liability and considered as an increase in capital. Based on these facts, it is reasonable to infer that the Oklahoma regulators understand the law and regulations in Oklahoma better than Buttner with reference to their authority to approve the reversal of the PDR and its effect on the financial statement in Oklahoma.
*525(d) Conclusion
Buttner was wrong as a matter of fact and law in preparing his spreadsheet on the basis that it was illegal to reverse PDRs in Louisiana, Oklahoma, and Texas. This legal and factual error caused him to make serious and substantial errors in the calculations in his spreadsheet. When a PDR line item is reversed, the amount of the PDR is subtracted from the line item of the spreadsheet that lists it as an asset or liability and it is added to the opposite line time. In this case it goes from a liability to an asset as paid-in capital (surplus). Thus, in Buttner’s spreadsheet, the following calculations should have oc-. curred: (1) in Louisiana, a negative liability of $1,421,764 should have .become a positive asset; (2) in Oklahoma, a 1S27$3,309,990 liability should have become an asset; (3) in Texas, a $3,584,364 liability should have become an asset; and (4) the combined effect should have been to change an $8,316,118 liability into an $8,316,118 asset. Buttner did not do this and left the $8,316,118 as a liability. When a financial number like that is reversed, the effect or “swing” is twice the amount of the number. In this case, that effect or swing is $16,632,236. This seriously interdicts Buttner’s calculations.
(2) Intercompany Receivables and Payables
An intercompany receivable is a receivable owed by one company in a group of affiliated (related) companies to another company in the same group; an intercom-pany payable is a payable owed by one company in a group of affiliated (related) companies to another company in the same group.
In her testimony, Brignac discussed in-tercompany receivables and payables as follows:
Q. Let’s move down and go to the next asset, intercompany receivables right here. It shows a number on the left-hand side and then it shows an adjustment in the middle and then it shows an end result, correct?
A. That’s correct.
Q. All right. Now, what is the amount of the intercompany receivable shown for the Louisiana plan in the left-hand column?
A. A little over one million dollars.
Q. And what is the adjustment that’s occurring?
A. The same amount.
Q. The same amount. And then what is the final amount, make sure the jury can see, the final amount after that adjustment.
A. It goes to zero.
| 32sQ- Tell the jury ivhen you got this and you revieioed it, what did you understand that adjustment ivas all about?
A. That the intercompany receivables and payables were going to be settled before the acquisition -was approved,, or at approval.
Q. Okay. Hoiv do you settle an account receivable?
A. You know, accounts receivable are typically established in, accordance with an agreement and there [are] payment provisions in those agreements and you, ivould, settle in, accordance with that.
Q. Would it be fair to say in order to settle an account receivable you pay it?
A. Yes.
[[Image here]]
Q. What does that mean? How do you adjust a payable and reduce it to zero? What—
A. You pay it.
Q. You pay it.

A. Yes.

*526Q. That’s how you reduce a payable from an amount to zero?
A. That’s correct
Q. You pay it.
A. Yes.
Q. And you understood that that’s what that adjustment was at the time that you reviewed this, correct?
A. Yes, that it was going to be adjusted to zero.
Q. Let’s look back up again to the top and, you understood — let me ask you this. I know you don’t remember what sections of the stock purchase agreement that you actually reviewed, but didn’t you understand that one of the requirements of this transaction was all inter-company balances had to be settled? Didn’t you understand, that?
A. That — yeah, that’s pretty typical with an acquisition.
|S2c)Q. All right. You understood that, meaning if it’s a receivable, it’s got to be paid into the plan?

A. Yes.

Q. If it’s a payable, it has to be paid out of the plan.
A. That’s comet.
Q. And let’s see if we can go ahead and do a little calculation here again for all the non-accountants in the group. Let’s take as best you can — if this amount, the two point whatever is being paid and the — up here, one million whatever is being paid into or collected, what is the difference between the two?
A. Somewhere around one million.
Q. About $980,671.00, correct?
A. That’s correct.
Q. So the difference between what is being paid out of the plan and what is having to be paid into in order to settle up the accounts is exactly the amount of cash that is going out of the plan up on the top line, isn’t it, Ms. Brignac?
A. It’s the difference between the in-tercompany receivable, the premium deficiency reserve and — no, the difference between the intercompany receivable and the intercompany payables.
Q. So isn’t it fair, Ms. Brignac, that you understood when you went through all these adjustments and all these transactions that 980,671.00 was being paid out of the Louisiana plan to net out the intercompany payables and receivables; isn’t that correct?
A. The intercompany receivables and payables would be settled at some point in accordance with the agreement that is on file with the department of insurance. Q. And you knew that?
A. I would expect it to happen, yes. (Emphasis added.)
In her letters of transmittal of the Form-A spreadsheet to the Regulators, Susan Conway advised them “[tjhis schedule contains the most current estimate of what the expected book value of the three HMOs will be at the time of closing.” (Emphasis added.) This spreadsheet is referred to as U%the “Estimated Balance Sheet” in Paragraph 2.1 of the Stock Purchase Agreement. Because the financial information contained in the Estimated Balance Sheet is an estimate, Paragraph 2.3 of the Stock Purchase Agreement provides for a true-up of the financial information one year later when the definitive financial numbers have been determined. Thus, Paragraph 2.3 provides, in pertinent part, that “[wjithin 45 days after the first anniversary of the date of the closing, Buyer [AmCareco] shall prepare a balance sheet of the [the HMOs] as of the Effective Time (the ‘Final Balance Sheet’) utilizing the same methodologies and procedures set forth in section 2.1 used to calculate the Estimated Balance Sheet, *527and shall deliver to Seller [Health Net] a statement setting forth in reasonable detail the calculation of the amount of the Cash Payment ... required pursuant to section 2.1 and the number of shares of Class A Preferred Stock required pursuant to section 2.2.”
On the Form-A spreadsheet, the inter-company receivables are line item assets entitled “Intercompany Receivables” under the general category of Assets and the “Intercompany Payables” are line items under the category of Current Liabilities. The receivables are (1) Louisiana— $1,082,327, (2) Oklahoma — -$1,331,810 and (3) Texas — $1,354,095, for a combined total of $3,768,232. The payables are (1) Louisiana — $2,062,998, (2) Oklahoma — negative $403,809 (and, thus, a plus for liability purposes) and (3) Texas — a negative $1,082,014, for a net (or total) of $577,175 in liabilities. When the receivables are collected and the payables are paid under the Form-A spreadsheet settlement of receivables and payables, the net result for each state is (1) Louisiana — a liability of $980,671, (2) Texas — an asset of $1,735,619 and (3) Oklahoma' — an asset of $2,436,109, for a combined total of $3,191,057. The cash and cash equivalent line item for each on the Form-Aai spreadsheet is (1) Louisiana — $4,696,526, (2) Oklahoma— $5,001,163 and (3) Texas $5,687,279, for a combined total of $15,384,968. Finally, on the Form-A spreadsheet, the cash and cash equivalent line item is adjusted by the result of the settlement of the receivables and payables to become the following: (1) Louisiana — $3,715,855 ($4,696,526 minus $980,671); (2) Oklahoma — $6,736,782 ($5,001,163 plus $1,735,619); and (3) Texas $8,123,388 ($5,687,279 plus $2,436,109), for a combined total of $18,576,025. The Regulators of all three states accepted, and thus approved, this method of accounting for the settlement of the intercompany receivables and payables, which settlement is required by the Stock Purchase Agreement.
Pursuant to the Stock Purchase Agreement, a Final Balance Sheet was prepared and the true-up was executed by the parties on October 3, 2000. Neither the Final Balance Sheet nor the true-up is in the record on appeal. However, Buttner refers to them in his report as follows:
As previously discussed, the Purchase Agreement provided for a true up adjustment of certain of the April 30, 1999 financial statement amounts one year after the closing. As a result of that true up adjustment, the Adjusted Equity for the three HMOs increased by $143,000 in comparison to the March 31, 1999 calculation and also resulted in an additional 144 shares of AmCareCo’s [sic] Preferred Class A shares being issued to [Health Net], In addition, Am-CareCo [sic] issued a 9.5% note for $674,000 payable to [Health Net] to settle various indemnity issues. Those settlement arrangements are memorialized in an October 3, 2000 letter agreement between [Health Net] and AmCareCo [sic].
The true-up was used to confirm the format and calculations of the Form-A spreadsheet except that Health Net received an additional 144 shares of AmCa-reeo stock valued at $1,000 per share.
Buttner prepared a spreadsheet which was filed in evidence and from which he testified at the trial. He used a different accounting method to |S32settle the in-tercompany receivables and payables (which he described as “Due from Affiliates” and “Due to Affiliates”). He testified that he examined various corporate records, audits, financial filings, and depositions. He reached the conclusion that “the moment after the cash sweep the HMOs did not meet the require-*528merits mandated by the regulators in any of the three states.” To reach this conclusion, he “looked at the March 31st, 1999 statutory financial statements that were filed with the regulators” for the first quarter of 1999 by the HMOs “on or before May 15th” 1999. Even though the Form-A spreadsheet contains estimated financial information for March 31, 1999, many of the financial numbers in it are identical with those used in Buttner’s spreadsheet: (1) Cash and Equivalents— Louisiana ($4,696,526) and Oklahoma ($5,001,163); (2) Intercompany Receivables — Louisiana ($1,082,327), Oklahoma ($1,331,810), and Texas ($1,354,095); (3) Intercompany Payables — Louisiana ($2,062,998), Oklahoma (plus $403,809), and Texas (plus $1,082,014); and (4) the individual state settlement of the receivables and payables — Louisiana (minus $980,671), Oklahoma ($1,735,619) and Texas ($2,436,109).125 For Due to Affiliates (Intercompany Payables) Buttner used (1) Louisiana — $3,788,781, (2) Oklahoma — $331,262, and (3) Texas — $591,542, for a combined total of $4,711,584. He also had a line item for Other Liabilities that was not present in the Form-A spreadsheet and that had a combined total of $1,738,366. Using a methodology different than that used for the Form-A, Buttner concluded that the post-sale equity in the three |333HMOs was Louisiana — $1,370,866, Oklahoma — $102,185, and Texas — a negative $1,631,969, for a combined total of a negative $158,918.
As previously indicated in Part VIII, Section Bla of this opinion, unless otherwise provided, the party seeking relief bears the initial burden of producing evidence to obtain the relief sought. The Regulators have asserted that based on Buttner’s testimony and spreadsheet that the manner in which the Intercompany Receivables and Payables were settled in the Form-A spreadsheet was misleading and fraudulent. Accordingly, the Regulators bear the initial burden of proving these facts by a preponderance of the evidence. This is particularly pertinent because all three Regulators originally accepted and approved the format and method of calculation used in the Form-As and approved the sale.
Health Net called as a witness Bryon H. Jones, who was qualified as an expert certified public accountant. Jones testified that he reviewed the contract documents, correspondence, the confidential Private Offering Memo, various corporate ledgers, audited financial statements, and various depositions. He determined that AmCare-co raised $8,567,000 from the sale of its Class B Preferred and Common stock, and that after collateralizing the $2 million dollar letter of credit and paying estimated start-up costs of $1.25 million that AmCa-reco netted $5,317,000. Jones gave the following specific testimony about the sources of the information that he used to evaluate the accuracy of Buttner’s spreadsheet:
Q. Let’s move to your exhibit-3. Before I ask you questions about this, where did you get the numbers on which you’re basing exhibit-3?
A. I was provided with a disk from AmCareco’s accounting records or from the accounting records of the three HMOs and that disk contained general ledger or accounting transaction information for 1999, April 30 through December 31st. That is |S34there [sic] I *529got — I got all the information here except for the premium deficiency reserve.
Q. Now first I need to ask you, was it your understanding under the stock purchase agreement that the initial payment of the cash payment to Health Net, as a result of this transaction, was based upon estimated balance sheets?
A. Yes.
Q. And ultimately was there supposed to be a true up to true it all up according to the April 30, '99 balance sheets?
A. Yes, and there was one. (Emphasis added.)
A review of Buttner’s spreadsheet (Exhibit E attached to his report) shows that he “zeroed out” the intercompany receivables but did not “zero out” the intercom-pany payables for the HMOs. Jones testified as follows about this accounting method:
Q. Let’s talk briefly why you don’t. What assumptions do you not agree with regard to this particular HMO in Texas and Mr. Buttner’s recalculation of the cash spreadsheet?
A. I think the main problem with this spreadsheet — I’ve got a couple of other ones, but the main one I’ve got that applies to Texas as well as Louisiana and Oklahoma is how Mr. Buttner continued to include this liability, the inter-company liabilities between the HMOs and Health Net. Those were settled in the stock purchase agreement at zero. The HMOs did not owe anymore [sic] money after the transaction to Health Net. However, Mr. Buttner has deducted some very significant liabilities which makes the HMOs look like they are in worse financial position than they really are.
Q. Let’s go back to that blowup that we just had on Texas. All right. Are you talking about this number right here for due to affiliates?
A. Yes. It’s $1,674,000.00 according to Mr. Buttner’s schedule.
Q. And according to your analysis, what should that number be?
A. Zero. The HMOs and Foundation or Health Net settled their intercompa-ny accounts at the time of the transaction.
Q. Was that one of the requirements of the stock purchase agreement ?
ImbA. Yes.
Q. And did it, in fact, occur ?
A. Yes. I found that the cash was exchanged. I looked at the books or the general ledger of the HMOs after the transaction. The adjustments were recorded, additional corrections were made. I looked at the financial statements of the HMOs for Oklahoma and Texas for 2000 that said the intercompa-ny accounts were settled with no cash changing hands after the transaction. And I also listened to the testimony this morning from Mr. Westen or yesterday where he explained how the trae up worked. In the true up, no cash was exchanged. And I looked at the true up itself. It showed no cash being exchanged to settle anymore intercompany liabilities.
[[Image here]]
Q. All Right. What did you do next?
A. The next adjustment I think we’ve talked about. That is to add back inter-company liabilities. Those were settled by [Health Net], but Mr. Buttner continued to deduct them. Those need to be added back to correct his analysis.
Q. First question I will ask you is, when you add back the intercompany payables as Mr. Buttner was deducting, what is the capital in the Louisiana health plan?
A. $3,097,000.00.
*530Q. Now on the date prior to the closing, what is your understanding of the statutory capital — minimum capital and surplus requirement in Louisiana on the date before the closing which was April the 30th of 1999?
A. Based on the testimony and the records in this case, that was $3 million.
Q. So does Louisiana exceed the capital requirements in Louisiana as of the date of the closing?
A. Yes, that’s what the double check-mark means.
Q. How about in Oklahoma? What was the statutory minimum capital and surplus required in Oklahoma at the time?
A. Based on the testimony and documents that I’ve seen in this case, that was $750,000.00.
Q. So with the adjustment of intercom-pany liabilities 'which were settled at the time of the transaction, both Louisiana and \ ^Oklahoma meet minimum statutory capital and surplus requirements on the day before the closing, correct?
A. Yes.
Q. And does the transaction in any way change that?
A. No.
[[Image here]]
Q. Let’s keep on going. We have taken care of those first adjustments for adding back the intercompany liabilities. What did you do next?
A. The next thing, I did — I ivas aware of testimony in this case indicating that in Louisiana and Oklahoma at the time of the transaction, the state regulations did not require recording a premium deficiency reserve in order to compute capital. Therefore, I added back the premium deficiency reserve that Mr. Buttner deducted when he made his regulatory capital calculation.
Q. And what does that do in Louisiana and Oklahoma by adding back premium deficiency reserves that are not required in those states?
A. Well, it increases the capital for regulatory capital purposes and puts Louisiana in even more compliance as well as Oklahoma. So they have plenty of regulatory capital.
Q. Now I notice that you didn’t add back premium deficiency reserve in Texas, correct?
A. Right.
Q. Why is that?
A. I understand that Texas had, from the testimony I read, Texas had a regulation in place requiring a premium deficiency reserve to be recorded.
[[Image here]]
Q. Have you actually reviewed the cash calculation spreadsheets submitted to each of the states in this case?
A. Yes.
Q. If you bear with me a second, I will try to find that exhibit. There it is. This is the cash calculation spreadsheet and it shows the Louisiana Department of Insurance Bates stamp. Now when you reviewed this, did you review this in connection with a review of the stock purchase agreement and the letter agreement that you had seen?
I337A. Yes.
Q. Is there anything on this cash calculation spreadsheet that, in your opinion, deviates in any way from the provisions of the stock purchase agreement or the letter agreement?
A. No.
Q. What transactions occur on this, on the face of this cash calculation spreadsheet that ivas submitted to each of the regulators in this case?
*531A. Sorry it’s so small. Well, if you take each HMO, you can see there is a settlement of the intercompany receivables and payables with cash. That’s shown.
Q. Let’s make sure we understand what we are talking about. Let’s call up exhibit-1248 and we will try and blow it up so everyone knows what we are pointing to and talking about. Let’s go to the cash calculation spreadsheet. Let’s do Texas. Blow up Texas if you would. Actually, let’s do Louisiana because it’s next to the account titles and that would be a little easier. And start up at the top. Let’s talk about the transactions shown on the face of the sheet. Tell me where to start.
A. Okay. At the top, look at cash. Go over to the right. There is a transaction and that is to settle intercompany accounts. Louisiana paid out $981,000.00. That was disclosed and that is what Louisiana actually did. What that meant was if you go down a few more lines, $1,082,000.00 of intercompany receivables went away. And then — I think we will need to go down a little more.
Q. Let’s go down a little bit and catch on the liability section. That’s good.
A. Very bottom of the liabilities $2,063,000.00 of intercompany payables go away. So that is step one.
Q. So the difference between the inter-company payables and intercompany receivables is what the cash transaction was at the top?
A. Right.
Q. What are the other transactions that are shown in this schedule?
A. I think right above that you can see that for purposes of calculating the cash payment and the amount of shares received by Health Net, there is a worksheet reversal of restructuring and | ¡^premium deficiency reserves. And for Louisiana that was $1,422,000.00.
Q. Is there another transaction that occurs in connection with that?
A. Yes, further down the page.
Q. And what is the next adjustment?
A. You can see there is a positive again for purposes of computing capital as defined in the stock purchase agreement that 1,421,000 is added back on that worksheet to capital as defined.
Q. How many hours did you work on this matter?
A. I spent about a hundred and twenty hours on it.
Q. How many hours did it take you, to see all of the adjustments that were being made on this cash calculation spreadsheet?
A. I saw it the first day I started looking at this worksheet
Q. Did you have any difficulty seeing what the adjustments were?
A. No.
Q. And when you saw this in connection with the stock purchase agreement and the letter agreement, did you have any questions or issues with what was being depicted on this?
A. No.
Q. Did you actually complete all the transactions and all the calculations that went on below it ?
A. Yes.
Q. Did you see anything in any of those calculations that deviated in any ivay from the stock purchase agreement and the letter agreement?
A. No.
[[Image here]]
Q. With regard to the issue of reversal of premium deficiency reserves, what is your understanding based upon the evi*532dence and testimony you have reviewed on when the premium deficiency reserves may have been reversed on the actual books of the HMOs in this case?
|339A. Based on the testimony I have read, it appears that was done after AmCareco became the owner of the three HMOs. Some of the entries were made as late as June or the • second quarter of 1999, but it was after the transaction.
Q. And based upon the testimony that you’ve heard and read and the evidence you have seen in this case, what was the reason for the reversal of premium deficiency reserves on the books of the HMOs by AmCareco after the closing?
A. The estimate — the premium deficiency reserve is an estimate. It’s based on current management’s estimate of how much premium income they can collect on contracts and is a shortfall. How much is it and how long is it going to last. New management had new plans for the HMOs which meant they could come up with a different estimate for the PDR’s[sic] based on how they were going to run the HMOs.
Q. And based upon the evidence that you have seen in this case, is there anything wrong with that?
A. No.
Q. Let me ask this, Mr. Jones. Based on everything you have seen and everything that you have reviewed,, did Health Net do anything wrong or improper in connection [sic] this transaction?
A. No.
Q. Based 'upon what you have seen were the regulators — was everything in this transaction disclosed to the regulators?
A. Yes.
Q. To your knowledge, did any of the regulators — have you seen any evidence that any of the regulators asked any . questions about what was disclosed to the regulators in this transaction?
A. Yes, they did. They asked questions during the application process. I’ve seen notes and memoranda about that and there was testimony about that.
Q. And was information provided?
A. Yes, it was provided by AmCareco and AmCareco’s lawyers.
Q. Let me talk very briefly about Exhibit-48 because that’s the one that was submitted to Texas. And I want to talk very briefly about that and specifically the second page — move to |34nthe next letter. This letter right here, this is the letter dated April the 29th from Ms. Conway to Ms. Licette Espinosa. Let’s move to the second page of the letter, the first full paragraph. Let’s blow that up. The jury has seen this before. Did you review this in preparation of your testimony?
A. Yes.
Q. Let me ask you this. Does this paragraph outline the cash adjustments and transactions that occurred as a result of this—
A. Yes.
Q. —Transaction?
A. Yes, it does.
Q. Does this paragraph match up with what is depicted on the cash calculation spreadsheet?
A. Yes.
Q And is there any confusion, in your mind, about what is being said here and how it ties into the cash calculation spreadsheet that was submitted to the Texas regulators?
A. Not at all. I think it’s very clear.
*533Q. Now is it your understanding that this was actually submitted to Texas by Ms. Conway?
A. Yes.
Q. Was there anything wrong in what Ms. Conway submitted, in your opinion, to the Texas regulators in this case?
A. I have not seen anything wrong.
Q. With regard to the cash calculation spreadsheet, what was your understanding on whether it’s according to — it was prepared according to generally accepted accounting principles or statutory accounting principles?
A. The stock purchase agreement makes it clear that the cash calculation would be done on generally accepted accounting principles as adjusted. In other words, there are some adjustments in the stock purchase agreement that would be beyond generally accepted accounting principles.
Q. Is there any suggestion anywhere in the stock purchase agreement, the letter agreement, the confidential private placement memorandum, or this cash spreadsheet that indicates 1341 that this is a representation of the transaction according to statutory account [sic] principles?
A. No.
[[Image here]]
Q. Mr. Jones, you were aware these were estimated balance sheets?
A. Yes.
Q. Have you seen anything anywhere in any of the Department of Insurance documents that you have reviewed, any documents anywhere where anyone has suggested that any of the numbers on the cash spreadsheet were incorrect as of the date they were used and estimated?
A. No.
Q. Mr. George showed, you the March statutory filing. Do you have that, Mr. George, that you used?
MR. GEORGE [Counsel for the Texas Receiver]: There’s one sitting around.
THE COURT: Testy, testy.
BY MR. PERCY [Counsel for Health Net]:
Q. Did he leave it with you? First question, here’s a copy of it, who signed the March 31 statutory filing?
A. Thomas Lucksinger and Steve Na-zarenus.
Q. And do you, have any idea what the basis was of their filing that March statutory filing?

A. Well, they would, have had to put this together after the transaction ivas over, after they took over the accounting function.

Q. And final question — well, final series of questions. Mr. George went into great detail about Ms. Conway’s letter. Who wrote that letter?
A. Susan Conway.
Q. Who was copied on that letter?
A. Tom Lucksinger.
Q. And he went through the paragraph where it described what the transactions were, the cash transactions, comet?
I342A. Yes.
Q. And there ivas a cash infusion of $2.1 million into the State of Texas, comet?
A. Right.
Q. And did, you verify that that wire transfer actually occurred?
•A. Yes.
Q. And then there was a cash outflow from, the State of Texas in [sic] how much?
A. $2,920,123.00.
Q. Did you verify that took place ?
A. Yes.
*534Q. What is the net effect between those two numbers?
A. That was net cash withdrawal from the Texas HMO by [Health Net] of $Jp8U,01Jp.00.
Q. Did you verify that calculation according to the cash spreadsheet?
A. That was on the cash spreadsheet.
Q. Mr. Jones, if Mr. Lucksinger had done what his attorney said was intended to be done after this transaction and after he and Mr. Nazarenus reversed the premium deficiency reserves on the books, is the Texas HMO solvent and statutonly solvent?
A. Yes.
Q. Thank you, Mr. Jones. (Emphasis added.)
The following are portions of Buttner’s testimony concerning what he perceived to be misleading about the Form-A spreadsheet and his response to Jones’ testimony about his spreadsheet:
Q. And what are you referring to? What was misleading?
A. Well, I think that this schedule that was transmitted to the regulators to purport equity in the companies post closing without specifying much more clearly what that equity was is misleading. I was misled by it.
I343Q. But again, you don’t know if the regida,tors were actually misled, correct?
A. No. You will have to ask them what their view of this schedule was, but clearly when I looked at this schedule the first time, my impression of that schedule ivas, okay, here’s what the companies are going to look like post closing. And in the reality, it is not what the companies were going to look like post closing. So once I reached that conclusion, then that led me to a lot of other calculations and documents to try to better understand what this was actually doing versus what I was looking for which was a statutory schedule.
Q. So you believe this is misleading because it’s based on general [sic] accepted accounting principles instead of statutory accounting principles? Is that what you’re saying?
A. Not entirely, Mr. Black. We went through a lot of — I mean two hours of deposition testimony back several months ago on what my view of this is, and, as I said then and I’m going to try to be clear now, two parties can agree to do whatever they want to do. And they can agree to put whatever mechanism in place that they want to put in place to do that. And that is what the stock purchase agreement, that’s what the side letter, that’s what the closing agreement, and that’s what this schedule did.
[[Image here]]
Q. So just so that I understand, and I apologize to the court if I have asked this already, so that I understand it, your problem with this schedule is simply that it’s not based on statutory accounting principles. Is that correct?
A. No, sir, that’s not correct.
Q. Okay. Now what other problems do you have?
A. Well again, I think that I have articulated all of my problems. This schedule is a schedule — is a calculation of a contractual purchase price based on the terms and conditions that two parties entered into. Now, this schedule, not only does it calculate the shares that are going to be issued and does it demonstrate the cash that’s going to be transferred, but then it goes beyond that and it shows equity that is going to be left. And that equity that is going to be left is not statutory and it really isn’t GAAP once the calculations are all done because there are some reversal of items *535there, but it’s just a calculation of values for two parties. And for that to be used to show the regulators in any way, shape, or form that that’s what’s going to remain in the companies on a statutory basis I think is misleading.
1344...
A. I think my testimony, Mr. Black, was that if AmCareco tvould, have paid from their proceeds, directly paid from their proceeds, your client, tve would in all likelihood not be here today. But they didn’t. And to try to articulate that you could use their money retrospectively for solvency does not meet any of the statutory requirements.
Q. Let’s look at exactly what you did say, Mr. Buttner. It’s page 543 of your deposition.
A. Yes, sir.
Q. And it is line 15 through 21.
A. Yes, sir.
Q. And there you state, and here, to count the eight million that AmCareco raised, I mean the very easiest thing in the world that somebody could have done, and AmCare could have done it, is they could have written a check or wired in, made that money, that $8 million, whatever portion they deemed appropriate, made it a part of the insurance company. So, in fact, you are saying that they could have put that money into the insurance company, correct?
A. I am saying that they could. But the question that you asked me was, when you and I were going back and forth over my deposition whether they would be here today had they done something, I think there is another Q and A on that but—
Q. I think you’re right. That’s—
A. But again, just to be clear and I don’t want any misunderstanding of what my testimony is here, okay. This transaction between the two parties, they could agree to pay whatever they wanted to. My exception is where the money came from. And if AmCareco would have done one of two things, paid it outside of the insurance companies or put the money into the insurance companies before the cash siveep, not even after the cash siveep but before the cash siveep, then different calculations would have been made. But they didn’t. And as I sit here today, I know two things for sure and certain. AmCareco didn’t ‘put in the money then. AmCareco didn’t put in the money later. So all of the what ifs and what fors is Fantasy Land. It didn’t occur. So I didn’t count it then and I can’t count it now.
Q. You also stated in our deposition that you think that everyone associated with what happened with these HMOs bears some responsibility for what happened with the failure of the HMOs[. Ijsn’t that correct?
IímsA. I do.
[[Image here]]
Q. My question is, after this transaction, was there any big slug of money that paid these intercompany accounts payable?
A. Mr. Percy, here’s what I know for sure. Okay. I looked at the June 30 statutory statements of Texas, and the payable to affiliate is zero. The due from affiliate is zero. And there is only, by their own reported numbers, I believe $900,000.00 of equity in Texas. Now, I’ll let you tell me whether a big slug of money came in because Mr. Jones says a million six should have come in. Mr. Jones says that the Texas number should’ve increased a million six. If you’ll look at just the June 30 statement, those balances — or as Mr. Jones says should be zero, but no big slug of money came in. I didn’t do it. I am *536just telling you what the statements show.
Q. Well, here’s the problem, Mr. Butt-ner. I just asked you how you got that number and you said that’s what the company reported, correct?
A. No. what I said was that is the math from what the company reported and did. Again, those weren’t statements that were filed because that is a March statement. We already went through the fact that the company, for whatever reason, didn’t prepare a pro forma statutory statement. That’s what I’m trying to do there, is to see, okay, if you prepare a pro forma statutory statement, do they meet the minimum. The ansioer is no. Now someone has taken exception to what I have done and they’ve said, okay, you know, we agree with what you did but, hey, there’s a million six over here, a big slug of money that ought to be coming in. So you asked me, did I look, did a big slug of money come in. I looked. It didn’t.
Q. You say a million six is the amount payable from the Texas HMO, correct?
A. That’s the math on that schedule which is — again, Mr. Percy, it’s a March schedule with May numbers in it. So it’s not purported to be anything other than a, pro forma of what the company looked like after the transaction, after the cash sweep transaction.
Q. And I want to understand what your testimony was. You said you verified that that still was a payable by looking at the statutory filings in June and after, correct?
A. I didn’t say I verified that that was still a payable. I said that those numbers, that that number — there was no money that came in. The way the company recorded the entry they didn’t roll it into equity as Mr. Jones implied. I said I couldn’t tell from all of the records I looked at specifically what _j^4(¡happened to it because I don’t have all the documents. So all I could do was to do the analysis I did, which is to say, okay, if I’m wwng, and God knows I have been wrong many times, if I’m wrong. I’m going to see, as Mr. Jones said, equity increasing. So I looked. Did equity increase in June? No. I went, okay, well, maybe they just weren’t smart enough to recognize it. Let me go to September. Did equity increase in September? No. Then I said, okay, well, maybe they just didn’t get it, the auditors caught it. So I go to December. Did equity change? If I just hold the PDR’s [sic] constant, I’m only going to use their numbers and hold the PDR’S [sic] constant, no, the number doesn’t change. So I don’t know what specifically happened. I wasn’t there. But what I do know, the companies were still broke and there was no big slug of money that came in, which is the suggestion that Mr. Jones makes.
Q. Mr. Buttner, didn’t you represent to this jury in your original testimony in this case that you went to the June financial statements, the June statutory financial statements and specifically looked at the accounts payable due to affiliates to make sure that there was [sic] still payables due?
A. Mr. Percy, at June 30—
Q. Please answer my question.
A. Yes, I did.
Q. Is that what you represented to the jury?
A. Yes, sir, and I did. At June 30, if you will take all three of the statutory financial statements for the three HMOs as of the pro forma date here, I think the total of that intercompany payable that Mr. Jones takes exception to is $4.1 million. Is that correct? I mean, that’s *537the math. He takes exception to 4.1 million?
Q. Mr. Buttner, I asked you a question and I’m looking for a response to my question.
A. I am trying to answer it. As of June 30, if I add up the intercompany payable due to, due from all three companies, I think it’s 3.6 or $3.8 million. So that number only changed by a half million dollars or so from the number I have on here for the pro forma. So, yes, the testimony I gave to the jury was that I looked. I did. The number is similar, and I don’t see any magic infusion of capital.
Q. Didn’t you suggest to this jury that when you looked at the June statutory filings there were numbers on the due to affiliates lines in each of those states?
|;M7A. No, I said that there were due to affiliates, and if I said they were in each of the states, then I am sorry, I misspoke without the statements here in front of me, but Texas had no due to or due from. The other two did and the totality of it was either three six or three eight.
[[Image here]]
Q. Page 79 it says question up at the top it says, question, all right. In connection with this intercompany due and from affiliates, do you remember that, and what was your answer?
A. Yes, sir.
Q. Question by Mr. George, did that appear on the statutorily filed statements from March, and what was your answer?
A. It did.
Q. And he asked you, the one on 3036, which was the exhibit, correct?
A. Yes, sir.
Q. And did it appear again in June, and what was your answer?
A. I said there were numbers that appeared on those lines in June, yes, sir, and I think the numbers were zero.
Q. So your answer is that there were numbers on that line and that zero is a number that you were referring to?
A. Well again, Mr. Percy, I don’t know if there is a zero or a slash there and this is part of the problem ivith trying to testify from memory because I had a memory of what the total was. But when 1 went back and looked the other day at the three separate states, Texas ivas zero on both counts. So again if I misspoke. I certainly don’t want to, and I apologize for misspeaking.
[[Image here]]
Q. Mr. Buttner, you would agree with me that if, in fact, the intercompany payables are zero after this transaction that you would have to make an adjustment to your analysis and add back $1.6 million on the books of the Texas HMO, would you not?
A. No, sir, that’s not accurate at all. I mean the fact that that number would have changed could have changed for any number of reasons. I mean that’s not correct at all.
Q. But you also testified, did you not, that whatever they agreed to that they did on their books, correct?
_|j48A. What I believe I said, Mr. Percy, is that I tried to account for what they did using what they did on their books and what they did, they did on their books. You know, again I am trying to be clear. I didn’t use Ed’s judgment here. I tried to use what the company did.
Q. What the company did, and that was what your testimony was correct?
A. That’s what I’m trying to do. That’s absolutely right.
*538Q. Please refer the jury to the page— refer the jury to what page on there deals with the numbers for due to affiliates, which is what we are talking about, intercompany payables, correct?
A. Well, we are talking about two things, Mr. Percy. We’re talking about intercompany payables and how they affect equity. That is what we were talking about because at the end of the day you’re trying to get credit for a million six to increase equity. Okay. And so we are going to walk through that. So if you look at line number three—
Q. What page? Please refer the jury to what page.
A. I am going to do that. It’s line five on TDI0570. And it says amount due from affiliates and in the current period there’s not a number there. And then if you’ll flip the page, and I think this is front and back, so if you go to 0572, which is the liabilities, you will see on line eleven amounts due to affiliates.
Q. How about on line six?
A. It’s zero.
Q. And what is the amount due to affiliates?
A. The amount on line six is zero.
Q. And what is the amount on line eleven?
A. The amount on line eleven is zero.
Q. There are two locations for amounts due affiliates on the — let me see if I can get Mr. George’s gesture, on the sworn quarterly financial statements that were filed with the state of Texas, correct?
A. That is absolutely right, Mr. Percy. There are zeros.
Q. And the amounts shown sworn to by the company for amounts due affiliates is what?
A. Zero.
linaQ- Zero.
A. But the equity, Mr. Percy, is $936,000.00. So if the equity at March' — and let’s go back to my schedule. Let’s go back to March, Mr. Percy.
Q. Your Exhibit-E?
A. Yeah, let’s go back to Exhibit-E.
Q. Let’s do that because I want to follow up with you on Exhibit-E.
A. Absolutely. Let’s go to the as-reported column for March for Texas. And what is the equity number for as-reported in Texas? It’s — is that a million two eighty-eight one fifty-four? I mean my eyes are pretty bad, but is that the number for Texas in the column statutory reported, a million two eighty-eight? The very last number on the bottom just before the total. Go over to the left. First column. So it’s a million two eighty-eight one fifty-four. So now between March and June this magic bean number, this million six that Mr. Jones want to count as equity, disappears. So under Mr. Jones’s analysis, I’m expecting that million two is going to be 3.8 million. But on the statement it’s 936,000. Now that is not my statement. I didn’t do it. So where is the magic bean, where’s the gold? And the answer is that there isn’t, Mr. Percy, and that’s what I am getting at.
Q. Mr. Buttner, you would have been a great football player because of how you shift around — •
A. I’m not shifting.
Q. But what we’re talking about is the intercompany payables due to affiliates number.
A. And that’s the number I’m talking about too, Mr. Percy.
Q. All right. Let me ask you this, Mr. Buttner. Where did all these numbers come from?
*539A. They came from a June — from a March 31 statutory statement filed by the HMOs.
Q. By Mr. Nazarenus and Mr. Luck-singer.
A. I believe that is right. There were some amended statements, but that is where they came from. They came from an as-filed statement.
IssnQ. And you relied on these numbers from your1 recalculation, correct?
A. I relied on those numbers to prepare a pro forma statutory analysis. Yes, sir, I did.
Q. Those same two individuals filed sworn statutory filings in June with the State of Texas, correct?
A. They did.
Q. And what was this number on the sworn statutory statement in Texas filed by the same two individuals?
A. Zero, Mr. Percy.
Q. You relied on those two individuals for these numbers—
A. I did.
Q. —But you won’t rely on those same two individuals for that number?
A. Mr. Percy, there is [sic] a lot of numbers that changed. Cash changed. The reserve balances changed. You want to focus on one number. You want to connect two dots and find the rabbit. The rabbit is not there. I don’t know whether they paid them, whether they settled them, whether they wrote them off. All I knoiv is I looked at the records and couldn’t determine it. But here’s what I know for sure. The equity, which is what we are all interested in, was there enough and did it change. And the answer is, no, it went from one two to $900,000.00 So maybe you have some magic that I don’t have and maybe Mr. Jones has some magic I don’t have, but when I add them up I don’t get the same picture you do and I guess Pm just sorry I don’t. (Emphasis added.)
After reviewing the pertinent parts of the record and the argument of counsel on this issue, we conclude as matters of fact that (1) Buttner improperly accounts for the settlement of the intercompany receivables and payables in his spreadsheet and, (2) as a matter of law, Buttner failed to' properly reverse the PDRs on his spreadsheet in reaching his conclusions.
The evidence shows that all of the Regulator personnel who reviewed the Form-A spreadsheet properly understood it: Smith (Louisiana), Espinosa (Texas), Saenz (Texas), and House (Oklahoma). Only Brignac (Louisiana) | ¡¡^failed to understand it, and she should have. Accordingly, the Receivers have failed to prove by a preponderance of the evidence that the Form-A spreadsheet was misleading.
3. Failure to file Side Letter
In her reasons for judgment in the Louisiana and Oklahoma cases, the trial judge found as a fact that Health Net committed fraud, in part, because “the side letter modifying the agreement was not sent to the regulators.” The evidence in the record shows that this factual finding is false. The testimony of Espinosa, Saenz, House, Brignac and Smith clearly shows that the Louisiana, Oklahoma, and Texas regulators were provided with the Side Letter. Moreover, Form-A documents and copies of the Form-A applications sent to the states’ regulators are contained in the record on appeal and contain copies of and references to the side letter.126 The trial court’s factual conclu*540sion on this fact is wrong as a matter of fact and law.
4. Failure to file Letter of Intent
In brief the Receivers assert that, in part, fraud was committed because the Letter of Intent executed by AmCare-co and Health Net was not filed with them. The record reflects that the Letter of Intent ivas not included in any of the Louisiana, Oklahoma, or Texas Form-A applications. Brignac testified “[w]hen a Louisiana Domestic insurance company, when the change of ownership is going to occur and the parent company has entered into a letter of intent to sell the company, we require that the letter of intent be filed with our department.” Curtis Westen of Health Net testified that he was not “aware of any rule, regulation in any state that a nonbinding | .^letter of intent must be filed with the Department of Insurance.” (Emphasis added.)
A review of the Letter of Intent shows that it specifically states that “[T]his letter of intent and the term sheet are for the purpose of setting forth the substance of the discussions between Acquiring Co. (AmCareco) and FHS and to serve as the basis for continuing discussions and preparations of definitive agreements for the Proposed Acquisition” and that “[TJhis letter of intent and the term sheet do not constitute an agreement to consummate the Proposed Acquisition or create any binding obligation in connection therewith, and no such binding obligation shall arise unless and until such definitive agreements are executed by Acquiring Co. and FHS.” (Emphasis added.)
Instructions for Form-A applications in Louisiana are found in Title 37, Part XIII, §§ 131 and 133 of the Louisiana Administrative Register. Section 3 — EXHIBITS of the Louisiana Form-A application provides at “2) Exhibit B — COPY OF ACQUISITION/MERGER AGREEMENT relative to the proposed transaction. This should include copies of any agreements described in Section 8 of the Form-A statement.”
I
Item 8 of the Form-A statement provides as follows:
ITEM 8 CONTRACTS, ARRANGEMENTS, OR UNDERSTANDINGS WITH RESPECT TO VOTING SECURITIES OF THE INSURER
Give a full description of any arrangements, or understandings with respect to any voting security of the insurer in which the applicant, its affiliates or any person listed in Item 8 is involved including, but not limited to, transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guarantees of loans, guarantees against loss, or guarantees of profits, division of losses or profits, or the giving or withholding of proxies. Such description shall identify the persons with whom such contracts, arrangements or understandings have been entered.
IssiJn Item 1 of the Louisiana Form-A entitled INSURER AND METHOD OF ACQUISITION, AmCareco advised that the purchase transaction is contained in a Stock Purchase Agreement and related Letter Agreement [Side Letter] which are attached as Exhibits B1 and B2. Then in Item 8 entitled CONTRACTS, ARRANGEMENTS, OR UNDERSTANDINGS WITH RESPECT TO VOTING SECURITIES OF THE INSURER appears the following:
The Applicant, as Buyer, and Foundation Health Corporation, Inc., as Seller, have entered into the Purchase Documents (attached to the Application as Exhibits Bl and B°2, respectively) in which the Applicant agrees to acquire 100% of the outstanding and issued shares of the HMO. There are no other *541contracts, arrangements, or understandings with respect to any voting security of the HMO. With respect to the HMO’s voting securities, the above-referenced agreements do not contain any joint ventures, loan or option arrangements, puts or calls (on the HMO’s voting securities), guarantees of loans, guarantees against loss or guarantees of profits, division of losses or profits, or the giving or withholding of proxies. (Emphasis added.)
This statement accurately describes and attaches the two documents that contain and define the substantive obligations and legal relations between the parties. The Letter of Intent provided for agreements pertaining to the discussion of potential obligations and legal relations; it did not contain any substantive provision pertaining to “any contracts, arrangements, or understandings with respect to any voting security of the insurer.” This claim is without merit insofar as it pertains to the Louisiana Receiver.127
There is no evidence in the record to support the claims of the Texas and Oklahoma Receivers that the Letter of Intent should have been filed with the Texas and Oklahoma Form-As. The only evidence on this [.^particular part of this claim is that of Westen who testified that he knew of no state that required such. The Texas and Oklahoma Receivers have not presented evidence of rules and/or regulations of any board, commission or agency of their respective states concerning this issue. La. C.E. art. 202 B(e).
Accordingly, this part of this claim is without merit.
5. Failure to file Closing Agreement
In brief, the Receivers assert that, in part, fraud was committed because the Closing Agreement was not provided to the Regulators and, in particular, paragraph 3(q) of the agreement improperly classified the PDRs as Restructuring Reserves, and this resulted in a different number for the Cash Sweep. The record does •not reflect that the Closing Agreement teas sent to the Regulators.128
Paragraph 3(q) of the Closing Agreement provides as follows:
(q) The Parties hereby acknowledge and agree that the premium deficiency reserves of the Acquired Corporations should be considered a “Restructuring Reserve” and therefore reversed pursuant to Section 2.1 of the Stock Purchase Agreement in order to calculate the Cash Payment, which reversal has been reflected in the FHS Cash Sweep and Preferred A Share Calculation prepared for Closing and attached as Exhibit E to this Agreement.
The Louisiana Spreadsheet in the Closing Agreement reflects the following: (1) a cash deficit to settle the intercompany payables and receivables — $980,671; (2) Less Cash Contributed by FHS [Health Net] to Fund Premium Deficiency — no entry; (3) cash increase in paid-in capital due to reversal of pre-existing PDR— $1,421,764; (4) cash required for AmCare-co — $6,511,482; (5) FHS [Health Net] cash sweep — $2,543,530; (6) FHS [Health Net] contribution to the purchase price of the AmCareco stock — $5,216,488: and (7) Book Value of the adjusted cash in the Louisiana |3aHMO — $7,760,019. Items 1, 3, 4, 6 and 7 are identical to the same items in the Louisiana Form-A spreadsheet. The only material difference be*542tween the two spreadsheets is that the Form-A spreadsheet contains the items “Less Cash Contributed by FHS to Fund Premium Deficiency — (2,300,000)” and “FHS Cash Sweep — (243,531)”129 that the Closing Agreement spreadsheet does not have, and the Closing Agreement spreadsheet has the item “FHS Cash Sweep— (2,543,530)” which the Form-A spreadsheet does not have. However, if $2,300,000 and $243,531 in the Form-A spreadsheet are added together the result is $2,543,531, a result that is only $1.00 different from $2,543,530 line item in the Closing Agreement spreadsheet.
Brignac gave the following pertinent testimony concerning this issue:
Q. I’d like to show you, this is a blowup of exhibit-447, the closing agreement, and specifically, the blowup is relating to section 3-q of that closing agreement, and we’ve read it before. We might — we may all have it memorized before the trial is over, for better or worse. I’ll read it for you, just to kind of speed things along. It says, post closing covenants, “q,” the parties hereby acknowledge and agree that the premium deficiency reserves of the acquired corporations should be considered a, quote, restructuring reserve, close quote, and therefore reversed pursuant to section 2.1 of the stock purchase agreement in order to calculate the cash payment, which reversal has been reflected in the FHS Cash Sweep and Preferred A Share calculation prepared for Closing and attached as Exhibit-E to this Agreement. You never saw that 3-q, correct?
A. That’s correct.
Q. In your opinion, in your thirteen years of experience as an insurance regulator, is that a provision which affected the terms of the stock purchase agreement and should have been provided to the department of insurance?
A. If the premium deficiency reserve was going to be reversed off of the financial statements and actually paid to the selling party, then yes, it would be deemed a material transaction and an amendment required to be filed.
| asfiQ. I show you another blowup from the closing agreement, exhibit-447, this is the last page, referred to as in exhibit-e in paragraph 3-q. It refers to it, exhibit-E. You never received this exhibit or the closing agreement at all, right?
A. Not that I recall.
Q. Had you received this exhibit that’s attached to the closing agreement, how would you have personally interpreted this schedule that’s attached to the closing agreement?
A. It appears that the proposed cash sweep to FHH was — FHS, excuse me, was $2.5 million.
[[Image here]]
Q. And how much total?
A. Over six million
Q. Is it over six or over eight?
A. Sorry, looks to be about 8.3 million
Q. And that, in fact, that figure on the total is the actual amount of the cash sweep that we now know was taken out almost immediately after approval, correct?
A. Well, I can speak to Louisiana, which is the 2.5.
Q. Which schedule, from your perspective, is clearer, is more direct, this exhibit-e attached to the closing agreement *543you never got, or the schedule that you got the night before the morning of the hearing, in terms of how much cash sweep was going to happen?
A. Well, both of them show a cash sweep. The one provided to the Department of Insurance showed two hundred and forty-three thousand was going to be swept out. This particular schedule shows $2.5 million.
Q. Let me ask you the direct question, Ms. Brignac. Do you believe you were fully informed by the parties to this stock purchase agreement, the predecessors to Healthnet [sic] and AmCareco, about the terms of this stock purchase agreement?
A. It was not my understanding that $2.5 million was going to be swept out. Q. Do you feel you were misled?
A. Yes, I do believe.
1 .^Subsequently, under cross-examination by counsel for Health Net, Brignac gave the following testimony:
Q. Now what I want to ask you is this number shoivs two point five four three five thirty it looks like.
A. That’s correct.
Q. Which appears to be the 24.3,000 that you say you, believe was coming out plus the $2.3 million that was tivo lines above on the form that you saw, correct ?
A. That’s correct.
Q. And those two, those two numbers add up to this.
A. Yes.
Q. My question is if you had seen this one, are you telling the jury and the court that you wouldn’t have been confused,, you would have understood that ivas the amount coming out?
A. On the very same line in this calculation this particular exhibit says $2.5 million is going to be swept out. That is how I reviewed this exhibit, and, yes, I would have been concerned about that.
Q. You would have been concerned, but you would have understood that that’s what was being represented.

A. I would have understood from this document that $2.5 million was the proposed sweep.

Q. And that’s what I’m getting at. You would not have been confused because it has the same transactions up here, correct?

A. That’s correct.

Q. The cash coming out.

A. That’s right.

In her deposition testimony, House stated:
Q. Okay. Now, let’s go to the closing agreement. And again, the closing agreement, Paragraph 3-Q, says that, “For purposes of receiving the refund of the premium deficiency reserve, the premium deficiency reserve will be considered a restructuring reserve pursuant to Section 2.1 of the stock purchase agreement.” Do you see that?
IsssA. Yes, I do.
Q. So with that foundation, ivhat effect would Paragraph 3-Q have on the cash payment calculation?

A. When reading it with 2.1, it lowers the liabilities, so it increases the potential payment.

Q. And it increases the payment by the amount of the premium deficiency reserve; right?
A. Correct.
Q. Right. And it’s true that that’s exactly what the letter agreement says; correct?
A. Correct. (Emphasis added.)
Paragraph 6 of the Side Letter is clear and unambiguous in stating that “Seller [Health Net] would be able to receive back *544any cash contributed to the Acquired Corporations [HMOs] in establishing the Additional PDR” and that “Seller would receive such cash either through the Cash Sweep procedure or the Sweep Shortfall procedure described at item 5 above.” The Louisiana Form-A spreadsheet is clear and unambiguous in referring to the $2,300,000 cash deduction as cash contributed to “fund premium deficiency” that was subject to be swept pursuant to Paragraph 6 of the Side Letter. Brignac agreed to the other cash sweep of $243,531, which obviously represented the “Cash Payment” referred to in the Stock Purchase Agreement. The sum of these two items is substantially the same as that listed for the cash sweep in the Closing Agreement. Westen, Lawrence Burdish, Byron Jones and Brian Crary all testified that Paragraph 3(q) and the spreadsheet attached to the Closing Agreement made no substantive change in the Louisiana Form-A spreadsheet. Because the total cash sweep of $2,543,530 in the Closing Agreement is essentially the same as the sum of the $2,300,000 and $243,530 shown in the Form-A spreadsheet, no material | ¡^change was made by the Closing Agreement and the Closing Agreement was not required to be filed with the Louisiana DOI.
This claim is without merit.
6. Conclusion
For all of the foregoing reasons, we conclude as a matter of law and fact that there was no fraud committed by Health Net in obtaining Regulator approval of the Stock Purchase Agreement in Louisiana, Oklahoma, and Texas because: (1) the uncontested evidence of record shows that the Side Letter of the parties was properly filed with the Regulators in each state and the trial court judge erred as a matter of fact and law by finding otherwise; (2) as a matter of law it was unnecessary to file the Letter of Intent with the Regulators because it did not affect any substantive rights of the parties; (3) as a matter of fact (a) the Closing Agreement confirmed the financial provisions of the Form-A spreadsheet, and (b) did not make a material change in the spreadsheet and, therefore, as a matter of law and fact it was unnecessary to file it with the Regulators; (4) as a matter of fact and law Buttner failed to properly reverse the pre-existing PDRs of the Louisiana, Oklahoma, and Texas HMOs on his spreadsheet; (5) as a matter of fact Buttner failed to properly settle the intercompany receivables and payables for the Louisiana, Oklahoma, and Texas HMOs on his spreadsheet; and (6) as a matter of fact the Form-A spreadsheet did not mislead the Regulators in Louisiana, Oklahoma, and Texas.
B. Fraud in Financial Reporting to Regulators After the Sale
As previously discussed, the sale of the stock in the HMOs effected substantial changes in the duties, obligations, and legal relations of and between Health Net, AmCareco, the HMOs, and the three state regulators. _[^0The control of the HMOs along with whatever obligations Health Net owed as a parent corporation to its wholly-owned subsidiaries were transferred from Health to AmCareco. Health Net became 1 of 28 shareholders in AmCa-reco. The officers and directors of Health Net owed a fiduciary duty to Health Net and its shareholders and were required to discharge the duties of their respective positions in good faith and with that diligence, care and judgment, and skill that ordinary prudent men would exercise under similar circumstances in like positions. It is well established that officers and directors owe their fiduciary obligations to the corporation and its shareholders. North American Catholic Educational *545Programming Foundation, Inc. v. Gheewalla, 930 A.2d 92, 99 (Del.Supr.2007); Guth v. Loft, 5 A.2d 503, 510 (Del.1939); cf. La. R.S. 12:91; Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939); General Dynamics v. Torres, 915 S.W.2d 45, 49 (Tex.App.-El Paso, 1995); International Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567, 576 (Tex.1963); Wilson v. Harlow, 860 P.2d 793, 798 (Okla.1993), cert. denied, 510 U.S. 1117, 114 S.Ct. 1067, 127 L.Ed.2d 386 (1994); McKee v. Interstate Oil & Gas Co., 77 Okl. 260, 188 P. 109, 112 (1920). The HMOs remained regulated insurance corporations that were obligated to file accurate quarterly and annual financial reports with the Regulators. Because the HMOs were juridical persons, they could only act through their officers, directors, and agents. Lucksinger, Nazarenus, and Na-dler were the President, CFO, and COO, respectively, of the HMOs and served in those same positions for AmCareco. Health Net, AmCareco, and AmCare-MGT were not regulated corporations. The Regulators were obligated to monitor the financial filings and conditions of the HMOs and regulate them for the best interest of the HMOs’ enrollees (members), providers, and creditors and |3fi1for the general public good. Health Net’s liability for fraud in financial reporting to the Regulators after the sale must be analyzed and determined on that basis.
1. Facts
On September 24, 1999, Nazarenus advised Brignac of LaDOI by facsimile transmission that the June 30, 1999 quarterly filing of the Louisiana HMO was being amended to show a “restated net worth of $3,785,000 as of June 30, 1999”. Nazare-nus further advised specifically as follows:
The first adjustment of $535,000 relates to an updated reconciliation of the Intercompany account balances with Foundation Health Systems as of the acquisition date of the Plan (April 30, 1999). As the intercompany balances were higher than originally recorded, a portion of cash paid at closing was reclassified from a return of capital to a payment of intercompany liabilities.
Finally, he advised, “[T]he second adjustment of $1,313,000 relates to a reversal of the premium deficiency reserve that was recorded in June 1999” because “management has concluded that a premium deficiency reserve was not warranted as of June 30, 1999 and the reserve has been reversed.” On that same date, Nazarenus advised Brian Crary of Health Net, “[T]he revised trial balances recognize adjustments to the intercompany accounts and other related accounts due to unreconciled accounts”. He further advised, “The revised cash sweep statement indicates that approximately $370,000 was overpaid to Foundation at closing and the preferred stock issued should be reduced to 12,289 shares.” He finally advised as follows:
The amounts included in the schedules are supported by documentation that is attached. To some extent, these amounts will continue to change as additional items are identified. Also, we don’t have a complete analysis of all the liability accounts for the health plans so we weren’t always able to determine if some of the adjustments had been previously recognized.
|3fii>The first exhibit attached to this letter is entitled “Analysis of Cash Transfers Adjusted April 30, 1999 versus Closing (3/31/99)”.
As previously indicated in Part X, Section D2 of this opinion, Health Net and AmCareco entered into a Transition Services Agreement wherein Health Net agreed to perform certain administrative services for the HMOs for a period of *546transition; this agreement specifically provided that AmCareco would at all times retain the ultimate authority and responsibility for the HMOs.
On November 23, 1999, the TxDOI conducted a Management Conference with the Texas HMO. Representing the Texas HMO at the conference were Lucksinger as President, Nadler as Vice President and COO, and Nazarenus as CFO. No one from Health Net attended this meeting. Among other things discussed at the meeting, Nazarenus advised that “the PDR reserve set up initially by Foundation included a wind down reserve, as of 12/31/98. AmCare didn’t think this reserve was necessary so they amortized the full amount in the second quarter of 1999.”
In 2000, AmCareco had AmCare Management, Inc., incorporated for the purpose of providing executive management, marketing, accounting and financial support, claims processing, claims analysis, statistical reporting, peer review programs, and provider and member relations services for the HMOs. The HMOs agreed to pay a per-member per-month fee for these services. The record on appeal contains no evidence to show that Health Net was involved in these activities.
During the trial, the plaintiff called Mark D. Tharp who was qualified as an expert witness in “claims processing or adjusting specifically in an insurance receivership context.” Tharp testified that in late 1999 AmCareco began a “search and selection” process for a new computer system because |363the system in place was not capable of performing all of the functions required by AmCareco. It was ultimately determined at an AmCareco Board of Directors meeting on April 17, 2000, that the GBAS system that had been acquired needed to be replaced. Tharp then testified as follows:
A. Okay. No sooner had AmCareco acquired the GBAS system than it was abandoned. Rather than stepping back and taking a reasoned and measured approach to correct the perceived problems and deficiencies with the newly acquired GBAS system. AmCareco put into motion a chain of events resulting in a piecemeal claim adjudication and payment process, which was destined for failure, thereby contributing to the demise of the AmCare Health Maintenance Organizations. This is not to mention the ill-conceived and premature acquisition of the GBAS system to begin with, a system that would not adjudicate lines of business resident with AmCare. What follows is a pattern of reactionary behavior by former management, resulting in shoddy and piecemeal adjudication and payment processes and millions of dollars in overpayments and mispay-ments to providers and members, while concurrently pursuing acquisitions, blocks of business and new business. In short, the claims adjudication and payment processes were negligent to reckless to inconceivable.
Q. Now in that description of Am-Care’s computer system, you’re referred to the management of AmCareco and AmCare HMO’s [sic], correct?
A. Yes.
Q. And you’re referring to the actions taken by Tom Lucksinger, Steve Nazar-enus, Michael Nadler, and other officers, directors of AmCareco, correct?
A. Whoever was involved in the claims payment processes.
Q. You’re not at all referring to Health Net; is that correct?
A. No, I’m not. (Emphasis added.)
On May 10, 2000, Lucksinger sent an EMail to Nazarenus that provided as follows:
*547Steve-I signed the various quarterly-state filing signature pages this evening but we need to discuss the Oklahoma filing if it is going to show us out of statutory compliance. If we are[,] then I believe we should think about making some sort of intercompany receivable/capital contribution in order to not submit showing non-compliance. If we show non-compliance |36.1they will immediately request a meeting and then demand that we infuse not just the shortfall but the estimated amount of our shortfall going forward for the rest of the year. The whole deal will get extremely sticky. If we show compliance, regardless of how we get there, they should not push us on this issue at this time-or if they do, in no way as hard as if we show up out of compliance. We will also need to immediately fund the amount that we show as the intercompa-ny payable.
On May 11, 2000, Nazarenus sent a reply to Lucksinger that provided as follows;
Let’s discuss. We can reflect an I/C receivable and a capital contribution to get us into compliance at 3/31/00; the funding of this contribution is a problem. We don’t have sufficient funds at this time nor we will [sic] for the remainder of this quarter.
Nadler was copied with both E-Mails; neither Health Net nor any of its officers or directors were sent copies of these EMails. It appears from the record that this policy was continued until, apparently, it was discontinued in the fall of 2001.
It appeal’s from the record that, during the latter part of 1999 and the early part of 2000, the Louisiana HMO “was consistently reporting at or just below its minimum net worth requirements.” The La-DOI contacted AmCareco and told it to make a cash infusion into the HMO to make up the shortage. By letter dated April 27, 2000, AmCareco requested an extension to file the Louisiana Form-B with LaDOI. Subsequently, on May 30, 2000, Nazarenus wrote to Brignac, filed with the LaDOI an amended 1999 Annual statement and an amended March 2000 quarterly statement for the Louisiana HMO, and proposed filing monthly financial statements for April, May, and June 2000 instead of making an immediate cash infusion into the Louisiana HMO. Brignac discussed this situation with Deputy Commissioner Craig Gardner and they agreed to “afford the company an opportunity to make up those net worth deficiencies with operating results conditioned on them | S(i5providing us monthly financial estimates.” There is no evidence in the record to show that Health Net was involved in any way in this transaction. Brignac testified that she had no further contact with Health Net after the closing of the sale.
Effective September 1, 2000, AmCareco acquired ownership of all of the stock of AmeriHealth of Texas, Inc. (AmeriHealth) from Independence Blue Cross, Philadelphia with TxDOI approval. The funding for this acquisition came, in part, from cash given by the following named investors in exchange for Subordinated Convertible Notes given by AmCareco: (1) Health Net-$1,750,000; (2) Dr. M. Lee Pearce — $1,500,000; (3) William Galtney— $500,000; and (4) other smaller investors — $140,000, for a total of $3,890,000.
On October 3, 2000, the true-up for the Stock Purchase Agreement between Health Net and AmCareco was executed. The final and definitive financial information for March 31, 1999, showed that Health Net was entitled to an additional 144 shares of AmCareco’s Preferred Class A stock and was entitled to $673,967 to settle various indemnity provisions of the *548sale contract. AmCareco gave Health Net a promissory note for the $673,967.
Effective December 1, 2000, AmCareco acquired ownership of all of the stock of Texas Health Choice, Inc., from Sierra Health Services, Inc., with TxDOI approval.
During the period from closing (April 30, 1999) until the true-up (October 3, 2000) AmCareco sent monthly financial statements to Health Net. Thereafter, quarterly and annual financial statements required by the Regulators were sent to Health Net.
latifDuring the period from closing until the end of 2000, except for investing in the AmeriHealth acquisition and participating in the true-up, Nazarenus, Health Net’s CFO, testified that Health Net did not “participate in any of the management of any of the HMOs.” Health Net did not have any officer or director in AmCareco or in any HMO. Health Net was not involved in any: (1) marketing, (2) sales, (3) claims functions, (4) provider contracts, or (5) member services of any of the HMOs. Health Net was not involved when AmCa-reco hired PWC as its auditor. During this time, all claims that were filed with the HMOs while they were under the control of Health Net were paid by AmCareco except for a small number that either were contested or had administrative problems. No Health Net provider who stayed on with AmCareco after the sale called on Health Net to pay a claim. By the end of 2000, Health Net had the sum of $16,191,333 invested in AmCareco as follows:
1. $13,623,366 — Class A Preferred Stock at Closing
2. 673,967 — True-up note
3. 144,000 — Class A Preferred Stock at true-up
4. 1,750,000 — AmeriHealth Note
$16,191,333
This investment by Health Net was described by some witnesses as a “passive investment.” Because of the manner in which the HMOs were managed by AmCa-reco after the sale, Health Net has potentially lost all of this investment less the $2 million redeemed in the letter of credit.
During the middle of 2000, AmCareco’s financial 'condition was such that it was unable to meet the minimum cash and surplus (net worth and surplus) requirements of Louisiana, Oklahoma, and Texas. To solve this problem, AmCareco “booked” intercompany receivables as assets even though they were in fact “cashless contributions”. AmCareco continued to pay claims as due into 2001, at which time it sometimes utilized “cash | S,i7swirls” to give the impression that the HMOs met the minimum cash and surplus requirements of the three states. On December 4, 2002, Nazarenus was interviewed about these, and the questions asked and answers given in the interview were transcribed. This document was filed in evidence and shows that in response to the question “Were contributed capital and intercompany receivables recorded for the sole purpose of misleading regulators and hiding your insolvency?” Nazarenus responded “Yes.” This admission and other evidence in the record proves that AmCareco, AmCare-MGT, the three HMOs, Lucksinger, Na-zarenus, and Nadler committed fraud in reporting the financial status of the HMOs to the Regulators after the sale. The question remaining on this issue is whether Health Net is jointly liable for this fraud.
AmCareco’s problems with the manner in which it reported intercompany receivables emerged when PWC commenced auditing the 2000 annual and quarterly financial statements of the three HMOs. At that time AmCare-OK recorded intercompany receivables of $2,800,000; AmCare-LA recorded $4,400,000; AmCare-TX recorded *549$9,800,000.130
On April 30, 2001, Lucksinger wrote a letter to “AmCareco, Inc. Shareholders” and referred to it as “Financial and Operations Update”. Lucksinger first advised that “we are still in business and growing daily.” He then advised the 28 shareholders as follows:
As to financial results, I have included herewith the January and February monthly operating statements for the Company. While these statements were somewhat disappointing to me in that we had originally forecast a profit for the first quarter of 2001 and the enclosed statements reflect consolidated losses of approximately $75,000 and $195,000 for the two months, respectively, we are pleased that in these first two months of 2001 we did in fact operate at a cash flow, i.e., |36Sthe net loss for the two months reflected in the statements was less than the non-cash expenses (depreciation, amortization, etc.) included in the net profit computation.
He then advised, “[o]verall, the fact that we are showing profits in our regulated entities with normal administrative charges is quite encouraging, particularly in view of the increasing membership in these entities over which to spread the overhead.” Lucksinger discussed the Am-eriHealth acquisition and observed:
Consequently, we believe that the $6-8 million purchase price payment which we had originally estimated would be due as of December 1 of this year has now already effectively been paid. That is the good news. The bad news is that the substantial negative cash flows on the AmeriHealth business and the likely negative balance sheet have created significant receivables from AmCareco to its regulated insurance subsidiaries. This has also substantially depleted Am-Careco’s book capital. Hoivever, since AmCareco is at or effectively at positively cash flowing, this accov.nti.ng result would not be a problem but for the various state’s [sic] insurance regulators and AmCareco’s auditors who are questioning classifying the AmCareco intercompany receivables on the regulated entity’s books as admitted assets (due to AmCareco’s weakened capital position). This issue is very significant and could be extremely detrimental to the Company if not favorably resolved. If the receivables from AmCareco to the regulated entities are not classified as admitted assets, then the capital and reserves of the regulated entities would fall below statutorily required, levels and, AmCareco would be obligated to pay off the receivables in full to bring the regulated entities into compliance. Unfortunately. AmCareco does not have the resources to pay off these intercompany payables at this time. Obviously, we are working with our auditors and the state insurance departments in regard, to the matter. We will keep you informed of developments, but it is possible that we may have to obtain either some form of intercompany payment guarantees or new capital to finally resolve the matter. We must be able to demonstrate that AmCareco has the capacity to continue forward and honor its intercompany payables in order to satisfy both the auditors and the three state insurance departments. (Emphasis added.)
Finally, Lucksinger concluded as follows:
*550In summary, I believe that subject to our resolving the intercompany payables issue with our auditors and insurance departments AmCareco has reached the point of successful continuing operations. I believe we can operate going forward |.%flwith little or no actual additional capital, save and except resolving the current auditor/regulatory intercom-pany payable issue or if additional capital became necessary to finance a substantial acquisition or merger. It is also possible that at some point during this year we could reach that point where we may be able to access the debt markets to cover cash flow requirements should any arise. However, until we resolve the intercompany payable issue we must advise you that the Company is at substantial regulatory risk. We, of course, continue to take all possible actions to address and favorably resolve tins matter. I will keep you advised concerning developments on this point. (Emphasis added.)
On May 11, 2001, Lucksinger sent the following to Westen (Health Net) with copies to Stuart Rosow (Pearce’s attorney), Nazarenus, Nadler and Todd Lucksinger (Thomas Lucksinger’s son and an employee of AmCareco):
Curt — Attached is some information which should be useful in connection with our scheduled telephone conference on next Monday morning regarding Am-Careco’s current issue with its auditors and state regulators on its intercompany payables. As I previously indicated to you, we have a serious issue which has arisen due to the auditors’ concerns with certifying the books of our state regulated entities because of the high level of intercompany receivables from AmCare-co on these subsidiaries’ books. This is an issue with which we have been concerned internally for some time due to Am,Careco’s current capitalization-or lack thereof
The attached information reflects the current status of intercompany payables, our current estimate of our outstanding settlement with IBC, and a summary of AmCareco’s operating statistics for the last year. You should also probably have available for your conversation the information which I recently sent to you and all the other shareholders concerning the current outlook for AmCareco, together with the 2001 budget included therewith. (I have also included a 2001 budget as an attachment hereto, but it is not as detailed as the information previously transmitted to you.) (Emphasis added.)
On June 5, 2001, Lucksinger wrote to the AmCareco Board of Directors concerning “Auditors/Insurance Regulators’ Capital Issues” and copied Pearce, Rosow, and Westen. He referred to a May 14, 2001 AmCareco Board of Directors meeting and discussed the AmeriHealth acquisition. He then advised as follows:
laroBut since these intercompany accounts are in the majority payable by AmCareco to its regulated subsidiary companies, PriceWaterhouse [sic] and the state insurance regulators have raised concerns regarding AmCareco’s ability to meet these intercompany obligations to the regulated entities in view of AmCareco’s current depleted capital position. If these intercompany pay-ables are not accepted by PriceWater-house [sic] and the state regulators as valid receivables such would then not be classified as admitted assets for minimum state capital purposes and AmCa-reco’s regulated entities would not be in compliance with the various states’ minimum capital requirements. The regulated entities would thereby become subject to a broad range of state regula*551tory/administrative actions, including from administrative supervision to license revocation. This is thus a very serious issue. We have had meetings with the auditors and a preliminary meeting with the Texas Department of Insurance (“TDI”) to discuss these issues.
Lucksinger further advised that “[w]e continue to work on resolving the inter-company payment and capitalization issue on a daily basis. We are in contact with a variety of parties, including the auditors, regulators, shareholders and potential outside interested, parties in addressing these issues.” (Emphasis added.) Lucksinger then concluded with the following:
I hope the foregoing has been of further informational value to you as regards the present status of AmCareco’s inter-company payable/capital issue, as well as its positive current financial operating results and future potential. Based on the current operating results as well as the positive impact which AmCareco will receive from sales and other activities which are already underway for the third quarter (presuming we can satisfactorily resolve the currently outstanding intercompany payable issue), the company’s future financial prospects seem [sic] solid. We are presently cash flowing (although the State of Texas account with its 45 day payment delay will challenge us) and feel very positive regarding AmCareco’s future success.
On July 25, 2001, representatives of Am-Care-LA met with representatives of La-DOI and requested authority to report the $4.4 million intercompany receivable balance as an asset. The record does not reflect that Health Net was present at this meeting. The request was denied by La-DOI.
|:i7iPWC refused to favorably report the AmCare-OK 2000 Annual Report until AmCare-OK’s $2.8 million intercompany receivable was collected. The “cash swirl” by AmCare-MGT previously discussed occurred on July 17, 2001. Nazarenus testified that the document that evidenced the swirl “shows funds going into Oklahoma to satisfy the auditor’s request.” After the receivable was “collected,” PWC approved the audited report. There is no evidence in the record to show that Health Net participated in this particular conduct.
The AmCare-TX 2000 Annual Report was filed on February 28, 2001, and reported $9.8 million as being due from affiliates. In July of 2001, AmCare-TX applied to the TxDOI for authority to treat this receivable as an asset. The TxDOI agreed to consider the $8 million part of the receivable acquired from AmeriHealth as an asset on the basis that the receivable was collectible and not in dispute but reserved the right to consider its collectability.
On August 17, 2001, Lucksinger sent a letter to Westen, Pearce, and Galtney (who were holders of large blocks of stock) that was referenced “AmCareco Capital and Cash Flow Funding Requirements.” A note on the letter stated that it was “highly confidential” and should not be shared “with any party who is not directly related to the operations of AmCareco and its subsidiaries, and then only on a ‘need to know’ basis.” Lucksinger first observed, “[a]s indicated in the June 30 financials recently transmitted to you and earlier financial information provided to you, Am-Careco was profitable on a company wide basis for the second quarter of this year.” He then pointed out that “[hjowever, despite this positive result as regards the profitability of current and ongoing operations, we continue to be stressed by ever increasing demands from both the insurance department regulators and Jjj2ongoing operations for both capital and more operating cash. It is our present *552estimate that AmCareco will run out of operating cash between the upcoming September 1 and September 15. In addition, AmCareco is already either actually or effectively undercapitalized for state regulatory purposes in each of its jurisdictions.” Lucksinger then discussed the capital and cash requirements and summarized with the following:
In summation, from both the regulatory capital requirement perspective and from our cash flow operating requirements, AmCareco requires $8 million or more in additional cash and capital at this time. Without this infusion the Company will not be able to continue, which event would be disastrous from the investors’ perspective since the Company has now reached profitability with tremendous upside potential.
Lucksinger then concluded with the following observations:
While the last thing that I wish to do is to present each of you with the hard facts contained in this memorandum, there is basically nothing I can operationally do at the present time to circumvent the situation. I have run out of smoke and min ors.
[[Image here]]
We have successfully grown AmCare to a representative size organization and have attained a level of profitability based on the limited capital with which we have had to work, but we do not have enough remaining capital to maintain regulatory compliance and grow the Company. If we can raise the capital necessary to attain my originally estimated required level, I believe that my current estimate of forward-looking results will again be determined to be reasonably accurate. In addition, we are also presently being provided some exceedingly attractive acquisition opportunities which can likely be effected for relatively small amounts of cash as compared to the resulting operation and its valuation potential. The upside potential for AmCareco is significant. I am thus asking each of you to work with me to raise the capital and operating funds required in order to continue the success of AmCare that we have enjoyed, to date and to realize all of the profit potential which presently exists for the Company and its shareholders. Without the additional capital infusion the result will be a loss of all of our respective investments and the almost three years of tremendous effort put in by AmCareco’s management and staff to bring the Company to its current status. Your immediate assistance would be greatly appreciated. (Emphasis added.)
1373On September 7, 2001, AmCareco issued an Operational and Funding Analysis which provided for, among other things, “Potential Investment Outcomes” and “Current Potential Investment Alternatives.”
On October 10, 2001, Scott H. West-brook, the Vice President of AmCare-LA, sent an E-Mail to Lucksinger and Nadler stating that “[o]ur lagging claims payment situation has reached a critical point with providers.” He concluded with the observation, “At this point, our claims payment situation has impacted most all departments and our ability to maintain group renewals, obtain new groups and negotiate favorably with providers.”
In the fall of 2001, Jeffrey C. Villwok, the Managing Partner of Harpeth Capital Atlanta, a subsidiary of Caymus Partners, was contacted by Pearce who advised that he had an equity investment in AmCareco, that AmCareco was not doing very well, and asked Villwok to “see what could be done.” Caymus Partners is a middle market investment bank that does advisory work pertaining to private placement of *553debt and equity securities. Pearce was concerned about his investment and wanted to know “what the company needed ... in order to be successful.” Villwok “analyzed by quarters the results of the operation since they had acquired the business from Health Net,” got historical information from Pearce, and contacted and got information from Lueksinger. Villwok formed “the initial view ... that this company hit bottom, was starting to do better.” Possible solutions considered were merger or another round of private equity investors. Villwok met with the AmCare-co Board of Directors on March 18, 2002. Westen attended this meeting but did not participate in it. Villwok opined that Am-Careco needed a $30 million infusion of capital. He later gave the following reasons for this opinion:
b!74Q. Now turn to page 44, line 13. Question, one thing we haven’t talked about is the reason when Mr. Lucksinger — when you first got in touch with him, what the reasons were for the need for thirty million investment. Do you remember those?
A. Yeah, we talked about that at some length. When they bought the portfolio from Health Net, I think they had made some unrealistically optimistic assumptions about the profitability of the portfolio, about the ability to have a certain medical loss ratio and the medical costs had run higher. They found out that the portfolio had a fair amount of adverse selection in it as it came to profitability of certain lines of business or certain contracts. And so they needed to terminate certain contracts. But in the process of doing that and getting their systems up and running, the financial table that we reviewed earlier indicated that-^and they had lost a fair amount of money. And so they had not, I don’t believe, originally budgeted for that size loss. And, therefore, they needed the capital to not only recoup their loss and, you know, they were behind in reserves with, I believe, all three states. And so the idea was to put your reserves back in full compliance and at the same time provide growth capital so that as this company went from 100,000 lives to a hundred and fifty or two hundred or 300,000 lives that the working capital was already there to support that growth.131
By message dated March 4, 2002, Na-zarenus advised Lueksinger and Nadler that the 2001 Annual statements were completed and mailed on March 1, 2001. It was stated that Oklahoma had a net worth of $814,000, $11,664,000 in net inter-company receivables, cash available lor operations of a negative $324,000, and a claims payable balance of $13,719,000; Louisiana had a net worth of $2,832,000, $8,172,000 in net intercompany receivables, cash available for operations of a negative $476,000, and a claims payable balance of $4,802,000; and Texas had a net worth of $2,924,000, $21,797,000 in net intercompa-ny receivables, cash available for operations of $3,343,000, and a claims payable balance of $32,070,000.
|375On April 30, 2002, AmCare-Ok’s license to operate in Oklahoma expired, the HMO was placed on “operations limited to conclusion of business,” and renewal of the license was denied on October 1, 2002.
On May 1, 2002, the LaDOI placed the Louisiana HMO under administrative supervision.
*554On June 4, 2002, Health Net sent a letter to AmCareco advising of proposed terms and conditions for it to make any future investment in AmCareco. Paragraph 4a of this letter provided as follows:
4. Conditions to Investment. Shareholder shall not be obligated to make the Additional Investment, or any part thereof, unless the following conditions have been satisfied:
a. All regulatory approvals or filings reasonably necessary in order to consummate the Restructuring, including without limitation the acceptance and approval of a plan of rehabilitation for the AmCareco regulated subsidiaries by the state insurance departments in which each subsidiaries operate (collectively, the “Insurance Departments”), approvals of the Insurance Departments as required for the consummation of the transactions contemplated in the Restructuring, and expiration of the applicable waiting period after submission of a Hart-Scott-Rodino filing, shall be received or made, as applicable.
On or about July 26, 2002, Health Net exercised its contractual right to require AmCareco to redeem its Class A Preferred Stock with the $2 million secured by the letter of credit with the Chase Bank of Texas.
AmCare-LA was placed in rehabilitation on September 23, 2002.
AmCare-TX was placed in receivership on December 16, 2002.
2.The Law of Fraud
a. Texas
The Texas tort of fraud was previously discussed in Part VI, Section D2b of this opinion. The elements of fraud by misrepresentation in Texas are as follows:
|87B1. a party makes a material misrepresentation;
2. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion;
3. the misrepresentation is made with the intention that it should be acted on by the other party; and
4. the other party relies on the misrepresentation and thereby suffers injury.
The elements of fraud by omission (failure to disclose when there is a duty to disclose) are as follows:
1. a party fails to disclose a material fact within the knowledge of that party;
2. the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth;
3. the party intends to induce the other party to take some action by failing to disclose the fact; and
4. the other party suffers injury as a result of the action without knowledge of the undisclosed fact.
However, as previously indicated in Part VI, Section D2a, the language of Article 2.21 of the Tex. Bus. Corp. Act is clear and unambiguous in providing that a shareholder (Health Net) “shall be under no obligation to the corporation” in which it holds shares (AmCareco) with respect to “any contractual obligation ... or any matter relating to or arising from the obligation” of the corporation (AmCareco) on the basis that the shareholder (Health Net) “was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to perpetuate fraud, or other similar theory.” This limitation is applicable unless the obligee (the Texas *555HMO and/or its creditors as represented by the Texas Receiver) proves the following elements: (1) the shareholder (Health Net) caused the corporation (AmCareco and/or the Texas HMO) to be used to perpetuate \ñllacttial fraud on the obligee (Texas HMO and/or its creditors); and (2) this conduct was primarily “for the direct personal benefit ” of the shareholder (Health Net).132 Article 2.21 preempts all other tort causes of action except those specifically created by another statute.
b. Oklahoma
In Oklahoma the common law version of the tort of fraud prevails and it is essentially the same as the Texas standard instruction version. In Ramsey v. Fowler, 308 P.2d 654, 656 (Ok.1957), the following elements are set forth:
1. defendant made a material misrepresentation;
2. it was false;
3. he made it when he knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion;
4. he made it with the intention it should be acted upon by the plaintiff;
5. the plaintiff acted in reliance upon it; and
6. he thereby suffered injury.
See also Rogers v. Meiser, 68 P.3d 967, 977 (Okla.2003).133
c. Louisiana
In Louisiana, contractual fraud is a vice of consent that can be the basis for rescission of a contract; it is specifically provided for in La. C.C. art. 1953 et seq. Fraud also is a tort that is generally provided for in La. C.C. art. 2315 et seq. Griffin v. BSFI Western E & P, Inc., 2000-2122, pp. 8-9 |87R(La.App. 1 Cir. 2/15/02), 812 So.2d 726, 734. The jurisprudence in Louisiana construing the Civil Code tort Article on fraud is not as well developed as that construing the Civil Code contract articles on fraud.134 However, a review of the Civil Code Articles on contractual fraud are instructive in determining how the tort article should be interpreted. Thus, the Civil Code provides as follows:
Art.1953. Fraud may result from misrepresentation or from silence
Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.
Art.1954. Confidence between the parties
Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill.
*556This exception does not apply when a relation of confidence has reasonably induced a party to rely on the other’s assertions or representations.
Art.1955. Error induced by fraud
Error induced by fraud need not concern the cause of the obligation to vitiate consent, but it must concern a circumstance that has substantially influenced that consent.
Art.1957. Proof
Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence.
Louisiana jurisprudence indicates that the following are the elements of the tort of fraud:
1. a misrepresentation of material fact; |S7<>2. made with the intent to deceive;
3. reasonable or justifiable reliance by the plaintiff; and
4. resulting injury.
The intent to deceive is a specific intent. Systems Engineering v. Science & Engineering, 2006-0974, p. 3 (La.App. 4 Cir. 6/20/07), 962 So.2d 1089, 1091; Guidry v. United States Tobacco Co., Inc., 188 F.3d 619, 627 (C.A.5 [La.] 1999); F. Maraist & T. Galligan, supra, § 2.06(10), pp. 2-39 & 40 and the cases cited therein. To find fraud from silence or suppression of the truth, there must exist a duty to speak or disclose information. Boucosky Services, Inc., 1998-2339 at p. 12, 751 So.2d at p. 287.
In her judgment in the Louisiana case, the trial court judge ruled that “the plaintiff sustained its burden of proving by a preponderance of the evidence that Health Net, Inc., is liable for negligent misrepresentations which proximately caused damage to the Louisiana HMO or its creditors.” Negligent misrepresentation is encompassed within the broad language of La. C.C. art. 2315. Louisiana Retailers Mut. Ins. Co. v. DeRamus, 2006-1427, pp. 4-5 (La.App. 1 Cir. 5/4/07), 960 So.2d 1048, 1050-1051, writ denied, 2007-1189 (La.9/21/07), 964 So.2d 336; Ethyl Corp. v. Gulf States Utilities, Inc., 2001-2230, p. 8 (La.App. 1 Cir. 10/2/02), 836 So.2d 172, 178, writ denied, 2002-2709 (La.12/19/02), 833 So.2d 340; Abbott v. The Equity Group, Inc., 2 F.3d 613, 624-625 (C.A.5 [La.] 1993), cert. denied., 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); F. Maraist & T. Galligan, supra, § 5.07(8), pp. 5-32 to 5-34.1; W. Crawford, supra, § 2.11, p. 3 Pocket Part. Negligent misrepresentation is essentially a less culpable version of fraud because fraud requires specific intent.
However, as previously indicated in Part X, Section B2 of this opinion, La. R.S. 12:93 B is clear and unambiguous in providing “[a] | ^shareholder of a corporation ... shall not be liable personally for any debt or liability of the corporation.” (Emphasis added.) The provisions of La. R.S. 12:93 B are tempered by La. R.S. 12:95 which provides that “[n]othing in this Chapter shall be construed as in derogation of any rights which any person may by law have against a ... shareholder ... because of any fraud practiced upon him by any of such persons or the corporation, or in derogation of any right which the corporation may have because of any fraud practiced upon it by any of these persons.” (Emphasis added).
When La. R.S. 12:93 B and 12:95 are interpreted in reference to each other, it must be concluded that fraud as provided for in La. R.S. 12:95 is the sole tort cause of action that the Louisiana Receiver has against Health Net as a stockholder in AmCareco. The cause of action for negligent misrepresentation is not the same as that for fraud which requires specific intent. Accordingly, the trial court judge committed legal error by ruling that *557“Health Net, Inc. is liable for negligent misrepresentation which proximately caused damage to the Louisiana HMO or its creditors.”
3. Conclusion
A review of the jurisprudence pertaining to fraud in Louisiana, Oklahoma, and Texas shows that they have three common elements: (1) a misrepresentation (falsity); (2) of a material fact; and (3) a specific intent to deceive. Pursuant to Article 2.21, Texas requires two additional elements to prove fraud by a shareholder: (1) the shareholder used the corporation (Am-Careco) to perpetuate actual fraud on the obligee (AmCare-TX and/or its creditors) and (2) the fraud was for the direct personal benefit of Health Net.
The preponderance of the evidence shows the following. In May of 2000 Am-Careco began to have financial problems concerning the |3Si availability of enough cash to pay claims and maintain the minimum cash and surplus necessary to meet state and regulator requirements. Luck-singer, AmCareco’s president, Nazarenus, Amcareco’s CFO, and Nadler, AmCareco’s COO, concocted a scheme to book inter-company receivables (capital contributions) that did not reflect the actual available cash in the five-corporation system. Neither the regulators nor the other shareholders were advised about this policy. This practice continued into 2001, when the 2000 Annual Reports for the regulators were being audited by PWC and the regulators became aware of the practice. During April of 2001, Lucksinger advised the 28 AmCareco stockholders of the practice and the problem. At this point in time, the AmCareco shareholders (other than Luck-singer, Nazarenus, and Nadler) were not parties to the proscribed practice, and therefore, had no liability for it.
In the April 2001 letter, Lucksinger specifically advised all 28 shareholders that “the various state’s insurance regulators and AmCareco’s auditors ... are questioning classifying the AmCareco intercompa-ny receivables on the regulated entity’s books as admitted assets (due to AmCare-co’s weakened capital position).” At this point in time, the parties who had the primary and overriding interest in this practice (the regulators and auditors) already knew of and were questioning the practice. For Health Net to advise them of what they already knew would be a vain and useless act. Accordingly, Health Net, as a shareholder, had no duty to do so. Instead, at this point in time, Health Net’s primary duty was to its shareholders.
There is no evidence in the record that shows that, during the period from April 2001 until the HMOs were put in receivership, Health Net or any other shareholder (other than Lucksinger, Nazarenus, and Nadler) made a [^misrepresentation of material fact with an intent to deceive to a Regulator or auditor. Instead, the record shows that Health Net tried to work with Pearce and Galtney to fashion a plan to salvage the AmCareco operations. This is evidenced by the June 4, 2002 letter sent by Health Net to AmCareco proposing terms and conditions for future investments in AmCareco.
The plaintiffs have failed to prove by a preponderance of the evidence that Health Net committed fraud in reporting to regulators after the sale.
C. Conclusion
These assignments of error have merit.
XII. LIABILITY FOR BREACH OF FIDUCIARY DUTY
A. The Texas Case
(Assignment of Error TX-17, TX-26)
In its First Supplemental and Amending Petition in Intervention,-the Texas Receiver asserted as follows:
*55823. At least by the time AmCareco or the single business enterprise that consisted of all the AmCare enterprises became insolvent, the Control GroupC135] also owed a fiduciary duty and a duty of good faith and fair dealing to the creditors, which as to AmCareco included AmCare-TX, AmCare-LA, AmCare-OK and AmCare Management [sic], [Health Net] also owed a fiduciary duty to all of the creditors of all entities of the single business entities, including all of the people and entities that have assigned claims to the [Texas Receiver], [Health Net] breached theses duties. This breach was a proximate cause of damages to the groups to which duty was owed.
In the Texas case, the jury found Health Net “breached a fiduciary duty that caused damage to the Texas HMO or its creditors.”
Health Net argues that it did not owe any fiduciary duties to the HMOs before or after the sale of the HMOs to AmCare-co.
laaaThe Texas Receiver responds Gellert, Health Net’s CEO, was a director of the Texas HMO; Gellert owed fiduciary duties to the HMO; and Gellert breached his fiduciary duties to the HMO when he approved the cash sweep. Further, Health Net owed a fiduciary duty to the Texas HMO pursuant to Tex. Ins.Code Article 20A.08, now § 843.401 of the Tex. Ins.Code. Health Net breached its fidueia-ry duty by benefiting from the cash sweep, knowing it would render the HMOs unable to meet their statutory and other legal obligations. Health Net injected money into the HMOs “to make the HMOs temporarily ‘solvent’ for regulatory purposes.” Thus, “[B]ecause the three HMOs were already insolvent prior to the sale to Am-Careco, Health Net owed pre-sale fiduciary duties to the creditors of the HMOs.” Pursuant to Tex. Ins.Code Article 21.49-1, § 2(d), Health Net was a controlling shareholder after the sale and continued to owe fiduciary duties to the creditors of the HMOs.136 Finally, “[t]hese fiduciary duties required Health Net to assure that the HMOs were operated in a manner that did not defraud the creditors or cause them an unreasonable risk of harm, and especially to refrain from engaging in or allowing activities that benefited Health Net at the expense of these creditors.”
1. Pre-sale fiduciary duties
The elements of a claim for breach of fiduciary duty are: (1) the existence of the duty; (2) breach; (3) causation; and (4) resulting damages. |384Jones v. Blume, 196 S.W.3d at 447. The weight of authority in the common law holds that a parent corporation owes no fiduciary duties to its wholly-owned subsidiary. See Westlake Vinyls, Inc. v. Goodrich Corp., 518 F.Supp.2d 902, 917 (W.D.Ky.9/27/07); Anadarko Petroleum Corp. v. Panhandle Eastern Corp., 545 A.2d 1171, 1174 (Del.1988); Abex, Inc. v. Koll Real Estate *559Group, Inc., 1994 WL 728827, p. 16 (Del.Ch. Dec.22, 1994); Richardson v. Reliance Nat’l Indem,. Co., 2000 WL 284211, p. 12 (N.D.Cal. Mar.9, 2000); Household Reinsurance Co., Ltd. v. Travelers Ins. Co., 1992 WL 22220, pp. 8-4 (N.D.Ill. Jan.31, 1992); Resolution Trust Corp. v. Bonner, 1993 WL 414679, pp. 2-3 (S.D. Tex. June 3,1993).
According to the order approving the sale of the Texas health plan, there was “no evidence upon which the [Texas] Commissioner could predicate a denial of the acquisition of control, under TEX. INS. CODE ANN. Art. 20A.05 § (d) and 28 TEX. ADMIN. CODE § 11.1205(a).”137 As evidenced by the Texas regulators’ approval of the sale, AmCare-TX could be expected to meet its obligations and had the required capital. The preponderance of the evidence shows that, at the time of the sale, the Texas HMO was not insolvent.
Texas Business Corporation Act art. 2.21 is the statute that specifically provides for shareholder liability for fraud, is exclusive and preempts any other type of liability under the common law or otherwise, | .^except liability provided for by another statute. The Texas Insurance Code, § 843.401, is such a statute, and it specifically applies to the Texas HMO and provides as follows:
A director, officer, member, employee, or partner of a health maintenance organization who receives, collects, disburses, or iibvests funds in connection with the activities of the health maintenance organization is responsible for the funds in a fiduciary relationship to the enrollees. (Emphasis added.)[138]
Section 843.401 is clear and unambiguous in imposing fiduciary responsibilities on the directors and officers of a Texas HMO if they receive, collect, disburse, or invest funds in connection with the activities of the health maintenance organization. Prior to the sale, Gellert was on the Board of Directors of the Texas HMO and Jansen, Health Net’s vice president, assistant general counsel and assistant secretary, was the secretary of the Texas HMO. Section 843,401 also is clear and unambiguous in providing that only specified persons owe a fiduciary duty to HMO enroll-ees and, then, only if such persons collect, disburse, or invest funds in connection ivith the activities of the Texas HMO. The evidence in the record on appeal does not establish that Gellert, acting as a director of the Texas HMO, or Jansen, acting as the secretary of the Texas HMO, engaged in any receiving, collection, disbursement, or investment activities of funds of the HMO prior to the sale. Therefore, neither Gellert nor Jansen owed a fiduciary duty to the HMO enrollees prior to the sale. Accordingly, in the Texas case, Health Net could not be vicariously liable through Gel-lert and/or Jansen for a fiduciary duty owed to an enrollee prior to the sale as a matter of law.
Section 843.401 is also clear and unambiguous in not imposing a fiduciary relationship on a shareholder of a Texas HMO *560to enrollees. Prior |SRfito the sale, Health Net was not a director, officer, member, employee, or partner of the Texas health maintenance organization. Because Health Net was not one of the types of persons listed in § 843.401, it did not owe a fiduciary duty to the Texas HMO enroll-ees. Further, because the Texas legislature provided for the fiduciary duty to flow from specified persons to HMO enrollees only, and Texas like Louisiana applies an “actual language used” standard of statutory construction, see Osterberg v. Peca, 12 S.W.3d 31, 38 (Tex.2/3/00), cert. denied, 530 U.S. 1244, 120 S.Ct. 2690, 147 L.Ed.2d 962 (2000), it is arguable that no fiduciary duty flows to HMO employees, providers, and other creditors (who were not provided for). Cf. Ransome v. Ransome, 2001-2361, p. 6-7 (La.App. 1 Cir. 6/21/02), 822 So.2d 746, 753 and the authorities cited therein.
The sale of the Texas HMO stock by Health Net to AmCareco was a valid sale and was not fraudulent. The Texas Regulator specifically found that “[N]o evidence was presented that the acquisition of control [of the HMO] would violate any laws of this State ... ”. The Texas plaintiff has failed to prove by a preponderance of the evidence that there was a breach of a fiduciary duty (if one existed) by Health Net connected with the sale of the stock in the Texas HMO.
2. Post-sale fiduciary duties
Because we held in Part IX of this opinion that the sale was valid, the legal relations between the parties were modified after the sale. In this factual posture, after the sale, Health Net was a shareholder in AmCareco and not in the Texas HMO. Health Net was not a director, officer, member, employee, or partner of the Texas HMO. Health Net as a shareholder of AmCareco did not owe a fiduciary duty to the Texas HMO and did not owe a fiduciary duty to the enrollees of the Texas HMO pursuant to Section |SR7843.401 as a matter of law. Further, because Health Net was not in a single business enterprise with AmCareco, it could not be vicariously liable with it on that basis.
B. The Louisiana Case
(Assignment of Error LA-13, Supp-4)
In their Consolidated, Amended and Restated Petition, the Louisiana and Oklahoma Receivers asserted as follows:
78.
Each of the D & O Defendants [139], [Health Net], Rosow, Proskauer Rose and PWC aided and abetted breaches of applicable statutes and regulations, breaches of fiduciary duty and fraud by the others and willfully conspired with the others in connection with the wrongful conduct outlined in this Petition.
[[Image here]]
81.
[[Image here]]
i. From the time the single business enterprise comprised of AmCareCo [sic], AmCare-MGT, AmCare-LA, AmCare-TX and AmCare-OK became insolvent, the D & O Defendants owed a fiduciary duty and a duty of good faith an[d] fair dealing under relevant law to creditors of the HMOs. The D & O Defendants breached these duties in all of the particulars discussed in this Paragraph and otherwise in this Petition.
*561In the Louisiana and Oklahoma cases the trial court judge, in her August 20, 2007 written reasons for judgment, found Health Net breached a fiduciary duty and stated the following:
(B) How Health Net breached a fiduciary duty that caused damage to the Louisiana and Oklahoma HMOs.
| ^Recognizing that all three plans had been losing money for several years, Health Net refused to wind down operations without delay upon instructions of Dr. Malik Hasan, MD, and CEO, as was being done with the Utah plan; submitted misleading financial statements and other documents to confound the regulators; infused $6 million to meet statutory capitalization and withdrew it thirty days later; swept $8.3 million cash and deposited it in their own coffers causing insolvency immediately thereafter; removed the premium deficiency reserve; and impaired the capital. Became controlling shareholders (47%), in a shell corporation created for the sole purpose of divestiture of the three orphans [sic] HMOs.[140]
Health Net argues that it did not owe any fiduciary duties to the HMOs before or after the sale of the HMOs to AmCare-co.
The Louisiana Receiver responds Health Net, as a controlling shareholder, owed a fiduciary duty to the corporation, asserting “Health Net breached its fiduciary duty [to the HMOs] by taking an action benefiting the parent corporation (the cash sweep) knowing it would render the HMOs (the subsidiaries) unable to meet their statutory and other legal obligations.” “[The fiduciary duties that Health Net owed] required Health Net to assure that the HMOs were being run properly in a manner that did not defraud the creditors or cause them an unreasonable risk of harm, and especially to refrain from engaging in or allowing activities that benefited Health Net at the expense of those creditors.”
1. Pre-Sale fiduciary duties
Under the Louisiana Business Corporation Law, a fiduciary is any natural or juridical person “who or which occupies a position of peculiar confidence toward any other natural or juridical person.” La. R.S. 12:1 J. The fiduciary’s duty includes the ordinary duties owed under tort principles, as well as a legally imposed duty which requires the fiduciary to handle the |Sgi)inatter “as though it were his own affair.” Federal Deposit Insurance Corp. v. Caplan, 874 F.Supp. 741, 744 (W.D.La.1995), quoting, Noe v. Roussel, 310 So.2d 806, 819 (La.1975). “The dominant characteristic of a fiduciary relationship is the confidence reposed by one in the other and [a person] occupying such a relationship cannot further his own interests and enjoy the fruits of an advantage taken of such relationship. He must make a full disclosure of all material facts surrounding the transaction that might affect the decision of his principals.” Plaquemines Parish Commission Council v. Delta Dev. Co., Inc., 502 So.2d 1034, 1040 (La.1987) (quoting Anderson v. Thacher, 76 Cal.App.2d 50, 172 P.2d 533, 543 (1946)).
Louisiana Revised Statutes 12:91 provides, in pertinent part:
A. Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment, and skill which ordinary prudent men would *562exercise under similar circumstances in like positions; however, a director or officer shall not be held personally liable to the corporation or the shareholders thereof for monetary damages unless the director or officer acted in a grossly negligent manner as defined in Subsection B of this Section, or engaged in conduct which demonstrates a greater disregard of the duty of care than gross negligence, including but not limited to intentional tortious conduct or intentional breach of his duty of loyalty
[[Image here]]
B. As used in this Section, “gross negligence” shall be defined as a reckless disregard of or a carelessness amounting to indifference to the best interests of the corporation or the shareholders thereof. (Emphasis added.)141
| :W0Louisiana Revised Statutes 22:2007 A pertains specifically to Louisiana HMOs and provides:
Any director, officer, or employee of a health maintenance organization who receives, collects, disburses, or invests funds in connection with the activities of such health maintenance organization shall be responsible for such funds in a fiduciary relationship to the health maintenance organization. (Emphasis added.)
Health Net was the sole shareholder of the Louisiana HMO. La. R.S. 22:2007 A is clear and unambiguous in imposing flducia-ry responsibilities on the directors, officers, and employees of the Louisiana HMO; it is also clear and unambiguous in not imposing fiduciary duties on a shareholder of the Louisiana HMO. Thus, prior to the sale, Health Net individually did not owe a fiduciary duty to the Louisiana HMO because it was not one of the types of persons listed in La. R.S 22:2007 A.
Moreover, as previously indicated in Part X, Section B2 of this opinion, pursuant to La. R.S. 12:93 B and La. R.S. 12:95, in Louisiana the shareholder of a corporation can be liable only for the tort of fraud. Therefore, Health Net, in its capacity as shareholder, cannot be liable for the tort of breach of a fiduciary duty as a matter of law.
The evidence in the record on appeal indicates that prior to the sale, Gellert, Health Net’s CEO, was on the Board of Directors of the Louisiana HMO and Jansen, Health Net’s vice president, assistant general counsel and assistant secretary, was secretary of the Louisiana HMO. La. R.S. 22:2007 A is clear and unambiguous in providing that only specified persons owe a fiduciary duty to the HMO and then only if they receive, collect, disburse, or invest funds in connection with the activities of the Louisiana HMO. The record on appeal does not indicate that either Gellert or Jansen engaged in any of these activities prior to the sale. Therefore, neither Gellert nor Jansen |Ri)1owed a fiduciary duty to the Louisiana HMO prior to the sale. Accordingly, in *563the Louisiana case, Health Net cannot be vicariously liable through Gellert and/or Jansen as a matter of law prior to the sale.
Finally, the sale of the Louisiana HMO stock by Health Net to AmCareco was valid and was not fraudulent. The Louisiana Regulator approved the sale stating that the acquisition was “in the best interest of the policyholders and the citizens” of this state. The Louisiana Regulator has failed to prove by a preponderance of the evidence that there was a breach of a fiduciary duty (if one existed) by Health Net connected with the sale of the Louisiana HMO.

2. Post-Sale fiduciary duties

Considering we held in Part IX of this opinion that the sale was valid, the legal relations between the parties were modified when the sale occurred. In this factual posture, Health Net is a shareholder in AmCareco and not in AmCare-LA. Health Net is not a director, officer, or employee of AmCare-LA. As provided for in La. R.S. 22:2007 A, Health Net as a shareholder of AmCareco did not owe a fiduciary duty to AmCare-LA as a matter of law.
C. The Oklahoma Case
(Assignment of Error OK-13)
1. Pre-Sale fiduciary duties
“Under Oklahoma law, a fiduciary relationship exists whenever trust is placed by one person in the ‘integrity and fidelity’ of another.” FDIC v. UMIC, Inc., 136 F.3d 1375 (C.A.10 [Okla.] 1998), cert. denied, 525 U.S. 962, 119 S.Ct. 404, 142 L.Ed.2d 328 (1998), quoting In re Estate of Beal, 1989 OK 23, ¶ 15, 769 P.2d 150, 154. A fiduciary relationship “is not confined to any specific association of parties” and “[n]o precise language can define the limits of the relation.” Beal at ¶ 15, 769 P.2d at 155, quoting |;i92In re Null’s Estate, 302 Pa. 64, 153 A. 137 (1930). In some cases, the relationship “is a conclusion of law; in others ... it is a question of fact to be established by the evidence.” Id.
It is well settled that directors of a corporation owe a fiduciary duty to the corporation and its stockholders under the common law in Oklahoma. Wilson v. Harlow, 860 P.2d at 798. Oklahoma cases refer to a triad of fiduciary duties owed by directors: due care, loyalty, and good faith. Beard v. Love, 173 P.3d 796, 804 (Okla.Civ.App.Div.2, 8/28/07) (citing Emerald Partners v. Berlin, 787 A.2d 85, 90 (Del.Supr.11/28/01)). These duties, however, do not extend to creditors of the corporation. Resolution Trust Corp. v. Greer, 911 P.2d 257, 264-65 (Okla.1995).
36 Okla.StAnn. § 6906 provides, in pertinent part:
A director, officer, employee or partner of a health maintenance organization who receives, collects, disburses or Invests funds in connection with the activities of the organization shall be responsible for the funds in a fiduciary relationship to the organization. (Emphasis added.)
This language essentially is the same as La. R.S. 22:2007 A. Because this language is essentially the same, it must be construed in the same way and the legal result of that construction must be the same. Section 6906 is clear and unambiguous in imposing fiduciary responsibilities on the directors, officers, employees, and partners of an Oklahoma HMO if they receive, collect, disburse, or invest funds in connection with the activities of the health maintenance organization. The record on appeal does not establish that Gellert or Jansen engaged in any receipt, collection, *564disbursement, or investment activities of the funds of the HMO prior to the sale.
Section 6906 is also clear and unambiguous in not imposing a fiduciary relationship on a shareholder of an Oklahoma HMO. Prior to the sale, Health Net was not a director, officer, employee, or partner of the |:i9aOklahoma health maintenance organization. Because Health Net was not one of the types of persons listed in § 6906, it did not owe a fiduciary duty to the Oklahoma HMO.
Finally, review of the evidence in the record shows that as a matter of fact, as well as law, the existence or breach of a fiduciary duty between the Oklahoma HMO and Health Net has not been proven by a preponderance of the evidence.
2. Post-Sale fiduciary duties
After the sale, Health Net was a shareholder in AmCareco, Health Net was not a shareholder in the Oklahoma HMO, and Health Net was not a director, officer, employee, or partner of the Oklahoma HMO. Health Net as a shareholder of AmCareco did not owe a fiduciary duty to the Oklahoma HMO as a matter of law or fact.
D. Conclusion
These assignments of error have merit.
XIII. LIABILITY FOR VIOLATION OF THE TEXAS INSURANCE CODE
A. The Texas Case
(Assignments of Error TX-16, TX-25)
In her First Supplemental and Amending Petition in Intervention, the Texas Receiver asserted as follows:
42. During the period in question, ... Health Net [was a] person ... engaged in the insurance business. [Health Net] violated Tex. Ins.Code Art. 21.21 § 4(1), § 4(2), § 4(5)(a) and (b), and § 4(11). They further violated Article 21.21 thixmgh their violation of § 17.46(b)(24) of the Texas Business & Commerce Code.... Each of the ... defendants are “persons” within the meaning of Art. 21.21 § 16(a) who engaged in the prohibited practices and each such Defendant controlled the insurance companies -within the meaning of Art. 21.49-1 (c) and § 823.005 of the Texas Insurance Code.
|p,<MThe jury in the Texas case found Health Net had knowingly engaged in an “unfair or deceptive act or practice that was the proximate cause of damage to the Texas HMO, or its creditors.”
On appeal, Health Net argues:
[T]he Receivers did not even attempt to establish that Health Net committed any such acts when it operated the HMOs before the 1999 AmCareco sale. They never showed that the HMOs prepared or filed any false statements or engaged in any false advertising during Health Net’s period of pre-sale control ... [,] made no serious attempt to establish that Health Net committed any such acts in connection with AmCareco’s efforts to obtain regulatory approval for the proposed sales ... [and] failed to show any violation based on post-sale activity ... because AmCareco, not Health Net, owned and operated the HMOs after the sale.
The Texas Insurance Code Article 21.21 provides, in pertinent part:
Unfair Methods of Competition and Unfair or Deceptive Acts or Practices Defined
Sec. 4. The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance:
*565(1) Misrepresentations and False Advertising of Policy Contracts. Making, issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby or the dividends or share of the surplus to be received thereon, or making any false or misleading statements as to the dividends or share of surplus previously paid on similar policies, or making any misleading representation or any misrepresentation as to the financial condition of any insurer, or as to the legal reserve system upon which any life insurer operates, or using any name or title of any policy or class of policies misrepresenting the true nature thereof, or making any misrepresentation to any policyholder insured in any company for the purpose of inducing or tending to induce such policyholder to lapse, forfeit, or surrender his insurance;
(2) False Information and Advertising Generally. Making, publishing, disseminating, circulating or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in a newspaper, magazine or other publication, or in the form of a notice, circular, pamphlet, letter or poster, or over any radio or television station, or in any other way, an advertisement, 139.-,announcement or statement containing any assertion, representation or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business, which is untrue, deceptive or misleading;
[[Image here]]
(5) False Financial Statements, (a) Filing with any supervisory or other public official, or making, publishing, disseminating, circulating or delivering to any person, or placing before the public, or causing directly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public, any false statement of financial condition of an insurer with intent to deceive;
(b)Making any false entry in any book, report or statement of any insurer with intent to deceive any agent or examiner lawfully appointed to examine into its condition or into any of its affairs, or any public official to whom such insurer is required by law to report, or who has authority by law to examine into its condition or into any of its affairs, or, with like intent, wilfully omitting to make a true entry of any material fact pertaining to the business of such insurer in any book, report or statement of such insurer;
[[Image here]]
(11) Misrepresentation of Insurance Policy. Misrepresenting an insurance policy by:
(a) making an untrue statement of material fact;
(b) failing to state a matei'ial fact that is necessary to make other statements made not misleading, considering the circumstances under which the statements were made;
(c) making a statement in such manner as to mislead a reasonably prudent person to a false conclusion of a material fact;
(d) making a material misstatement of law; or
(e) failing to disclose any matter required by law to be disclosed, including a failure to make disclosure in accordance with another provision of this code.
*566The purpose of Article 21.21 “is to regulate trade practices in the business of insurance by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.” (Emphasis added.) Tex. Ins.Code art. 21.21 § 1(a);_|396Dagley v. Haag Engineering Co., 18 S.W.3d 787, 792 (Tex.App.-Houston 3/23/00). Article 21.21 of the Texas Insurance Code creates a cause of action for injuries caused by practices declared to be “unfair or deceptive” in section 4 of Article 21.21. The action may be maintained against “the person or persons engaging in such acts or practices.” Tex. Ins.Code art. 21.21 § 16. For purposes of Article 21.21, the term “person” is defined as “any individual, corporation, association, partnership, reciprocal exchange, inter-insurer, Lloyds insurer, fraternal benefit society, and any other legal entity engaged in the business of insurance, including agents, brokers, adjusters and life insurance counselors.” (Emphasis added.) Tex. Ins. Code art. 21.21, § 2(a).
The Texas Supreme Court considered who is a “person” under Article 21.21 in Liberty Mutual Ins. Co. v. Garrison Contractors, Inc., 966 S.W.2d 482, 485 (Tex.1998). The term “person” was held broad enough to include individual employees who “engage in the business of insurance” but not “an employee who has no responsibility for the sale or servicing of insurance policies and no special insurance expertise, such as a clerical worker or janitor.” Liberty Mutual Ins. Co., 966 S.W.2d at 486.
As previously indicated, the rules for interpretation of Texas laws are substantially the same as those in Louisiana. Article 21.21, § 2(a) is clear and unambiguous in providing that a corporation and its agents, brokers, and adjusters can be persons subject to liability for engaging in an unfair or deceptive act or practice as defined in § 4 of the Article. Befoi'e the sale of the stock of the HMOs to AmCareco, Health Net was the parent corporation of a wholly-owned subsidiary, the Texas HMO. The Texas HMO was the “entity engaged in the business of insurance.” Health Net was not a person engaged in the business of insurance. As discussed in Part VI, Section D2c 1397of this opinion, as a matter of law, Article 21.21 does not apply to Health Net as a shareholder of the Texas HMO.
After the sale of the stock of the HMOs to AmCareco, Health Net was a shareholder of AmCareco which was the new parent corporation of a wholly-owned subsidiary that “engaged in the business of insurance.” As such, Article 21.21 does not apply to Health Net.
B. The Louisiana and Oklahoma Cases
(Assignments of Error LA-11, LA-12, OK-11, OK-12, LA-Supp-5e and OK-Supp-5e)
Health Net argues that Article 21.21 “has no conceivable application to ... the Louisiana or Oklahoma HMOs, which did no business in Texas.”
As we held in Part V of this opinion, Louisiana law applies in the action brought by the Louisiana Receiver and/or the Louisiana Commissioner in a Louisiana court, unless for a particular issue, the totality of the circumstances in an exceptional instance indicates that the policies of another state would be more seriously impaired than those of this state if the law of that state was not applied to that particular issue. We also held that Oklahoma’s law should be applied to the action brought by the Oklahoma Receiver.
The Texas Insurance Code clearly and unambiguously states its purpose is to *567“regulate trade practices in the business of insurance ... in [Texas].” Tex. Ins.Code art. 21.21 § 1(a). There is no serious impairment of this Texas law by not applying it in the Louisiana and Oklahoma actions. Accordingly, we find no basis for the application of Article 21.21 to these Louisiana and Oklahoma actions.
C. Conclusion
These assignments of error have merit.
ImbXIV. liability for conspiracy
A. The Texas Case
(Assignments of Error TX-15, TX-18, TX-24)
In her First Supplemental and Amending Petition in Intervention, the Texas Receiver asserted as follows:
20. The Control Group ..., the Officers and Director Defendants, and HealthNet [sic], Proskauer Rose, Stewart Rosow[,] and PricewaterhouseCoop-ers [sic] each agreed to continue to operate AmCare-TX, AmCare-OK[,] and AmCare-LA even thought each of those entities were insolvent hoping to improve the cash flow of the HMOs with the goal to sell them at a profit, which would benefit each of the conspirators or them principals. Thus conspiracy was carried forward by, among other illegal acts, filing false quarterly financial statements with the regulators in the applicable states, and by defrauding the employees, employers[,] and healthcare providers who dealt with AmCare-TX, AmCare-OK[,] and AmCare-LA. Specifically, they failed to disclose to these people and entitles material facts within their knowledge, when they knew that the employers, employees[,] and healthcare pxwiders were ignorant of those facts and did not have an equal' opportunity to discover the truth. The control Group and the other conspirators intended to induce these people and entities to pay premiums by failing to disclose to them that the HMOs were insolvent and that the conspirators and others were hiding their insolvency by recording worthless accounts receivable as assets on the HMOs’ books.
[[Image here]]
37. Each of the defendants agreed to the scheme to operate insolvent HMO’s [sic] and to disguise their insolvency by showing on the books of those HMO’s accounts receivables from an insolvent parent and insolvent affiliate. Each agreed to the scheme for those insolvent insurance companies to sell health insurance, to accept premiums, to contract with healthcare providers while the insurance companies’ insolvency was being hidden from regulators and without disclosing the insolvency to the people and entities these HMO’s [sic] did business with.
38. All of the defendants willingly conspired with the others in connection with the wrongful conduct outlined above to commit breaches of fiduciary duty and fraud. (Emphasis added.)
|SMThe jury in the Texas case found Health Net conspired with another person, and this proximately caused damage to the Texas HMO or its creditors.
Health Net argues the Receiver did not prove what “ ‘wrong against, or injury on, another’ Health Net and Lucksinger specifically intended to ‘inflict.’ ” The Texas Receiver responds:
[W]hat parties in a conspiracy do is the proof of what they intended and decided, to do. A conspiracy may be established by proof which shows a concert of action or other facts from which the natural inference arises that the wrongful, overt *568acts were committed in furtherance of a common design, intention, or purpose of the conspirators. The circumstantial evidence of conspiracy here was abundant. (Emphasis in original; citations omitted.)
Conspiracy is a derivative tort in Texas. RTLC AG Products, Inc., v. Treatment Equip. Co., 195 S.W.3d 824, 833 (Tex.App.-Dallas 6/27/06, no pet.). To prevail on her conspiracy claim, the Texas Receiver was required to produce evidence of the following elements: (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result. Denson v. Dallas County Credit Union, 262 S.W.3d 846, 850 (Tex.App.-Dallas 8/15/08), reh’g overruled, (9/30/08). For a civil conspiracy to arise, the parties must be aware of the harm or wrongful conduct at the inception of the combination or agreement. Firestone Steel Products Company v. Barajas, 927 S.W.2d 608, 614 (Tex.1996).
Civil conspiracy is a specific intent tort. Triplex Communications, Inc. v. Riley, 900 S.W.2d 716, 719 (Tex.1995, reh’g overruled, (7/21/95)). The elements of conspiracy require some participation in an underlying tort; if no intentional tort was committed, there is no claim for conspiracy. |400Firestone Steel Products, 927 S.W.2d at 617; Tilton v. Marshall, 925 S.W.2d 672, 681 (Tex.1996); Trammell Crow Company No. 60 v. Harkinson, 944 S.W.2d 631, 635 (Tex.1997). Proof of a civil conspiracy may be, and usually must be, made by circumstantial evidence, but vital facts may not be proved by unreasonable inferences from other facts and circumstances. Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp., 435 S.W.2d 854, 858 (Tex.1969).
As a matter of law, a parent corporation cannot conspire with its wholly-owned subsidiary. Copperweld Corp. v. Independence Tube Co., 467 U.S. 752, 777, 104 S.Ct. 2731, 2744-45, 81 L.Ed.2d 628 (1984); Atlantic Richfield Co. v. Misty Products, Inc., 820 S.W.2d 414, 420 (Tex.App.-Hous. [14 Dist.] 1991). Accordingly, as a matter of law, Health Net, as the parent corporation, could not have conspired with its wholly-owned subsidiary, the Texas HMO, before the sale of stock to AmCareco.
As previously discussed, we do not find Health Net liable for any intentional tort either before the sale of the stock of the HMOs to AmCareco or after. If there is no underlying wrong, there can be no conspiracy. Tilton, 925 S.W.2d at 681.
B. The Louisiana Case
(Assignments of Error LA-10, LA-Supp-8)
In their Consolidated, Amended, and Restated Petition, the Louisiana and Oklahoma Receivers asserted as follows:
28.
[Health Net] and the D & O Defendants therefore conspired in and agreed upon a plan or scheme to make the subsidiaries look better capitalized than they actually were, in order to mislead the respective regulators. Specifically, [Health Net] loaned $2.3 Million in cash to the Louisiana HMO, $2.9 Million in cash to the Oklahoma HMO, and $3.3 Million in cash to the Texas HMO in March of 1999 on a very short-term basis, but the transfers were not booked as loans. Rather, these |401 cash infusions were booked as capital contributions and were deliberately made to appear as paid in capital on the quarterly financial statements ending March 31, 1999. These quarterly financial state-*569merits, which materially misrepresented the true nature of the capitalization of the HMOs as of that time, were then submitted to the respective regulators for their consideration in deciding whether to approve the proposed sale to AmCareCo [sic], [Health Net] and the D & 0 Defendants, however, had planned and schemed in advance that the amounts detailed in this paragraph would be transferred back to [Health Net] immediately after the sale of the HMO subsidiaries.
[[Image here]]
77.
The D & 0 Defendants, [Health Net], Rosow, Proskauer Rose and PWC agreed to and conspired in a scheme to operate insolvent HMOs and to disguise the insolvency by showing on the books of those HMOs accounts receivables from an insolvent parent and insolvent affiliates. Each agreed to the scheme for those insolvent insurance companies to sell health insurance, to accept premiums, to contract with healthcare providers while the insurance companies’ insolvency was being hidden from regulators and without disclosing the insolvency to the people and entities these HMOs did business with.
78.
Each of the D & 0 Defendants, [Health Net], Rosow, Proskauer Rose and PWC aided and abetted breaches of applicable statutes and regulations, breaches of fiduciary duty and fraud by the others and willfully conspired with the others in connection with the wrongful conduct outlined in this Petition.
[[Image here]]
83.
[[Image here]]
f. [Health Net] controlled AmCareCo [sic] and consequently its three HMOs at all relevant times along with the D & 0 Defendants, and were co-conspirators in or at least jointly negligent in all acts and omissions of the D & 0 Defendants. (Emphasis added.)
In her judgment, the trial court judge stated that the plaintiff proved that “Health Net, Inc. conspired with other persons which proximately caused damage to the Louisiana HMO or its creditors.” In the Louisiana and Oklahoma cases, the trial court judge in her August 20, 2007 written reasons |4fl2for judgment found Health Net conspired with others to cause damage to the HMOs. The trial judge stated:
Health Net conspired with AmCareco to prolong the impending disaster until it could extract its $2 million put, using the carrot-and-stick approach. Specifically it continued to suggest to skeptics that they might infuse capital....
Health Net conspired with Thomas Lucksinger by installing him as president and CEO of AmCareco and allowing him an exorbitant rate of pay ... for a period in excess of three years, thereby allowing him to recoup his $1 million investment while enjoying corporate perks that were emoluments of his salary.
Health Net argues:
The Oklahoma and Louisiana Receivers argued in post-trial briefing that Health Net conspired with Lucksinger and AmCareco through the negotiations and execution of the Purchase Agreement to accomplish an unlawful act: creating and operating statutorily insolvent and grossly undercapitalized HMOs. In other words, they contended the parties intended to obtain regulatory approval of what appeared to be a legal transac*570tion, but then immediately employed the cash sweep to render the HMOs statutorily insolvent.
... [T]he Receivers introduced no evidence whatsoever that Health Net specifically intended (let alone even understood) the cash sweep would have that effect. The Receivers introduced no direct ... [or] circumstantial evidence that Health Net intended the cash sweep to render the HMOs statutorily insolvent.
The Louisiana Receiver responds, “Health Net conspired with Tom Luck-singer of AmCareco, at least, to bring about the misleading documentation provided to the regulators and the secret cash sweep.”
Conspiracy is not a substantive tort in Louisiana. Louisiana Civil Code Article 2324 A provides that “[h]e who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person for the damage caused by such act.” (Emphasis added.) Our Supreme Court has said that this article does not by itself impose liability for a civil conspiracy. Ross v. Conoco, Inc., 2002-0299 (La.10/15/02), 828|403So.2d 546, 552. Citing Butz v. Lynch, 97-2166, p. 6 (La.App. 1 Cir. 4/8/98), 710 So.2d 1171, 1174, the Louisiana Supreme Court noted that the conspiracy by itself was not the actionable tort under La. C.C. art. 2324. The actionable element of a claim of conspiracy pursuant to Article 2324 pertains to loss distribution and not substantive liability. Accordingly, because Health Net is not liable for a substantive tort, conspiracy has not become an issue in the Louisiana case. In Louisiana the concept of civil conspiracy is only relevant to the distribution of quantum after liability is determined.
C. The Oklahoma Case
(Assignment of Error OK-10)
To Health Net’s assignment of error that the trial court judge erred in holding Health Net conspired with AmCa-reco and Lucksinger, the Oklahoma Receiver responds, “Health Net conspired with Tom Lucksinger of AmCareco, at least, to bring about the misleading documentation provided to the regulators and the secret cash sweep.”
Conspiracy is a derivative tort in Oklahoma. In Brock v. Thompson, 1997 OK 127, ¶ 39, 948 P.2d 279, 294, the Oklahoma Supreme Court stated “A civil conspiracy consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means. Unlike its criminal counterpart, civil conspiracy itself does not create liability. To be liable[,] the conspirators must pursue an independently unlawful purpose or use an independently unlawful means. There can be no civil conspiracy where the act complained of and the means employed are lawful.” Id. (Footnotes omitted; emphasis in original.)
“A conspiracy between two or more pei'-sons to injure another is not enough; an underlying unlawful act is necessary to prevail on a civil 14n4conspiracy claim.” Roberson v. PaineWebber, Inc., 2000 OK CIV APP 17, ¶ 21, 998 P.2d 193, 201 (Citation omitted; emphasis added). For Health Net to be hable for a civil conspiracy, it is necessary that Health Net be liable on an underlying unlawful act alleged by the Receivers. As previously discussed, Health Net is not liable on any of the underlying unlawful acts alleged by the Receivers. With no underlying unlawful act, a conspiracy claim cannot prevail.
D. Conclusion
These assignments of error have merit.
*571XV. COSTS
A. Facts
In each of the three consolidated district court cases, the trial court rendered judgments which cast Health Net with all costs and provided that the amount of the costs due would be determined at a subsequent rule to tax costs. The record on appeal does not reflect that such a rule has been held. However, the record on appeal contains two other trial court judgments that provide for the allocation and taxing of costs. The first dated October 11, 2005, is certified as a final judgment pursuant to La. C.C.P. art. 1915 by the trial court and dismisses all claims of the Louisiana, Oklahoma, and Texas Receivers in the three actions against M. Lee Pearce, M.D. “with prejudice, and with the parties bearing their own costs.” The second is dated October 13, 2005, “is designated a final judgment” and dismisses all claims of the Louisiana, Oklahoma, and Texas Receivers against PWC in the three actions with prejudice and provides that “each party shall pay its own Court costs and attorneys’ fees.” Each of these judgments was rendered pursuant to a compromise agreement that previously was approved by a court order and | ^judgment. Compromises are nominate contracts provided for in La. C.C. art. 3071 et seq. and are binding on the parties. Further, the record on appeal does not reflect that these judgments dismissing Pearce and PWC have been appealed, and, thus, they are definitive, res judicata, and executory.142
B. Conflict of Laws on Costs
As previously discussed in Section V of this opinion, matters of procedure are determined by the law of the forum, ie., the place where the action is filed. Section 127 of the Restatement (Second) of Conflict of Laws states at Comment a, “The local law of the forum governs, among other things, ... costs and security for costs.” This comment was cited as authority in Standard Reserve Holdings, Ltd. v. Downey, 2004 WL 3316264, p. 7 (Md.Cir.Ct.2004). The Restatement (Second) of Conflict of Laws § 122 notes:
Enormous burdens are avoided when a court applies its own rules, rather than the rules of another state, to issues relating to judicial administration, such as the proper form of action, |.tnfiservice of *572process, pleading, rules of discovery, mode of trial and execution and costs.
But see U.S. v. French Sardine Co., 80 F.2d 325, 326 (C.A.9 1935).
Accordingly, costs herein will be allocated pursuant to the law of Louisiana.
C. Louisiana Law on Costs
Louisiana Code of Civil Procedure Article 1920 provides:
Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.
Louisiana Code of Civil Procedure Article 2164 provides:
The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal. The court may award damages for frivolous appeal; and may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered equitable.
Louisiana Revised Statutes 13:4521, provides in pertinent part:
A. (1) Except as provided in R.S. 13:5112, R.S. 19:15 and 116, and R.S. 48:451.3, and as hereinafter provided, neither the state, nor any ... other political subdivision ... nor any officer or employee of any such governmental entity ivhert acting within the scope and authority of such employment or when discharging his official d,uties shall be required to pay court costs in any judicial proceeding instituted or prosecuted by or against the state, or any such parish, municipality, or other political subdivision, board, or commission, in any court of this state or any municipality of this state. (Emphasis added.)
Louisiana Revised Statutes 13:5112, provides an exception:
A. In any suit against the state or any department, board, commission, agency, or political subdivision thereof, the trial or appellate court, after taking into account any equitable considerations as it would under Article 1920 or Article 2164 of the Code of Civil Procedure, as applicable, may-grant in favor of the successful party and against the state, department, board, commission, agency, or political subdivision against tvhich \imjudgment is rendered, an award of such successful party’s court costs under R.S. 13:4533 and other applicable law as the court deems proper but, if awarded, shall express such costs in a dollar amount in a judgment of the trial court or decree of the appellate court. (Emphasis added.)[143]
Louisiana Revised Statutes 22:744 provides:
The commissioner of insurance shall not be required to pay any fee to any public officer for filing, recording or in any manner authenticating any paper or instrument relating to any proceeding under this Part [Part XVI, Rehabilitation, Liquidation, Conservation, Dissolution, and Administrative Supervision], nor for services rendered by any public officer for serving any process; but such fees and costs may be taxed as costs against the defendant in the suit by order of the court and paid to such public officer.
As indicated in these statutes, certain governmental entities may be cast with costs only when the action is against them *573as defendants. In this case, the Louisiana Commissioner and Receiver is a plaintiff and not a defendant and the action is not against him. Further, La. R.S. 13:5112 only applies to the state, or any department, board, commission, or political subdivision; the Commissioner in his capacity as Receiver is not one of these named entities in section 5112. Instead, he is an officer of the State of Louisiana and covered by La. R.S. 13:4521. Jarrell v. Town of New Llano, 2007-0787, pp. 8-9 (La.App. 3 Cir. 12/28/07), 973 So.2d 952, 958-959, writ denied, 2008-0234 (La.3/24/08), 977 So.2d 959. The language of La. R.S. 13:5112 is clear and unambiguous and does not apply to the Commissioner in his capacity as a receiver; La. R.S. 13:4521 prevails and costs may not be assessed against him.144
LosThe Texas and Oklahoma Receivers have limited sovereign immunity in their respective states. Texas Tort Claim Act, Tex. Civ. Prac. & Rem.Code Ann. §§ 101.001-109; 42 Tex. Jur. 3rd, Govern-meat, Tort Liability, § 13; 51 Okla. Stat. Ann. §§ 152.1, 153, and 155; Medina v. State, 871 P.2d 1379 (Okla.1993); Black’s, pp. 752-53. But when a state voluntarily enters the courts of another sovereign state as a party plaintiff, it waives its sovereign immunity and subjects itself to liability for costs in the same manner as any other litigant. State ex rel. Reynolds v. Smith, 19 Wis.2d 577, 583-84, 120 N.W.2d 664, 668 (1963); State of North Dakota v. State of Minnesota., 263 U.S. 583, 585, 44 S.Ct. 208, 209, 68 L.Ed. 461 (1924); 81A C.J.S. States § 299, p. 952.
A review of the record on appeal in these matters reveals no definitive determination of the particular costs attributable to each separate action.
It is well settled in Louisiana that a court has great discretion in awarding costs, including expert witness fees, deposition costs, exhibit costs, and related expenses. Gauthier v. Wilson, 2004-2527, pp. 6-7 (La.App. 1 Cir. 11/4/05), 927 So.2d 383, 387, writ denied, 2005-2401 (La.3/31/06), 925 So.2d 1258. The only costs taxable against a litigant are those provided for by positive law. Degruise v. Houma Courier Newspaper Corp., 2000-0229, p. 9 (La.App. 1 Cir. 3/28/02), 815 So.2d 1074, 1081, writs denied, |.(nn2002-1202, 2002-1179 (La.6/21/02), 819 So.2d 342, 345. La. R.S. 13:4533 provides as follows: “The costs of the clerk, sheriff, witness’ fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court, shall be taxed as costs.” (Emphasis added.)
*574Louisiana Revised Statutes 13:3666 provides:
A. Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of time employed and the degree of learning or skill required.
B. The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment either:
(1) From the testimony of the expert relative to his time rendered and the cost of his services adduced upon the trial of the cause, outside the presence of the jury, the court shall determine the amount thereof and include same. (2) By rule to show cause brought by the party in whose favor a judgment is rendered against the party cast in judgment for the purpose of determining the amount of the expert fees to be paid by the party cast in judgment, which rule upon being made absolute by the trial court shall form a part of the final judgment in the cause. (Emphasis added.)
D. Allocation of Costs
The instant matter is one of three actions which were consolidated for purposes of trial on the merits by a ruling by the trial court judge on November 8, 2004. Consolidation of actions pursuant to La. C.C.P. art. 1561 is a procedural convenience designed to avoid multiplicity of actions and does not cause a case to lose its status as a procedural entity. Reed v. Pittman, 257 La. 389, 242 So.2d 554 (1970); Burke v. State Farm Mutual Automobile Insurance Company, 234 So.2d 432 (La. App. 1 Cir.1970); Voth v. American Home Assurance Company, 219 So.2d 236 (La.App. 1 Cir.1969); Darouse v. Mamon, 201 So.2d 362 (La.App. 1 Cir.1967). 1 ^Consolidation of actions for trial does not procedurally merge the actions for all purposes. Dendy v. City Nat. Bank, 2006-2436, p. 6 (La.App. 1 Cir. 10/17/07), 977 So.2d 8, 11. Procedural rights peculiar to one case are not rendered applicable to a companion case by the mere fact of consolidation; each case must stand on its own mei’its. Howard v. Hercules-Gallion Co. 417 So.2d 508, 511 (La.App. 1 Cir.1982). For the same reason, within consolidated actions procedural responsibilities peculiar to each action remain distinct and the costs must be allocated accordingly.
Therefore, it is ordered, adjudged, and decreed that the costs that are attributable to Pearce, PWC, and the Louisiana, Oklahoma, and Texas Receivers that have been allocated by the compromises and judgments pertaining to those persons must be determined, allocated, and taxed first in the trial court. Thereafter, the remaining trial court costs shall be determined, allocated, and taxed as follows:
(1) in Nineteenth Judicial District Court Docket Number 499,737, Court of Appeal Docket Numbers 2006-1140-1142, 2006-1143-1145, and 2006-1158-1163, the Texas Receiver and the Oklahoma Receiver each shall be cast for one-half (1/2) of the costs attributable to that action;
(2) in Nineteenth Judicial District Court Docket Number 509,297, Court of Appeal Docket Numbers 2006-1140-1142, Health Net shall be cast with one-half (1/2) of the cost attributable to that action and the Texas Receiver and the Oklahoma Receiver each shall be cast with one-fourth (1/4) of *575the costs attributable to that action; and
(3) in Nineteenth Judicial District Court Docket Number 512, 366, Court of Appeal Docket Numbers 2006-4140-1142, 2006-1143^145,4!! and 2006-1158-1163, the Texas Receiver and the Oklahoma Receiver each shall be cast with one-half (1/2) of the costs attributable to that action.
In these consolidated actions on appeal in Court of Appeal Docket Numbers 2006-1140-1142, 2006-1143-1145, and 2006-1158-1163, all appellate costs are allocated and taxed as follows: (1) the cost of the transcript shall be allocated twenty percent (20%) to Health Net, forty percent (40%) to the Texas Receiver, and forty percent (40%) to the Oklahoma Receiver, and these amounts shall be determined and taxed in the trial court; and (2) the court costs attributable to this Court are allocated and taxed at the same rates.
After this judgment becomes final and definitive, pursuant to La. C.C.P. arts. 2166 and/or 2167, the trial court judge shall expeditiously proceed to fix and hear a rule to determine, allocate, and tax all costs of these proceedings as provided for herein.
DECREE
For the foregoing reasons, the judgments of the trial court in favor of the Louisiana, Oklahoma, and Texas plaintiffs on all of the tort causes of action herein are reversed and judgment is rendered in favor of Health Net, Inc., and against J. Robert Wooley, Commissioner of Louisiana, Kim Holland, Insurance Commissioner for the State of Oklahoma, and Jean Johnson, Texas Special Deputy Receiver, dismissing all of their petitions asserting tort causes of action with prejudice.145
|412A11 costs in this action shall be determined, allocated, and taxed as provided for in Part XV of this opinion.
REVERSED AND RENDERED.
*576APPENDIX 1 FILED k2005 J. ROBERT WOOLEY, _ COMMISSIONER OF INSURANCE'FOR1 STATE OF LOUISIANA, AS LIQUIDATOR FOR AMCARE HEALTH PLANS OF LOUISIANA, INC, ET AL VERSUS P© THOMAS S- LUCKS1NGER, ET AL ^ ..CONSOLID] IRTED Vlimty ***"• Numbar 499,737 DIVISION "D" JUDICIAL DISTRICT COURT PARISH OF EAST BATON ROUGE STATE OF LOUISIANA J. ROBERT WOOLEY. COMMISSIONER OF INSURANCE FOR STATE OF LOUISIANA, AS LIQUIDATOR FOR AMCARE HEALTH PUNS OF LOUISIANA, INC, ET AL. VERSUS FOUNDATION HEALTH CORP, ET AL Numbar. 309,297 DIVISION “D" 19™ JUDICIAL DISTRICT COURT PARISH OF EAST BATON ROUGE STATE OF LOUISIANA CONSOLIDATED WITH J, ROBERT WOOLEY, COMMISSIONER OF INSURANCE FOR STATE OF LOUISIANA, AS UQUDATOR FOR AMCARE HEALTH PUNS OF LOUISIANA, INC, ET AL. VERSUS PRICEWATERHOUSECOOPERS, LLP Numbar 512,398 DIVISION “Ir 19™ JUDICIAL DISTRICT COURT PARISH OF EAST BATON ROUGE STATE OF LOUISIANA JURY INTERROGATORIES 1. Do you find by the preponderance of Iho evidence thet the defendant Health Net, Inc. was at fault In the transactions at issue with the Texas HMO? 2. Do you find by the preponderance of the evidence that any other person or company wjpwrffautt In the transactfona at issue with the Texas HMO? Yes No
*577[[Image here]]
*578[[Image here]]
*579[[Image here]]
*580[[Image here]]
*581[[Image here]]
*582[[Image here]]
*583[[Image here]]
*584[[Image here]]
*585IM2Í1322M1 DOCUMENTS AND EXHIBITS, HAS READ TRANSCRIPTS, BRIEFS, AND MEMORANDA IN A PAINSTAKINGLY, THOUGH BELATED, EFFORT TO COMPLY WITH THE ORDER OF THE COURT OF APPEAL, AND ITS OWN OBLIGATION TO RENDER JUSTICE FOR THE LITIGANTS, COUNSEL!. AND THE PUBLIC AT LARGE, ALL WHILE MAINTAINING ITS AMBITIOUS DOCKET, ITS PUBLIC, ADMINISTRATIVE, AND QUASI-JUDICIAL FUNCTIONS. RESULTANTLY, ANY ERRORS OR OMISSIONS SHOULD BE VIEWED IN THAT CONTEXT AND UNDER THOSE CONSTRAINTS. IN ACCORDANCE WITH THE INSTRUCTIONS OF THE COURT OF APPEAL FIRST CIRCUIT, ISSUES ADDRESSED IN THE REASONS FOLLOW: (A) ALLOCATION OF FAULT WITH AN ITEMIZATION OF EACH PERSON AND COMPANY AT FAULT XN THE LUMP SUM CATEGORIES OF "ANY OTHER PERSONS" AND "ANY OTHER COMPANY." HEALTH NET 701, AMCARECO 15%, THOMAS LUCKSINGER 15%. HOW HEALTH NET BREACHED A FIDUCIARY DUTY THAT CAUSED DAMAGE TO THE LOUISIANA AND OKLAHOMA HMDS. RECOGNIZING THAT ALL THREE FLANS HAD BEEN LOSING MONEY FOR SEVERAL YEARS, HEALTH NET REFUSED TO WIND DOWN OPERATIONS WITHOUT DELAY UPON INSTRUCTIONS OF DR, MALIK HASAN, MD, AND CEO, AS WAS BEING DONE WITH THE UTAH PLAN; SUBMITTED MISLEADING FINANCIAL STATEMENTS AND OTHER DOCUMENTS TO CONFOUND THE REGULATORS; INFUSED 36 MILLION TO MEET STATUTORY CAPITALIZATION AND WITHDREW IT THIRTY DAÍS LATER; SWEPT ?8.3 MILLION CASH AND DEPOSITED IT IN THEIR OWN COFFERS CAOSING INSOLVENCY IMMEDIATELY THEREAFTER; REMOVED THE PREMIUM DEFICIENCY RESERVES; AND IMPAIRED THE CAPITAL, BECAME CONTROLLING SHAREHOLDERS (471), IN A SHELL CORPORATION CREATED FOR THE SOLE PURPOSE OF DIVESTITURE OF TRAUD THAT CAUSED DAMAGE TO THE HMOS-1 Hi JUDICIAL DISTRICT COURT 2
*586[[Image here]]
*587[[Image here]]
*588[[Image here]]
*589[[Image here]]
*590[[Image here]]

. Even the interrogatories submitted to the Texas jury were under all three District Court Docket Numbers.

. The trial court did not render judgments adjudicating the issues in each numbered trial court action individually; instead, the trial court rendered the following four individual judgments: (1) for the Louisiana Receiver on both the contract and tort causes of action under all three District Court Docket Numbers: (2) for the Oklahoma Receiver on the tort causes of action under all three District Court Docket Numbers: (3) for the Texas Receiver on the tort causes of action memorializing the jury verdict on the tort causes of action under all three District Court Docket Numbers; and (4) against the Texas Receiver granting a judgment notwithstanding the verdict (JNOV) in favor of Health Net under all three District Court Docket Numbers. Thus, *338instead of having four judgments pertaining to three district court docket numbers on appeal, there are four judgments pertaining to twelve District Court Docket Numbers oil appeal.

. Some testimony and evidence referred to in this opinion pre-date Health Net's name change and identify Health Net as Foundation, Foundation Health System or FHC. For clarity, we will refer to the corporation as Health Net.

. The term used to describe the process of gradually lessening the business activity with the intent of bringing the business to an end.

.Louisiana, Oklahoma, and Texas each regulate and require licensing to conduct insurance business within their respective states. See La. R.S. 22:4 (By 2008 La. Acts, No. 415, effective January 1, 2009, the Louisiana Insurance Code will be renumbered. The renumbering will not change the substance of the pi'ovisions. For the sake of clarity, we will refer to the Louisiana Insurance Code sections as they were numbered prior to the 2009 renumbering.); 36 Okla. Stat. Ann. § 606; V.T.C.A. Ins.Code § 801.051.

. In the record, Mr. Nazarenus' name is sometimes spelled Nazarenas.

. In the record, Mr. Jhin's name is sometimes spelled Jihn.

. Hasan testified that if Lucksinger “gets better contracts” and "controls the business” the HMOs "may in the future, have some value” and this was a reason to take the stock in AmCareco.

. This target date was not met.

. This target dale was not met.

. These redemption rights gave Health Net the right to require AmCareco to redeem and purchase the AmCareco preferred stock issued to Health Net at a designated price at a certain point in the future and gave AmCare-co the right to redeem and purchase the stock from Health Net at a designated price at a certain point in the future.

. In business, a true-up usually means an accounting exercise to balance or compare actual figures against earlier, estimated figures.

. A premium deficiency reserve (PDR), or a loss reserve, is an amount set aside for future losses if the premiums received are not sufficient to meet all claims and expenses. Only the State of Texas has a statutory requirement for a loss reserve. V.T.C.A. Ins.Code § 421.001, previously V.A.T.S. Ins.Code, art. 21.39, effective until March 31, 2007.

. Because the parties agreed that the money given by Health Net to each of the HMOs was to be returned, these transactions were nominate contracts of non-interest bearing loans and were not donations. La. C.C. arts. 1914 and 2904 el seq.; see also La. C.C. arts. 2891 et seq.; V.T.C.A., Finance Code § 301.002.

.It appears from the record that the funds Health Net loaned to the Louisiana HMO in early 1999 were also described as funds necessary to meet minimum statutory capital requirements. See La. R.S. 22:2010. The record is not clear concerning whether the funds Health Net contributed to the Texas HMO in late 1998 and early 1999 were for minimum statutory capital requirements, 1998 V.A.T.S. Ins.Code, art. 20A.13(j), effective April 30, 1999 and renumbered as Tex. Ins. § 843.405 by Tex. Acts 2001, 77th Leg., ch. 1419, § 1, effective June 1, 2003, or statutory loss reserve requirements, V.T.C.A. Ins.Code, § 421.001, previously codified at V.A.T.S. Ins. Code, art. 21.39.

. In Oklahoma, HMOs obtain a "regular HMO license;” a Form-A is not used. For purposes of this opinion the license application in Oklahoma will be refereed to as a Form-A.

. Galtney testified that he invested $750,000 in AmCareco.

. The balance sheets attached to the April 29, 1999 electronic facsimiles by Ms. Conway to the state regulators included under "Current Liabilities” a line item identified as "Restricting/Premium Def.” This line item in other versions of the balance sheets was identified as "Restructuring/Premium Def.” The evidence shows this was intended to refer to "pre-existing” PDRs.

. Betty Patterson, Senior Associate Commissioner for the Financial Department of the Texas Department of Insurance, testified she reviewed the Closing Agreement.

. Pursuant to the April 30, 1999 ruling by the Louisiana Commissioner of Insurance approving the acquisition, AmCare-LA was to maintain at all times a minimum "capitol [sic] ... of $4,000,000.00 (Four Million dollars).” But see La. R.S. 22:2010 C.

. Pursuant to 36 Okl. St. Ann. § 6913, "Every health maintenance organization licensed before the effective date of this act [November 1, 2003] shall maintain a minimum net worth of the greater of Seven Hundred Fifty Thousand Dollars ($750,000.00)....”

. Pursuant to the 1998 V.A.T.S. Ins.Code, effective April 30, 1999, article 20A. 13(j) provided, "Notwithstanding any other provision of this section, the minimum surplus for a health maintenance organization authorized to provide basic health care services and having a surplus of less than $1,500,000 shall be as follows:
(1) $700,000 by December 31, 1998....”

. An amended quarterly statement was forwarded to LaDOI on September 24, 1999.

. Amendments to the original filing were prepared on October 8 and October 19, 1999.

. See La. R.S. 22:768.

. Hereinafter, for ease of identification, the Commissioner may sometimes be referred to as the Louisiana Commissioner and/or the Louisiana Receiver.

. The named defendants in action number 499,737 were Thomas S. Lucksinger, Michael D. Nadler, Stephen J. Nazarenus, Scott West-brook, Michael K. Jhin, William F. Galtney, Jr., John P. Mudd, Executive Risk Indemnity, Inc., Executive Risk Management Associates, Executive Risk Specialty Insurance Co., Executive Liability Underwriters, Greenwich Insurance Co., AmCareco, Inc., and AmCare Management, Inc. This suit was later amended to add XL Specialty Insurance Co. as a defendant.

. Shattuck Hammond is a division of PWC.

. Initially, Carroll Fisher, Commissioner of Insurance for the State of Oklahoma, in his capacity as Receiver, was the named plaintiff in the Oklahoma intervention. During the course of the litigation, Daryl English and then Kim Holland were substituted for Carroll Fisher.

.The record contains an unsigned order, apparently prepared by counsel for the Louisiana Receiver, which would grant the petitions to intervene by the Oklahoma and Texas Receivers and would grant the Receivers’ motion to consolidate the three actions. The record does not contain a signed judgment granting these motions.

. We note Health Net's amended answer was filed by electronic facsimile transmission within the ten day delay allowed by La. C.C.P. art. 1151. The record contains an original signed document filed on February 15, 2005, as required by La. R.S. 13:850 B(l).

. Settlement documents between the Louisiana Receiver, the Oklahoma Receiver, Am-CareCo [sic], Inc., Thomas S. Lucksingcr, Stephen J. Nazarenus, Michael D. Nadler, William F. Galtney, Jr., Michael K. Jhin, John P. Mudd, Scott Westbrook, Executive Risk Specialty Insurance Company, Executive Risk Indemnity, Inc., Executive Risk Management Associates, XL Specialty Insurance Company and Greenwich Insurance Company are contained in the record.
Settlement documents between the Louisiana Receiver and PWC are contained in the record.
Settlement documents between the plaintiffs and M. Lee Pearce, M.D. are contained in the record.
The transcript contains a statement by counsel for Proskauer Rose and Rosow that a settlement agreement between his clients and counsel for the Louisiana Receiver had been reached, and signed documents would be submitted to the court. However, the record on appeal contains only unsigned settlement documents between the three Receivers, Pros-kauer Rose and Stuart Rosow.
Although the Louisiana Receiver’s petition contains instructions for service upon defendant Executive Liabilities Underwriters, the record does not contain a return of service or an answer by this defendant.

.Our opinion in Wooley v. Foundation Health Corp., et al., District Court Docket Numbers 499,737 c/w 509,297 c/w 512,366, Court of Appeal Docket Numbers 2006-1140-1142, attached hereto and handed down this day, considers the issues raised by Health Net in their appeal of the award pursuant to the parental guarantee.

. Although the Louisiana and Oklahoma Receivers answered Health Net’s appeals, their briefs abandon their answers and ask that the judgments be affirmed.

. This judgment is erroneously dated December 6, 2000.

. This judgment is erroneously dated December 12, 2000.

. The rules for the interpretation of laws in Texas and Oklahoma are substantially the same as those in Louisiana, and, thus, there is no conflict of laws problem to be decided on this issue.
When interpreting statutory language, the Texas Supreme Court looks first and foremost to the plain meaning of the words. American Home Products Corp. v. Clark, 38 S.W.3d 92, 95-96 (Tex.2000); State v. Shumake, 199 S.W.3d 279, 284 (Tex.2006). If the statute is clear and unambiguous, words are applied according to their common meaning. Id. Interpretation should give effect to every word, clause, and sentence. City of Marshall v. City of Uncertain, 206 S.W.3d 97, 105 (Tex.2006). When divining legislative intent, "the truest manifestation” of what lawmakers intended is what they enacted, "the literal text they voted on.” Alex Sheshunoff Management Services, L.P. v. Johnson, 209 S.W.3d 644, 651 (Tex.2006). See also V.T.C.A. Government Code Construction Act § 311.001 et seq.
The Oklahoma Supreme Court recently stated that the cardinal rule of statutory construction is to ascertain the intent of the legislature and if possible give effect to all its provisions. Bed Bath & Beyond, Inc. v. Bonat, 2008 OK 47 ¶ 11, 186 P.3d 952, 955. "A statute must be read to render every part operative and to avoid rendering parts thereof superfluous or useless.” Moran v. City of Del City, 2003 OK 57, ¶ 8, 77 P.3d 588, 591. Absent an ambiguity, the intent is settled by the language of the provision itself, and the courts are not at liberty to search beyond the instrument for meaning. In re Protest Against the Tax Levy of Ardmore Independent School No. 19 for Fiscal Year 1997-1998, 1998 OK 43, 11 7, 959 P.2d 580. The primary goal of statutoiy construction is to ascertain and follow the intent of the legislature. Cooper v. State ex rel. Dep’t of Public Safety, 1996 OK 49, ¶ 10, 917 P.2d 466. The words of a statute will be given their plain and ordinaiy meaning unless it is contraiy to the purpose and intent of the statute when considered as a whole. Samman v. Multiple Injury Trust Fund, 2001 OK 71, ¶ 11, 33 P.3d 302

. Compare La. C.C.P. art. 1636 and La. C.E. art. 103.

. The Louisiana Insurance Code is comprised of La. R.S. 22:1-3312. La. R.S. 22:611 et seq. is Part XIV of the Code entitled "THE INSURANCE CONTRACT" and currently comprises La. R.S. 22:611-682. (Pursuant to 2008 La. Acts 415, effective January 1, 2009, the Insurance Code will be renumbered without changing the substance of the provisions. We will identify the statutes by the number utilized before the 2009 renumbering.) Pursuant to La. R.S. 22:2002(7), "[a] health maintenance organization is deemed to be an insurer for the purposes of R.S. 22:213.6 and 213.7, Part XVI, comprised of R.S. 22:731 through 774, Part XXI-A, comprised of R.S. 22:1001 through 1015, and Part XXVI-B, comprised of R.S. 22:1241 through 1247.1, of Chapter 1 of this Title. A health maintenance organization shall not be considered an insurer for any other purpose." (Emphasis added.) Except for La. R.S. 22:657, La. R.S. 22:611 et seq. does not apply to HMOs. Part XVI of the Louisiana Insurance Code pertains to the rehabilitation, liquidation, conservation, dissolution and administrative supervision of "all insurers or persons purporting to be doing an insurance business in this state.” La. R.S. 22:732. Part XXI-A pertains to insurance holding companies and Part XXVI-B pertains to insurance fraud.

. The record on appeal does not contain a judgment memorializing this trial court interlocutory judgment. See La. C.C.P. art.1914. However, the court minutes for May 9, 2005, reflect the following:
Initially argued was Motion on Issue of Choice of Law filed on behalf of La-Ok Receivers, thereafter submitted to the Court. Whereupon, for Oral Reasons assigned, the Court will apply Texas Law to substantive matters and apply Louisiana Law as to procedural matters.

. La. C.C. art. 3515 et seq. was enacted by 1991 La. Acts, No. 923. Section 3 of that Act provides that the “comments in this Act are not part of the law and are not enacted into law by virtue of their inclusion in this Act.”

. A complete discussion of the effect of the trial court's failure to timely provide written findings of fact and reasons for judgment is contained in Part VII of this opinion.

. If the law of Texas is substantially identical to the law of Louisiana, it would not be prejudicial error to apply Texas law rather than the law of Louisiana. The same would be true in the case of a false conflict. Prejudicial error can result only from the application of the wrong law only if there is a true conflict.

. In brief and oral argument, the parties agreed that the Louisiana parental guarantee claim was contractual and controlled by Louisiana conventional obligation law. La. C.C. art. 3537, et seq.

. La. C.C. arts. 38-46 relative to domicile were amended by 2008 La. Acts, No. 801, effective January 1, 2009.

. This is known as the balance billing law. Texas and Oklahoma also have versions of this restriction. V.T.C.A. Ins.Code § 843.361; 36 Okl St. § 6913.

. Pursuant to Section 11 of 1988 La. Acts No. 515, the comments in the Evidence Code are not part of the law.

. The Supreme Court of Oklahoma followed the Cambre case in Benham v. Keller, 673 P.2d 152, 153 (Okla.1983), and held that when the law of another state is not invoked, it will be presumed that the law of the foreign state is the same as that of the forum state, and the law of the forum state will be followed.

. A Louisiana appellate court may, on its own initiative, inquire into another state's law, where applicable. See LSA-C.E. art. 202; Gathright v. Smith, 368 So.2d 679 (La.1978) (on rehearing); Mahmud v. Mahmud, 444 So.2d 774 (La.App. 4th Cir.1984). Also, we note that counsel for Matlack raised the conflicts of law issue in his opposition to Liberty Mutual's motion for |CTsummary judgment; his post-trial memorandum to the hearing officer; and in his brief to this court. Thus, Liberty Mutual had sufficient notice of the conflicts of law issue.

. All subsequent designations of assignments of error will contain the following abbreviations: LA for assignments made by Health Net in the Louisiana case, LA-Supp. for assignments made by Health Net in supplemental briefs in the Louisiana case, OK for assignments made by Health Net in the Oklahoma case, OK-Supp. for assignments made by Health Net in supplemental briefs in the Oklahoma case, TX for assignments made by Health Net in the original Texas case and TX-Supp. for assignments made by Health Net in supplemental briefs in the Texas case.

. Health Net filed 102 requests for jury instructions. They were numbered 1 to 103; numbers 21, 33 and 48 were left blank and two were designated 27.1 and 87.1.

. Health Net was first named as a party defendant wherein tort claims were asserted against Health Net in the Louisiana and Oklahoma actions in a Consolidated, Amending, and Restated Petition filed by the Louisiana and Oklahoma Receivers on October 15, 2004.

. Comment-1983 (a) for Article 1813 is identical to that for Article 1812.

. See, for example, Landeche v. McSwain, 960959, p. 5 (La.App. 4 Cir. 2/5/97), 688 So.2d 1303, 1306, writ denied, 97-0557 (La.5/1/97), 693 So.2d 741, for the proper procedure.

. A copy of the interrogatories answered by the jury is attached hereto as APPENDIX 1.

. Query: If the sale was a sham, what effect did this have on the contracts that AmCareco and/or AmCare-TX had with third persons after April 30, 1999?

. The parlies did not contest the validity of AmCareco’s corporate status.

. Although the trial court judge defined gross negligence, malice, and clear and convincing evidence when she instructed the jury about what constituted a fiduciary duty, the interrogatory submitted to the jury on fiducia-iy duty did not refer to these issues and provided as follows: "5. Do you find that defendant HealthNet, Inc. breached a fiduciary duty that caused damage to the Texas HMO or its creditors?”

. Whether Health Net owed any fiduciary duties to AmCareco and its creditors is not at issue in this case because the Texas Receiver did not bring this action on behalf of AmCare-co and its creditors.

. In Louisiana pursuant to La. R.S. 12:1 L, " 'Insolvency' means the inability of a corporation to pay its debts as they become due in the usual course of business.”

. Castleberry v. Branscum, 721 S.W.2d 270, 271 (Tex.1986) ("The corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations ...see also Pabich v. Kellar, 71 S.W.3d 500, 507 (Tex.App.-Fort Worth 2002, pet. denied) ("A corporation is a separate legal entity that normally insulates its owners or shareholders from personal liability.”); Aluminum Chems. (Bol.), Inc. v. Bechtel Corp., 28 S.W.3d 64, 67 (Tex.App.-Texarkana 2000, no pet.) ("[A] major purpose of the corporate structure is to shield its shareholders from liabilities of the corporation."); Nat'l Hotel Co. v. Motley, 123 S.W.2d 461, 465 (Tex.App.-Eastland 1938, writ dism’d judgm't cor.) ("[A]n individual whose business is authorized to be incorporated may incorporate such business for the sole purpose of escaping individual liability of the owner for the debts of the corporation.”).

. See Farr v. Sun World Savings Ass’n, 810 S.W.2d 294, 296 (Tex.App.-El Paso 1991, no writ) (“Largely because of the uproar in the business community over the ramifications of Castlebeny on stockholder liability, the 71st Texas Legislature amended Article 2.21 A....”). The 1996 Bar Committee Comment to Article 2.21 of the Business Corporation Act states:

. Of course, the shareholder remains personally liable if he “expressly assumed, guaranteed, or agreed to be personally liable” or if he is otherwise liable under the provisions of the Business Corporation Act or other applicable statute. Tex. Bus. Corp. Act Ann. art. 2.21(B)(1) & (2) (Vernon Supp. 1997).

. So, to the extent Sarratt suggests that Garnett could be held responsible, under the common law, for performance of the settlement agreement because he did not observe the corporate formalities of Alamo, she is wrong. Such a contention was expressly addressed in and rejected by subparagraph (A)(3), article 2.21, of the Business Corporation Act. Moreover, we do not read either Mancorp, Inc. v. Culpepper, 802 S.W.2d 226 (Tex., 1990) or Coastal Shutters & Insulation, Inc. v. Derr, 809 S.W.2d 916 (Tex.App.-Houston [14th Dist.] 1991, no writ) as suggesting that Castleberry remained viable law after the 1989 amendments to article 2.21 were enacted. Indeed, the trial in Mancorp was held before the amendments came into effect. Mancorp, Inc. v. Culpepper, 802 S.W.2d at 233 n. 2 (dissent). They being ineffective at the time, one can hardly suggest that the Mancorp court intended to subjugate them to Castleberry. Additionally, the panel in Coastal Shutters never addressed the interrelationship between the amendments and Castlebeny which, in turn, implies that the amendments were again inapplicable at the time.

. This statute is similar to La. R.S. 22:2007 A except that the Louisiana law does not apply to a partner, and its duty runs in favor of the HMO instead of the enrollees. In Oklahoma, 36 Okla. Stat. § 6906 establishes a fiduciary duty running in favor of the HMO by any director, officer, employee, or partner of the HMO who receives, collects, disburses, or invests funds in connection with the activities of the HMO.

. Part VI, section B3, of this opinion disposed of the Texas Receiver’s claim adversely to her position.

FN3. This statement was quoted with approval in the more recent case of Oilwell Division, United States Steel Corp. v. Fryer, 493 S.W.2d 487, 491 (Tex.1973). (Page citation omitted; emphasis added.)

. Huggins v. Gerry Lane Enterprises, Inc., 2005-2665, pp. 9-10 (La.App. 1 Cir. 11/3/06), 950 So.2d 750, 757, affirmed on other grounds, 2006-2816 (La.5/22/07), 957 So.2d 127; Watts v. Aetna Cas. & Sur. Co., 574 So.2d 364, 370 (La.App. 1 Cir.1990), writ denied, 568 So.2d 1089 (La.1990); cf. La. R.S. 1:9; La. C.C.P. art. 5056; La.C.Cr.P. art. 6; La. Ch.C. art. 108; Gregor v. Argenot Great Cent Ins. Co., 2002-1138, pp. 7-8 (La.5/20/03), 851 So.2d 959, 964-65.

. Effective April 1, 2005, Article 21.21 was re-codified in § 541 of the Texas Insurance Code. See Act of June 21, 2003, 78th Leg., R.S., ch. 1274, § 1, 2003 Tex. Gen. Laws 3611. For clarity, in this opinion all references will be to Article 21.21.

. V.A.T.S. Ins.Code, Article 21.21 §§ 4(2), 4(5)(a) and 4(5)(b) provide, in pertinent part:
The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance:
(2) False Information and Advertising Generally. Making, publishing, disseminating, circulating or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in a newspaper, magazine or other publication, or in the form of a notice, circular, pamphlet, letter or poster, or over any radio or television station, or in any other way, an advertisement, announcement or statement containing any assertion, representation or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business, which is untrue, deceptive or misleading;
(5) False Financial Statements, (a) Filing with any supervisory or other public official, or making, publishing, disseminating, circulating or delivering to any person, or placing before the public, or causing directly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public, any false statement of financial condition of an insurer with intent to deceive;
(b) Making any false entry in any book, report or statement of any insurer with intent to deceive any agent or examiner lawfully appointed to examine into its condition or into any of its affairs, or any public official to whom such insurer is required by law to report, or who has authority by law to examine into its condition or into any of its affairs, or, with like intent, willfully omitting to make a true entry of any material fact pertaining to the business of such insurer in any book, report or statement of such insurer....

. In Part VI, section B3, of this opinion, this Court disposes of the Texas Receiver's claim adversely to her position.

. It apparently is unsettled whether Texas law recognizes a cause of action for "aiding and abetting” separate from a conspiracy claim. Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co., 51 S.W.3d 573, 583, n. 7 (Tex.2001).

. Texas Acts 2003, 78th Leg., ch. 204, substituted "designated” for "joined”.

. It is arguable that these factual conclusions show intentional rather than negligent misrepresentations.

. See Tex. Civ. Prac. & Rem.Code § 41.003(a)(l)(2) and (3) and (b).

. The jury answered "Yes" to the question in Interrogatory 2 about whether "any other person or company was at fault.” The ambiguity of this question asked with the disjunctive conjunction "or” was clarified by the 0% fault response for "Any other person(s)” in Interrogatory 3. However, there is no jury interrogatory that answers the question of whether the other company’s or any other person’s fault was a "proximate cause” of the damages. See, for example, Interrogatory 4. Proximate cause is an essential element for finding liability in the Texas case.

. Although the trial judge’s reasons for judgment were typed in all upper case- type, for ease of reading we have replaced the type with lower case.

. Proximate cause applies in Oklahoma. Jackson v. Jones, 1995 OK 131, ¶ 8, 907 P.2d 1067, 1072-73.

. Conspiracy is a derivative tort in Texas and Oklahoma. In Texas, to succeed on a civil conspiracy claim, a party must offer proof of the following elements: (1) two or *436more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result. See Tri v. J.T.T, 162 S.W.3d 552, 556 (Tex.2005). It is a derivative tort and, thus, a defendant’s liability for conspiracy is dependent upon his participation in an underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable. Preston Gate, LP v. Bukaty, 248 S.W.3d 892, 898 (Tex.App.-Dallas 2008).
In Oklahoma, it is well settled that "[c]ivil conspiracy itself does not create liability.” Roberson v. PaineWebber, Inc., 1999 OK CIV APP 17, ¶ 21, 998 P.2d 193, 201. "A conspiracy between two or more persons to injure another is not enough; an underlying unlawful act is necessaiy to prevail on a civil conspiracy claim.” (Emphasis in original.) Id.

. La. C.C. art. 24.

. In Wooley v. Lucksinger, 2006-1167-69 (La.App. 1 Cir. 5/4/07), 961 So.2d 1228, we referred Health Net’s assignments of error pertaining to regulator fault to the merits. However, in Louisiana regulator fault can be a viable issue for purposes of allocation of fault in this appeal. La Const, art. XII, § 10 and La. R.S. 9:2798.1. Because we find no fault on the part of Health Net, it is unnecessary to address this issue in this opinion.

. The judgment in the Louisiana case is attached hereto as APPENDIX 2. The judgment in the Oklahoma case is attached hereto as APPENDIX 3.

. It appears that the thirty-day period referred to by the trial court judge is that provided for in Rule 4-3, Uniform Rules — Courts of Appeal.

. A copy of the reasons are appended to this opinion as APPENDIX 4, and a copy of the trial court's "Reasons for Judgment, Part II" are appended as APPENDIX 5.

. Although the trial judge’s reasons for judgment were typed in all upper case type, for ease of reading we have replaced the type with lower case.

. La. Const, of 1921, art. 7, § 43 provided, in pertinent part, "All district judges, in contested civil, other than jury cases, wherein there is a right of appeal, when requested by either party, shall give in writing a finding of facts and reasons for judgment.” (Emphasis added.)

. 2005 La. Acts, No. 205, § 1 designated the existing paragraphs as paragraphs A and B. In newly designated par. A, "the mailing of the notice of" was inserted preceding "the signing of the judgment”.

. The common law of Texas and Oklahoma refers to Louisiana's prescription and per-emption doctrines as statutes of limitations and repose. See generally Marchesani v. Pellerin-Milnor Corp., 269 F.3d 481 (C.A. 5th Cir. [La.] 2001).

. La. R.S. 22:735 B provides as follows,
Notwithstanding any law to the contrary, the filing of a suit by the commissioner of insurance seeking an order of conservation or rehabilitation shall suspend the running of prescription as to all claims in favor of the subject insurer during the pendency of such proceeding. The filing of a suit by the commissioner of insurance seeking an order of liquidation shall interrupt the running of prescription as to such claims from the date of the filing of such proceeding for a period of two years, if an order of liquidation is granted.

. The brief of the Oklahoma Receiver on this issue essentially tracks that of the Louisiana Receiver. The Texas Receiver adopted the Louisiana and Oklahoma briefs by reference.

. La. Const, art. XII, § 13 provides,
Prescription shall not run against the state in any civil matter, unless otherwise provided in this constitution or expressly by law. If peremption is not a species of prescription, and, thus, not provided for in La Const, art. XII, § 13, the result could be catastrophic for the State of Louisiana.

. La. C.C. art. 3549 is the Louisiana choice-of-law provision governing liberative prescription. Revision comments — 1991 (a) therefore provides, in pertinent part, that "For the purpose of this article, peremption (See La. Civ.Code. Arts 3458-61) (Rev.1982) is treated as a species of liberative prescription.”

. The doctrine of jurisprudence constante does not require that the jurisprudence holding that peremption is properly raised in the objection of no cause of action or in a motion for summary judgment be followed. In the civilian system, legislation trumps jurisprudence. La. C.C. arts. 1, 2, 3 and 4; Willis-Knighton Medical Center v. Caddo-Shreveport Sales & Use Tax Comm., 2004-0473, pp. 21, 25-26, 32 (La.4/1/05), 903 So.2d 1071, 1084-1085, 1087-1088, 1091.

.A 2005 amendment designated the existing text as paragraphs A and B, and added a third paragraph.

. According to the record, AmCareco was authorized to issue Class A Preferred Stock, entitled to cumulative dividends at an annual rate of 6%, Class B Preferred Stock, and Common Stock. The Preferred Stock had a $10.00 par value per share and the Common Stock had a $.01 par value per share. The Class A Preferred Stock was of a higher ranking than the Class B Preferred Stock and the Common Stock and enjoyed a preference in the payment of dividends and entitlement to assets upon liquidation of the company.

. Intercompany accounts are reciprocal accounts set up between two related companies. In this instance, all reciprocal credit and debit accounts between Health Net and each of the HMOs would be "settled” or zeroed out.

. Redemption rights, referred to as "put” and "call” rights, provide protection against stock value declines and provide potential for profit if the value of the stock increases above a stated amount.

. The true-up was a final balance sheet prepared one year after the sale, utilizing the same methodologies used to calculate the estimated balance sheet. The delayed final balance sheet reflected the difference between the estimated figures that were used in calculations at the time of the sale and the actual figures that would only be known at the later date.

."Preemptive rights” protect a shareholder's interest against dilution of either its financial or voting interest. G. Morris & W. Holmes, 7 La. Civ. Law Treatise, Business Organizations, § 28.03, p. 672 (1999). Various methods include prohibiting the issuance of below par stock or providing that a shareholder may purchase additional shares on a pro-rata basis either before others or before the issue of new shares. Id.

. See infra note 14.

. See La. C.C. art. 3540 Revision Comments-1991 comment (a).

. Deloitte & Touche also performed an audit of the Texas health plan for Health Net for the year ending 1998.

. There is no assertion by anyone that, as of the date of the memo, a sale had occurred. Rather, it appears that Deloitte & Touche auditors utilized this past-tense perspective, assuming the transaction had occurred as designed in the Stock Purchase Agreement, for ease of examining the proposed transaction.

.Even if the transaction technically was not a nominate conventional obligation of sale, it still was a valid innominate contract.

. "A loan ... is the furnishing or delivery of anything, usually money ... on the condition or agreement, express or implied, that the thing loaned or its equivalent in kind shall be returned or repaid.” 9 C.J.S. Banks and Banking, § 460. Cf. La. C.C. art. 2904 et seq. (La. C.C. art. 2907-Loan for consumption.)

. The issue of whether fraud was committed to obtain regulatory approval of the sale will be addressed in Part XI of this opinion.

. The trial court reasons do not address the issues of: (1) did Health Net and the HMOs operate as a SBE; and (2) did AmCareco and the HMOs operate as a SBE.

. The distinction between the single business enterprise theory and the alter ego theory in Texas is described in Bridgestone Corp. v. Lopez, 131 S.W.3d 670, 682 (Tex.App.-Corpus Christi 2004).

.As previously discussed in Part VI, Section Dlb of this opinion, in Article 2.21 piercing the corporate veil is referred to as the alter ego theory and it is doubtful that piercing the corporate veil still will be referred to as the single business enterprise theory in Texas.

. See discussion in Fina Oil & Chemical Co. v. AMOCO Production Co., 95-1877 (La.App. 1 Cir. 5/10/96), 673 So.2d 668, writ denied, 96-1446 (La.9/27/96), 679 So.2d 1353.

. La. R.S. 12:93 and 12:95 are contained in Part IX “Liability of Directors, Officers, Shareholders and Subscribers'' of Chapter 1 "Business Corporation Law” of Title 12 “Corporations and Associations.” Pursuant to La. R.S. 1:13 and the rule of statutory conslruction of Expressio Unius est Exclusio Alterius, headings of Titles, Chapters and Parts of statutes are considered a part of the law. See State, Department of Public Safety & Coirec-tions, 94-1872 atp. 17, 655 So.2d at 302, and the discussion of these authorities in Part VIII, Section A4 of this opinion.

.The record reflects that the Louisiana HMO was organized after January I, 1929.

. As stated in Joiner, no case has imposed upon a parent corporation a duty to control the acts of its subsidiaries. See also Fletcher v. Atex, Inc., 861 F.Supp. 242, 247 (S.D.N.Y.1994), order aff’d, 68 F.3d 1451 (2d Cir.1995) (absent a special relationship between the parent and the subsidiary there is no duty to control the subsidiary’s conduct to prevent harm to third persons).

. La.C.C. art. 13.

. A corporation can also be vicariously liable for the torts of its employees. La. C.C. art. 2320; and see Baptist Memorial Hosp. System v. Sampson, 969 S.W.2d 945, 947 (Tex.1998); DeWitt v. Harris County, 904 S.W.2d 650, 654 (Tex.1995); Baker v. Saint Francis Hosp. 126 P.3d 602, 605 (Okla.2005); Restatement (Third) of Agency § 2.04 (2006).

. The asserted under-capitalization of the three HMOs at the time of the sale issues will be discussed in detail in Part XI of this opinion.

. The record indicates that at some point in time after the sale AmCareco, AmCare-MGT, and the three HMOs appeared to disregard corporate formalities. As previously indicated in Part II of this opinion, "[Djocuments reveal that during the business day of July 17, 2001 :(1) $1,941,875.65 was transferred from AmCare-LA to AmCareco; (2) $2,829,360.13 was transferred from AmCareco to AmCare-OK; (3) $1,021,075.75 was transferred from AmCare-OK to AmCare-LA; (4) $89,450.76 was transferred from AmCare-TX to AmCare-OK; (5) $462,838.38 was transferred from AmCare-TX to AmCare-LA; (6) $200,000.00 was transferred from AmCare-LA to AmCare-MGT; and (7) $900,000.00 was transferred from AmCare-MGT to AmCareco." This massive commingling or "kiting” of funds between the five corporations indicates that corporate separateness had ceased to exist. Le-Blanc v. Opt, Inc., 421 So.2d 984, 989 (La.App. 3 Cir.1982), writs denied, 427 So.2d 438 and 429 So.2d 132 (La.1983); National Bank of Commerce v. Hughes-Walsh Co., 246 So.2d 872, 874 (La.App. 4 Cir.1971).

. Although the trial judge's reasons for judgment were typed in all upper case type, for ease of reading we have replaced the type with lower case.

.Thus, in 2002, Health Net had a legal contractual right to require AmCareco to redeem Health Net’s AmCareco stock and take in lieu thereof the two million dollars secured by the letter of credit.

. Vendor financed sales are common in the business community.

. When an item on a balance sheet is reversed, it is either changed from an asset to a liability or from a liability to an asset.

. See footnote 15 and the authorities cited therein.

. The record reflects that a Health Net Staff Accountant referred to the $2.3 million dollar wire transfer as a "capital contribution” and as a “capital infusion.”

. See the discussion and the authorities cited in Part X, Section D1 of this opinion.

. This spreadsheet is the balance sheet referred to in the contract and may be discussed referring to it as the Form-A spreadsheet.

. The Texas Receiver also introduced deposition testimony from Patterson.

. Willis v. Donnelly was decided after Keller gave her testimony.

. This Review was filed in evidence as part of AmCareco's Form-A Application and is marked as Plaintiff’s Exhibit 700. See also Exhibit 1200.

. The fault that Buttner found with the spreadsheet will be discussed in the next seo tion of this opinion on “The Combined Spreadsheet.”

. GAAP stands for “Generally Accepted Accounting Principles.” These principles are the most commonly accepted accounting principles used by companies to compile their financial statements.

. Buttner also used the same financial numbers as the Form-A for all three HMOs for (1) Premiums Receivable, (2) statutory deposits, and (3) Unearned Premiums. For other assets, he used the same numbers for Louisiana and Oklahoma, He used $5,999,151 instead of $5,687,279 for Cash and Equivalents for Texas.

. The Side Letter was referred to as the “Letter Agreement” in the Form-A applications.

. Even if Item 8 applied to the Letter of Intent, such an error would be harmless because the Stock Purchase Agreement and Side letter control substantively.

. Betty Patterson testified she saw the Closing Agreement.

. The number 5,755,012 is also on the Form-A spreadsheet, has no item description, appears to be the result of subtracting 2,300,-000 from 9,055,012, and is wrong by 1,000,-000.

. The sum of $8,000,000 was attributed to receivables acquired by AmCare-TX in the AmeriHealth sale.

. Villwok stated that he did not see the "smoke and mirrors" memorandum and that if Lueksinger had told him about it he and his company would not have gone forward to help AmCareco.

. The trial court judge did not submit an interrogatory to the jury pertaining to negligent misrepresentation, and that is not at issue in the Texas case.

. In Rogers v. Meiser, the Oklahoma Supreme Court held that common law fraud must be proved by clear and convincing evidence. As previously indicated in Part X, Section C proof by clear and convincing evidence is a rule of evidence that is controlled by the law of the forum (Louisiana). In Louisiana, fraud may be proved by a preponderance of the evidence.

.Greene v. Gulf Coast Bank, 593 So.2d 630 (La.1992); Bunge Corp. v. GATX Corp., 557 So.2d 1376 (La.1990); Chiarella v. Sprint Spectrum LP, 2004-1433 (La.App. 4 Cir. 11/17/05), 921 So.2d 106, writ denied, 2005-2539 (La.3/31/06), 925 So.2d 1263; Cortes v. Lynch, 2002-1498 (La.App. 1 Cir. 5/9/03), 846 So.2d 945.

. In its petition, the Texas Receiver identified Lucksinger, Mudd, Pearce, Jhin, Galtney, Rosow, and Health Net as the “Control Group.”

. The Texas Receiver asserts pursuant to Article 21.49-1, § 2(d), Health Net was a controlling holding company, and the Texas HMO was a controlled insurer. Therefore, Health Net owed a fiduciary duty to the Texas HMO. Article 21.49-1 is entitled “Insurance Holding Company System Regulatory Act” and applies to holding companies in general; § 843.401 specifically applies to Texas HMOs. Assuming that there is any conflict between Article 21.49-1 and § 843.401, and there does not appear to be, pursuant to the general rules of statutory construction, § 843.401 would apply in this case as a specific exception to the general rule of Article 21.49-1. V.T.C.A. Government Code § 311.026(b).

. Texas Insurance Code Article 20A.05 § (d), now V.T.C.A. Insurance Code §§ 843.082 and 843.083, provided for the issuance of a certificate to an HMO to engage in business if the Commissioner was satisfied that the HMO was responsible and could be expected to meet its obligations after considering its financial soundness, capital, and deposits of cash or securities. 28 Tex. Admin. Code § 11.1205(a). 28 Tex. Admin. Code § 11.1205(a) provides that the commissioner may disapprove an applicant upon a finding that the financial condition of the applicant might jeopardize the financial stability of the HMO or prejudice the interest of its enrollees.

. See Part VI, Section D2a(6),(7) and (8) of this opinion.

. In their petition, the Louisiana and Oklahoma Receivers identified Lucksinger, Na-dler, Nazarenus, Mudd, Jhin, Galtney, and Pearce as the "D & O Defendants.”

. Although the trial judge's reasons for judgment were typed in all upper case type, for ease of reading we have replaced the type with lower case.

. La. R.S. 12:91 was amended by 1999 La. Acts, No. 1253, § 1, eff. July 12, 1999. Section 3 of the Act provides,
“This Act is curative in nature and is intended to be interpretative of existing law and shall apply to any claim or action pending on its effective date and to any claim arising or action filed on and after its effective date. It is intended to legislatively overrule Theriot v. Bourg, 96-0466, (La.App. 1 Cir. 2/14/97, 691 So.2d 213), insofar as that decision applied a simple negligence standard of care under R.S. 12:91 and failed to apply the business judgment rule, and to apply the same clarified standards to all business organizations, whether incorporated or unincorporated, formed under Louisiana law.”

. By order signed June 23, 2005, the trial court dismissed with prejudice "all claims in the recovery actions as to AmCareCo [sic], Inc., Thomas S. Lucksinger, Stephen J. Na-zarenus, Michael D. Nadler, William F. Galt-ney, Jr., Michael K. Jhin, John P. Mudd, Scott Westbrook, Executive Risk Specialty Insurance Company, Executive Risk Indemnity, Inc., Executive Risk Management Associates, XL Specialty Insurance Company[,] and Greenwich Insurance Company.”
By order signed July 15, 2005, the trial court dismissed with prejudice "all claims in the recovery actions as to Pricewaterhouse-Coopers [sic].”
By order signed October 11, 2005, the trial court dismissed with prejudice "all [claims brought by the plaintiffs in the consolidated actions] against defendant M. Lee Pearce, M.D.”
The transcript contains a statement by counsel for Proskauer Rose and Rosow that a settlement agreement between his clients and counsel for the Louisiana Receiver had been reached and signed documents would be submitted to the court. However, the record on appeal contains only unsigned settlement documents between the three Receivers, Pros-kauer Rose, and Stuart Rosow. The record on appeal does not contain a signed order dismissing any claims against Proskauer Rose or Rosow.
Although the Louisiana Receiver's petition contains instructions for service upon defendant Executive Liabilities Underwriters, the record does not contain a return of service or an answer by this defendant.

. La. Const art. XII, § 10.

. In Dixon v. Fidelity Fire & Cas. Ins. Co., 93-0014 (La.App. 1 Cir. 3/11/94), 633 So.2d 888, proceedings were brought by the Commissioner of Insurance, concerning a dispute the right to funds placed in escrow pursuant to the terms of a contract of lease. The lease of office space was to an insurance company which was subsequently placed in liquidation. The trial court found the lessor entitled to claim the funds held in escrow, and the trial court cast the Commissioner of Insurance for costs. The Commissioner appealed. This Court noted La. R.S. 22:744 provides that the Commissioner shall not be cast for costs in litigation against an insurance company and that a defendant insurance company can be cast for costs. However, in Dixon, casting the Commissioner wi(h costs in the dispute with the lessor was upheld. Dixon, 93-0014 at p. 3-4, 633 So.2d at 890. The Court did not consider La. R.S. 13:4521 or La. R.S. 13:5112.
In State v. Kitterlin Creek, LLC, 2002-1063, p. 12 (La.App. 3 Cir. 2/5/03), 838 So.2d 926, 933, writ denied, 2003-1111 (La.6/6/03), 845 So.2d 1097, and Caddo-Bossier Parishes Port Commission v. Arch Chemicals, Inc., 36,505, p. 9 (La.App. 2 Cir. 10/23/02), 830 So.2d 498, 505, the state and a political subdivision were taxed with costs. These cases are from other Courts of Appeal, are clearly wrong, and we are not obligated to follow them.

. Because of our decision herein, it is unnecessary to address the assignments of error pertaining to: (1) regulator fault in the Louisiana case, (2) allocation of fault, (3) mitigation of damages, (4) offset of damages, (5) liability due to gross negligence or malice, (6) liability and excessiveness of exemplary damages, (7) liability and quantum for attorney fees, and (8) liability for treble damages.